# Exhibit 1



# Transcript of Fahmi Alubbad, Corporate Designee & Individually

**Date:** April 16, 2024
**Case:** Mission Integrated Technologies, LLC -v- Clemente, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3              ALEXANDRIA DIVISION
   --------------------------------X
 4  MISSION INTEGRATED              :
 5  TECHNOLOGIES, LLC,              :
 6              Plaintiff,          :
 7        v.              : 1:23-CV-1608
 8  TIMOTHY G. CLEMENTE, et al.,    : (LMB/JFA)
 9                                  :
10              Defendants.         :
11  --------------------------------X
12        Videotaped Deposition of
13   MISSION INTEGRATED TECEHNOLOGIES, LLC
14   By and Through Its Corporate Designee,
15          And Individually,
16              Fahmi Alubbad
17           Rockville, Maryland
18            April 16, 2024
19            10:09 a.m. EST
20  Job No.:  532973
21  Pages 1 - 499
22  Transcribed by:  Jacalyn Mann
```

## Page 2

```
 1        Videotaped Deposition of FAHMI ALUBBAD, held
 2  at the office of:
 3
 4            WERTHER & MILLS, LLC
 5         2000 Tower Oaks Boulevard
 6            Rockville, MD 20852
 7
 8
 9
10        Pursuant to agreement, before Brennan
11  Plummer, Notary Public in and for the State of
12  Maryland.
13
14
15
16
17
18
19
20
21
22
```

## Page 3

```
 1        A P P E A R A N C E S
 2
 3  ON BEHALF OF PLAINTIFF, MISSION INTEGRATED
 4  TECHNOLOGIES, LLC:
 5        LAURIN H. MILLS, ESQUIRE
 6        BRIAN P. DONNELLY, ESQUIRE
 7        WERTHER & MILLS, LLC
 8        2121 Eisenhower Avenue
 9        Suite 608
10        Alexandria, VA 22314
11        (703)547-4696
12
13  ON BEHALF OF DEFENDANT, TIMOTHY G. CLEMENTE:
14        ANDREW J. HENSON, ESQUIRE
15        TROUTMAN PEPPER HAMILTON SANDERS LLP
16        Troutman Pepper Building
17        1001 Haxall Point
18        15th Floor
19        (804)697-1200
20
21
22
```

## Page 4

```
 1        A P P E A R A N C E S (Continued)
 2
 3  ON BEHALF OF DEFENDANT, JOSHUA CLEMENTE:
 4        REBECCA S. LEGRAND, ESQUIRE
 5        LEGRAND LAW PLLC
 6        1100 H Street, NW
 7        Suite 1220
 8        Washington, DC 20005
 9        (202)587-5725
10
11
12
13
14
15
16  ALSO PRESENT:
17  Adam Schuman - Planet Depos Videographer
18  Tim Clemente - Defendant/Counterclaim Plaintiff
19  Abigail Schofield - Paralegal with LeGrand Law
20
21
22
```

**Page 5**

C O N T E N T S

EXAMINATION OF FAHMI ALUBBAD

Page

By Mr. Henson            11
By Ms. LeGrand            287

E X H I B I T S

(Attached to the transcript.)

DEPOSITION EXHIBIT                     PAGE
Exhibit 1     Plaintiff's Rule 26(a)(1)      18
Exhibit 2     First Amended Complaint      19
Exhibit 3     Plaintiff Objections to Notice  19
Exhibit 4     Notice of 30(b)(6) Deposition  20
Exhibit 5     Second Declaration of Alubbad   61
Exhibit 6     MIT Technologies Operating      72
            Agreement
Exhibit 7     2017 Emails Re: ARES Vehicle   84
Exhibit 8     Emails re: Bank Docs         135
Exhibit 9     January 2017 Email re MIT     181

**Page 6**

E X H I B I T S (Continued.)

DEPOSITION EXHIBIT                     PAGE
Exhibit 10   9/2/19 Letter from A. Sachsel   234
Exhibit 11   Declaration from Alubbad     241
Exhibit 12   Audio recording of Meeting   268
Exhibit 13   Emails with Lenco         313
Exhibit 14   9/4/15 Email re: MIT Briefing  328
Exhibit 15   11/2/18 ARES Booklet Emails    337
Exhibit 16   3/4/22 Transfer of Stock Letter 360
Exhibit 17   DS-2032 Statement of         381
            Registration
Exhibit 18   11/16/2016 Emails re:        417
            Chase Wiring
Exhibit 19   MIT Financial Documents      426
Exhibit 20   Emails re: Unanimous Consent   447
            Agreement

**Page 7**

P R O C E E D I N G S

FAHMI ALUBBAD,

having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, testified as follows:

THE VIDEOGRAPHER: Here begins Media Number 1 in the videotaped deposition of Fahmi Alubbad in the matter of Mission Integrated Technologies, LLC versus Tim Clemente, et al. in the United States District Court for the Eastern District of Virginia, Alexandria Division, Case No. 1:23CV1608 (LMB/JFA).

Today's date is April 16th, 2024. The time on the video monitor is 10:09 a.m.

The videographer today is Adam Schuman, representing Planet Depos. This video deposition is taking place at Werther & Mills, LLC, 2000 Towers Oak Boulevard, Suite 200, Rockville, Maryland 20852.

Would counsel please voice-identify themselves and state whom they represent?

MR. HENSON: Andrew Henson from Troutman

**Page 8**

Pepper on behalf of the defendant, Timothy Clemente.

MS. LEGRAND: Rebecca LeGrand on behalf of defendant and counterclaim plaintiff, Joshua Clemente.

MR. MILLS: And Laurin Mills and Brian Donnelly on behalf of the plaintiff, Mission Integrated Technologies.

THE VIDEOGRAPHER: The court reporter today is Brennan Plummer, representing Planet Depos. The witness will now be sworn.

COURT REPORTER: Please raise your right hand. Do you solemnly swear or affirm under the penalties of perjury that the testimony you shall give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

COURT REPORTER: Thank you. You may proceed.

MR. HENSON: Thank you. And actually, before we get started with witness questioning, I just want to make a couple statements on the

9

1 record in light of some recent events. So this
2 is, by agreement, a personal and 30(b)(6)
3 deposition of Mr. Alubbad in his personal capacity
4 and as a designee of the plaintiff, Mission
5 Integrated Technologies. There are wide-ranging
6 claims that the plaintiff has brought, and there
7 is a counterclaim at issue here as well. There
8 are two different defendants.
9        As a result of the complexity both of
10 the individual and corporate depositions and the
11 claims involved, Friday of last week, the
12 defendants conferred with plaintiff to discuss,
13 you know, our position that we are entitled to at
14 least 14, if not more, hours on the record to
15 taking the testimony that's needed. But we
16 anticipated needing only 10.
17        In response, plaintiff communicated that
18 they would be seeking a protective order at
19 something around seven hours on the record. We
20 offered an earlier start time than 10:00 a.m., but
21 plaintiff declined and insisted on the 10:00 a.m.
22 start time.

10

1        We understand that Mr. Alubbad is
2 leaving sometime tomorrow and will be unavailable
3 for the remainder of the discovery period. And
4 that is not acceptable to the defendants. We
5 issued this notice to run from day-to-day until
6 complete. We will move with, you know, all
7 reasonable expediency throughout the course of
8 today's deposition, but we are -- we believe
9 strongly that we are entitled to the time that is
10 allowed under the discovery rules.
11        And particularly, in light of
12 yesterday's supplemental production, where there
13 were new invoices, dozens and dozens of invoices,
14 reflecting allegations of the plaintiff's damages
15 that we had not had access to until yesterday.
16 There was also a supplemental report. And I might
17 also mention that the invoices are for attorneys
18 fees that the plaintiff purports to assert as an
19 item of damages in this matter. They were
20 produced without fee agreements, despite the
21 defense explicit requests.
22        And in addition, yesterday there were

11

1 also two new witnesses that were identified in the
2 plaintiff's 26 (a)(1) initial disclosures. We are
3 requesting that the plaintiff hold open this
4 deposition for the purpose of taking any needed
5 testimony on any of the additional
6 supplementations on Friday, and we would ask for
7 plaintiffs consent to that.
8        MR. MILLS: The answer is no. This
9 deposition was scheduled before you even sent a
10 30(b)(6) notice. There were no new witnesses.
11 I've already responded to your allegations in
12 e-mail. You probably haven't had a chance to read
13 it yet. But if you'd gotten here on time, we'd be
14 already into the deposition.
15        So let's get going, rather than argue
16 about this. The case isn't that complicated. You
17 can finish it up today. Thank you.
18        EXAMINATION BY COUNSEL FOR
19        THE DEFENDANT, TIMOTHY CLEMENTE
20 BY MR. HENSON:
21   Q   Mr. Alubbad, my name is Andrew Henson.
22 I represent the defendant, Timothy Clemente, in

12

1 connection with the lawsuit that Mission
2 Integrated Technologies, or MIT, has brought in
3 this matter. I'm going to be asking you a series
4 of questions today. Would you please state your
5 full name for the record?
6   A   My name is Fahmi Alubbad.
7   Q   And is that the only name by which
8 you're known?
9   A   Yeah.
10   Q   Mr. Alubbad, are you taking any
11 medications today that could affect your
12 testimony?
13   A   No, sir.
14   Q   A couple of ground rules today: In
15 ordinary conversation, people tend to, when they
16 know where the question is going or they think
17 they know, that they'll sort of jump in and answer
18 before the question is completed. That's very
19 difficult for the court reporter to transcribe and
20 for the videographer to capture. If you would,
21 please wait until I'm done completing my question
22 before answering today, and I will attempt to show

13

1  you the same question courtesy, okay?
2  **A   Yes.**
3     Q    And if at any point today, you don't
4  understand one of my questions, would you please
5  let me know?
6  **A   I will.**
7     Q    And please also answer the question
8  verbally in lieu of a head nod or an uh-huh.  It's
9  also more difficult for the court reporter to
10 transcribe, okay?
11 **A   Yes, sir.**
12    Q    If at any point you need a break in the
13 course of this deposition, would you please let me
14 know?  We can take a break.  The only thing I
15 would ask is that if a question is pending, that
16 you answer the question before we recess, okay?
17 **A   Yes, sir.**
18       THE VIDEOGRAPHER:  Sorry to interrupt.
19 I'm having a small technical difficulty.  We are
20 going off the record.  The time is 10:15 a.m.
21       (Whereupon, a recess was taken.)
22       THE VIDEOGRAPHER:  We are back on the

14

1  record.  The time is 10:16 a.m.
2  BY MR. HENSON:
3     Q    Mr. Alubbad, we're back on the record
4  after a short break.  Do you understand that
5  you've been placed under oath today?
6  **A   Yes, sir.**
7     Q    And you understand that it's you have an
8  obligation to answer the questions truthfully to
9  the best of your knowledge and ability?
10 **A   Yes, sir.**
11    Q    Just as you would if you were in court?
12 **A   Yes.**
13    Q    Mr. Alubbad, what are you doing
14 tomorrow?
15 **A   Tomorrow, I was planning to travel, and**
16 **something came up, and I'd don't think I will be**
17 **able to make my flight tomorrow.  I have some**
18 **family issue.**
19    Q    I'm sorry.  You don't think -- you had a
20 flight, but you don't think you'll be able to make
21 the flight?
22 **A   Yes.**

15

1     Q    And where were you flying?
2  **A   Utah.**
3     Q    Flying to Utah.  And why aren't you able
4  to go to Utah?
5  **A   I have some family issue.**
6     Q    A family issue?
7  **A   Yes.**
8     Q    And so tomorrow, will you be in
9  Virginia?
10 **A   Yes, sir, I will.**
11    Q    At your place of residence?
12 **A   Probably, yeah.**
13    Q    And on Wednesday, will you be in
14 Virginia?
15       MR. MILLS:  That's tomorrow.
16       MR. HENSON:  I'm sorry.
17    Q    On Thursday, will you be in Virginia?
18 **A   I don't know.  I have to check.**
19    Q    Do you have any other plans at this
20 present time?
21 **A   I don't know, but things can come up.**
22    Q    I'm just asking you, sitting here today,

16

1  are you aware of any conflicting obligations on
2  Thursday?
3  **A   I'm not aware of right now my schedule.**
4  **So --**
5     Q    Okay.  And on Friday, April 19th,
6  sitting here today, are you aware of any other
7  conflicting obligations?
8  **A   Friday is a holy day for me.  So I'm not**
9  **available.**
10    Q    Friday is a holiday for you?
11 **A   It's a holy day.**
12    Q    A holy day?
13 **A   Yeah.**
14    Q    And will you be in Virginia?
15 **A   Probably.  I'm not sure.  Maybe.**
16    Q    But sitting here today, you don't have
17 any present plans to be anywhere else on Friday?
18 **A   Again, like I said to you, I really**
19 **don't know what's my schedule.  I don't have a**
20 **planned agenda where I know every day what, you**
21 **know, so --**
22    Q    All right.  Mr. Alubbad, have you done

17

1 anything to prepare for today's deposition?
2     A    Yes, sir.  I looked at some documents.
3     Q    And what documents did you look at?
4     A    I looked at the document that my
5 attorney shared with me.
6          MR. MILLS:  Let me caution you.  Don't
7 discuss what we discussed.  You can talk about
8 what documents you reviewed, but don't discuss
9 anything that we discussed.
10          THE WITNESS:  Okay.
11     A    I looked at the Rule 26 (b).
12     Q    You looked at Rule 26 (b)?
13     A    Is it 26 (B)?  No.  It's --
14     Q    For the record --
15     A    Rule 30(b)(6).
16     Q    I see.  Rule 30(b)(6), okay.
17     A    And I looked at the complaint.
18     Q    Okay.  And you have some documents in
19 front of you this morning; correct?
20     A    That's correct.
21     Q    And can you tell me what these documents
22 are?

18

1     A    This one, I got it today.  I have not
2 had a chance to look at it.  It's the plaintiff
3 26(a).  And the second one is the complaint.  And
4 the other one is the Rule 30(b)(6).
5     Q    The Rule 30(b)(6) deposition notice in
6 this matter?
7     A    Yes.
8     Q    Okay.
9          MR. HENSON:  And I'd like to -- before
10 we leave here today, I'd like to have these
11 submitted as exhibits for today's deposition.
12 Could we go ahead and mark those now?
13          COURT REPORTER:  Sure.  Any preference
14 to order?
15          MR. HENSON:  And what exhibit numbers
16 are these?  I'm sorry.  Take a look at this real
17 quick, okay.  So this will be -- Exhibit 1 is
18 plaintiffs 26(a)(1), initial disclosures, dated
19 April 15th, 2024, which is yesterday.
20          (Exhibit 1 was marked for identification
21 and is attached to the transcript.)
22     A    This is --

19

1     Q    Exhibit 2 is the first amended
2 complaint, dated December 20th, 2023.
3          (Exhibit 2 was marked for identification
4 and is attached to the transcript.)
5     A    Yes.  Exhibit 3?
6     Q    Thanks.  And Exhibit 3 is plaintiffs
7 notice of objections to defendants notice of
8 30(b)(6) deposition, dated April 10, 2024.
9          (Exhibit 3 was marked for identification
10 and is attached to the transcript.)
11     Q    Thank you.  Apart from these exhibits, 1
12 through 3, were there any other documents that you
13 reviewed in preparation for today's deposition?
14     A    No.
15     Q    And about how much time did you spend
16 preparing for today's deposition?
17     A    Probably a couple of hours.
18     Q    A couple of hours?
19     A    Yeah.
20     Q    And did you do anything else, other than
21 spending a couple of hours looking at these
22 documents to prepare for today's deposition?

20

1     A    No, sir.
2     Q    You understand that today you are here
3 not just speaking for yourself, but actually
4 speaking for the corporate entity of MIT?
5     A    I understand, yes.
6     Q    And so there are notices.  There are a
7 series of topics of testimony that are identified.
8 And, in fact, I will introduce this as Exhibit 4.
9          (Exhibit 4 was marked for identification
10 and is attached to the transcript.)
11     A    Thank you.
12     Q    Have you seen this Exhibit 4 before,
13 Mr. Alubbad?
14     A    No, I did not.
15     Q    This is the -- I'll represent to you
16 that this is the notice of 30(b)(6) deposition
17 that was served on your counsel.
18     A    Okay.
19     Q    And it indicates at the top of Page 2
20 that the depositions will continue from day to day
21 thereafter; do you see that?
22     A    Okay.

21

1    Q    Do you see that there, sir, at the top
2 of Page 2?  You see that?
3    **A    The deposition -- okay.**
4    Q    Except on Sundays, Saturdays, state
5 and/or federal holidays at the same place
6 beginning at the same time until complete; do you
7 see that, sir?
8    **A    Yes, I see it.**
9    Q    What could --
10   **A    I did not see this document before.**
11 **This is my first time seeing it.**
12   Q    Okay.
13   **A    Okay.**
14   Q    Thank you for clarifying.
15   **A    Yes.**
16   Q    Could you explain what the nature of the
17 family issue is that requires you to stay in
18 Virginia tomorrow?
19   **A    My wife is -- she has medical issue for**
20 **the last 10 years.**
21   Q    For the last 10 years?
22   **A    Oh, yeah.  And this is ongoing health**

22

1 **issues.  And that's the only thing I can talk**
2 **about, you know.**
3    Q    And what -- I mean, this has been a
4 long-running thing, and yet you had plans to go to
5 Utah.  What happened that caused you to have to
6 cancel those plans?
7    **A    My wife, she hasn't been feeling well**
8 **for the last week.  And she has medical**
9 **appointment, and she doesn't really feel**
10 **comfortable whenever I'm out of town.  And this**
11 **has been constantly happening.  You know, this is**
12 **not something new.**
13       **Tim Clemente, he knows about this issue**
14 **with me, you know.  Sometimes if I'm overseas, I**
15 **have to cut down my trip and come home --**
16   Q    Okay.
17   **A    -- because of this issue.  So --**
18       MR. MILLS:  Might I suggest you get on
19 with the deposition rather than his travel plans?
20       MR. HENSON:  And I would suggest that if
21 you have an objection --
22       MR. MILLS:  I have an objection.  I

23

1 object to the line of questioning, especially when
2 you're complaining about time.
3       MR. HENSON:  Then you can make it in a
4 non-argumentative and non-suggestive manner, as
5 the rules require.
6       MR. MILLS:  There's no question pending.
7 I'm just suggesting that you get on with the
8 deposition.
9       MR. HENSON:  And I would encourage you
10 to refrain from making those remarks as we proceed
11 here.
12 BY MR. HENSON:
13   Q    Is there an appointment that your wife
14 has tomorrow?
15   **A    Yeah.  She does have an appointment.**
16   Q    And is that with a medical provider?
17   **A    That's correct.**
18   Q    And what time is that appointment?
19   **A    I think her appointment is**
20 **10:00 o'clock.  She does have an appointment today**
21 **at 1:00 o'clock also.  So --**
22   Q    But you're not going to be there for the

24

1 1:00 o'clock appointment today?
2    **A    No.  Because my daughter is going to be**
3 **with her.**
4    Q    Okay.  Mr. Alubbad, have you had your
5 deposition taken prior to today?
6    **A    Yeah.  I had deposition before.**
7    Q    And how many times have you been
8 deposed?
9    **A    I think twice.**
10   Q    Two times?
11   **A    I believe so.**
12   Q    And when was the -- when were those
13 times, approximately?
14   **A    It's probably -- one time, probably 10**
15 **years ago, and another time, probably, maybe --**
16 **maybe 20 years ago, or 18.  I'm not really sure**
17 **with the exact date.**
18   Q    And what was the matter -- what was the
19 lawsuit in which you were deposed 10 years ago?
20   **A    When you said the lawsuit, can you be**
21 **more specific?**
22   Q    Sure.  You said you were deposed.  That

25

1  was in the course of a lawsuit, right?
2      A    I was suing people.
3      Q    But there was an ongoing lawsuit?
4      A    Yes.
5      Q    And you -- it was a lawsuit that you had
6  filed?
7      A    That's correct.
8      Q    And this is the lawsuit that you had
9  filed through the entity Atlantis; correct?
10     A    That's correct.
11     Q    Against Terradyne?
12     A    Yeah.  Again, it's Terradyne.  But you
13 know, since you mentioned Terradyne, I forgot
14 about Terradyne.  I had something else in mind.
15 So it makes it three.
16     Q    Okay.  And so you were deposed in
17 Terradyne?
18     A    That's correct.
19     Q    In Terradyne.  And what was the other
20 matter 10 years ago that you were referencing?
21     A    One, again, is the company in Virginia,
22 in Alexandria, Virginia, and the other one, again,

26

1  is as Tim's partner.
2      Q    So the Alexandria, Virginia matter --
3      A    It's called SyTec.
4      Q    SyTec?
5      A    Yeah.  Which you mentioned last time.
6      Q    And then the 20 years ago --
7      A    20 or 18.  I'm not really sure.  Again,
8  it's defense control.
9      Q    Defense control.  And each of these
10 three matters that you just mentioned were
11 lawsuits that you had brought; correct?
12     A    That is correct.
13     Q    And have there been any other lawsuits
14 that you have brought in the course of your
15 lifetime?
16     A    This one.
17     Q    This being the --
18     A    MIT.
19     Q    MIT?
20     A    Mission Integrated Technologies, yes.
21     Q    And apart from there might be litigation
22 by MIT, are there any other lawsuits that you have

27

1  brought?
2      A    No, sir.
3      Q    Mr. Alubbad, you have before you Exhibit
4  4, and this is a series of topics that were served
5  on MIT counsel asking for testimony as to a series
6  of issues, Topics 1 through 21, including
7  subparts.  You see Topics 1 through 21 there?
8      A    Starting from here?
9      Q    Yes, sir.  Starting on Page 3 and ending
10 on Page 7.
11     A    Okay.  Page 7, which is -- yes.  Thank
12 you.
13     Q    And with the exception of a recently
14 redesignated topic -- I believe it is Topic 13C;
15 is that correct?
16         MR. MILLS:  That's correct.
17     Q    With the exception of Topic 13C, do you
18 understand that you are the -- you're MIT's
19 designee to speak on these issues?
20     A    I have to read it.
21     Q    You've never before read this document,
22 or the topics listed in this document?

28

1      A    I have to look at the topics.
2      Q    Of course.
3      A    Because you gave me a document that I
4  have not seen.
5          MR. MILLS:  He looked at the objections
6  and the topics in them.
7          THE WITNESS:  You're asking me to look.
8  I mean --
9      Q    Mr. Alubbad, take a moment and look at
10 these topics, and I'd like you to tell me if
11 you've ever before seen these topics.
12     A    You mean only Number 13?
13     Q    All but 13C.
14         MR. MILLS:  He's asking, have you seen
15 these topics.
16     A    I believe some of them, yes, I have
17 seen.
18     Q    Are there any topics that look
19 unfamiliar to you?
20     A    I mean, Mr. Henson, there is 21 items.
21 I mean, you're asking me if I've seen.  I
22 recognize some of them, but I don't know if -- you

29

1  know, I haven't had a chance to go through 21, you
2  know, to recognize all of them.  I want to be
3  truthful and correct with you when you ask me a
4  question.  So I've seen some of these, but I have
5  to sit and read them all in order to tell you,
6  yes, I've seen them.
7     Q    Okay.  In Exhibit -- what was the
8  objections exhibit?  Can you referred back to --
9        MR. MILLS:  That would be 3.
10    Q    Exhibit 3.
11    A    Exhibit 3?
12    Q    Yes, sir.  Did you read that whole
13 document?
14    A    Yeah, I read this.
15    Q    And every topic that's mentioned in
16 there?
17    A    Yes.
18    Q    You came prepared to discuss those
19 topics today; correct?
20    A    I believe so, to the best of my
21 knowledge.  I'm trying to remember all these
22 things, because this document, okay, was given to

30

1  me, okay, when -- at the end of Ramadan, when I
2  finished fasting.  I didn't have time, enough
3  time, to absorb everything.  But, yes, I looked at
4  it.
5     Q    Okay.  Do you understand that with
6  respect to the issues that are mentioned in that
7  Exhibit 3, when you're speaking today, you will
8  not only be speaking for yourself, but you'll be
9  speaking for the plaintiff entity?
10    A    I understand, yes.
11    Q    Okay.  I'd like to change gears now, and
12 just ask you a little bit about your personal
13 background, Mr. Alubbad.  Where were you born?
14    A    I was born in Turkey.
15    Q    And how long have you been living in the
16 United States?
17    A    Over 40 years.
18    Q    For more than 40 years, 4-0?
19    A    Yeah, over 40 years.
20    Q    And do you have dual citizenship with
21 any country -- any other country -- other than the
22 US?  I'm sorry.  Let me strike that.

31

1        Do you have -- are you a citizen of the
2  United States?
3     A    Yes.  I am a US citizen.
4     Q    Do you have citizenship with any other
5  nation?
6     A    Yes, sir, I do.
7     Q    Which other nation?
8     A    Saudi Arabia.
9     Q    And how did you -- how did it come that
10 you immigrated to the United States?
11    A    How did I come to the US?  I came to the
12 US because the US government wanted me to come to
13 the US.
14    Q    So did you have a relationship with the
15 US government?
16    A    I served in the Gulf War.
17    Q    You served in the Gulf War?
18    A    Yes.
19    Q    Now, the Gulf War happened less than 40
20 years ago.
21    A    Yeah.  Because I was here before the
22 Gulf War.  I was here going to school.  I

32

1  graduated, you know, from the University of
2  Florida.  And so I did all my school, and then I
3  came back after school.
4     Q    And what did you study at the University
5  of Florida?
6     A    Engineering.
7     Q    Engineering?  And the University of
8  Florida in Gainesville?
9     A    That's correct, sir.
10    Q    And did you -- did you get a BS degree?
11    A    Yes, I did.
12    Q    And what year did you graduate?
13    A    I think I graduated in the beginning of
14 '89.
15    Q    And what did you do after you graduated
16 from the University of Florida?
17    A    I had several other trainings, you know,
18 and went back to Saudi Arabia because I was on the
19 scholarship.  And once I finished -- because I was
20 sent by the government to go to school, and they
21 paid for my school on a scholarship.  After I
22 finished, I went back to Saudi Arabia.

33

1    Q    So the kingdom of Saudi Arabia paid for
2    you to go to school at the University of Florida?
3    **A    That's correct.**
4    Q    Hang on just one second.
5        MR. MILLS:  Thank you.  You said that's
6    correct, sir?
7    **A    That's correct, yes.**
8    Q    So the kingdom of Saudi Arabia paid for
9    you to go to school at the University of Florida.
10   And after you graduated, you returned to the
11   kingdom?
12   **A    That's correct, sir.**
13   Q    And then for how long -- how long until
14   you came back to the United States?
15   **A    Right after the Gulf war, immediately, I**
16   **came back.  So I only was gone a few years there.**
17   Q    And why did you come back?
18   **A    I like this.  I like the country.**
19   **That's why I came back.**
20   Q    You liked living here, and that's why
21   you came back?
22   **A    Yeah.  I like living here, yeah.**

34

1    Q    And did you have any business interest
2    that brought you back to the United States?
3    **A    No.  I wasn't in business, so I just**
4    **came back because I like it here.**
5    Q    And did you come on -- I mean, what kind
6    of visa allowed you to come back?
7    **A    When I came back, I came back on a**
8    **tourist visa.**
9    Q    You came back because you liked it, and
10   you stayed here, right?
11   **A    No.  I came back, and I went back.  Then**
12   **I came back again.  So --**
13   Q    Okay.  So were you on sort of a
14   revolving schedule of the tourist visa, 120 days?
15   **A    No.  I mean, when you get a tourist visa**
16   **-- I don't know if you're familiar with the**
17   **tourist visa they give.  It's a multiple-entry**
18   **visa for five years.  So you can come and go as**
19   **long as you want.**
20   Q    And so you didn't have any business
21   relationships in the United States that was
22   drawing you back here?  We're talking about in the

35

1    mid-'90s, right?
2    **A    Yes.  That is correct.**
3    Q    So when did you start -- when did you
4    get in business in the United States?
5    **A    I started my company, Atlantis, in 1996.**
6    Q    And are you the sole owner of Atlantis?
7    **A    Yes, I am.**
8    Q    Has that always been the case?
9    **A    Yes, sir.**
10   Q    Does Atlantis have any employees?
11   **A    Yeah.  It does.**
12   Q    How many?
13   **A    I had three employees, and after Covid,**
14   **I only have one right now.**
15   Q    Has Atlantis ever had more than three
16   employees?
17   **A    No, sir.**
18   Q    And after Covid, you're down to one?
19   **A    Yes, sir.**
20   Q    Before Covid, who were those three
21   employees?
22   **A    The three employees I had, it's**

36

1    **basically technical engineers I have.  And they**
2    **were overseas, basically, supporting me on**
3    **projects that I was consulting for.**
4    Q    What were their names?
5    **A    Name is Hani, and the other guy's name**
6    **is Mohi, M-O-H-I, okay, and the third one, his**
7    **name is Mohammed.**
8    Q    And these were engineers, you said?
9    **A    Yes, sir.**
10   Q    All of them?
11   **A    Except Mohammed.  He's not an engineer.**
12   Q    And what kind of business is Atlantis
13   in?
14   **A    It's in consulting, defense and**
15   **security.**
16   Q    Consulting defense security?
17   **A    Yes.**
18   Q    And how does it make money?
19   **A    Two ways.  One way, the defense**
20   **companies, they pay me a retainer, a monthly**
21   **retainer.  And some other companies, they only pay**
22   **me a success fee.**

37

1    Q    And a success fee -- so let me just back
2  up for a second.  So you're consulting -- the
3  consulting defense and security business, you are
4  helping arrange sales of military products to
5  foreign governments; is that correct?
6    A    So let me explain to you the definition
7  of consulting, what exactly I do:  Consulting
8  means I provide the service to these defense and
9  security companies and help them how to do
10 business in this part of the world, which is the
11 area -- it's in the Middle East, North Africa, you
12 know.
13         I am not the salesperson.  I don't
14 basically go and sell the product, or go convince
15 the client to buy the product.  It is the company
16 who does this.  I don't give the report.  I don't
17 basically take money from foreign companies or
18 foreign nationals.  I just provide the consulting
19 to the American companies, and also European,
20 because I consult with European also.  And they do
21 the sales themselves.
22    Q    And you market the sales, right?

38

1  Atlantis markets the products of its client;
2  correct?
3         MR. MILLS:  Object to the form.
4    A    Again, you know, when you say market,
5  you know, I mean, if you have a product, and I
6  understand if the product has a need, okay, for
7  this particular client, I just help them to
8  understand what's the product and what the product
9  does.  But I am in no way, like, I convince them
10 to buy the product.  It's their decision, if they
11 want to buy it or not.
12    Q    You understand what marketing is, right?
13    A    Yeah, I do.
14    Q    And that's something you do for MIT,
15 right?
16    A    That's correct.
17    Q    And I just want to make sure your
18 testimony is clear.  Your testimony under oath is
19 that you don't provide marketing services for
20 Atlantis?
21    A    Yes, I provide.  I mean, again, what
22 people sometimes don't understand, marketing,

39

1  okay, I'm not a salesperson, okay?  When you are
2  -- when you have a product and I'm trying to
3  market or consult for it, I basically help the
4  end-user to understand the benefit of this
5  product.  Now, if you want to call it marketing,
6  then, that's fine, you know.
7    Q    Okay.  So Atlantis does provide
8  marketing services for its clients; correct?
9    A    That's correct.
10   Q    Is Atlantis an independent entity from
11 MIT?
12   A    100 percent, yes.
13   Q    So Atlantis doesn't have any ownership
14 interest in MIT; correct?
15   A    No, sir.
16   Q    Does Atlantis have any business
17 relationship at all with MIT?
18   A    No.  They are two separate companies.
19   Q    Tell me about F2E.  What entity is that?
20   A    F2E, it's an entity that was created,
21 okay, so for my interest in MIT.  That's it.
22   Q    A holding company?  It's a holding

40

1  company?
2    A    Yeah.
3    Q    And it holds your ownership interest in
4  MIT?
5    A    That's correct.
6    Q    Does it have any other business purpose,
7  apart from holding your membership interest?
8    A    No, sir, it doesn't.
9    Q    What does F2E stand for?
10   A    I don't know.  Just a name, F2E.
11   Q    Well, it's a name that you came up with,
12 right?
13   A    I think my attorney came up with that
14 name.
15   Q    Okay.  So as far as you're aware, it
16 doesn't have any meaning at all?
17   A    No, it doesn't.
18   Q    Does F stand for Fahmi?
19   A    If you want to make up something.  I
20 mean, I don't know.
21   Q    I don't want to make up anything.  I'm
22 asking you.

41

1    A    Okay. I don't know. You asked me a
2 question. I said my lawyer, you know, he set up
3 the company.
4    Q    Okay. And all right. And I'm not going
5 to ask you about any conversations you had with
6 your lawyer, but all right. That's fine.
7         So does F2E have any employees?
8    A    No.
9    Q    We talked about Atlantis and F2E. Are
10 there any other companies that you own?
11    A    Yes.
12    Q    What are those companies?
13    A    OmniTrue Technologies, LLC.
14    Q    And let's sort of get the list down, and
15 we can come back and talk about them. Apart from
16 OmniTrue Technologies, are there any other
17 companies?
18    A    No, sir.
19    Q    Okay. So there are four companies total
20 in which you have a membership interest, either
21 directly or indirectly, right?
22    A    That's correct.

42

1    Q    MIT, Atlantis, F2E, which is really a
2 membership in MIT?
3    A    And OmniTrue.
4    Q    OmniTrue. Four total?
5    A    That's correct.
6    Q    Okay. Can you tell me about OmniTrue,
7 what kind of company is that?
8    A    OmniTrue is — it's also a defense
9 contracting company.
10    Q    And what kind of work does it do?
11    A    OmniTrue has agreements with various
12 defense and security companies to act on their
13 behalf as a reseller.
14    Q    As a reseller?
15    A    Yes.
16    Q    Can you explain what that means?
17    A    Which means, if a company, they have a
18 product, for example, like, Coke, okay, and some
19 of these companies they want to help to do
20 business in the Middle East and North Africa, but
21 they don't want to touch it. So they come into
22 some companies, like my company, OmniTrue, and

43

1 they say we would like you to be our reseller,
2 where we are responsible for everything from A to
3 Z. So that's what OmniTrue does.
4    Q    And the term reselling, I mean, what
5 does that really mean?
6    A    Reseller of the product, of their OAM.
7    Q    And what does OAM mean?
8    A    It's the manufacturer of the product.
9 Like, example, for the Coke, you know.
10    Q    So you're a retailer?
11        MR. MILLS: Object to the form.
12    A    No. So I'll give you an example, okay?
13 OmniTrue is the reseller for a company that makes
14 weapons, okay? Small and large weapons. And
15 OmniTrue is the reseller for these weapons
16 overseas. Does this make sense to you?
17    Q    And let me just ask some questions to
18 make sure that it makes sense to me. So let's say
19 the manufacturer is Company X, okay?
20    A    Yes.
21    Q    Company X sells its products to
22 OmniTrue; is that correct? And then OmniTrue

44

1 sells it to the end user?
2    A    I mean, you could — you could say it
3 this way. I mean, it's not always this way. I
4 mean, in a way, yes, they are actually selling to
5 OmniTrue. Yeah, I see your point. But OmniTrue
6 basically distribute and sells it overseas.
7    Q    Okay. And so is there any other way
8 that OmniTrue does business in the ordinary
9 course?
10    A    I don't understand your question.
11    Q    You just -- you said that OmniTrue is a
12 reseller, and we described, you know, they would
13 buy the products from the manufacturer and can
14 sell or distribute in the --
15    A    Or represent also. It could be many
16 different ways. It could represent or sell the
17 product, but, you know — and that's the
18 difference between Atlantis. Atlantis does not
19 sell, does not, you know, do all these things.
20 OmniTrue, on the other hand, what makes it
21 different than Atlantis, OmniTrue will take the
22 lead. They do all the heavy lifting from A to Z,

45

1 okay, which Atlantis doesn't do.
2    Q    Okay.  Are there any other owners in
3 Atlantis, apart from yourself?
4    A    You asked me already.
5    Q    Sorry.  Are there any other owners in
6 OmniTrue apart from yourself?
7    A    As of today, no.
8    Q    Were there at any other times?
9    A    Yeah, there were.
10    Q    Okay.  And who were they?
11    A    I had two partners before.  And one is a
12 lawyer, and the other one is a retired Navy
13 officer.
14    Q    Was Chris Ayres a partner?
15    A    Oh, no.
16    Q    Chris Ayres was not a partner in
17 OmniTrue?
18    A    No, no, no.
19    Q    Does Chris Ayres work for OmniTrue
20 today?
21    A    No, sir.
22    Q    Did he once?

46

1    A    Yes, he did before.  He was a full-time
2 employee.
3    Q    And what was the name of the Navy
4 officer that was a co-owner at OmniTrue?
5    A    Rigoberto Saez.
6    Q    How do you spell the last name?
7    A    S-A-E-Z.
8    Q    Roberto is the first name?
9    A    Rigoberto.
10    Q    Rigoberto?
11    A    Yeah.
12       MR. MILLS:  Rigoberto.
13    A    Yeah.
14    Q    And the lawyer partner, what was his
15 name or her name?
16    A    It was his son, Quito Saez.
17    Q    Quito Saez?
18    A    Yeah.
19    Q    S-A-E-Z?
20    A    Yeah, the same.
21    Q    And they are no longer partners of
22 OmniTrue?

47

1    A    No, sir.  No.
2    Q    And did they -- were their membership
3 interests bought out by you?  What happened?
4    A    Yeah.  I took over the company.
5    Q    Did you ever -- did you ever threaten
6 litigation against Mr. Saez, either of them?
7    A    Yes, I did.
8    Q    And why?
9    A    I discovered that they were doing
10 business on the side without letting me know.
11    Q    And was Mr. Ayres involved in that?
12    A    No.
13    Q    And when did Quito and Rigoberto Saez,
14 when did their membership interest in OmniTrue
15 end?
16    A    I really don't recall, Mr. Henson.  I
17 don't recall the exact date.  It could be --
18    Q    It was within the last 10 years;
19 correct?
20    A    Oh, yeah.  I mean, I don't know.  In the
21 last five years, maybe, yeah.
22    Q    But not ancient history?

48

1    A    Oh, no, no, no.
2    Q    All right.  Let me change gears a little
3 now.  Let's talk about MIT.  MIT was created as an
4 entity on August 3rd, 2013; does that sound right?
5    A    I believe so, yes, in 213 [sic].
6    Q    And why was that?  Why was MIT created?
7    A    Tim Clemente called me, and he asked me,
8 you know -- he told me he was working on some
9 design, okay, and some concept, okay?  And he
10 discussed it with me, and I told him, yes, it's --
11 I think this is good idea because, you know, I am
12 -- based on my consulting, I am familiar with the
13 market, okay, and what's out there, either in
14 Europe or in the US.
15       And what Tim discussed with me, I told
16 him, yes, it's a good idea.  And then he asked me,
17 you know, if we do this together.  And I said,
18 Okay, we can set up a company.  And this is how we
19 started with this.
20    Q    And how did you know Mr. Clemente, Tim
21 Clemente?
22    A    I knew Mr. Clemente while he was still

49

1 at the FBI.

2    Q    And how did you know him through the

3 FBI?

4    A    I was introduced to Mr. Clemente by a

5 friend of mine who is a retired military special

6 ops, okay?  And he introduced me to Tim, because

7 Tim, that time, while he was at the FBI, he was

8 the president of a company called SWATEC, and they

9 had something called HARAS, you know.

10    Q    So you knew Mr. Clemente through his

11 work at SWATEC?

12    A    Yes.

13    Q    And what was the business purpose of

14 MIT?

15    A    The business purpose of MIT is, we only

16 have one product.  It's called the ARES.

17    Q    The ARES?

18    A    Yeah.

19    Q    A-R-E-S?

20    A    That's correct.  And that's the only

21 product MIT has, you know.  So the business is to

22 market and sell this product.

50

1    Q    And how would you describe the ARES?

2 What is it?

3    A    The ARES is an elevated tactics system.

4 It's used for, you know, if you are doing an

5 assault of a building, or you're doing an assault

6 of an aircraft, okay, and, you know, that's the

7 summary.

8    Q    And at the founding of MIT on

9 August 3rd, 2013, how many members did it have?

10 How many members of the company were there?

11    A    There was only me and Tim.

12    Q    Just you and Tim?

13    A    That's correct.

14    Q    And it was you through your holding

15 company, F2E?

16    A    No.  I did not have F2E at that time.

17 When I was talking to Tim, at the beginning, when

18 he called me, okay, and he asked me to meet with

19 him, and we were discussing -- this is before we

20 incorporated MIT.  I was talking to him as

21 Atlantis, because Atlantis is my company.  And

22 then, when we set up the company, this is when F2E

51

1 Holding, you know, was set up.  So there was only

2 two members --

3    Q    Okay.

4    A    -- of MIT.  It's myself and Tim

5 Clemente.

6    Q    Okay.  But at the inception of MIT as

7 its own company, that's when you created F2E

8 entity?

9    A    F2E was created the same time we created

10 MIT.

11    Q    Right.

12    A    Yes.

13    Q    And you are the majority owner of MIT;

14 correct?

15    A    That's correct.

16    Q    You have a supermajority?

17         MR. MILLS:  Object to the form.

18    A    I don't understand the meaning of

19 supermajority.

20    Q    Well, you have a majority membership?

21    A    Okay.  Yeah.  I have the majority, yes.

22    Q    Through F2E; correct?

52

1    A    That's correct, sir.

2    Q    And that's always been the case;

3 correct?

4    A    Yes.

5    Q    At no time have you held less than a

6 majority ownership interest in MIT through F2E?

7    A    No.  I was always the majority.

8    Q    And let me talk about the roles and

9 responsibilities that you played and that Tim

10 Clemente played.  And just starting with you

11 personally, you know, what has been your -- what

12 has been your primary roles in carrying out the

13 business in MIT?

14    A    In order for me to answer your

15 questions, you need to understand, okay, the

16 basis, how -- you know, what was the agreement

17 when we set up, you know, MIT, okay?  So this is

18 really important.  And just so you understand how

19 we set up, because the way I do business, I like

20 to make things very clear to people so there's no

21 surprises down the road.  That is how I live my

22 life.

53

1      When I created -- when we created the
2  company, okay, Tim Clemente approached me because
3  he knows I am very well-connected, and I have
4  relationship internationally.  So he wanted me and
5  him to work on this -- in this company where Tim
6  Clemente handled the business domestically in the
7  United States, because he's a retired law
8  enforcement, and he is supposed to be the expert
9  in law enforcement and in United States, and my
10 job is to market internationally.  Anywhere
11 international.
12      And remember, Mr. Henson, I was very
13 specific with Tim Clemente.  I told him, Do you
14 see the map?  This is the world map.  Keep
15 everything to me, and I leave you the United
16 States and Canada.  And he agreed.
17  Q   Okay.
18  A   So my goal is to market the only product
19 that MIT has, which is the ARES, anywhere outside
20 the United States.
21  Q   Okay.  So you marketed the ARES
22 internationally?

54

1  A   That's correct.
2  Q   Not including Canada?
3  A   Not including Canada or the United
4  States.
5  Q   Right.  What other roles did you play?
6  A   Finance, 100 percent.
7  Q   You've always been in charge of the
8  financial aspect of the company; correct?
9  A   I was -- there was no anybody else
10 except me putting the money.
11  Q   Okay.  So you provided the investments,
12 the financial investments of the company?
13  A   That's correct.
14  Q   So international marketing, financial
15 investments.  Were there any other roles that you
16 played for MIT?
17  A   Yeah.  I played the roles when Tim
18 Clemente failed to do his own duties.
19  Q   Let's come back to the question.  What
20 other roles did you play?
21      MR. MILLS:  He's answering the question.
22  A   Look, you asked me what other roles.  I

55

1  played the roles when my partner failed his duty.
2  Basically, you know, running day-to-day, because
3  he was not available, okay?  Trying to take care
4  of late payments that he did not pay.  I tried to
5  take care of taxes that he failed to pay.  Tried
6  to take care of, you know, all the other issues
7  that what he was supposed to do, I had to step in.
8  Q   So --
9  A   Would you like to know more?
10  Q   It sounds like you're saying you would
11 play a role on an as-needed basis; is that fair to
12 say?
13  A   No.  So you don't put words in my mouth.
14 What I'm trying to say to you, when we started the
15 company, we both agreed on what Tim is going to do
16 and what I am going to do.  Now, when you are my
17 partner and you fail, I'm not going to sit and
18 hammer you all the time.  I just step in whenever
19 it's necessary to cover for you.
20      So I was doing all my duties that, you
21 know, according to the operating agreement,
22 according to what I said I would do.  And on top

56

1  of it, whatever failure, you know, my partner
2  could not do, I was stepping in and doing it.
3  Q   Okay.  Were there any other roles that
4  you played in MIT?
5  A   Yeah.  At a later stage, you know, since
6  I took responsibilities, you know, completely from
7  Tim, I was the person who was signing NDAs, work
8  for hires, and basically writing the checks for
9  the vendors, and taking responsibility for the
10 company, making sure all our taxes paid on time,
11 and all our registration -- company registration.
12 I am the designated officer for the State
13 Department to make sure we comply with items
14 100 percent.  I mean, all of that.
15  Q   Okay.  And, I mean, I noticed there was
16 some MIT marketing materials that were in Arabic
17 and some in French.  Are you fluent in both those
18 languages?
19  A   In Arabic, yes.  French, no, not that
20 well.
21  Q   Would you translate marketing materials
22 into Arabic?

57

1    A    Yes, I am.  I translated it, yes.
2    Q    I mean, has there ever been a time where
3  you've had an Arabic translation done by somebody
4  else at MIT?
5    A    Oh, yes.  I mean, outside, you know.
6  Sometimes I seek help outside, you know, for
7  translation.
8    Q    Okay.  So other than yourself, who else
9  have you used for Arabic translations of MIT
10 materials?
11   A    Companies overseas.
12   Q    Can you give me the name?
13   A    I can't recall the name, because you
14 cannot use only one particular.  There is many
15 companies who basically do the translation, and
16 you have to contract them.
17   Q    So sitting here today, you can't think
18 of a single --
19   A    I can't.  I can't think --
20   Q    And, I'm sorry.  Mr. Alubbad, please
21 wait for me to finish my question.
22   A    Okay.

58

1    Q    Sitting here today, you can't think of a
2  single translation company that you've ever used
3  to translate MIT marketing materials into Arabic?
4    A    No, I can't.  I can't recall the exact
5  name.
6    Q    Would you -- was it your general
7  practice to translate marketing materials into
8  Arabic yourself, or would you generally contract
9  out?
10   A    No.  Usually I contract out, unless
11 there is some -- you know, something very simple
12 that it requires to do it [sic].  But if we have a
13 proposal or something big, like manuals we have to
14 do and stuff like this.  I am not a translator.  I
15 have to give it outside.
16   Q    What titles did you have for MIT; job
17 titles?  Officer titles?
18   A    My title was marketing.  The director of
19 marketing, I believe, I use this.  I had a
20 business card that says on it the director of
21 marketing.
22   Q    Any others?

59

1    A    Yeah.  Owner.  I don't have a business
2  card or have anything that was printed that says
3  owner on a business card.
4    Q    And any others, other than those two?
5    A    No, sir.
6    Q    And to become director of marketing, how
7  did that occur?  How was that formalized as an
8  action at MIT?
9    A    Basically, this is what has been agreed
10 from the beginning.  I handle the marketing.
11   Q    Well, I guess to sort of wear that
12 title, was that referenced to a written consent by
13 the company?
14   A    No.  I don't think there is some
15 agreement or written consent that, you know, I
16 have to -- that says director of marketing.  No.
17   Q    Now, there is -- there are corporate
18 documents that designate Tim Clemente as
19 president; correct?
20   A    That's correct.
21   Q    And there was also written consent to
22 remove him as president; correct?

60

1    A    That's correct.
2    Q    But it's your testimony that there was
3  no such written document authorizing you to become
4  the director of marketing for MIT?
5    A    No, sir.
6    Q    Why not?
7    A    I don't know the answer to this.
8    Q    Did you just come up with it; come up
9  with the job title?
10   A    Well, this was something that was agreed
11 between me and Tim that I'm doing the marketing.
12 To be honest with you, there wasn't really
13 anything besides this.
14   Q    So there was no written documentation
15 designating Fahmi Alubbad as MIT's director of
16 marketing at any time that you can recall?
17   A    I don't think there's any document.  If
18 you're asking me if there was a document, no.
19   Q    Mr. Alubbad, have you been the only
20 person who acts unilaterally on behalf of MIT?
21   A    Well, can you explain the question?  I
22 don't really understand.

61

1        MR. MILLS: I'm going to object to the
2    form. At what point in time?
3    Q    Let me ask -- I'd like to introduce
4    this. It's Exhibit 5. For the record, this is
5    titled the Second Declaration of Fahmi Alubbad.
6        (Exhibit 5 was marked for identification
7    and is attached to the transcript.)
8    A    Where would you like? What page?
9    Q    It's a 14-page document. Mr. Alubbad,
10   have you ever seen this document before?
11   A    I've seen many documents. I don't know.
12   I mean, this particular one, but, you know.
13   Q    I'm sorry. You do know this one?
14   A    I mean, I've seen some of it, but,
15   because you have part of the stuff from the
16   operating agreement. But I have not -- I have to
17   read it all to understand.
18   Q    Mr. Alubbad, this is your signature
19   appearing on Page 14; correct?
20   A    On the last page. I said to you, yes,
21   I'm familiar with this, okay, but I'm not sure
22   about the rest.

62

1    Q    Okay. And right above your signature,
2    do you see where, in Paragraph 43, you are
3    representing that the statements in this document
4    are true?
5    A    That's what it says in 43, yes. But
6    what I am saying, you cannot give me the last page
7    that has my signature on it and the rest, you know
8    -- I'm not familiar with the rest. I have to make
9    sure I read it and make sure this is my own
10   wording.
11       Who prepared this document?
12   Q    We received this document from you.
13   A    Okay.
14       MS. LEGRAND: Do you want the
15   Bates-numbered version? I've got it on me.
16   That's an MIT exhibit. You can see it's been
17   submitted.
18       MR. MILLS: It's been submitted in the
19   IPRF.
20       MS. LEGRAND: I'm overjoyed that you're
21   going to make that opinion to give.
22       MR. MILLS: I'm not saying that at all.

63

1        MR. HENSON: Let's stay focused, please.
2    Q    All right. Mr. Alubbad, this is a sworn
3    statement by you --
4    A    Okay.
5    Q    -- less than six months ago. And I just
6    want to make sure that we're clear. You don't
7    have any recollection of signing this document?
8    A    Again, for the record, this is my
9    signature on this page. But what I'm saying to
10   you regarding the document, okay, I just, you know
11   -- I have not seen the whole entire document like
12   this, okay?
13   Q    Do you recall providing a declaration to
14   the US Patent and Trademark Office?
15   A    This is through my patent attorney.
16   Q    Okay.
17   A    You know what? I mean, I have a patent
18   attorney. You know, you can ask him.
19   Q    All right. Let me turn to Page 2 of
20   this document.
21   A    Okay.
22   Q    And I'm sorry, Page 3, please.

64

1    A    Okay. Page 3.
2    Q    In Paragraph 5, do you see where it
3    says, In the initial agreement, F2E Holdings, LLC
4    was provided with a supermajority membership unit;
5    do you see that there?
6    A    Okay.
7    Q    Isn't it true that you, through your
8    entity F2E, held a supermajority of MIT ownership?
9    A    Again, that's not my wording. That's my
10   lawyer's wording. So when you ask me if you are a
11   supermajority, I told you I don't understand what
12   supermajority versus majority.
13   Q    Okay.
14   A    It's majority, yes.
15   Q    Okay.
16   A    What's supermajority, I don't know.
17   Q    So, Mr. Alubbad, your testimony here
18   under oath is that you signed this document
19   without understanding the wording of what you were
20   signing; is that what you're saying?
21   A    Again, I signed this document, okay, but
22   I did not see this document.

65

1    Q    You signed it without seeing it?
2    A    No.  I signed the last page, but, again,
3 I haven't had a chance to read everything you're
4 giving me here in order to make sure these are my
5 wordings, okay.
6    Q    Paragraph 5, is there anything about
7 Paragraph 5 that is not your wording?
8    A    I mean, supermajority.  I never used the
9 word supermajority, you know.  If you're going to
10 sit and think about the word supermajority, if
11 75 percent is majority, it's called supermajority,
12 that's fine.
13    Q    Please turn with me to the next page.
14    A    What page number?
15    Q    Page 4.
16    A    Okay.
17    Q    Do you see in Paragraph 7 where you
18 wrote, I have always had authority to act on
19 behalf of MIT as a managing member since the
20 inception of MIT to the present.  Do you see that
21 there?
22    A    Okay.

66

1    Q    Is that correct?
2    A    I think.  Yeah, I see it.
3    Q    Is that correct?
4    A    Yeah, it is correct.  I guess, maybe it
5 means because I'm the majority, you know.
6    Q    You guess?  You don't know?  You don't
7 know the --
8    MR. MILLS:  You're asking him for a
9 legal conclusion.  I object.
10    MR. HENSON:  You can object to form, but
11 no argumentative or suggestive --
12    MR. MILLS:  It's not.
13    MR. HENSON:  It's very argumentative.
14    MR. MILLS:  It's not.
15    Q    Mr. Alubbad, have you -- did you
16 understand yourself to have authority to act on
17 behalf of MIT?
18    A    Yes.
19    Q    And at the bottom of Paragraph 8, the
20 sentence that carries over --
21    A    Page 8?
22    Q    Paragraph 8, the bottom of Page 4.

67

1    A    Okay.
2    Q    There's a sentence here that I've
3 highlighted that I would like your opinion on.  Do
4 you see where you wrote, I have continuously been
5 the only person that can act on behalf of MIT
6 unilaterally since the initial agreement; do you
7 see that there?  Did I read that correctly?
8    A    That's what's written.
9    Q    And is that true, Mr. Alubbad?
10    A    I don't know the meaning of it.
11    Q    What don't you understand?
12    A    I mean, if you're asking me, did I write
13 this?  No, I didn't.
14    Q    You signed it saying it was true under
15 the penalty of perjury; correct?
16    A    Well, you know, again, like I said to
17 you, I did not see this document before, okay?
18 I'm just now seeing this document.
19    Q    This is the first time that you've seen
20 the document that you signed under penalty of
21 perjury?
22    A    Again, I am telling you that's my

68

1 answer.  I just saw this document.
2    Q    Can you answer the question, please?
3 Are you saying that this is the first time you've
4 seen the document --
5    MR. MILLS:  Asked and answered.
6 Objection.
7    Q    -- that you signed under penalty of
8 perjury?
9    A    Again, I just -- I'm telling you I'm
10 just seeing this document.
11    Q    Okay.  Is this the first time you've
12 seen it?
13    A    It's the first time I've seen this
14 document.
15    Q    Ever?
16    A    Yes.
17    Q    Okay.  Is it true that you believed that
18 you had the unilateral authority to act on behalf
19 of MIT?
20    A    As the majority member of the company,
21 it was always agreed, no decision to be made
22 without coming to me first.  So if that's how it

69

1 means, then, this is correct.
2    Q   Did you believe that you could do
3 whatever you wished as it related to how MIT was
4 managed?
5    A   Well, that's a wide question, okay?  No.
6 I mean, my -- whatever decision has been made, it
7 is within the scope of the operating agreement
8 that is written between me and the other member.
9    Q   I'm not asking you about the operating
10 agreement.  I'm asking about how you perceived
11 your own authority?
12    A   No.  My own authority was always within
13 the scope of the operating agreement.
14    Q   So you do not believe that you had the
15 authority to act on behalf of MIT unilaterally?
16       MR. MILLS:  Object.
17    Q   Is that what you're testifying?
18       MR. MILLS:  Object to the form and
19 foundation.
20    A   Within the scope of the operating
21 agreement.
22    Q   Did you have the authority -- did you

70

1 perceive yourself to have the authority from
2 August 2013 until December 2023?  Did you perceive
3 that you had the authority during that period of
4 time to terminate Tim Clemente as president?
5    A   From 2013?
6    Q   From the inception of the company until
7 he was actually terminated.  You possessed the
8 power to terminate him; correct?
9    A   If the other member violated the terms
10 of the agreement, yes.
11    Q   I'm not asking about specific
12 circumstances.  I'm asking, you understood that
13 you possessed the authority to terminate
14 Mr. Clemente as president, based upon your
15 membership interest; correct?
16    A   This is, I believe, within the right of
17 the operating agreement is written, okay, that as
18 the majority holder of the company, okay, if the
19 other member fails -- failed his duty and violated
20 his fiduciary duty and his loyalty to the company,
21 then he would be terminated.
22    Q   I'm not asking about the circumstances.

71

1 I'm asking about the authority in general.
2    A   Tim Clemente was terminated in
3 December 2023.
4    Q   Correct.
5    A   Tim Clemente was not terminated from
6 2013 until 2023.  So I don't understand your
7 question.
8    Q   He remained president from the inception
9 of the company --
10    A   Until 2023; until he was terminated.
11    Q   Okay.  And he was terminated by your
12 written consent; correct?
13    A   That's correct.
14    Q   You offered the written consent?
15    A   My lawyer wrote the letter.
16    Q   On your behalf?
17    A   On my behalf, yes.
18    Q   And you could have done that at any
19 point earlier as well; correct?
20    A   Well, I mean, if it was required, you
21 know, then, yes.
22    Q   When MIT was formed, there was only one

72

1 officer role that was created; correct?
2       MR. MILLS:  Object to the form.
3    A   No.
4    Q   The president was the only officer that
5 was explicitly identified in any corporate
6 documents; correct?
7    A   Yeah.  He was -- he was the appointed
8 president, you know, when we set up the operating
9 agreement, yes.
10    Q   And let's take a look at the operating
11 agreement.  I will introduce this as Exhibit 6.
12       (Exhibit 6 was marked for identification
13 and is attached to the transcript.)
14       MR. MILLS:  We've been going a little
15 over an hour.  Is it okay if we take, like, a
16 five-minute break?
17       MR. HENSON:  That's fine.
18       THE VIDEOGRAPHER:  We are going off the
19 record.  The time is 11:23 a.m.
20       (Whereupon, a recess was taken.)
21       THE VIDEOGRAPHER:  We are back on the
22 record.  The time is 11:31 a.m.

73

1  BY MR. HENSON:
2     Q   Mr. Alubbad, we're back on the record
3  after a short break.  We were discussing the
4  officers of MIT.  And I placed before you what's
5  been marked as Exhibit 6 to this deposition.
6         Do you recognize this document?
7     A   Yes, sir, I do.
8     Q   And what is this document?
9     A   It's the operating agreement.
10    Q   It's MIT's operating agreement?
11    A   That's correct.
12    Q   And so the effective date -- so you can
13 see the very first paragraph on the first page,
14 which is MIT 6153, it says that it was executed on
15 October 7th, 2013; correct?
16    A   Okay.  That's correct.
17    Q   And it was made effective as of
18 August 5th, 2013; correct?
19    A   That's correct.
20    Q   And if you'll turn to MIT 6536.
21    A   Okay.
22    Q   Is this your signature here, Fahmi

74

1  Alubbad?
2     A   Yes.  Yes.
3     Q   Signing as authorized representative of
4  F2E Holdings, LLC?
5     A   Yes, sir.
6     Q   And is Mr. Tim Clemente's signature next
7  to it?
8     A   That's correct.
9     Q   Please turn to MIT 6538.
10    A   Okay.
11    Q   Do you see this is a written statement
12 of organization?  You see that there at the top?
13    A   Yes.
14    Q   And on the next page there's the
15 signature of both yourself and Mr. Clemente; is
16 that correct?
17    A   That's correct.
18    Q   That's MIT 6539?
19    A   That's correct.
20    Q   Okay.  Turning back to MIT 6538, can you
21 see where it says management in bold, underlined?
22    A   Yes, I see.

75

1     Q   The company shall be managed by the
2  members; do you see that?
3     A   That's correct.
4     Q   And then officers is immediately below
5  it?
6     A   I see it, yes.
7     Q   Timothy Guy Clemente is hereby elected
8  as the president of the LLC to serve until his
9  resignation or removal; do you see that there?
10    A   Yes, sir.
11    Q   And the president shall have the
12 authority to act only as approved by the members;
13 you see that there?
14    A   Yes.
15    Q   Sitting here today, are you aware of any
16 other officer position that was created in the way
17 in which we see Mr. Clemente's election as
18 president?
19    A   No.
20    Q   Mr. Clemente was the only one who
21 obtained his title through this formal process;
22 correct?

76

1     A   Well, yeah.  According to this document,
2  yes.
3     Q   And but -- as we've just discussed, you
4  assumed a title that was not created by this
5  process when you used the title of director of
6  marketing; correct?
7     A   Again, this was discussed with Tim.
8  That was my role, to do the marketing.  We don't
9  have a document exactly like this there to say,
10 you know, Fahmi Alubbad, director of marketing.
11    Q   You did not do a written consent to
12 create that job title; correct?
13    A   No.
14    Q   Did you understand the scope of
15 Mr. Clemente's authority as president to require
16 consent from F2E for anything?
17    A   Yes.  Everything has to be approved by
18 the majority members.
19    Q   So you understood his role as president
20 to require approval for everything he did?
21    A   That's correct.
22    Q   And if you could speak up a little bit,

**77**

1  Mr. Alubbad?
2      A   Yes.  I said that's correct.
3      Q   Okay.  So what could Mr. Clemente do
4  without approval as president?
5      A   What's the things he can do without
6  approval?
7      Q   Yes, sir.
8      A   Yeah.  Run day-to-day of the company,
9  okay, and basically make sure he is available, you
10 know, to run the business, okay, be available, you
11 know, to meet with the clients, okay, do whatever
12 he agreed to do, the marketing.
13     Q   And I'm asking a slightly different
14 question about his authority as president.  Could
15 he incur charges on behalf of MIT without talking
16 to you first?
17     A   Yes, but with a limited amount.
18     Q   And what's the limit?
19     A   I think we discussed it.  At the
20 beginning, we did not have this discussed.  But at
21 later stage, I told him he was not authorized to
22 make any financial commitment above, I think -- I

**78**

1  have to remember this correct.  I'm not really
2  sure.  I have to look at the document, because I
3  sent him a document.  My lawyer draw a document
4  for him.  Was it 5,000 or $500?  He couldn't make
5  any commitment without basically discussing it
6  with me.
7      Q   Okay.  So it's your understanding that
8  Mr. Clemente's authority as president was limited
9  to incurring only 500 or $5,000.
10     A   Yes.
11     Q   Anything higher required F2E's approval?
12     A   That's correct.
13     Q   And sitting here today, can you -- what
14 document references that?
15     A   My attorney, my corporate attorney, made
16 that document to Tim Clemente, and Tim Clemente
17 never signed it.
18     Q   Okay.  And who is your corporate
19 attorney?
20     A   David Marko.
21     Q   And that was F2E's attorney?
22     A   That's the attorney who made the

**79**

1  agreement, the operating agreement.
2      Q   Okay.  And did Mr. Marko represent F2E?
3      A   He's the one that did also that F2E, the
4  company.  Set up the company F2E also.
5      Q   Okay.  So he represented both?
6      A   Yeah.  You can say that.
7      Q   Okay.  And so -- but Mr. Clemente never
8  signed this document drafted by Mr. Marko?
9      A   Yes.
10     Q   And what was the name of the document?
11     A   Again, I don't recall.  But I'm -- I
12 think, if I'm not mistaken, and I have to check
13 with my lawyer.  I think we produced that
14 document.
15     Q   Okay.  What year was it created?
16     A   I had problems with Tim when he was
17 basically claiming in e-mails to me that he spent
18 hundreds of thousands of dollars.  But
19 Mr. Clemente always failed to provide receipts.
20 So I didn't want any commitment made, you know,
21 that he is putting the company at risk and
22 basically saying he spent this money.

**80**

1      So I say to him, No.  And I remember,
2  you know, in 217, we had a discussion, okay, a
3  very harsh discussion, where I told him he is no
4  longer authorized to make any commitment.  And I
5  think that's in December 217.  Now, you know, I'm
6  trying to remember the exact date.
7      Q   Okay.  And this document that was
8  created, was it a written consent on behalf of
9  MIT?
10     A   Yeah.  It was -- a legal document was
11 made by my lawyer.
12     Q   But Mr. Clemente never agreed to it?
13     A   Mr. Clemente did not sign it.
14     Q   And sitting here today, do you have any
15 reason to believe Mr. Clemente agreed to it?
16     A   Yes, he agreed to it.  Because since
17 then, he did not make one single thing.
18     Q   He did not make one single thing?
19     A   One single purchase or decision
20 financially without coming back to me.
21     Q   Okay.  So you presented a document to
22 Mr. Clemente, and it said his authority is

81

1  restricted?
2  **A    That's correct.**
3  Q    Mr. Clemente didn't sign it?
4  **A    Did not sign it.**
5  Q    And yet you think that he agreed to it
6  nevertheless?
7  **A    Yes.  Because I'm the one who writes the**
8  **check.**
9  Q    Okay.  Do you have any other basis for
10 believing that Mr. Clemente agreed to this
11 document that you're referencing?
12 **A    Mr. Clemente has the habit of receiving**
13 **document and not signing it.  So there is another**
14 **document, but you're asking me specifically for**
15 **this.  I am answering you with this, that this**
16 **particular document, he did not sign.**
17     MR. HENSON: I'd like to make a request
18 on the record.  If this document has not been
19 produced, that it would be produced.
20     MR. MILLS: Okay.  If it hasn't, then,
21 you know, we'll take a look at it.
22     MS. LEGRAND: It hasn't.

82

1      MR. MILLS: Your knowledge is that
2  encyclopedic?
3      MS. LEGRAND: Uh-huh.
4      MR. MILLS: Okay.  Mine is not.
5  Q    Now, Mr. Clemente told you -- so you had
6  a -- would it be fair to say you had a relatively
7  narrow view of what Mr. Clemente's authority was
8  to act independently in 2019?
9  **A    Again, I don't understand the meaning of**
10 **you.  What do you mean?**
11 Q    Well, he needed to confer with you about
12 a lot of matters; correct?
13 **A    Yeah.  At the beginning, he had carte**
14 **blanche, where he was doing whatever he want,**
15 **okay, until 2017.  Things have changed.  So I hope**
16 **this answered your question.**
17 Q    So he had carte blanche to incur
18 expenses up until 2017?
19 **A    I mean, basically within limitation.**
20 Q    What limitation?
21 **A    Limitation that it's needed, basically.**
22 **You know, he always does this stuff, like, say,**

83

1  **Oh, I did marketing, I printed catalog, I did**
2  **this, I did this.  Okay.  And Fahmi, I am short of**
3  **money; I sent money.**
4  **And his duty as the president was**
5  **supposed to keep receipts for everything he**
6  **purchased, everything he does.  And to this date,**
7  **to this date, I don't have a single receipt.**
8      Q    Okay.
9  **A    And I was basically avoiding any**
10 **confrontation because he's a friend; he's my**
11 **partner.  I was just basically writing the check.**
12 **Fahmi, we needed this, Fahmi, we needed this.  No**
13 **problem.  How much do you need?  I write the**
14 **check.  Only until 217.**
15 Q    All right.  And so what happened in 2017
16 that caused you to end the carte blanche authority
17 that you'd allowed Tim to possess?
18 **A    In December 217, we had an argument**
19 **after the Milipol, and it's all written, and it's**
20 **been produced you guys.  You guys have seen it.**
21 **Tim made a decision that caused lots of**
22 **problems for the company, and, basically, I made**

84

1  **the decision inviting -- I told him he is no**
2  **longer okay to make any decision on behalf of MIT**
3  **without checking with me first.**
4  Q    Okay.  And that's around the time that
5  you believe you got Mr. Marko to draft that
6  document that you were mentioning?
7  **A    Yes, sir.**
8  Q    Now, Mr. Clemente told you that he had a
9  broader understanding of his authority as
10 president, didn't he?
11     MR. MILLS: Object to the foundation.
12 **A    I really don't understand the question.**
13 **When did he tell me this?**
14 Q    I'm going to be showing you what's been
15 marked as Exhibit 7.
16     (Exhibit 7 was marked for identification
17 and is attached to the transcript.)
18 Q    For the record, this is MIT 6829 through
19 6834.  It appears to be e-mail correspondence
20 beginning in November 30th, 2017, and ending
21 December 5th, 2017; Is that correct, Mr. Alubbad?
22 **A    That's correct.**

**85**

1    Q    Is this the argument that you were
2  referencing?
3    A    That's correct, yes.
4    Q    And so it's in this e-mail
5  correspondence were you purported to remove
6  Mr. Clemente's authority as president; is that
7  right?
8    A    No.
9        MR. MILLS:  Object to the form and
10 foundation.
11   Q    Well --
12   A    Please show it to me.  Where does it
13 say?
14   Q    Let's look at MIT 6834.  Do you see a
15 December 1, 2017, e-mail at 1:10 p.m.?
16   A    Yeah, I see it.
17   Q    And you wrote, You're no longer
18 authorized to make any executive decisions on
19 behalf of MIT; is that right?
20   A    That's correct.
21   Q    And so did you understand this e-mail to
22 be a formal act of the company?

**86**

1    A    It means what?
2    Q    Were you purporting to make a formal act
3  of MIT by sending this e-mail?
4    A    Yes.
5    Q    So as of the date of this e-mail,
6  Mr. Clemente did not have authority to make
7  executive decisions?
8    A    No.  That's not true.  I asked him,
9  because we were having problem in 217, and he was
10 making the wrong decision and putting the company
11 in jeopardy, okay?  And I asked him, you know -- I
12 was really upset when I wrote him this e-mail, and
13 I basically told him he is no longer to make any
14 executive decision on behalf of the company, okay,
15 without coming back to me.
16   Q    That's what you wrote, isn't it?
17       MR. MILLS:  Object to the form.
18   A    Yeah.  I mean, that's basically what I
19 meant, when I say to him, you cannot make an
20 executive -- Mr. Henson, you cannot -- you have to
21 read though whole entire e-mail.  You cannot use
22 one word and tell me I said this.  You need to

**87**

1  look at the whole e-mail.
2        What caused the problem?  Don't look at
3  the last sentence.  This is not going to work with
4  me.  Listen to me.  I like to be very clear and
5  honest when I deal with anybody.  When I wrote
6  this e-mail, I wrote this e-mail because -- you
7  can ask me.  I know this vividly.  You can ask me
8  why I wrote this e-mail, and I will tell you,
9  without looking at this document, what caused me
10 to write this document.
11       Tim lied to me.  Tim lied to me about
12 the vehicle.  Tim made a bunch of lies, and then
13 basically, when I -- when he got caught in lying,
14 and basically, when I told him.  I said, you know what?
15 You're no longer making any decision.
16       Because he was my partner making that
17 decision, and I told him, No, you cannot make any
18 decision without checking with me first.  And
19 that's what I meant.  And he continued to be the
20 president until he was removed in December 2023.
21   Q    So through this e-mail, it's your
22 testimony that you were requiring him to make all

**88**

1  future executive decisions first by conferring
2  with you; is that right?
3    A    1,000 percent.
4    Q    Every single one?
5    A    Every single one.  From what happened in
6  December 217.
7    Q    Okay.  Now, turn, in the same e-mail
8  correspondence here, please turn to Bates MIT
9  6832.
10   A    Okay.
11   Q    Do you see where Mr. Clemente wrote back
12 to you on December 2nd, 2017?
13   A    Yeah, I see it.
14   Q    And the e-mail starts, Fahmi, I returned
15 home late last night, and I received you e-mail
16 [sic].  Do you see on the third paragraph here,
17 the first sentence says, You do not order me to do
18 anything because you cannot order, in quotations,
19 me to do anything.  You can act as a friend and a
20 colleague and make suggestions and provide advice,
21 but I am performing the duties of the president of
22 MIT, per our operating agreement, which me grants

89

1  me, and only me, the authority to do so; do you
2  see that there?
3      A    Yes, I see it.
4      Q    Did I read that correctly, Mr. Alubbad?
5      A    That's what Tim said.
6      Q    Yes.
7      A    You read it correct.  Tim's wording, not
8  mine.
9      Q    I understand.
10     A    Okay.
11     Q    And did you agree with Mr. Clemente's
12 apparent understanding of his authority?
13     A    No.
14     Q    You didn't agree?
15     A    What he said here is completely wrong.
16 Show me where in the operating agreement it gives
17 Tim the right to make a decision and only him.
18     Q    So is it fair to say you were perturbed
19 by his e-mail response?
20     A    No.  No.  Because this is usual with
21 Tim.  Tim always make a thing of lies and
22 accusations about a bunch of stuff, and I have to

90

1  basically respond immediately to him, because if
2  you've seen all my e-mails, I always respond to
3  him.
4      Q    So Tim regularly makes lies all the
5  time?
6      A    100 percent, yes.
7      Q    And, I mean, how long has that been
8  going on?
9      A    Oh, from -- I tell you what.  At the
10 beginning, when we started the company in 213, I
11 think I was naïve enough to believe everything he
12 told me.  But now with everything released, with
13 all the documents, the guy has been lying to me
14 from day one.
15     Q    And you believe that he was lying in
16 this e-mail to you?
17     A    I am -- you're asking me about what he
18 said.  He said that he is performing his duty as
19 the president, according to operating agreement,
20 which grant him, only him, the authority.  Your
21 asking me about this.  I am giving you my answer
22 that basically what he wrote is completely not

91

1  true.  Because the operating agreement does not
2  give, you know, Mr. Clemente the right to make the
3  decision, and he is the only guy who makes the
4  decision.
5      Q    And so you've testified that you
6  disagree with his characterization of his
7  authority?
8      A    Yes.
9      Q    Right?
10     A    And I believe this is my response.
11     Q    And what did you do about it?
12     A    Nothing.  I basically responded.
13 Everything in this e-mail, okay, and you will see
14 with the work how I do my business.  When you
15 write me something and you accuse me of something,
16 I am the kind of person that will write to you
17 back, okay, and tell you on the record.  Because
18 for me, I want to make sure we set things clear.
19 He said this to me.  I wrote back to him.  And you
20 can -- let's go back to what I wrote to him.
21     Q    Were you referring to something in
22 particular?

92

1      A    Yeah.
2      Q    Mr. Alubbad, I'm just trying to move
3  along.  Do you know -- are you referring to any
4  particular part of that e-mail that you wanted to
5  discuss?
6      A    Yes.
7      Q    Well, what is it?
8      A    Can you give me a minute, please?  I'm
9  reading.  Okay.  Let's look at Page 4, MIT 6832.
10 And I read -- I said, With regard to the operating
11 agreement, please show me where it grants the
12 president or anyone, for this matter, the sole
13 authority, you and only you, to make a decision.
14 If you want to go that route, Tim, then you need
15 to find someone to buy me out and repay me for all
16 my expenses and time.  Then you can make all the
17 decisions you want on your own.  As a partner, you
18 owe me the courtesy and respect to discuss things
19 with me, the same way I do with you before making
20 any decision on your own.
21     Q    Now, you didn't remove Tim Clemente as
22 president as a result of this e-mail, did you?

93

1      A    No.  This wasn't intended for
2  Mr. Clemente to be removed.
3      Q    And you didn't issue a written consent
4  clarifying his authority as president, did you?
5      A    No, no.  I mean, the e-mail is very
6  clear, okay?  He was not removed as the president.
7  As I testified earlier, he was removed December
8  '23.
9      Q    But you had the authority at this moment
10 in time to remove him as president, if you had
11 chosen to?
12     A    Yeah.  If I chose, yes.
13     Q    But you didn't choose that?
14     A    No.
15     Q    Did you do anything, other than respond
16 to his e-mail, to address his assertions of
17 authority that you disagreed with?
18         MR. MILLS:  Object to the form.
19     A    Again, you have to be more specific.
20 What do you mean?
21     Q    You said you responded to this e-mail?
22     A    Yes, I responded, and he responded, and

94

1  that's it.
2      Q    So he asserted a level of authority that
3  you disagreed with.  You responded to his
4  authority, and you noted your disagreement, right?
5      A    Yes.
6      Q    And I'm asking you, did you do anything,
7  other than respond to his e-mail to check the
8  authority that he was claiming to possess?
9          MR. MILLS:  Object to the form.
10     A    I think — I don't recall if there was
11 anything happened after this [sic].
12     Q    Okay.  So Mr. Clemente remained
13 president, and for many years, after this e-mail
14 was written, despite telling you that he
15 understood his authority as president was much
16 broader than you believed, right?
17         MR. MILLS:  Object to the form.
18     A    Again, he was the president until he was
19 removed December 2023.
20     Q    So yes?
21         MR. MILLS:  Objection.
22     A    He was the president.

95

1      Q    Is it correct that you were expecting
2  Josh Clemente to send you an NDA to him in August
3  of 2013?
4      A    Could you please ask the question again?
5      Q    In August of 2013, is it correct that
6  you were expecting Josh Clemente to send you a
7  nondisclosure agreement that he had signed?
8      A    The way it happened, okay, Tim Clemente
9  -- I didn't know Josh.  Tim Clemente -- when we
10 started the company, I was under the impression we
11 were going to be 50/50.  Tim said, No, I don't
12 have money, Fahmi; I want to, you know, just have
13 a small percentage.
14         And I said, What?  And it was Tim, from
15 his own mouth, he wanted to be 20 percent and I am
16 80 percent.  And then I immediately contacted the
17 attorney who drafted the operating agreement,
18 80/20.
19         When Tim received it, Tim called me that
20 evening.  And he said, Fahmi, you know, I'm
21 thinking to ask my son, Josh, to assist me because
22 Josh is an engineer, and I am not an engineer.

96

1  Can you please change the operating agreement and
2  make it 25/75, where this way, the 5 percent, I
3  can pay Josh.  And that time, also he mentioned to
4  me about another friend of his.  His name is Ken
5  Fournier, and he wants me to meet him.
6          Anyway, to make it short for you, sir, I
7  said, Okay.  Called my attorney again, and I said,
8  Please redo the operating agreement.  He did the
9  operating agreement, which was sent to Tim.
10         When Tim mentioned to me that his son is
11 going to be involved, I said, Make sure anybody
12 who gets involved has to be under NDA.  So I sent
13 him my NDA, and then Tim told me in an e-mail that
14 he already sent it to him and to his roommate,
15 Wes.  And, you know, they are filling it and
16 sending it to me.  So basically, I said, Okay.
17 And then the next thing, he sent me an invoice,
18 that his son and his roommate that they were on.
19 So that's how it happened.
20         But I didn't know Josh.  I didn't speak
21 to Josh.  I don't know what was said to Josh.  So
22 that's the event.

97

1    Q    Okay.  I believe -- again, if we could
2  refer back to Exhibit 2.  I believe it's the
3  amended first amended complaint.
4    A    This one?
5    Q    Yes, sir.  I believe so.
6    A    Okay.
7    Q    If you could please turn to Paragraph
8  23.  Well, actually, I'm sorry.  Before I get
9  there, just do you recognize this document?
10   A    Yes.
11   Q    And you understand that this is the
12 complaint that you filed on behalf of MIT?
13   A    Yes.
14   Q    Did you review this document --
15   A    Yes.
16   Q    -- before it was filed?  And were there
17 any inaccuracies that you noted throughout?
18   A    I don't recall.
19   Q    You don't recall?
20   A    Yeah, I don't recall.
21   Q    But you reviewed it; correct, before you
22 filed it?

98

1    A    I believe so.  This was a while back.
2    Q    Okay.
3    A    I reviewed many documents.  So you know
4  what?  I --
5    Q    So I'd like to ask about Paragraph 26.
6  If you could please turn --
7    A    What page?
8    Q    It might be on a slightly different
9  page?
10   A    26?
11   Q    26, sir.
12   A    26.
13   Q    Do you see where it's written, On or
14 about August 7, 2013, Tim reported to Alubbad that
15 Josh was filling out the nondisclosure and
16 non-circumvention agreement and will e-mail the
17 signed copy back to you; do you see that there?
18   A    Yeah.
19   Q    Is that correct?
20   A    Yes.
21   Q    So you were expecting Josh Clemente to
22 send the NDA back to you?

99

1    A    I expected him to send it to me, or I
2  expected him to send it to Tim and Tim send it to
3  me.  So --
4    Q    Well, Tim -- I mean, the allegation here
5  is that Tim told you that Josh would be sending
6  the NDA to you; correct?
7    A    Yes.
8    Q    And did that happen?
9    A    I did not receive anything from him,
10 okay?  And I believe Tim told me that they're
11 sending the NDA to him.  So in 213, okay, he send
12 the NDA.  I did not send the NDA.  So because he
13 send the NDA, you know, they were supposed to send
14 it back to him and he send it to me.  So -- or
15 they send it directly to me.  I did not receive
16 it.
17   Q    You did not receive it?
18   A    No, I did not.
19   Q    And what did you do about that?
20   A    Actually, you know, to be honest with
21 you, I don't remember, you know, for me checking.
22 When we started the company, I was asked to do

100

1  many things, okay?  And I was doing a bunch of
2  stuff that Tim is asking me.  Tim is doing a bunch
3  of stuff.  And we were like stepping on top of
4  each other.
5        For example, you know, we're setting up
6  the company.  He told me at the beginning, the
7  company is going to be called, not Mission
8  Integrated Technologies, Elevated something.  And
9  then we incorporated the paper.  Then he came back
10 and he said, No.  We changed the name.
11       And then, the other thing, you know,
12 when he gave me that name, I went and I bought,
13 you know, from GoDaddy, some site, and then Tim
14 went and bought some.  And then in his e-mail to
15 me says, I guess we are going so fast we're like,
16 you know, stepping on each other.  So this is what
17 really happened.
18       And to be honest with you, since he was
19 the one to send the NDA to Josh and to his
20 roommate, I expected him, you know -- that he is
21 getting the NDA.
22   Q    Okay.  So did I hear you -- that was a

101

1  long answer, and I don't think it was directly
2  responsive. I want to go back to my question.
3        Did I hear you say that you don't
4  remember checking whether or not you had received
5  the NDA from Josh?
6     **A   Yeah. I don't remember receiving**
7  **anything from Josh.**
8     Q   Do you remember checking?
9     **A   And when you say checking, I don't have**
10 **an NDA from Josh.**
11    Q   Okay. But you were expecting one; you
12 testified to that?
13    **A   I expected one to be signed, that Tim**
14 **say to me that they're signing the NDA.**
15    Q   That's different than what's in the
16 complaint; would you agree?
17    **A   I mean, I don't know what the complaint**
18 **-- what is different.**
19    Q   Well, you've testified here that there
20 was an e-mail saying -- Paragraph 26, right? This
21 is the complaint that you authorized your
22 attorneys to file; correct?

102

1     **A   Okay.**
2     Q   Is that right?
3     **A   Yes.**
4     Q   And in Paragraph 26, you reference an
5  e-mail, or you're quoting something. I presume
6  it's an e-mail, right?
7     **A   Uh-huh.**
8     Q   Where Tim reported to Alubbad, which is
9  you, that Josh was filling out the nondisclosure
10 and non-circumvention agreement and will e-mail
11 the signed copy back to you.
12    **A   Again, there is an e-mail. I don't have**
13 **the e-mail in front of me. We can look at the**
14 **e-mail exactly what the wording that Tim wrote to**
15 **me, okay? So maybe Rebecca, she has it.**
16    Q   Well, I mean, I won't ask you about your
17 pleadings right now.
18    **A   Again, I explained to my attorney what**
19 **the e-mail basically said. That's an e-mail that**
20 **Tim sent to me.**
21        MR. MILLS: Don't talk about what you
22 wrote.

103

1     **A   Yeah.**
2     Q   So sitting here today, you don't
3  remember whether or not you'd checked to see if
4  you had received the NDA from Josh?
5        MR. MILLS: Asked and answered.
6     **A   I didn't. I don't have an NDA from**
7  **Josh.**
8     Q   But you don't recall checking whether or
9  not you'd received it; is that right?
10    **A   No. Again, it was Tim supposed to get**
11 **me the NDA. He's the one who send it to them.**
12 **And then, when documents -- they were released**
13 **this time, Josh released a document that basically**
14 **received from his dad, and his telling him, you**
15 **know -- because I wasn't. Because when Tim sent**
16 **the NDA, I wasn't copied on it. Josh released a**
17 **document, and I get to see it, that basically Tim**
18 **said, I want each one of you to sign separate from**
19 **the NDA.**
20    Q   Okay.
21    **A   And send it back to him. So this is an**
22 **e-mail that was produced by Josh.**

104

1     Q   Okay. And I --
2     **A   You can ask --**
3     Q   I need you to testify from your own
4  perception.
5     **A   For me, there is an e-mail from Tim to**
6  **me that basically says that he sent the NDA.**
7     Q   Okay. It's your testimony that you
8  don't recall checking; is that right?
9        MR. MILLS: Object. Object to the
10 foundation.
11    **A   Again, like I said to you, the NDA was**
12 **supposed to be signed by Josh and sent to Tim; Tim**
13 **send it to me. Now, if he --**
14        MR. HENSON: Let the record reflect the
15 witness is refusing to answer the question.
16    **A   No. If he told him to send it to me and**
17 **he did not send it, no. I don't have an NDA from**
18 **Josh.**
19    Q   Okay. I'm going to ask -- just so the
20 record is clear, I'm going to ask the question one
21 last time, because you refuse to answer.
22    **A   No. I --**

---

105

1       MR. MILLS:  Objection.  You're badgering
2   the witness.
3       MR. HENSON:  I'm not.
4       MR. MILLS:  You are.
5       MR. HENSON:  I want to make sure the
6   record is clear.
7       A   I answered you.
8       Q   Okay.  And you said you don't recall
9   checking whether or not --
10      MR. MILLS:  You don't have to answer.  I
11  instruct him not to answer.  Please move on.
12  Please move on.  You've asked him 15 times.  He's
13  given the answer.
14      MR. HENSON:  He has refused to answer
15  the question.
16      A   No, I did not.
17      MR. MILLS:  The record reflects what it
18  reflects.  Move on.
19      MR. HENSON:  So Mr. Mills has instructed
20  his witness to not answer.
21      MR. MILLS:  He's being badgered.  So
22  move on.

---

106

1       MR. HENSON:  We will be taking this up
2   later.
3       MR. MILLS:  Sure.
4   BY MR. HENSON:
5       Q   You knew that there was no-- you knew
6   that there was an NDA missing from Josh Clemente
7   as early as 2018, right?
8       A   As early as what?
9       Q   As early as 2018, you knew it was
10  missing; correct?
11      A   You know what?  I remember in 217, when
12  Josh came into my office with his dad, and he
13  refused an offer to work as full-time for the
14  company.  I asked him for the NDA.  I said, I need
15  a copy of your NDA.  But I remember I have asked
16  Tim repeatedly on many occasions about giving me
17  the NDA.  There was e-mails, e-mails.  There was
18  also -- my attorney did write to him and ask him
19  for the NDA in 218, 219, 217.  There was numerous
20  times.
21      Q   And I'm -- I think you're getting right
22  at what I'm asking, which is, in 2017, when you

---

107

1   had this -- December 2017, when you had this
2   conversation with Mr. Josh Clement Clemente --
3       A   Yes.
4       Q   -- you said you asked for the NDA in
5   that meeting after Milipol, right?
6       A   Yes.  Because I have asked his dad
7   before for the NDA, and Tim's answer was always to
8   me that his wife spilled the water on his
9   computer, and it fried his computer, and, you
10  know, maybe I can call Geek Squad, and making me
11  all these lies [sic].  So you know what?  And I
12  said, Okay, that's fine.  You know.
13      He said, But let me check, and I will
14  get back to you.
15      Q   And so you are -- you think it's a lie
16  that the computer was -- Tim Clemente's laptop was
17  broken?
18      A   You know what?  I don't know.  That's
19  what he told me.
20      Q   Well, you said it was a lie.
21      A   Because -- you know why?  Because if
22  your computer is fried, you still can access your

---

108

1   materials, you know.  I mean, what's the computer
2   got to do with the, you know -- he has all the
3   record in his AOL or whatever, you know.  So he
4   can access it.  The e-mails are not going to be,
5   you know, dissolved or completely evaporate.  So
6   basically, that is his story.  And later on we
7   find out it's nothing but a lie.
8       Q   And when did you find that out?
9       A   In 2022, when Josh threw his dad under
10  the bus and told the attorney that, No, I never
11  sign an NDA.  That was the first time I learned
12  that Tim has been lying to me.
13      Q   Didn't Mr. Clemente, Tim Clemente, tell
14  you in 2019 that he didn't know if Josh Clemente
15  had, in fact, signed the NDA?
16      MR. MILLS:  Object to the foundation.
17      A   No.
18      Q   So sitting here today, you have no
19  recollection of any conversation with Tim Clemente
20  in 2019 where he told you that he did not know if
21  Josh Clemente had, in fact, signed an NDA?
22      A   No.  He always assured me that Josh had

109

1  an NDA signed.

2      Q   He always assured you?

3      A   He always assured me, but he just
4  couldn't find it, or, you know, his computer and
5  all that stuff.  Until 2022, in an e-mail with the
6  lawyers, going back and forth, and then this is
7  when Josh -- and then Tim replied.  When Josh
8  said, I never signed an NDA, then Tim stepped in
9  immediately.

10         He said, Well, I thought -- maybe I
11 could be wrong; I thought I signed an NDA.  That
12 was all in e-mails in writing in 2022.

13     Q   Sitting here today, it's true, isn't it,
14 that MIT does not have a copy of any nondisclosure
15 or non-circumvention agreement with Josh Clemente?

16     A   That's correct, sir.  We don't have.

17     Q   And it does not have a work-for-hire
18 agreement with Mr. Josh Clemente?

19     A   We don't have.  This was the
20 responsibility of Mr. Tim Clemente to make sure,
21 you know, there was an NDA and work for hire with
22 every person who get involved with MIT.

110

1      Q   And so there's no agreement of any kind
2  with Josh Clemente and MIT; is that right?

3      A   To my knowledge.  Maybe there is with
4  Tim that he hasn't produced, but I have not seen
5  anything.  As of today, I have not seen any
6  document.

7      Q   Okay.  And speaking specifically for
8  MIT's corporate designee --

9      A   I have not seen.

10     Q   -- you're not aware of any document?

11     A   I have not seen any document.  But now,
12 maybe Tim has that.

13     Q   Okay.  I'm not asking you to speculate.

14     A   Again, like I said to you, you're asking
15 me, I have not seen it.  But Tim was the president
16 until December of 2023.  Now, if Tim has the
17 document and has not produced it, like other
18 missing document he failed to produce until now,
19 it is possible.

20     Q   Was it your practice to --

21         MR. MILLS:  Could I ask you to back up?
22 You're kind of getting into this space a little

111

1  bit.  Just back up a little bit.

2         THE WITNESS:  Okay.

3      Q   Was it your practice to require anyone
4  who interacted with MIT to have a nondisclosure
5  agreement?

6      A   Yes, sir.  That's correct.

7      Q   In every instance?

8      A   In every instance.

9      Q   Had you ever signed a nondisclosure
10 agreement with MIT?

11     A   Me?

12     Q   Yes, sir.

13     A   No.  I'm a member.  I'm the majority
14 member of MIT.

15     Q   A company that you own is the majority
16 member?

17     A   Okay.  Yes.  But I don't have.  Does F2E
18 have an NDA with MIT?  No.

19     Q   No, no, no.  I'm not asking about F2E.
20 I'm asking about you, Mr. Fahmi Alubbad.  You have
21 never in your personal capacity signed an NDA or
22 non-circumvention agreement with MIT; is that

112

1  right?

2      A   That's correct, sir.

3      Q   We were discussing earlier Josh
4  Clemente, and I'd like to return to that topic and
5  talk a little bit more about him.  You met Josh
6  Clemente through his father, Tim Clemente;
7  correct?

8      A   That's correct.

9      Q   And he was described to you as a
10 mechanical engineer?

11     A   That's correct.

12     Q   And you understood that he worked for
13 SpaceX or Hyperloop, right?

14     A   At that time --

15         MR. MILLS:  Object to the form.

16     A   At that time, it was SpaceX.

17     Q   SpaceX.  And SpaceX is generally
18 regarded as a prestigious place for an engineer to
19 work, isn't it?

20         MR. MILLS:  Object to the form.

21     A   If that's your opinion, then, you know.

22     Q   I'm asking is that your opinion?

113

1  A  I mean, I don't have any opinion about,
2  you know, if it's prestigious or not.  I mean,
3  it's just a place of work, you know, so —
4  Q  And so Josh Clemente was -- MIT used
5  Josh Clemente's services instead of going out and
6  getting a professional engineering firm to do
7  services for MIT; is that right?
8  A  Please ask me the question again,
9  because I do not understand what you're saying.
10  Q  MIT engaged Josh Clemente to provide
11  engineering services, right?
12  MR. MILLS:  Object to the form.
13  A  MIT did not engage.
14  Q  It did not engage Josh Clemente?
15  A  Okay.  Now, if his father engaged him,
16  okay, that's his father engaged him.  You need to
17  ask his father.  Because for me, as I mentioned to
18  you and testified earlier, I never met Josh.  I
19  never asked Josh to do anything for MIT.  It was a
20  decision made by Tim Clemente, who is his father,
21  to bring his son to assist him.  This was his
22  exact words, to assist him.

114

1  Q  Okay.  And speaking as MIT's corporate
2  designee, your testimony is that Josh Clemente was
3  never engaged to provide engineering services for
4  MIT?
5  A  It was engaged on behalf of his father.
6  Q  And -- well --
7  A  His father was the president that time,
8  and he engaged his son.  So his father was
9  responsible for his son, okay?  What — you know,
10  to assist him, because that's what he explained
11  this to me [sic].  And what other details between
12  them, I don't know.
13  Q  Okay.  But -- and again, Mr. Tim
14  Clemente was the president of MIT?
15  A  That's correct.
16  Q  And you're speaking now on behalf of
17  MIT.  Are you denying that Josh Clemente was ever
18  engaged to provide services for MIT?
19  MR. MILLS:  Objection.  Asked and
20  answered.
21  A  Again, Josh was brought by his father,
22  okay, to assist him in the development of the

115

1  ARES.
2  Q  Did Tim Clemente have authority as
3  president of MIT to engage Josh Clemente?
4  MR. MILLS:  Object to the form.
5  A  Tim Clemente, okay, has the authority to
6  hire people, as long as they are all under NDA,
7  okay, and they have work for hire.  The same
8  thing, he has work for hire in the operating
9  agreement.  So —
10  Q  You're not answering the question.  I
11  want to go back to it.
12  A  Okay.
13  MR. MILLS:  Can I ask you to back up,
14  because you really are in this space right now,
15  Andrew?  Back up a little bit.
16  MR. HENSON:  I'm confused by this.  I
17  mean, we're --
18  MR. MILLS:  Could you slide over just a
19  little bit?  It's an easy ask.
20  MR. HENSON:  This is really distracting.
21  MR. MILLS:  It's an easy ask.  I'm not
22  trying --

116

1  MS. LEGRAND:  We're very far away.
2  MR. HENSON:  It's extremely distracting.
3  Please, there's no basis for this.  And I've
4  completely lost the train of my thought.  Please
5  do not do that again.
6  Q  MIT -- is it your testimony, as the
7  designee of MIT, that Tim Clemente did not have
8  the authority to engage Josh Clemente?
9  A  Again, okay, this is a fine line for me
10  because of my friendship and relationship with
11  Tim.  What do you expect me to tell my partner
12  when he wants to bring his son to help him, you
13  know?  His son is not somebody stranger to him.
14  It's his son.  So for me, he said he wants to
15  bring his son, okay?  I didn't say no to him.
16  Q  So you allowed it?
17  A  Yeah.  I never -- I never said no to Tim
18  because he said, Fahmi, I'm bringing Josh; he's my
19  son; he's an engineer; I'm not engineer; he's
20  going to assist me.
21  This is why he asked for the additional
22  5 percent to compensate.  What I'm trying to

117

1 explain to you, what decision, what agreement that
2 they both had, I wasn't aware.
3    Q    Okay.  So you were not aware of any
4 agreement that MIT had, through Tim Clemente as
5 president, with Josh Clemente; is that right?
6    A    Yes.  I'm not aware of what Tim Clemente
7 promised his son or explained to him or anything.
8 I was not aware of all this.
9    Q    Okay.  And, I mean, you're speaking on
10 behalf of MIT right now?
11    A    Yeah.
12    Q    Okay.  Is it correct that F2E, which is
13 you, preferred to engage a professional
14 engineering firm instead of Josh Clemente?
15    A    That's correct.  At the beginning -- so
16 we are clear, at the beginning, when Tim asked me
17 that we wanted to build this, I immediately said,
18 Tim, we need to engage a professional engineer.
19 You have this idea in your mind.
20       He showed me some preliminary sketch.
21 And I said, We need to.
22       And Tim said, No, Fahmi we need to keep

118

1 things close hold.  We need to -- we don't want
2 this idea to reach outside.
3       I said, But it's a lot easier if we go
4 to an engineering company, and then we give them
5 this, and they build it for us.
6       He said, No, we need to do it in-house,
7 and my son, who is an engineer, is going to help
8 me with it.
9       I went along.
10    Q    So at the beginning, you preferred to
11 engage a professional engineering firm, but you
12 didn't; correct?
13    A    You know, because he did not want.
14    Q    Okay.  So Josh was providing that
15 service in lieu of a professional engineering
16 firm?
17    A    That's what him and his dad, they were
18 supposed to do, because that's what Tim said.
19    Q    Okay.
20    A    Him and his son, you know, they want to
21 build this.
22    Q    And Josh Clemente provided engineering

119

1 services to MIT from, at least, a time in 2013, is
2 when it began, right?
3    A    Yes.
4    Q    And it continued until the end of 2017?
5    A    That's correct.
6    Q    And it continued some time thereafter as
7 well; correct?
8    A    No, sir.
9    Q    No?  It ended in 2017?
10    A    It ended in 2017, because in 217,
11 actually, December 217, that's the last time I saw
12 Josh or spoke to Josh.  The last time I saw Josh
13 was during his deposition.
14    Q    So December 2017 was the last time that
15 you spoke with Josh Clemente?
16    A    Yes, sir.
17    Q    And it's your testimony here today that
18 Josh Clemente did not provide any services to MIT
19 at all after December 2017?
20    A    If he provided it to his father, you
21 know, I'm not aware of it.
22    Q    I'm asking, did he provide services to

120

1 MIT?
2    A    I never asked him to provide anything.
3    Q    And I'm not asking if you asked him.
4 I'm asking, did he provide?
5    A    Again, we had the president, and that's
6 his son.  What he was providing, his father, I am
7 not aware of it.  So you can ask me this so many
8 different ways.  I don't know.  It's his son.
9 What he was doing with his father, they kept me in
10 the dark.
11    Q    Okay.  So during the time that Josh
12 Clemente was providing these engineering services
13 to MIT, he was never regarded as an employee;
14 correct?
15    A    No.  When Josh was involved, I was
16 always under the impression, because he is
17 compensated with percentage from his dad, that
18 basically, he is a member, okay, a part, a part of
19 that family, let's call it, of MIT, because he is
20 getting compensated by his dad.  And I was always
21 under the impression that his dad, you know, has
22 the NDA or whatever, the proper document, work for

121

1 a hire, all these agreements, handled by Tim.
2 Because it was Tim's son, and he's the one who
3 brought him into this.
4    Q   Okay. Mr. Alubbad, you just testified
5 minutes ago that you had no understanding of what
6 the agreement was between --
7    A   That's correct.
8    Q   -- Tim Clemente and Josh Clemente?
9    A   Yeah, that's correct.
10    Q   Well, it just sounded like you just
11 testified that there was an agreement --
12    A   No.
13    Q   -- to compensate Josh.
14    A   No. The compensation -- don't put words
15 in my mouth. The compensation, it's from his
16 father to his son. There was no compensation from
17 me to Josh or MIT. MIT never made any agreement
18 to compensate. Except in 217, I offered him a
19 full-time job, and in 218, and he rejected it.
20        The 218 was not directly to him. It was
21 offered to his father. His father said to me, I
22 will speak to my son, Fahmi, and I will get back

122

1 to you.
2        He came back to me and said he does not
3 want. And this is in writing.
4    Q   He does not want what?
5    A   To work full time for the company. He
6 started his own business. That's what Tim
7 Clemente told me.
8    Q   Okay. We're going to come back to a
9 number of those topics here. But I want to circle
10 back around and just confirm what MIT's position
11 is. Are you testifying that Josh Clemente was an
12 employee of MIT?
13    A   When you said was employee?
14    Q   Did you understand Josh Clemente to be
15 an employee of MIT?
16    A   Josh Clemente was brought by his father
17 and was getting compensated by his father for the
18 extra percentage he asked to assist him and work
19 on the ARES.
20    Q   Just, Mr. Alubbad --
21        MR. MILLS: Objection. You're asking
22 him for a legal conclusion.

123

1    Q   Did you believe him to be an employee;
2 yes or no?
3    A   Listen. When you said an employee,
4 okay, again, I did not ask Josh to do anything for
5 MIT. I did not ask him to, you know -- it's his
6 father. He brought him to the company. And the
7 only way -- the only thing I understand,
8 100 percent, that whatever work Josh was doing for
9 MIT, he was getting compensated with a percentage
10 that Tim asked, additional, the 5 percent. And
11 Josh never complained.
12    Q   And we'll come back to that. Isn't it
13 true that you told Tim Clemente repeatedly that
14 Josh Clemente was never an employee of MIT? You
15 told him that, right?
16    A   Yeah. I mean, when you said an
17 employee, we had an employment contract with him?
18 No. It was Tim Clemente brought Josh, okay, and
19 Josh -- I was under the impression always that
20 Josh, doing all this work to assist his father.
21 Because Josh, Mr. Henson, was a full-time
22 employee, okay, as an engineer in SpaceX, and then

124

1 later on was a full-time employee at Hyperloop.
2 So he was assisting his dad. In return, he was
3 getting percentage. That's my answer.
4    Q   Was Josh Clemente ever on MIT's payroll?
5    A   One time in 213. It's not the payroll.
6 He asked -- his father wrote me an e-mail. He
7 said, My son is helping, and he is doing this as a
8 part-time; can you pay him for hourly rate? And
9 he gave me a link and all that stuff.
10        And I said, Okay, how much he is asking?
11        He said, 6,600.
12        I said, Okay, here's a check, but, I
13 said, I need a receipt, Tim.
14        Then Josh send me a receipt. It's
15 called J and W, which means Josh and Wes, because
16 his roommate is Wes, and the money was supposed to
17 go part for him and part for Wes. And I paid it.
18    Q   That was before MIT was founded, right?
19    A   I don't recall the date.
20        MR. MILLS: Objection to the foundation.
21    A   I don't recall the date exactly. I
22 don't have the e-mails and all this, but I paid it

125

1  based on what Tim asked me to do, and I did it.
2      Q    Josh never -- so we'll go back to that
3  one time in 2013.  Outside of that, Josh Clemente
4  was never on MIT's payroll, right?
5      A    That's correct.
6      Q    Josh Clemente never received any
7  employee benefits from MIT?
8      A    No.
9      Q    And you testified earlier that you had
10 offered him employment in December of 2017 and he
11 declined?
12     A    That's correct.
13     Q    And that was for a salary range of
14 60,000; was that right?
15         MR. MILLS:  Object to the foundation.
16     A    No.
17     Q    What was it?
18     A    There wasn't -- I mean, I didn't give an
19 offer.  We discussed, okay, what an engineer -- I
20 am engineer, okay, you know -- and keep in mind, I
21 think I offered 80,000.  You know, that's the
22 number I offered, okay?  And basically, you know,

126

1  the company had no business, and I was the only
2  source of funding.  And, in fact, you know, he's
3  getting 80,000 a year plus he has percentage from
4  his dad, that's a good day deal.  I wasn't getting
5  paid salary.  Tim Clemente wasn't getting paid
6  salary.  And Josh's answer, No, I am not
7  interested in money.
8      Q    So you believe it was $80,000, is what
9  you offered him for employment in 2017?
10     A    That's correct, yes.
11         MR. MILLS:  Would now be a good time?
12 It's 12:30.  Would now be a good time for a lunch
13 break.
14         MR. HENSON:  That's fine.  Let's do 30
15 minutes, and we'll come back on at 1:00 o'clock.
16         THE VIDEOGRAPHER:  We are going off the
17 record.  The time is 12:20 p.m.
18         (Whereupon, a recess was taken.)
19         THE VIDEOGRAPHER:  We are back on the
20 record.  The time is 1:05 p.m.
21 BY MR. HENSON:
22     Q    Mr. Alubbad, we're resuming after a

127

1  lunch break.  Before we adjourned, we were
2  discussing a number of issues relating to Joshua
3  Clemente.  Do you remember that discussion?
4      A    Yes, sir.
5      Q    And do you remember testifying that you
6  considered Josh Clemente to be a member of MIT?
7      A    Well --
8          MR. MILLS:  Object to the foundation.
9      A    Josh -- in my opinion, Josh Clemente,
10 because he was compensated by his father for the
11 percentage, you know, that he is part of MIT.  And
12 I was always under the impression and I believed
13 there was an NDA in place.  So that's how I looked
14 at it.
15     Q    Okay.  So you -- well -- and I'm sorry.
16 Are you saying that you did consider him to be a
17 member of MIT, or you did not?
18         MR. MILLS:  Object to the form and the
19 foundation.
20     A    Again, when he was compensated from his
21 father, a percentage from MIT, and he was helping
22 his father, I had no issue that he is a member of

128

1  the MIT, you know, because his father told me he
2  is under NDA.
3      Q    So you knew Tim Clemente was a member,
4  right?
5      A    That's correct.
6      Q    And you considered Josh Clemente to be a
7  member as well?
8          MR. MILLS:  Object to the form.
9      A    Again, like I said to you, based on what
10 Tim told me, that he is compensating his son.
11 It's the same thing, Mr. Henson.  Tim told me he
12 is compensating Ken Fournier.  Do I consider also
13 Ken Fournier?  They would ask to come to assist
14 Tim Clemente.  Tim Clemente was the president, and
15 they were getting compensated, and they were bound
16 by NDA and work-for-hire agreement.
17     Q    Mr. Alubbad, it's a very simple
18 question.  Did you consider him -- did you
19 consider Josh Clemente a member or not?
20         MR. MILLS:  Object to the form.
21     A    Again, he is -- he was compensated by
22 his father for the 5 percent, and he was working

129

1 on behalf of his father to assist him for MIT.
2        MR. HENSON: All right. Let the record
3 reflect that the witness is refusing to answer the
4 question.
5        MR. MILLS: He has answered your
6 question.
7    Q    And any members require consent from all
8 the other members of the LLC, right?
9        MR. MILLS: Object to the form.
10   A    Yes.
11   Q    You understand how the operating
12 agreement works for MIT?
13   A    Yes.
14   Q    And you've read it many times, right?
15   A    I don't recall. I read it just from the
16 time we signed. Did I read it recently? No.
17   Q    But it's your understanding that
18 admitting new members to become a member of MIT
19 requires consent from all members?
20   A    That's correct.
21   Q    And did you consent to the admission of
22 Josh Clemente as a member?

130

1    A    No.
2    Q    And why not?
3    A    Because Tim never asked for this to be,
4 you know, a consent. When we set up the company,
5 he never said, you know, We need to bring back
6 Josh and Ken or whoever as a part of the company.
7 At a later stage, he did.
8    Q    Okay. I'm just trying understand. So
9 you said you did not consent to Josh Clemente
10 being admitted as a member to MIT, and that was
11 because it was different from the agreement that
12 you had with Tim at the founding of the company?
13   A    When we found the company, I was never
14 asked to bring any member to the LLC. The only
15 thing I was asked, that he is bringing his son to
16 assist him, and the extra 5 percent he is giving
17 is to compensate him and his friend. I mean,
18 Tim's friend, Ken Fournier.
19   Q    Okay. And when was -- the 5 percent
20 that you mentioned, it's your testimony that that
21 was not part of the discussion at the founding of
22 the company?

131

1    A    What was at the founding of the company?
2    Q    Well, when we've been talking about what
3 the deal was for compensating Josh --
4    A    No.
5    Q    -- at the beginning, right?
6    A    There was no deal with me. There was a
7 deal between Tim and his father. Mr. Henson,
8 okay, as I explained to you, when we started, Tim
9 wanted to be 20 percent and 80 percent.
10   Q    I recall.
11   A    Then he asked for additional 5 percent.
12 When he asked for the additional 5 percent, he
13 said, Because I would like to compensate my son
14 and Ken Fournier.
15   Q    Right. And when did that occur?
16   A    This is in 2015. And Tim never said,
17 Fahmi, can you contact your attorney so we can
18 have an agreement? Can we I add them officially?
19   No. He didn't ask, and I didn't ask. I
20 figured this is between a son and father. He's
21 going to give him some percentage, whatever
22 agreement. I don't know if he gave his son

132

1 agreement or not.
2    Q    Okay. All right. And the testimony
3 that you've been giving just now, that -- you're
4 speaking on behalf of MIT? You're communicating
5 that; correct?
6    A    Well, I mean, you asked me a question.
7 Maybe you need to be more specific when you ask --
8 wait. When you ask me a question, Mr. Henson,
9 with all respect, you need to tell me, Fahmi, now
10 I'm asking you as MIT. So I need to wear a hat
11 called MIT. Or you're asking me as personal --
12 because you're shifting, you know, and you're
13 trying to use my answer to see if it suits you, if
14 it's for the MIT for not.
15       MR. MILLS: Fahmi, you don't have to
16 argue.
17   Q    I'm just asking --
18   A    I'm just trying to figure out. It's
19 just confusing.
20   Q    Mr. Alubbad, I'm asking questions. I'm
21 not arguing with you.
22   A    Okay.

133

1    Q    What we discussed at the very beginning
2 of this deposition is that when there are topics
3 that cover the topics identified in the 30(b)(6)
4 notice that was served on your attorneys --
5    A    Okay.
6    Q    When you're testifying on those topics,
7 you are not only testifying on your individual
8 behalf, but you're also testifying on behalf of
9 MIT. And you said you understood and agreed with
10 that.
11        MR. MILLS: But, Mr. Henson, he makes a
12 good point. If you're going to ask him about a
13 topic, refer to the topic, and say I'm asking in
14 your capacity. We talked about this the other
15 day, but you need to be clear, or your record is
16 going to be a mess, okay? And so it's a
17 legitimate ask that when you're asking him in his
18 30(b)(6) capacity, you refer to the topic and make
19 clear that you're asking him on behalf of MIT.
20        MR. HENSON: Okay.
21    Q    All right. I'm asking you about Topic
22 3, which is MIT's business relationship with

134

1 Joshua Clemente from August 5th, 2013, until the
2 present, including the nature of Josh Clemente's
3 work and any promises of compensation, such equity
4 from or in MIT in exchange for services rendered.
5        With respect to that question, that
6 topic, I would like to know what is your
7 understanding of any agreement that existed by
8 which Josh Clemente would be compensated by MIT?
9    A    Mr. Henson, my answer, Josh Clemente
10 does not have any agreement with MIT. Whatever
11 agreement he has, it is between him and his
12 father.
13    Q    And you testified moments ago, knowing
14 that admitting a member to the LLC requires
15 consent of all the members?
16        MR. MILLS: Object to the form.
17    A    Yes.
18    Q    And so it couldn't just be between Josh
19 and Tim Clemente, could it? It required all the
20 members to be involved in the decision to grant
21 equity, right?
22        MR. MILLS: Object to the form and

135

1 foundation.
2    A    Yes.
3    Q    But it's your testimony that you never
4 consented to the admission of Josh Clemente as a
5 member?
6    A    I was never asked by Tim.
7    Q    All right. I'd like to show you what's
8 going to be marked as --
9        MR. MILLS: 8.
10        (Exhibit 8 was marked for identification
11 and is attached to the transcript.)
12    Q    8. For the record, this is MIT Bates
13 Number 4825 through 4828. This is an e-mail
14 correspondence that appears to have been forward
15 over a period of time. I'd like to, Mr. Alubbad,
16 direct your attention towards the back half of
17 this e-mail correspondence.
18        Actually, before I go any further, do
19 you recognize this e-mail?
20    A    Yeah, I do.
21    Q    What is it?
22    A    It's an e-mail back in 215, and Tim used

136

1 it, and added 219 to it.
2    Q    Let's go back to MIT 4826.
3    A    482 what?
4    Q    26, sir.
5    A    4828?
6        MR. MILLS: 26, second page.
7    A    Second page, yeah.
8    Q    Do you see this is an e-mail that was
9 sent from Atlantis Corp. to Tim Clemente? Do you
10 see that there?
11        MR. MILLS: Which one? There's two.
12    A    I don't know which one.
13    Q    January 25th, 2015, at 8:37 p.m.?
14    A    Oh, yeah, I see this one. Yes.
15    Q    And this is in response to an e-mail
16 that appears on MIT 4827, dated January 20th,
17 2015, at 6:32 p.m.; do you see that?
18    A    Yeah, I see it.
19    Q    And so starting with the January 20th,
20 2015 e-mail from Tim Clemente to Christina Kindlon
21 -- first of all, who is Christina Kindlon?
22    A    She was my assistant.

137

1    Q    She was your assistant?
2    A    Yeah.
3    Q    And in the bottom paragraph of Tim
4  Clemente's e-mail to Ms. Kindlon, do you see where
5  Tim Clemente says, I promise part of my percentage
6  -- and then he references Josh, 4 percent, Ken,
7  2 percent?
8    A    Which page is this?
9    Q    It's on Page 4828.
10   A    4828. Yeah. The last paragraph?
11   Q    Yes.
12   A    Okay. Where he said, yes --
13   Q    He says --
14   A    -- I promise, okay.
15   Q    He says -- in the second sentence of
16 this paragraph he says, I was initially a
17 25 percent owner of MIT, but because of my son,
18 Josh, and Ken's work for the past year without any
19 significant compensation, I promised them part of
20 my percentage, Josh, 4 percent, and Ken,
21 2 percent, which leaves me with only 9 percent
22 ownership in the company; do you see that there?

138

1    A    Yeah, I see it.
2    Q    Okay. And then you respond. So it
3  looks like Christina Kindlon forwarded the e-mail
4  to you on January 22nd, 2015, at 2:50 p.m.; do you
5  see that at MIT 4827?
6    A    4827, yes.
7    Q    Christina Kindlon forwarded the e-mail
8  that we just read to you on January 22nd, 2015 at
9  2:50 p.m., right?
10   A    Okay.
11   Q    And then on MIT 4826, you responded to
12 Tim Clemente on January 25th, 2015, at 8:37 p.m.,
13 right?
14   A    That's correct.
15   Q    And in that e-mail -- I'll read you a
16 portion of it. This is the last sentence of the
17 first paragraph of your e-mail to Tim Clemente:
18 Christina provided me with a copy of the e-mail
19 that you sent her that said you have transferred 6
20 percent of your ownership interest to Josh. I'm
21 sorry -- Josh, 4 percent and Ken, 2 percent. Do
22 you see that there?

139

1    A    Yes, sir.
2    Q    And then you wrote further, Please
3  understand that pursuant to Articles III and VIII
4  of our operating agreement, you may not transfer
5  any part of your membership interest, transfer the
6  entirety of your membership interest, or otherwise
7  allow for the entry of additional members into the
8  LLC without my consent as the other member.
9        Did I read that correctly?
10   A    You did.
11   Q    To the extent you have already promised
12 this to Josh and/or Ken, or have documented any
13 such transfer, it will be considered void from its
14 inception.
15       Did I read that correctly?
16   A    You did.
17   Q    You continue on in the next paragraph,
18 Please also understand that I really do appreciate
19 your intent to shield the company from any credit
20 issues you may have in your desire to share the
21 benefit of your ownership percentage and financial
22 interest in the company with Josh and Ken.

140

1  However, their entry as members would cause a
2  number of complications that we would need to
3  discuss. And frankly, at this moment, I am not
4  really comfortable with the addition of new
5  members.; is that right?
6    A    That's correct. That's what's written
7  here.
8    Q    Okay. So in 2015, Tim Clemente wanted
9  to add -- wanted to give some of his equity to
10 Josh Clemente, but you prevented that from
11 happening; correct?
12   A    That's not correct.
13   Q    Okay. Explain.
14   A    Okay. First of all, your question
15 should be why this e-mail was sent. You forget to
16 mention the subject. The subject is bank
17 document.
18   Q    Please just answer the question.
19   A    No. I'm not going to answer the
20 question because this -- as I told you, you could
21 show me all the e-mail. I wrote the e-mail, and I
22 attributed to it. But the reason this was sent to

141

1 me, because we were in discussion about a bank
2 document.
3    Q    Mr. Alubbad, this is my opportunity to
4 ask you questions today, okay?
5    A    Okay.  That's fine.
6    Q    You can take issue with the question.
7 I'm just asking --
8    A    According to this e-mail, according to
9 that question, okay, what Tim asked me while we
10 are doing bank document, I said, No.  That's my
11 answer.
12    Q    Okay.  So Tim attempted to transfer part
13 of his ownership interest to Josh Clemente in
14 2015, and you said no; correct?
15    A    I said no because this was done for a
16 bank document that was needed for Algeria project.
17 And Tim, without my knowledge, decided to do this
18 without coming back to me.  My assistant -- they
19 sent in the document because we were asked by
20 Citibank to provide a bond, okay?  So Tim, because
21 he was a member, and he was at 25 percent, did not
22 want to take any financial risk.  So he decided,

142

1 in 215, when we were asked for the bank document,
2 to tell my assistant, Well, I'm just going to
3 give, you know, this.
4        And I said I needed this document for
5 the bank.  And I know I would not accept.
6    Q    That's not what you said at all, is it?
7    A    Excuse me?
8    Q    You said, I am really not comfortable
9 with the addition of new members.
10    A    Exactly.  Because of the bank document.
11    Q    I see.
12    A    Yes.
13    Q    And tell me where in this e-mail you
14 said it's because of the bank document.
15    A    Subject: Bank document.
16    Q    The subject line?
17    A    Yeah.  That's what my assistant sent
18 him, okay?
19    Q    Okay.  So let me just make sure I
20 understand your testimony.  Your testimony is that
21 you did block Tim Clemente from transferring part
22 of his equity --

143

1    A    Okay.
2    Q    Hold on.
3    A    Okay.
4    Q    You did block --
5    A    You asked me a question.  I'm going to
6 answer you.
7    Q    Hold on.  Please wait for me to ask the
8 question.
9    A    Okay.
10    Q    Your testimony is -- tell me if I'm
11 wrong -- that this e-mail reflects that you did
12 prevent Tim Clemente from transferring part of his
13 equity interest to Josh Clemente in January 2015,
14 but your testimony is that you didn't think it was
15 appropriate for the bank document?
16        MR. MILLS:  Objection to the form.
17    Q    Is that correct?
18    A    Again, when Tim asked for the 5 percent
19 for his son and for Ken, okay, I don't know what
20 type of agreement he made with them.  So I was not
21 privy to this conversation.
22        What I am saying to you, if you ask me

144

1 about this e-mail, Mr. Henson, we are talking
2 about a subject regarding the bank, okay?  This is
3 a bank document.  My assistant is chasing Tim.  If
4 you read the e-mail, Tim is nowhere.  He is
5 missing in action to find him.  And we needed the
6 document.  And Tim, basically, when we wanted the
7 document, he refused.  He decided, Okay, I
8 promised this, and I was going to.  No.  If you
9 want to do this, ask me professionally, and tell
10 me we want to do this document, and ask my lawyer
11 to do this.  He cannot just come and tell me,
12 Well, you know, I decided I want to do this to
13 avoid the bank document.  Then we are lying to the
14 bank.  Because the bank, Mr. Henson, has our
15 operating agreement.
16        And I specifically said to Tim, Anybody
17 who's 20 percent or more, has to sign on the
18 document.
19    Q    Mr. Alubbad --
20    A    That's my answer.
21    Q    I'm going to go back to the question
22 which you're declining to answer.

145

1      A     You can ask me again.

2      Q     Did you block Tim Clemente from

3   transferring part of his ownership interest as

4   reflected in this document or not?

5      A     I blocked him when we were doing the

6   bank document.

7      Q     Okay.  And, in fact, more than just

8   blocking him, you suggested to him, after saying,

9   if anything, you would not permit an equity

10  interest to be given to Josh and Ken Fournier in

11  this e-mail, you suggest to him that the 6 percent

12  that Tim Clemente was intending to transfer

13  instead of being transferred to Josh and Ken,

14  should be transferred to F2E, your company, right?

15     A     That's what my attorney suggested, yes.

16     Q     Well, that's what you suggested to Tim

17  Clemente?

18     A     That's correct.  Because what other way

19  the bank -- the bank wanted to do this, and Tim

20  say to me specifically, he said, I don't feel

21  comfortable, Fahmi, to sign any bank document.  I

22  don't want to be responsible.

146

1            Why, Tim?

2            Well, you know, I have financial

3   issue --

4      Q     I'm not asking that.

5      A     -- and I don't want the responsibility.

6   No.  Because this is where you're asking me about

7   the document.  You need to know the history of it.

8      Q     Mr. Alubbad?

9      A     Okay.  Then I cannot answer you, because

10  you cannot pick and choose.  I have to answer you

11  correct.  You asked me to raise my hand to tell

12  you the truth.  I'm telling you the truth.

13     Q     I want to hear the truth.

14     A     Okay.  But you cannot ask me -- because

15  you read the line, and then you want me to answer.

16  I will answer you correct.  This is why the

17  document was written: It's for the bank.

18     Q     Why were you not comfortable with the

19  addition of new members at this time?

20     A     Because Tim decided, when the bank was

21  asking us for a bond, and we needed to submit it

22  to the Algerian government, he's asking me -- all

147

1   of a sudden, oh, let's do this, so he can avoid.

2   But he did not bother to do it in 215 and 214.  He

3   was given this from the inception when we did MIT.

4   He did not bother.  213, 214, did not bother to go

5   and make an agreement or ask me or ask my

6   attorney.

7      Q     So you weren't comfortable with the

8   addition of new members because of the bank

9   document?

10     A     That's correct.

11     Q     Any other reasons that you were not

12  comfortable with the issue of new members?

13     A     No, no.  I had no issue against Josh or

14  Ken.  I have no issue.

15     Q     Okay.  But what about the sentence that

16  immediately follows your line about not being

17  comfortable with the issue of new members.  You

18  say, It will complicate decision-making in the

19  company pursuant to the operating agreement that

20  we signed, didn't you?

21     A     Yeah.

22     Q     Why would it complicate decision-making?

148

1      A     Because I --

2      Q     Was that part of the bank document too?

3      A     No.  Because when we made the company --

4            MR. MILLS:  Which question are you

5   asking?

6      A     -- it was me and him, okay?  So I did

7   not want to add any other member, okay, when we

8   were doing the bank document.

9      Q     So the complication of decision-making

10  was also because of the bank document?

11     A     That's correct.

12     Q     Okay.  And how would it complicate

13  decision-making for the bank document?

14     A     First of all, in order for us to do the

15  bank document, we were given, Mr. Henson, one week

16  to submit everything to the Algerian government.

17  For me to do another operating agreement, I have

18  to engage my lawyer, and we have to do another

19  agreement and wait until -- and then I have to

20  take that operating agreement.  It changed the

21  application I filled in the bank and said here is

22  an operating agreement with the new members.  No,

149

1  I wasn't comfortable to do this.
2     Q    Okay.  So this wasn't the right time,
3  then?
4     A    That's correct.
5     Q    Okay.  So then, after the bank document
6  was submitted, surely you then said, Hey, I'm
7  ready to admit Ken and Josh now?
8        MR. MILLS:  I object to the form.
9     A    I did not.
10    Q    You didn't say that, did you?
11    A    No, I didn't.
12    Q    In fact, you never said that, did you?
13    A    No.  It was said, and it was done in
14 2022.  When Tim requested it -- when we find out
15 that Tim was lying to me, him and his son, and
16 filing a patent behind my back.
17    Q    I'm talking about 2015 right now.
18    A    You asked me if --
19    Q    I asked you if after 2015 --
20    A    Okay.  After 2015, after this, the
21 discussion was never opened between me and Tim.
22 Tim never even opened the discussion again.

150

1     Q    I see.  I see.
2     A    He opened it in 219.  I know this
3  document by heart.
4        You can make faces, Rebecca, you know,
5  but, I mean, you don't need to make faces at me,
6  okay?
7     Q    Let's come back.  I'm asking questions.
8     A    No.  I need to -- please.  She doesn't
9  make need to make faces.
10       MR. MILLS:  I agree with that.
11       THE WITNESS:  Okay?
12       MR. MILLS:  It's not appropriate.
13       THE WITNESS:  Listen, everybody needs to
14 be with respect.  I am dealing with you with
15 respect.  She doesn't need to make faces at me,
16 okay?
17    Q    I didn't see any faces.
18    A    Okay.  I saw.
19    Q    I'm trying to keep things focused here.
20    A    Okay.
21    Q    I don't know why you're getting
22 distracted here.  Let's --

151

1     A    She's sitting next to you.
2     Q    Look at me.
3     A    I am looking at you.
4     Q    So he blocked -- you blocked Josh and
5  Ken from getting an equity interest in 2015?
6        MR. MILLS:  Object to the form.
7     A    Again, I did not say I blocked.  I did
8  not block.  I did not do anything.  No.
9     Q    That's exactly what you said.
10       MR. MILLS:  Object to the form.
11    Q    Are you backtracking your prior
12 testimony?
13    A    No.
14    Q    You said -- you previously testified
15 that you blocked him because of the bank document;
16 is that correct or not?
17    A    That was my discussion with Tim
18 Clemente, not with Josh.  I never had that
19 discussion with Josh and Ken and told them I am
20 blocking you.
21    Q    I'm asking about your discussion with
22 Tim Clemente.

152

1     A    I'm discussing with Tim.  I told Tim.  I
2  called him to the bank.  I don't feel comfortable.
3  But I never say to him, No, they are banned, they
4  are blocked, or whatever.  This is what I -- this,
5  regarding the bank document, this is what I
6  discussed with him.  I didn't feel comfortable for
7  him to make any transfer.  Whatever he has between
8  him and his son, that's it.  I mean, he can have
9  an agreement between them.
10    Q    Well, he can't.
11    A    You know what?  He could have had an
12 agreement and gave it to Ken, because, you know,
13 he asked him to help.  He could have drawn
14 something that he is offering him, that he is
15 going to give him percentage.  But what I said to
16 you earlier, if really Tim wanted this to be on
17 the record, they could have said to me, when we
18 did the operating agreement, let's do this
19 officially.  He couldn't.  He forget in 215.  He
20 had 214, one year, 12 months, he did not bother.
21    Q    And I'm sorry.  What's the relevance of
22 that?

153

1     A    The relevance, you're telling me I'm
2  blocking, okay? Tim didn't bother to bring this
3  subject, Mr. Henson, until the bank document.
4  That's what I'm saying to you. He did not bother
5  to bring this subject, okay, in 213, and he did
6  not bother for 12 month, in 214, to come and say,
7  Fahmi, it is time for us to put things and have
8  your lawyer draft or modify the operating
9  agreement so we enter members. He did not say it,
10 Mr. Henson.
11       This came in when he knew we needed the
12 bank document, and he wanted to choose the easy
13 way and said, Yeah, I promise. Okay. You told
14 me, from 215, you promised them, so okay. But
15 right now, we are in a bank document. We need
16 this document. And that's what happened.
17     Q    And at no time after the bank document
18 did you go back and say, Hey, I've changed my
19 mind, I'm no longer uncomfortable with admitting
20 new members; let's bring in Josh and Ken, at any
21 point in 2015?
22     A    Mr. Henson, in 215, after this, I never

154

1  said to Tim, Hey, Tim, do you remember the 215
2  e-mail you sent me; let's discuss it again so we
3  can. No. The answer is no.
4     Q    Okay. So your testimony is that it was
5  on Tim to come back to you again?
6     A    Exactly.
7     Q    I see. Okay.
8     A    Because he brought Josh into the
9  picture, not me.
10    Q    But you consented to him bringing Josh
11 into the picture?
12    A    You know, that's his son.
13    Q    Well, yes or no, did you consent?
14    A    Listen to me. This is his son. And in
15 my culture, we respect, okay? Tim is a friend. I
16 know him for a long time. I had no position,
17 Mr. Henson, to tell him not to bring his son.
18 That's his family, and this is how we feel. So I
19 was torn, you know, because of this issue.
20 Respecting my friend, okay, and making a decision
21 -- you know what? I couldn't say, you know what,
22 no, your son, there's -- no. It's his son. He

155

1  brought him into the picture; I accepted it.
2  That's it.
3     Q    But you didn't respect Tim Clemente
4  enough to allow him to transfer his equity to his
5  son, did you?
6     A    Excuse me?
7        MR. MILLS: Object to the foundation.
8     Q    You didn't respect Tim Clemente enough
9  to allow Josh Clemente --
10    A    No, no, no.
11    Q    -- to receive the equity that had been
12 promised to him?
13    A    No. Don't tell me I did not respect.
14 This is Tim's responsibility. He was the
15 president. He could have, every time, raised his
16 hand and said, We need your lawyer, your corporate
17 lawyer, to change. Tim always used this for his
18 convenience. Whenever there's some issue, he use
19 this, Mr. Henson. I had no issue.
20       I want to make clear in the record, I
21 never had any issue with Josh, never. I will tell
22 you, I never. I always liked Josh. He was a nice

156

1  gentleman. I was introduced to him. I had a talk
2  with him. And for me, he's the son of my partner.
3  I have nothing against him.
4     Q    Josh -- or Tim Clemente repeatedly asked
5  for your consent to compensate Josh Clemente,
6  didn't he?
7        MR. MILLS: Object to the foundation.
8     A    Please be more specific when he said,
9  you know. What do you mean?
10    Q    Compensation in any respect. I mean --
11       MR. MILLS: At what point in time? You
12 need to be --
13    Q    At any point -- was there any point in
14 time that you can recall Tim Clemente coming to
15 you and saying, We need to compensate Josh
16 Clemente for the services he provided?
17    A    Okay. Is that from 213? 220?
18    Q    At any time.
19    A    Until he was removed?
20    Q    Yes.
21    A    Yes, he did.
22    Q    When is the first time you can recall?

157

1    A    The first time Tim and his son came into
2  my office, and they both -- they were
3  disrespectful to me, and in 217.
4    Q    Is that December of 2017?
5    A    December 217, yes.
6    Q    Okay.  Let's go through the events and
7  them we'll come back to each of them.  So the
8  first time was December of 2017, and that was an
9  occasion where Tim Clemente asked for your
10 permission to compensate Josh Clemente.  What was
11 the next occasion after December 2017?
12   A    No.  Okay.  In 217, he came with his
13 son, and because we had an issue.  And Tim, in his
14 e-mail in 217, he mentioned that, you know, I
15 insulted him and Josh and his friend John and
16 everybody, and I so prejudiced against the French,
17 and all this crap.
18        So I said, Okay, so is there a problem?
19 Maybe we need to clear the air.  Why don't you
20 guys come to me?
21        So they came into my office.  Let me
22 finish.  And then I said, Josh, what is the

158

1  problem?  Okay.
2         And Josh, he said, I want to be
3  compensated.
4         I said, Okay, I am willing to offer you
5  a full-time job.
6         He said, I don't want money.
7         I said, Then what do you want?
8         This is what he did:  I need 10 percent.
9  And started pounding on my table.
10        I said, If you want percentage, take it
11 from your father.  Your father, take it from him,
12 I told him.
13   Q    And so --
14   A    That's the first time when he was
15 demanding he wanted 10 percent.
16   Q    That was the first time that he demanded
17 10 percent?
18   A    That's correct.
19   Q    And --
20   A    And then later.
21   Q    And he pounded on the table?
22   A    He pounded on the table.

159

1    Q    And what did you tell him?
2    A    I said, If you need percentage, go talk
3  to your father.
4    Q    And so you did not agree --
5    A    No.
6    Q    -- to give him any percentage from your
7  side at all?
8    A    I said to him, In conditions.  I said,
9  If I'm going to compensate you, Josh, I will
10 compensate you in conditions, which means I need
11 to understand what will be your role, what will be
12 your dad's role, what will be my role.
13        Because I told Josh in 216, in the
14 parking lot of Fredericksburg, at our old office
15 in Stafford County, he came in visiting.  He was
16 still working in SpaceX.  And basically, I was
17 complaining to Josh about his dad.
18        I told him, Josh, your father is never
19 around, okay, I am trying to do everything,
20 carrying all this on my shoulder, financing it,
21 and doing everything, and your father is spending
22 all his time in Hollywood, okay, and I need some

160

1  help, Josh.
2         And Josh told me, he said, Fahmi, I am,
3  you know, working full-time.  I'm just doing this
4  as part time to help my dad, okay?
5         So I said, Okay.  I need to understand,
6  you know, because this is what I am doing.
7         Then fast forward, in 217, because I
8  knew what I was struggling with.  This is when I
9  say to him, I need to know if you are going to
10 work full time, okay, so I can pay you a salary.
11 And I swear, I told him, God is my witness, I will
12 give you a percentage from my side, from my share,
13 okay?  And I was planning, Mr. Henson, to give him
14 5 percent as a token from me, okay, to him.  And
15 he refused.  He wanted his percentage and
16 commitment immediately in my office, and he was
17 demanding.  And then he was, you know, being
18 disrespectful.
19        And then all of a sudden, he's raising
20 his voice, and I said, What, two on one?  And I
21 told him, Okay, you know what?  This meeting is
22 done.

161

1        And that was the last time I saw Josh.
2   I saw Josh the next time at her office.  That's
3   it.
4        And then Tim write me an e-mail and
5   tells me that I was insulting to his son, because
6   I promised to give him a gift, 5 percent.  I never
7   said I give you a gift.  That word never came out
8   of my mouth.
9        I said, If you are going to work full
10  time, you're going to get salary.  And everybody
11  said I was insulting.  We are a small God damn
12  company, MIT.  We have no business; we have
13  nothing, okay, and somebody -- you asked me
14  earlier about SpaceX is prestigious.  Well, if
15  it's prestigious, he could have stuck and stayed
16  in SpaceX.  He has no business, you know, to come
17  and work in MIT, that MIT has no money.
18   Q   You think he was lying?
19   A   Huh?
20   Q   You think he was lying?
21   A   About what?
22   Q   Lying about leaving Space X.

162

1    A   Listen, we're not talking about leaving
2   SpaceX.  I'm saying, for him, okay, he refused an
3   $80,000.  Anybody who you said working at a
4   prestigious company, why would you leave SpaceX to
5   go work for 80,000?  That's what I'm trying to
6   explain to you.  For me, I offered him what I am
7   able to for a company that has zero business.
8        His father gave him a percentage, and,
9   you know, he gets a salary.  And if he is working
10  full time, I was planning to give him from my side
11  5 percent.
12   Q   And when was the 5 percent from your
13  side going to be given?
14   A   Once I get paid.  This is what I say to
15  everybody.  I said, Once F2E gets paid for all
16  their investment, and then, gentleman, we can sit
17  down on the table and then we can decide who is
18  going to be doing what.  But everybody go and do
19  their own business.  And whenever, you know, they
20  are available to come and see me, this was
21  unacceptable.
22   Q   So once F2E gets paid its full

163

1   investment, that's when you'd be willing -- that's
2   when you communicated that you were willing --
3    A   That's what I always told Tim, because
4   his signed in 217, the consent; that when he
5   decided to get, you know -- Mr. Henson, just for
6   the record, this e-mail you are asking that I said
7   to you about the bank document, where I was
8   required to do a bond, my attorney gave him a
9   consent letter in 215.  Tim refused to sign it.
10  And you know what I say, Tim, no problem, okay?  I
11  went along.  He refused to sign it.  I did the
12  bank document on my own, the bond.
13        But when it came 217 and we bid for the
14  Saudi program, and it was a big thing, I made it
15  very clear to Tim, Either you trust me, or you
16  don't trust me.  If you don't trust me, then you
17  are a member of MIT, you need to put your share.
18        And then he said, Yeah, I trust you.
19  And he signed.  The consent letter that was
20  signed, it says clearly.  And I'm sure you guys
21  have a copy.  Once I get paid for every penny, no
22  distribution, and any new member, they need to

164

1   come in; we need to sit down and discuss the role
2   of each member.  I was fair to everybody.
3    Q   I want to go back to what you were just
4   talking about in terms of the conditions that you
5   imposed when you communicated to Josh Clemente
6   about compensation from your side.  And it was
7   that once F2E gets repaid for its full investment,
8   then he could get 5 percent from your side?
9    A   And once I know what role is he going to
10  play.  He wasn't going to be compensated while he
11  is working for somebody else.
12   Q   Okay.  And this was -- I mean, this was
13  a discussion that you'd had with Josh Clemente
14  throughout 2017.  It just ended in December 2017,
15  right?  You had been discussing his role and the
16  percentage from your side at an earlier phase in
17  2017 as well?
18   A   Mr. Henson, you asked me earlier a
19  question, and now you're changing your question.
20  The question, I told you.  The first time Josh
21  asked me, it was in 217, when he came into the
22  office.  Before he wasn't asking me, okay?  His

**165**

1  father did ask me in this document because of the
2  bank.
3      But what I want to make clear for the
4  record, Josh wasn't coming in 217 when we built
5  the new ARES and was knocking on my door and being
6  pissed and saying, Hey, listen; I need to be
7  compensated.
8      You can be rest assured I am not the
9  type who can let things slide. I could have said,
10  Well, wait a second; we have a problem here?
11  Okay, I will not go over, risk my money and put a
12  bond for the Saudi government. I will not
13  continue by shipping the vehicle to Milipol and
14  paying, you know, thousands of dollars, and pay
15  everybody's ticket and hotel and all of that
16  stuff. I could have said, Well, wait a second; we
17  need to resolve.
18      This is how I am. This is all my
19  e-mails when you see. When there is a problem, I
20  raise the red sign, and I say, We need to discuss
21  that.
22      But Tim Clemente, okay, he think he

**166**

1  knows how to play me. Maybe I let him know how to
2  play me because I am a decent person and more
3  honest than him, okay? And I let him think he can
4  fool me.
5      But for me, I was clear with everybody.
6  I made a promise when we set up the company, and I
7  delivered at every point I made. There is not one
8  single thing that I have not delivered.
9      So if you have something to show me,
10  show it to me.
11      COURT REPORTER: Real quick, Counsel,
12  did you object to that question?
13      MR. MILLS: I didn't object to it.
14      COURT REPORTER: Okay. Thank you.
15  BY MR. HENSON:
16      Q   So that was a clarification of my
17  question, and I appreciate that, Mr. Alubbad.
18  Prior to December 2017, it was not Josh Clemente
19  himself, but rather Tim Clemente who had been
20  asking you to consent to compensating Josh;
21  correct?
22      A   He did not in 217, Mr. Henson. Josh,

**167**

1  okay -- I mean, Tim Clemente did not come and
2  basically was making a fuss and an argument about
3  compensating Josh, okay? In my opinion, okay, I
4  know Josh is being compensated. Everybody is
5  making it like Josh was not compensated. The guy
6  took an extra 5 percent, okay, because he wanted
7  to compensate his son. So for me, I am always
8  under the impression --
9      Q   Which you blocked?
10      A   No, no, no, no. Okay. I'm always under
11  the impression that Josh is being compensated, and
12  Josh is under NDA, okay? Not to block, not to,
13  you know. You could tell me it blocked if Mr. Tim
14  Clemente said, We need to make a resolution; we
15  need you to call your corporate lawyer; and we
16  need to make an amendment to the operating
17  agreement. Show it to me.
18      Q   So your testimony is that Tim Clemente
19  just didn't make enough of a fuss about it?
20      A   You know what? He did not make any
21  issue, okay, about telling me let's get an
22  operating agreement made.

**168**

1      Look, again, today, again, even if this
2  thing did not happen -- and I repeat for the
3  record, I have no issue for Josh being
4  compensated. You're making it sound like I don't
5  want to. His father took the 5 percent so he can
6  compensate him.
7      I don't want to jump into and tell you
8  all the details. I want to give you a chance,
9  Mr. Henson, to ask me the question so I can answer
10  you, because the event continued. But I am not
11  here to jump. I want you to ask me step-by-step
12  the event so I can tell you what is happening.
13      Q   Okay. I'm not sure what event you are
14  referring to. Would you tell me what event are
15  you talking about?
16      A   Okay. So --
17      Q   You don't have to go through the whole
18  thing. I just want to know what you're talking
19  about when you said the event.
20      A   Because you're trying to put words in my
21  mouth that I blocked. I did not block. You're
22  saying, like, okay, Tim was desperate to get his

169

1 son and wanted money. And I'm saying after 217 --
2 would you like me to continue? Would you like me
3 to continue?
4    Q    Oh, I'm not talking about after 2017
5 right now.
6    A    Okay.
7        MR. MILLS: Why don't you let him ask
8 the questions.
9        THE WITNESS: Okay. Yes, that's what I
10 said.
11       MR. MILLS: Just let him ask the
12 questions.
13    Q    And just to circle back around now, the
14 discussions about compensating Josh Clemente,
15 whether they involved Tim -- whether they were
16 just with Tim, or whether they were just with Josh
17 and Tim, or just with Josh, I'm trying to
18 understand when these events occurred?
19       MR. MILLS: Object to the form. Why
20 don't you break them down? Because you might get
21 better answers.
22    Q    So you identified an event in

170

1 December 2017 where you had a discussion about
2 compensating Josh Clemente, and you described that
3 in some detail. Were there any events that you
4 can recall prior to that where Tim Clemente came
5 to you and said, Hey, we need to compensate Josh?
6    A    Okay. See, you ask your question, and
7 you confuse me, and you confuse yourself. Let me
8 tell you why. First of all, you asked me about
9 Josh, and I told you, Mr. Henson, in 217. Are we
10 talking about Josh asking me directly, or you're,
11 forget Josh, we're talking about Tim Clemente, so
12 I can answer.
13    Q    In fact, my question was perfectly
14 clear. I said, all of the above, whether it was
15 with -- any discussion that you have had on the
16 topics -- any discussion that you have had on the
17 topic of compensating Josh Clemente, whether it
18 was with Tim Clemente, exclusively, Josh Clemente,
19 exclusively, or both of them.
20    A    Okay.
21    Q    That is what I am asking you about now.
22    A    Okay, sir. Thank you very much.

171

1    Q    Did I answer your question?
2    A    I understand.
3    Q    Okay. Now, I'd like to know was there
4 any time prior to December 2017 in which there was
5 such a discussion that you can recall?
6    A    In 217 -- before 217, you showed me your
7 215 e-mail, which is because of the bank. Tim
8 threw this at the last minute, and this is the
9 e-mail you just asked me. Move forward, the next
10 time Tim -- this issue was raised, in 217 in my
11 office. During that period, nobody.
12    Q    Okay.
13    A    Not Josh, not Tim. And after this, Tim
14 asked again.
15       MS. LEGRAND: Afterwards.
16    Q    I'm sorry. After Milipol is what you're
17 saying? So the event you're talking about was
18 after Milipol?
19    A    See, the whole issue, okay, everything
20 happen after the Milipol.
21    Q    Okay. And I'm just trying to make sure
22 everything was clear.

172

1    A    After the Milipol, they came in to my
2 office, and I am the one who asked, Mr. Henson,
3 for the meeting. And I said, to clear the air; if
4 there's any issue, I want you guys to come in and
5 tell me what is your issue. I mean, the fact is,
6 I had respect for my partner, and I wanted to see
7 what is his issue, him and his son. I invited
8 then to my office. If I didn't care, I'd say the
9 hell with you; I am the majority owner, and I care
10 less if you are upset. But I took the initiative.
11 And to ask them to come to my office so I can see
12 what's bothering them, why they were jerking me
13 around to give me a date to come.
14       Now, when document is released, I found
15 out what they were doing behind my back. While
16 they're telling me, Oh, we're busy, and this you
17 find while they are talking to -- trying to get
18 some investment to get me out. You see, if that's
19 what they wanted, they could have been honest
20 enough, both of them, the father and the son.
21       And they said, Fahmi -- in 217, when
22 Josh did not get what he wanted, he could have

173

1  said, Okay, Fahmi, you know what; we are not happy
2  with you; we don't want the relationship to
3  continue.
4        Listen to me.  And I said, Okay, that's
5  fine.  If you don't want -- you're not happy, then
6  find somebody to buy me out, okay.  I mean, it.
7     Q    You invited them to buy you out?
8     A    I said to them -- on my e-mail in 217, I
9  said, If you are not happy that I am making the
10 decision and you want to make your own decision --
11 because, Tim, you showed me on the file, that he
12 is the king of the jungle, and he wants to make
13 the decision himself.  And I said, Where is the
14 operating agreement to give you that right, when
15 he said, I am the only one.  And I said, If you
16 want to go that route, then buy me out, and be my
17 guest, and then do it.
18       Now, after this -- after this, in 219 --
19    Q    Are you answering the question about the
20 subsequent events and conversations?
21    A    Yes.  You asked me.  You asked me, and
22 I'm going to answer you.

174

1     Q    I'd actually only asked you about prior
2  to the 2017.  Can I ask the question?
3        MR. MILLS:  Why don't we take a quick
4  break?
5        MR. HENSON:  I think we're right at the
6  line of questioning here.  Let's give it another
7  two --
8        MR. MILLS:  I was trying to help you,
9  but, okay, you can reject it.
10       MR. HENSON:  I think I will this time.
11 Thank you.
12       MR. MILLS:  All right.
13    A    You asked me all the event.
14    Q    Let's just reset.
15    A    Okay, let's reset.
16    Q    Okay.  So you were aware that throughout
17 2017 Josh Clemente was doing work for MIT, right?
18    A    Okay.
19    Q    Yes?
20    A    Yes, he was helping.
21    Q    And, in fact, he did a significant
22 amount of design work for the second generation of

175

1  the ARES; correct?
2        MR. MILLS:  Object to the foundation.
3     A    Again, I don't know what he did, because
4  I hired a company to do the design.  And his
5  father, he said, My son is going to quit
6  Hyperloop, okay?  This is his own words, To come
7  and supervise, you know, Cardinal Engineering, the
8  one I hired, and I paid them to do the drawing and
9  the design.
10    Q    You don't know what Josh Clemente did
11 for MIT; is that your testimony?
12    A    Josh was helping his father, okay, on
13 the design of the ARES, okay?  And Josh and Tim,
14 they had a concept in their head, and they found
15 somebody like me to help them accomplish this
16 concept.  Because if they were -- basically, they
17 had it already; then they don't need me.  They
18 could have just built it themselves.  But I had to
19 hire the people, okay, to go build it, because the
20 money that was spent in 213, 214, 216, for the
21 first ARES was a disaster, okay?  Then we have to
22 go to build -- go to a professional.  They didn't

176

1  tell me, Hey, Fahmi, you know what, we want to
2  build it ourselves this time.  They realized they
3  screwed up.
4        So for me, I said, Okay.  We had a
5  discussion in Abu Dhabi overseas, and this is when
6  I decided to hire Cardinal Scientific with their
7  approval.
8     Q    Because Josh Clemente had a new design
9  for the ARES; correct?
10       MR. MILLS:  Object to the foundation.
11    A    Again, I am an engineer, Mr. Henson, and
12 Josh is an engineer, okay?  So when you go and
13 build, you know, the first article and you learn
14 from it, and F2E pays for everything.  To help
15 Josh, it's like, okay, you know what, now we know
16 where we screwed up.  Okay.  Let's do it again
17 this way.  So this is what happened.  They built
18 the first one.  They refused to go for a
19 professional company.  They did it.  Nobody wants
20 it.  The system is complicated.  And none of the
21 armoring companies, they wanted to touch us, so
22 everything was collapsed and wasted.

177

1       So to be more specific to you, when they
2   did the design, him and his father, they put
3   overload on the front axle.  And they figured this
4   is not going to work.  And it was disaster and a
5   mistake.  So what did they do this [sic]?  They
6   took the weight from the front axle and put it in
7   the back axle, okay?  And they said, Okay, now we
8   have the design, but does it move, does everybody
9   know it's go to work?  Hey, let's have Fahmi pay
10  for it and have an engineering company do it, and
11  we take all the information, and we claim it's our
12  design.  That's what happened.
13     Q    Okay.  So in the redesign that you're
14  talking about, the moving the weight from the
15  front axle to the back axle, that was the second
16  generation?
17     A    That's correct.
18     Q    And that came about in early 2017,
19  right, at iDEX?
20     A    No, sir.
21     Q    No?
22     A    No.  I hear Tim's testimony, and it was

178

1   a lie, complete lie.
2      Q    Okay.  I'm not asking about Tim's
3   testimony.  I'm asking about your testimony.
4      A    My testimony, no.
5      Q    Okay.  So what is your recollection of
6   when the second generation of the ARES was
7   completed, the design from Tim and Josh?
8      A    Completed?
9      Q    When was the first time that you knew
10  that there was a second generation of the ARES
11  that put the weight on the back axle?
12     A    Okay.  I knew this after we came back
13  from iDEX.  Now, looking at the document that was
14  released, they were discussing this with some
15  manufacturer company, the one we used, we had an
16  NDA without my knowledge.  And I saw the e-mail
17  that was produced, and I was not even aware of it,
18  and I was not copied.
19     Q    This Ivis Tech?
20     A    The Ivis Tech, yes.  They were
21  discussing it with Cory Brant.  Tim, in his e-mail
22  -- and I remember about this.  Tim is telling him,

179

1   Look, you know, we're coming up with another
2   design, okay.  And basically telling them, and
3   they wanted to see how they could meet, and all
4   these things.  And I believe Cory responded to him
5   by saying, I think, telling him, Yeah, there is
6   something.  Only this e-mail that I learned about
7   it, Mr. Henson, when it was released.  I didn't
8   even know about this.
9      Q    Okay.
10     A    Excuse me.
11          THE WITNESS:  Rebecca, I would like to
12  say -- and this is for you, okay?  If you're going
13  to make fun, or you're going to be disrespectful
14  to me, this meeting is over.
15          MR. MILLS:  I agree with that.
16          THE WITNESS:  Okay?
17          MR. MILLS:  She's got to do a lot
18  better.
19          MS. LEGRAND:  In this deposition, if I
20  flinch at inaccurate statements --
21          MR. MILLS:  You don't get to make faces.
22  Just be professional.

180

1          MS. LEGRAND:  I will attempt to stop
2   making faces, if that is how are you're construing
3   it, but I don't know of any law that allows you to
4   stop a deposition because you do not like how my
5   face looks.
6          THE WITNESS:  No.  I didn't say your
7   face.  You're making faces at me, like I am -- you
8   know, I mean, this is unprofessional.
9          MR. MILLS:  Yeah.
10          MR. HENSON:  Was she sticking her tongue
11  out at you?
12          MR. MILLS:  Here's what we're going to
13  do.  Yes, it's not fair.  We're going to take a
14  break.  So we're off the record.
15          MR. HENSON:  Okay.  Let the record
16  reflect that a break is being taken by
17  Mr. Alubbad.
18          MS. LEGRAND:  Because he doesn't like my
19  face.
20          THE VIDEOGRAPHER:  We are going off the
21  record.  The time is 2:02 p.m.
22          (Whereupon, a recess was taken.)

181

1    THE VIDEOGRAPHER:  We are back on the
2  record.  The time is 2:16 p.m.
3  BY MR. HENSON:
4    Q   All right.  We are back on the record
5  after a short break initiated by Mr. Alubbad.
6  Before we recessed, Mr. Alubbad, we were talking
7  about compensation discussions in which you were
8  involved relating to how Josh Clemente would be
9  compensated; is that right?  Do you recall
10 discussing prior discussions about compensating
11 Josh?
12   A   Yes.
13   Q   And I'd like to direct your attention
14 now to another e-mail that Tim Clemente sent you.
15 This is MIT 7394 through 7396, and it's been
16 marked as Exhibit 9.
17    (Exhibit 9 was marked for identification
18 and is attached to the transcript.)
19   Q   Take a look and tell me if you recognize
20 this e-mail.
21   A   Yes.
22   Q   And this e-mail is dated January 22nd,

182

1  2017; correct?
2    A   Yes.
3    Q   And in it Tim Clemente is sending an
4  attachment with a proposal to you, right?
5    A   Yes.
6    Q   And in that proposal -- I'll read the
7  top of MIT 7395.  He writes, Dear Fahmi, you
8  mentioned on the phone last week that you would be
9  willing to be 50/50 partners with me at MIT.  I
10 very much appreciate your offer, but I think
11 rather than you and I be 50/50 partners, a better
12 arrangement would be for us to include Josh and
13 Ken in the company membership/ownership to reflect
14 all of their continued contributions to MIT.  We
15 would not have been able to accomplish what we
16 have and get where we are without them.
17    Did I read that correctly?
18   A   Yes.
19   Q   And in the course of this e-mail, Josh
20 -- I'm sorry -- Tim Clemente makes a request to
21 compensate Josh Clemente for the services that he
22 provided to MIT; correct?

183

1    A   Yes.
2    Q   And in the bullet point, the second --
3  the bullet point second to the bottom on MIT 7395,
4  do you see where Tim Clemente writes, Josh has
5  agreed to work in lieu of pay in the short term,
6  but he would like to own a small but reasonable
7  stake in MIT in exchange for all he is doing.
8    Do you see that there?
9    MR. MILLS:  I don't see where you are.
10   MR. HENSON:  The second bullet from the
11 bottom --
12   MR. MILLS:  Okay.
13   MR. HENSON:  -- MIT 7395 --
14   MR. MILLS:  Okay.
15   MR. HENSON:  -- last sentence.
16   MR. MILLS:  Okay.
17   A   Josh has agreed to work lieu of pay in
18 the short term.  Okay, I see this.
19   Q   So do you recall this e-mail?
20   A   Yeah.
21   Q   And what was your reaction upon
22 receiving this e-mail?

184

1    A   Nothing.
2    Q   Okay.  Why not?
3    A   Because this is the same story as 215.
4  Every time I needed Tim, you know -- whenever we
5  needed financial document, Tim goes and sends me
6  the same e-mail.  So for me, when he wrote this
7  e-mail -- you need to ask me what did we discuss
8  on the phone for me to give Tim to tell him 50/50.
9  I know what I discussed with him.
10   Q   So you understood upon receiving this
11 e-mail --
12   A   I do.
13   Q   -- that Josh Clemente was working
14 without pay in the short term with an expectation
15 of receiving an equity interest in MIT; correct?
16   A   Sir, this e-mail, this is a continuous
17 thing by Tim Clemente, always.  Whenever the
18 company needed something, he'd throw this, okay?
19 In my opinion, and I say it for the record, Josh
20 was already has -- I mean, a percentage from his
21 father for the extra 5 percent that his father
22 basically told me he needed.  So it wasn't, you

185

1  know -- I mean, I wasn't planning.  Let me put it
2  to you this way:  I wasn't planning, and I made it
3  clear to Tim when I say to him about the 50/50.
4  For me, we made an investment, and we shook hands
5  and we wrote an agreement.  And part of the
6  agreement, Mr. Henson, that I get paid whatever I
7  put before any distribution.  Before giving
8  anybody any percentage; before making any changes
9  to whatever structure we have, I wanted to get
10 paid, because MIT, the only source of funding, it
11 was from me, F2E, and nobody else.  Tim write in
12 this e-mail, I have contributed 175.
13     Q    I'm not asking you about that.
14     A    Mr. Henson, there is another e-mail.
15 Tim says if he contributed 200.  There is another
16 e-mail.
17     Q    Mr. Alubbad, I need to direct you to
18 another question, please.  So I let you speak --
19     A    That's fine.  Okay.  Okay.
20     Q    Okay.  At the end of the day, I need to
21 get through my questions --
22     A    Go ahead.

186

1      Q    -- and you are not answering the
2  questions.
3      A    I am answering your questions.
4      Q    You were aware that as of the receipt of
5  this e-mail --
6      A    Okay.
7      Q    -- that Tim Clemente communicated that
8  Josh Clemente was working without pay and was
9  expecting a percentage equity in MIT; correct?
10     A    That's not true.
11     Q    Well, you received the e-mail, right?
12         MR. MILLS:  Are you arguing with him
13 now?
14     Q    You said you received the e-mail; that
15 you recall receiving it?
16     A    You asked me, and I said yes, okay?
17     Q    All right.  Now, so your testimony here
18 is a little confusing, and so I just want to make
19 sure that I'm understanding you.  Are you
20 testifying that Josh Clemente was a member of MIT?
21     A    I know you asked me this question a
22 million times.  I am telling you Josh was

187

1  compensated from the percentage that was given to
2  his father, but we did not have any written
3  agreement with Josh Clemente.
4      Q    When was it?  When was the 5 percent
5  transferred to Josh?
6      A    The 5 percent wasn't transferred,
7  Mr. Henson, to Josh, in 2022, okay, when I learned
8  there was a patent.  His father wrote him an
9  e-mail telling him, I want you to transfer this,
10 and in the end, I'm giving you the 5 percent.  And
11 finally, after all this, Josh said, I don't want
12 my 5 percent.
13     Q    Okay.
14     A    And this was in 2022.
15     Q    So the 5 percent -- I just want to roll
16 back the clock a little bit.  I'm asking about
17 2017 and before.
18     A    Okay.
19     Q    Josh never held an equity interest in
20 MIT; correct?
21     A    Whatever he had with his dad, whatever
22 percentage they agreed together, in my opinion,

188

1  Josh always had percentage promised to him by his
2  father.
3      Q    Okay.  Sitting here today, is there any
4  document that you know of reflecting a transfer of
5  equity from Josh to Tim -- I'm sorry -- from Tim
6  to Josh that you signed?
7      A    No, sir.
8      Q    It doesn't exist, does it?
9      A    No.  No.  To my knowledge, there was no
10 document that I put my signature on it, telling
11 Tim that, okay, yes we agree and all that stuff.
12 I don't have it.  Maybe there is a document I'm
13 not aware of, you know, but --
14     Q    Isn't it true that you told Tim Clemente
15 that you wanted to wait until you had more
16 business until compensating Josh Clemente?
17     A    Again, I did talk with Tim, and I told
18 him, before any compensation or any distribution,
19 first I always said we need to have business.
20 Second, in conditions.
21     Q    Is it true?
22     A    In conditions.

189

1    Q    Is it true or not true?
2    A    You see, when you say to me is it true,
3  true with conditions, which means, I said, Yes, as
4  long as I understand who will be doing what.
5        Mr. Henson, Tim and Josh, they wanted
6  10 percent each, and they wanted to fly and let me
7  do all the heavy lifting.  And it wasn't
8  acceptable to me.  When you try to pin them down,
9  they disappear.  That's why where we are.  That's
10  why we don't have an agreement.
11    Q    So you couldn't pin Tim down; that's
12  your testimony?
13    A    You know what?
14        MR. MILLS:  He's answered the question.
15    A    I answered the question because, like I
16  say to you, I never made a promise to Josh.  It's
17  his dad who made him the promise.
18    Q    All right.  How much business was needed
19  before you were willing to provide Josh Clemente
20  with a percentage?
21        MR. MILLS:  Object to the form.
22    A    You know, Mr. Henson, as I said to you,

190

1  how much business?  Until I get paid whatever
2  investment I made.  I don't know.  I mean, that
3  time, when we were talking, we didn't have any
4  business.  We have lots of promises that I was
5  bringing to the company, because it's all my
6  effort.  And you know, so that is, basically -- I
7  couldn't tell until we did the distribution and
8  figured out how much I owed them.  You know, I
9  always said to Tim -- and this is for the record.
10  I always said to Tim, I don't want this; you can
11  have it and hire me as a consultant for you --
12    Q    Okay.
13    A    -- to bring you the business.
14    Q    Let's stick to the questions, please.
15    A    Okay.
16    Q    I want to turn and talk about MIT's --
17  the intellectual property that you contend is at
18  issue here.  And this, you know, I'll be
19  referencing from the 30(b)(6) notice.
20        MR. MILLS:  Topic 13?
21        MR. HENSON:  That's right, Topic 13.
22    Q    Which I understand that you will be

191

1  testifying as to all subtopics with the exception
2  of Subtopic C; correct?
3    A    Yeah.
4    Q    What intellectual property do you, as
5  MIT's corporate designee, believe was
6  misappropriated or misused by either Tim or Josh
7  or both?
8    A    Actually, everything related to the
9  invention and the design of the ARES, because MIT
10  only had one product, which is the ARES.  And
11  second, all the electronic work and work product
12  that basically -- and all confidential information
13  that Josh is holding and never returned.  And he's
14  using it as leverage against MIT.  And the fact
15  also that there's no NDA or work for hire, okay,
16  and all the work that I paid -- that MIT paid for
17  Cardinal Scientific, and Twenty First Century work
18  this is all -- they're still holding this
19  information.  This has not been returned to me.
20  All the CAD drawing, 3D modeling, you name it.
21    Q    Okay.  All right.  So I'm wondering --
22  so all of the materials that were prepared by

192

1  Cardinal Scientific, that's one item, right?  The
2  materials prepared by Twenty First Century, right?
3  Then you said everything regarding the ARES, and
4  that's very broad.  Can you be more specific?
5    A    Yeah.  All the 3D modeling, CAD drawing.
6  To this date, Mr. Henson, okay, Josh Clemente is
7  holding the ITAR-related material that MIT did for
8  it.  And to this date, his dad allowed him, okay,
9  to keep this and not to -- I mean, to give it
10  back.
11    Q    ITAR; is that what you said?
12    A    Yes, ITAR
13    Q    And does ITAR relate to MIT's
14  intellectual property?
15    A    Because, you know, this information is
16  part of all the information, because this
17  ITAR-related material, it was shared with us from
18  another company, which is, you know -- basically,
19  all the information regarding the armored truck
20  from Lenco.  And this, also ITAR material, okay,
21  it was exposed when the patent was released.  So
22  when he filed for the patent, information,

193

1 confidential information, about the ARES, and then
2 also ITAR-related material was released to the
3 rest of the world. And Josh was holding also
4 confidential information that belonged to MIT,
5 like pricing, technical information about
6 customers, and stuff like this. This is all MIT.
7 And now finding out that Josh doesn't have an NDA,
8 I mean --
9     Q    Okay. There's a lot of broad categories
10 of things, and I just need to bring it down to a
11 greater level of specifics here. And just to be
12 clear, when we talk about intellectual property
13 what I mean by that is, whether it's a trade
14 secret, proprietary confidential information,
15 really any sort of tangible information or, you
16 know, tangible or intangible asset that is at
17 issue in this litigation. That is what I'm trying
18 to understand. What is MIT contending was either
19 wrongfully possessed or wrongfully used?
20         And so does that make sense about what
21 I'm asking about?
22     A    Okay.

194

1     Q    It does?
2         MR. MILLS: I think he answered your
3 question, but go ahead.
4     Q    And I'm just clarifying. So can you
5 take me through the first instance that MIT is
6 aware of, as MIT's designee, in which either Tim
7 or Josh Clemente wrongly possessed or wrongly used
8 any of MIT's intellectual property?
9     A    Okay. First of all, Tim failed to have
10 NDA signed with Josh.
11     Q    Okay.
12     A    And this is really important, because
13 the information, all the confidential information,
14 Tim was a member of the company, and he is bound
15 by confidentiality and work for hire. So anything
16 that's done, okay, it's confidentially, it's MIT.
17         And as I mentioned to you earlier, MIT
18 has only one product, which is the ARES. So the
19 invention, the design, anything related to the
20 ARES, that belongs to MIT.
21     Q    When was the first time that you were
22 aware of, as MIT's designee, of Tim or Josh

195

1 misusing or wrongfully possessing MIT's
2 intellectual property?
3         MR. MILLS: Those are two different
4 questions. Why don't you break it down?
5         MR. HENSON: I'm asking for either, any
6 event. Listen. And if the witness is confused,
7 he can ask me.
8         MR. MILLS: Well, then I object.
9         MR. HENSON: Make your objection for the
10 record.
11         MR. MILLS: Yeah.
12     Q    I'm trying understand the timeline --
13     A    Okay.
14     Q    -- of MIT's knowledge. Please let me
15 finish. When does MIT have knowledge of the first
16 instance in which its intellectual property, which
17 includes trade secrets, confidential business
18 information -- when does MIT have knowledge of
19 that first being misused or wrongfully disclosed?
20     A    Okay. Again, I might be confused with
21 your questions. But the first time I learned
22 about the patent, okay, it was in 2022.

196

1     Q    Is there anything outside of the patent
2 that you are seeking in this litigation as it
3 relates to wrongful possession or retention --
4     A    Yeah.
5     Q    -- of intellectual property for MIT?
6     A    Yes. All the information that MIT paid
7 for it, for Cardinal Scientific, all the work
8 product of the design, all of the original, that I
9 paid for it, that the company handed to Josh and
10 Tim, and to this date, they have not returned.
11 And all the work regarding Twenty First Century,
12 including the source code, including the design,
13 that they handed to Josh, and Josh sent me an
14 e-mail confirming he received, to this date, I
15 don't have. MIT does not have, okay?
16         They are using this as a leverage
17 against me, okay, for financial reason and
18 whatever. And this is — plus the confidential
19 information that Josh is holding, which is
20 confidential information that belongs to the
21 company, like business information, I mean,
22 information belong to the customers, all these

197

1  things Josh is holding.
2      Q   Okay.  Let me make sure I'm
3  understanding you.  So there's the information
4  that was disclosed in the patent application,
5  right?  There is the information that was received
6  by Josh and Tim from Twenty First Century;
7  correct?
8      A   That MIT paid for.
9      Q   But that's correct, right?
10     A   Uh-huh.
11     Q   And then there's the information that
12  was received by Josh and Tim relating to Cardinal
13  Scientific; correct?
14     A   Twenty First Century, Cardinal
15  Scientific, yes.
16     Q   So that's three issues, right?
17     A   Okay.
18     Q   The patent, Twenty First Century, and
19  Cardinals Scientific?
20     A   Okay.
21     Q   As MIT's designee, are there any other
22  instances that MIT is contending that there was a

198

1  wrongful use or wrongful possession of MIT's
2  intellectual property to include confidential
3  information and trade secrets?
4      A   Yes.
5      Q   And what is that?
6      A   It's basically when Josh, okay, and Tim
7  secretly went and filed for professional patent
8  without my knowledge.  It's when Josh, you know,
9  asked his friend, Jonathan Adam, who I never met
10  until I saw his face in Paris, was sharing company
11  information, okay, and, you know -- and all the,
12  you know, design and work.  Now I am learning and
13  seeing from all of these, you know, release from
14  document.
15          And for the record, okay, until this
16  day, Josh refused, through my attorney -- refused
17  to release all the GrabCAD document, refused to
18  release all the record that belong to MIT that
19  paid for it, to this date.
20     Q   GrabCAD?
21     A   GrabCAD, yeah, design and drawing that
22  he was sharing with Jonathan Adam, and they were

199

1  sharing with Tim.  Tim and Josh both, they failed
2  to produce, and I have asked my attorneys
3  repeatedly that all of this, all these missing
4  items, and to this date, nobody released it.
5      Q   Okay.  Is that GrabCAD, C-A-D?
6      A   Yeah, C-A-D.
7      Q   Okay.  And is that the same thing as
8  Twenty First Century or is it different?
9      A   It's different.
10     Q   Okay.  And was there a vendor that this
11  relates to?
12     A   No.  Because everything, as I mentioned
13  to you, related to the ARES.  So this is what they
14  were doing.  This is ARES.  It was designed,
15  everything for the benefit of MIT.
16     Q   Okay.
17     A   And as I mentioned to you, this is the
18  only product.
19     Q   I understand.
20     A   So no confusion.
21     Q   I'm just trying to get the instances
22  down.

200

1      A   Okay.
2      Q   So let's go through them one more time,
3  just to make sure this is a full list, and you can
4  tell me if I'm missing anything.  There's Cardinal
5  Scientific; there's Twenty First Century; there is
6  the filing of the patent itself; there is -- you
7  mentioned sharing of information with Wes
8  Regimbal; is that right?  Or just Wes?  And then
9  there's the GrabCAD information.  That's five?
10     A   GrabCAD, all the files, even Jonathan
11  Adam is holding, who is not a member of MIT.
12     Q   Okay.
13     A   And all the files that is still in the
14  possession of Tim Clemente, okay?  He never
15  returned back to the company, and he made false
16  claims that he did.  To this date, he has not
17  returned.
18     Q   Okay.  There's disclosures to Jonathan
19  Adam.  That's six.
20     A   Yeah.
21     Q   Right?  And then there sounds like
22  there's a seventh there with Tim Clemente

201

1  possessing information?

2    A   Yes.

3    Q   Okay.  Are there any others, other than

4  those seven?

5    A   I don't recall right now.  I don't

6  recall.

7    Q   Okay.

8    A   I have to go back into my record.  I

9  mean, look, this has been overwhelming for me,

10 because trying to remember so many things, okay,

11 but right now, this is what I remember.

12   Q   I'm asking about what MIT is seeking in

13 this lawsuit, and what property are we talking

14 about?

15       MR. MILLS:  You have the answer.

16   Q   And you've identified seven different

17 things.

18   A   Okay.

19   Q   And there's nothing else that you can

20 recall sitting here as MIT's corporate designee,

21 right?

22   A   Yes.

202

1    Q   Okay.  So now, Tim Clemente, he was a

2  member and an officer of MIT.  He properly had

3  access to MIT's intellectual property, right?

4    A   Yes.

5    Q   There was nothing he was restricted from

6  accessing, as you know?

7    A   MIT holders had access, yes.

8    Q   And so MIT is not asserting a claim

9  against Tim Clemente regarding his specific access

10 to MIT's intellectual property, right, as far as

11 you know?

12   A   I don't know the answer to this one.

13       MR. MILLS:  That was a bad question.

14 You just gave the answer.

15       MR. HENSON:  Okay.  Again, that's very

16 suggestive.

17       MR. MILLS:  No.  He just gave the

18 answer.

19       MR. HENSON:  You don't get to say on the

20 record it's a bad question.

21       MR. MILLS:  Okay.  Ask your question.

22       MR. HENSON:  If you want to make an

203

1  objection for the record, make it in a

2  non-argumentative and non-suggestive manner.

3        MR. MILLS:  Objection.  Bad.

4        MS. LEGRAND:  Object to form, I think is

5  traditionally permitted.

6  BY MR. HENSON:

7    Q   All right.  And so in the complaint,

8  there is an allegation.  I'm going to come back to

9  the seven here.  So MIT is contending that there

10 was a common scheme in 2015 to wrongly establish

11 control over MIT's confidential business

12 information and intellectual property rights; is

13 that correct?

14   A   I believe so.

15   Q   You believe so?  And why 2015?

16   A   Because in 2015, Tim filed for a

17 professional patent in both his name and his son,

18 and I was not informed about it.  I only learned

19 about it by coincidence and seeing it in a

20 proposal.  The way we do business, Tim always —

21 whenever he sent a proposal, sends it to me for me

22 to review it.  I saw something he mentioned about

204

1  patent, and then I ask him.  I said, Tim, does MIT

2  have a patent?

3        And then he said, No.

4        I said, Then why are you mentioning it?

5        He said, No.  This is an application; I

6  did it to scare people.  And I took his word.

7    Q   And so as of 2015, the patent, then --

8  so you were aware that there were materials

9  circulating that had a patent pending related to

10 the ARES; correct?

11   A   The first thing before patent pending,

12 the proposal.  There was a specific proposal.  We

13 sent it to a client in Belgium, and Tim mentioned

14 in it that we have a patent, okay?  And, you know,

15 I have to be honest with you.  I really don't -- I

16 didn't know the meaning or even understood what

17 professional patent mean.  I mean, look, I didn't

18 know.  I don't have a patent, so I don't know the

19 meaning of professional patent.  My partner, who I

20 trust, tell me something, I did not bother to go

21 and research.  That's it.  I trusted what he said.

22 He said, We did it to scare people so they don't

205

1  steal our design.
2      I said, Okay.
3      Q    So you didn't look any further into it?
4      A    No, sir, I did not, because I want you
5  to be rest assured, if I looked and I found out
6  there was some issue, I swear to you, we would not
7  continue.
8      Q    So you knew from at least in 2017, that
9  there were MIT marketing materials that actually
10 you distributed, as well, that had patent pending
11 printed on them, right?
12     A    Okay.  The answer is, yes, but I was a
13 messenger, because Tim was in control of the
14 website.  Tim is the designer of the catalog.  Tim
15 is making everything and is giving it to me.  Yes.
16 And I am distributing it to the whole entire world
17 by e-mail, by WhatsApp, you name it, yes.  And it
18 says patent pending.  And Tim told me again, we're
19 doing it so nobody can steal our stuff.
20     But Tim failed to tell me he filed a
21 professional patent in 217 right after the UAE.
22 Why?  Why would he hide this from his partner?

206

1      Q    Now, so you're talking about the
2  July 2017 provisional patent application?
3      A    Uh-huh.
4      Q    And after July 2017, there was a
5  second-generation ARES marketing brochure that you
6  distributed at Milipol that, again, contained --
7  it had the new ARES on it, and it said patent
8  pending, didn't it?
9      A    Again, this is Tim making the stuff, and
10 I'm distributing it.
11     Q    But you knew that the patent pending was
12 in there?
13     A    But what Tim said, worldwide patent
14 pending.  Was this true, worldwide?  You know
15 what?  He told me again, We're doing it so nobody
16 can steal.  And that's my partner lying to me
17 again.  Now, I did not make this.  I just
18 basically the messenger who basically told me
19 [sic] -- I told him, Tim -- I remember vividly
20 telling him in 217, when Cardinal designed and
21 finished the integration of the system, and I knew
22 we have an edge and a unique system over all our

207

1  competitors, I told immediately to Tim Clemente to
2  patent the system.  And Tim talked me out of it,
3  because Tim said, Oh, you know, let's just
4  concentrate on the marketing.  But Tim failed to
5  tell me he was in cahoots with his son filing a
6  professional patent.  And you know when we learned
7  about it?  We learned about it when everything was
8  released.  We didn't have it in our complaint.
9      Q    Okay.  So you wanted Tim Clemente to
10 patent the new second-generation ARES?
11     A    I am the one who told him, Can we patent
12 this so nobody -- because what -- when we did the
13 ARES, Mr. Henson, we knew we have an edge and
14 something unique over all our competitors, and I
15 wanted to protect it.  I learned that in 217, I
16 was telling Josh and Tim, Please, do not share
17 information.  And I instructed Josh in an e-mail,
18 when I learned he is talking to people, okay, and
19 not copying me.  I send him an e-mail, and I said,
20 Josh, do not share information, and every time you
21 send an e-mail, make sure you copy me.  And I
22 instructed Tim repeatedly, but they ignored

208

1  everything I said.
2      Q    Now, MIT was never harmed by the 2015
3  patent application, was it?
4      A    I don't know, Mr. Henson, how you
5  interpret harm.
6      Q    Well, how do you perceive harm?
7      A    I mean, look, I mean, for me, I can't
8  right now answer this question back in 215 how was
9  it harm or not harm.  I can't give you a really
10 honest answer.
11     Q    Well, I'm asking -- I mean, and
12 specifically in your capacity as the corporate
13 designee of MIT, you brought here a claim where
14 you're contending that there was a conspiracy that
15 began in 2015, and specifically because of the
16 provisional patent application, right?
17     A    You know --
18     Q    Is that right?
19     A    Yes.  I mean, this is just to show the
20 pattern of behavior that every time, okay, we do
21 something, they go secretly; they tried to patent
22 it without letting, you know, the F2E or MIT

209

1 member know about it. And I mean, I just don't
2 understand. Why is this okay? In 215, it
3 happened, and they're both -- and I said,
4 Gentlemen -- I'm sorry. I said to Tim, What?
5      Tim said, No, no, no. Nothing, no
6 patent. This is just to scare people.
7      Okay. Fast forward, we left it. I
8 didn't know he did it again. In July 217, they
9 filed in their both name, and then in 218, Tim and
10 Josh, they do it by himself. So this behavior,
11 okay, continued with both Josh and Tim, and
12 without the knowledge of MIT.
13      MIT pays for everything, and yet, they
14 choose to do this secretly.
15    Q    Secretly, but they put patent pending in
16 the marketing materials. That doesn't sound very
17 his secretive, does it?
18      MR. MILLS: Object to the form and the
19 foundation.
20      COURT REPORTER: I'm sorry. Was there
21 an answer there?
22      MR. MILLS: No. I think he withdrew the

210

1 question. It was argumentative.
2    Q    The comment that you testified that Tim
3 Clemente made that the patent was just to scare
4 people, You know there's a difference between a
5 provisional patent application and actually
6 pursuing a formal patent. Do you understand that?
7      MR. MILLS: Object to the form.
8    A    Again, I testified earlier that I am
9 not, you know, experienced enough to answer such a
10 question. As I told you earlier, I didn't know
11 the difference between provisional or
12 non-provisional. I didn't understand, and I'm
13 being honest.
14    Q    Okay.
15    A    Okay? I don't know.
16    Q    So for all you know or don't know, what
17 Tim Clemente was telling you could have been true?
18      MR. MILLS: Object to the form.
19    Q    That it was just intended to scare off
20 competitors who --
21    A    Again, at that time, when he told me, I
22 had no reason not to trust him, because he was my

211

1 partner. And my rule in life and business, okay,
2 when you don't trust your partner, you don't
3 continue on life. This is like marriage,
4 Mr. Henson. For me, I didn't have any doubt not
5 to trust him. I took whatever he told me, and I
6 just accepted it, okay? But when I learned later
7 on, okay, about the patent, and I start seeing and
8 going back, I knew this was a lie, after a lie,
9 after a lie, and disappointment, okay? So that's
10 the only way I can explain.
11    Q    Turning back to the seven items that you
12 mentioned that are apparently at issue in this
13 lawsuit, I want to take Cardinal Scientific first.
14 What is MIT's understanding of any wrongful
15 behavior on the part of Tim or Josh as it relates
16 to anything to do with Cardinal Scientific?
17    A    They took all the material that MIT paid
18 for completely. I have an e-mail that was sent by
19 Tim, and basically telling me, Fahmi, we received
20 the 3D modeling, we received the drawing, we
21 received the shop drawing, we received videos,
22 everything related, and we are satisfied, please

212

1 pay.
2      That's the e-mail. And we released that
3 e-mail to you. And to this date, Mr. Henson, they
4 refused to give it to me back. In 219, I asked an
5 attorney to meet with Tim and write him. And Tim
6 assured him, even though I didn't know Tim
7 recorded us, me and my attorney, secretly, and
8 basically it's the same thing. He said, Yeah,
9 yeah, yeah, this belong to Fahmi.
10      And in the tape, I said, No, it does not
11 belong to Fahmi; it belongs to MIT.
12      Oh, yeah, yeah, but Josh is traveling;
13 he is in a mountain in Georgia. He will give it
14 to him. To this date, I don't have the original
15 information that they received.
16    Q    What information?
17    A    Everything I paid Cardinal Scientific to
18 design, the ARES.
19    Q    Which is what?
20    A    I already answered.
21    Q    Are there any documents that you're
22 aware of that are specifically at issue?

213

1    A   I already answered you.
2         MR. MILLS:  Yeah.  He gave --
3    Q   Are there any documents that have been
4  produced in this litigation that reflect the
5  information that you contend was wrongfully
6  possessed by Josh or by Tim from Cardinal
7  Scientific?
8    **A   I'm confused.**
9    Q   I'm trying to --
10   **A   I don't know what you're asking me.  You**
11 **asked me about Cardinal, Mr. Henson, and I told**
12 **you what Cardinal did.  Cardinal designed the**
13 **system, okay?  Yes, Josh was a tremendous help.**
14 **Tim was tremendous help.  I was a tremendous help.**
15        **Look, in engineering, okay, when you**
16 **build something, many people, they work together,**
17 **okay?  So it wasn't just Josh.  The company, we**
18 **paid them to design, and then, at the end of the**
19 **day, okay -- to make it simple for you, they say,**
20 **Okay, this is everything we have done; this is all**
21 **the CAD drawing; this all the modeling, all that**
22 **-- everything related to the ARES.  They hand it**

214

1  **to Tim and Josh.  I wanted a copy of it.  Nobody**
2  **willing to give it to me.  So that's my answer.**
3    Q   And is it your contention that Josh
4  Clemente wrongfully obtained this information?
5    **A   Yes.**
6    Q   He should never had information for
7  that, that's your contention?
8    **A   Yes.  Because now, when I learned he**
9  **doesn't have an NDA, and his father lied to me, of**
10 **course.  This information, you know, it's all**
11 **confidential information.  This is all related to**
12 **the ARES, the invention, everything.  That does**
13 **not belong to, you know -- I mean, Josh, when he**
14 **is basically taking this information and sharing**
15 **it, even with Jonathan Adam, and God knows who**
16 **else also shared it with [sic].**
17   Q   Now, CAD drawings and 3D modeling and
18 photos and videos, those have all been produced in
19 this litigation, right?
20   **A   Produced to me?**
21   Q   Well, I think from both sides there's
22 been production --

215

1    A   No.
2    Q   -- relating to drawings?
3    **A   No, sir.**
4    Q   No?
5    **A   No, sir.  And I can assure you, I just**
6  **sent an e-mail to my lawyer a week ago or maybe 10**
7  **days ago, and I said, I just want to remind you.**
8         MR. MILLS:  Wait.  You don't talk about
9  me.
10        THE WITNESS:  Okay, fine.
11   **A   Of all the missing items.  I'm not go in**
12 **details.  Sorry, Laurin.**
13   Q   I'm just trying to get my arms around
14 what are the missing documents.
15   **A   Talk to my lawyer.  He will tell you.**
16   Q   You're under oath today.
17   **A   I mean, he told me not to tell you.**
18   Q   I think he was telling you not to tell
19 me about a specific message you sent to your
20 lawyer, and that's not the question that I'm
21 asking.
22        MR. MILLS:  I think he's answered your

216

1  question the best way he can.
2         MR. HENSON:  Again, Laurin, just state
3  the objection for the record.  We know how this is
4  done.  Come on.
5         MR. MILLS:  Yeah.  I'm doing it.  I'm
6  trying to help you, and you're not letting me.
7  He's answered it 10 ways from Sunday, and if you
8  want to have him recite Bates numbers, he can't do
9  it.  And you're going to -- you're wasting time.
10   Q   Is there anything -- are there any other
11 -- is there any other intellectual property,
12 including trade secrets, confidential information,
13 from MIT that MIT contends was wrongfully
14 possessed or used by Josh or Tim that was received
15 from Cardinal Scientific that we haven't already
16 discussed?
17   **A   I swear, your question, with all**
18 **respect, kind of confused me.**
19   Q   I'm just trying to figure out, have we
20 talked about everything about Cardinal Scientific
21 or --
22   **A   Yeah.  We talked about everything, yes.**

217

1    Q    Okay. There's nothing else?
2    A    No.  Everything, I told you, what they
3    received.  There is a specific -- Mr. Henson,
4    there is a specific e-mail that -- the Fahmi
5    things -- that Josh and Tim refused to release.  I
6    released it, okay?  And basically, it is from Tim
7    and it says, Yes, we received everything, please
8    pay him.
9         And he mentioned in the e-mail -- this
10   is what it says, We received 3D shop drawing,
11   videos, and he listed everything.  And basically,
12   I have this e-mail.  It was released to you guys.
13   Q    Okay.
14   A    And to this date, I don't have anything.
15   Q    But the disclosure that you're referring
16   to that happened on or around the time of that
17   e-mail, that is the intellectual property at issue
18   with respect to Cardinal Scientific?
19   A    Yes.
20   Q    Okay.  So as for Twenty First Century,
21   what is -- can you tell me what is at issue in
22   terms of MIT's intellectual property that MIT

218

1    contends Tim or Josh wrongfully used or possessed?
2    A    Okay.  With regard to Twenty First
3    Century, the one issue, I had an issue with Tim
4    when he allowed his son to sign the contract with
5    Twenty First Century and then remove the
6    work-for-hire clause, okay?  I had in there for
7    them the work-for-hire clause.  I told him, Tim.
8    Tim approved it, and gave it to Josh.  Josh signed
9    the contract, okay, and basically removed this.
10   And then, Josh sent an e-mail to me and Tim,
11   basically saying, Okay, we received everything.
12        And now, when I saw the text messages
13   that was released, Tim was texting his son,
14   telling him, Fahmi, they say, make sure you get
15   the source code.  Fine.  And then, you know -- so
16   when Twenty First Century, they get paid,
17   Mr. Henson, they released everything to Josh,
18   including all their work, including the source
19   code file, and everything.
20        Again, as of this date, and we are in
21   April 2024, I don't have access to it.
22   Q    And so MIT's contention is that, as it

219

1    relates to Twenty First Century, it's the source
2    code file that Twenty First Century developed?
3    A    Everything, yeah.
4    Q    Was there anything outside the source
5    code file?
6    A    I mean, everything that the company
7    developed: all the file, all the design, all their
8    software, everything that was developed for the
9    ARES was given to Josh.  If you are going ask me
10   the detail on this, I don't know it, okay?  I'm
11   just telling you that everything that this company
12   was contracted for and was paid by MIT, that Josh
13   received it, and basically kept it with him.  And
14   Tim claimed, Oh, it's with Josh.  But later on, I
15   found out also, Tim, he has it.
16   Q    So the source code file -- and I just
17   want to make sure the record is clear.  It sounded
18   like you said you didn't know anything -- you
19   didn't know the specifics of anything outside the
20   source code file?
21   A    No, no.
22        MR. MILLS:  Objection.  Foundation.

220

1    A    Let me say this:  I say to you, when the
2    company designed, you know, the system for us,
3    everything they design from their schematic, from
4    their, you know, work that they have done, okay,
5    including the source code.  Because what we give
6    them, we wanted to have everything belong to us.
7    So there was a schematic.  There was, you know, a
8    bunch of material.  There's a bunch of stuff that
9    was given.  The same thing when Cardinal
10   Scientific, Mr. Henson, okay, they bought
11   material.  So they submitted bills for materials.
12   They submitted a drawing.  They submitted videos.
13   They submitted a bunch of stuff.
14        This is not like, Oh, I'll give you this
15   part.  Part of the deal is to get everything.  And
16   I believe -- I don't recall all the details in the
17   agreement, you know, the contract that was signed
18   and has all the work, that Josh signed it, okay?
19   And it has everything that they received, and they
20   confirmed.  Josh, in an e-mail, he confirmed that
21   he received everything, and MIT has been asking
22   for it, and nobody want to return it.

221

1    Q    Okay.  So the intellectual property that
2  is at issue is that which was produced by Twenty
3  First Century to Josh Clemente approximately
4  around the time of the e-mail that Josh sent to
5  you?
6    A    This is in 217.
7    Q    In 2017?
8    A    Yeah.  Yes.
9    Q    Okay.
10    A    Because we contracted Cardinal
11  Scientific for the new ARES in 217, and Twenty
12  First Century, also in 217.  And I didn't know
13  that time there was a gentleman named by the name
14  of Jonathan Adam.  So all this information was
15  shared with him.  So Jonathan Adam has everything.
16  I only learned of him when we were going to Paris.
17        And in my e-mail, I said, who the hell
18  is John?
19        Okay.  And then, you know, then Tim
20  write me an e-mail.  He said, Oh, he's Josh's
21  friend; he's been working on the ARES for the last
22  six months.

222

1        I said, What?  How come nobody tells me
2  about John?  Do we have a NDA?
3        And immediately Josh shoot me an e-mail
4  with an NDA.  And I said, Who authorized Josh to
5  sign the NDA?
6    Q    Okay.
7    A    That's the intent.
8    Q    Okay.  But again, I'm just trying to
9  figure out Twenty First Century.  I think we're at
10  the end of this.
11    A    Okay.
12    Q    But I just want to confirm.  So the
13  e-mail that you're referencing that Josh Clemente
14  sent you saying we received the information from
15  Twenty First Century.
16    A    To me and his father, yes.
17    Q    Okay.  Whatever the files were received
18  from Twenty First Century happened around the time
19  of that e-mail; correct?
20    A    Yeah.
21    Q    And that's what at issue in this
22  lawsuit?

223

1    A    Yes.  Because he received all the
2  information.  He said, Yes.  Now we received
3  everything, so will he confirm?
4        What is interesting is that Tim sent me
5  an e-mail confirming receiving everything, because
6  they went and checked all the detail from Cardinal
7  Scientific.  And I made it very clear to Tim.  I
8  said, Tim, I will not make any payment until you
9  confirm to me.  So Tim wrote me an e-mail, and I
10  am happy to read it to you, okay?
11        And then, basically, he said, Yes, it is
12  safe to pay.
13        I said, Okay.  Then we paid Cardinal
14  Scientific.  He confirmed he received everything,
15  and I have the e-mail.  I can read it to you.
16    Q    Okay.  All right.  And then -- so the
17  information that was disclosed in the patent --
18        MR. MILLS:  I have a feeling, evidently,
19  this is where you're getting into the Hayduk
20  question, I think.  He's going to talk about
21  what's interesting with that.
22        MR. HENSON:  Well, I'm at 13A right now.

224

1        MR. MILLS:  Okay.  Maybe I was confused
2  by the way you asked the question.
3        MR. HENSON:  Yeah.
4    Q    So I'm coming back to -- we've been
5  spending some time on 13A of the 30(b)(6) issues,
6  each and every instance of wrongful disclosure or
7  misappropriation for which MIT is seeking relief
8  in this lawsuit from Tim Clemente and Josh
9  Clemente.  And I'm turning now to issue of the
10  patent, which, at least from my assumption, is the
11  easiest to identify, right?  It's just the
12  information that was in the patent was disclosed,
13  and that's information that MIT contends is its
14  own property; is that correct?
15    A    That's correct.  Everything related to
16  the ARES, from invention, design, yes.  Everything
17  related to the ARES.  This is the property that
18  belong to MIT.
19    Q    Okay.  The sharing of information with
20  Wes Regimbal, can you tell me your understanding
21  of why that is an instance of wrongful use or
22  possession of intellectual property that's at

225

1  issue in this lawsuit?
2    A    Well, because Tim failed to produce the
3  NDA with Josh, and failed to produce the NDA with
4  Wes.  So for me, as I testified earlier, I have a
5  strict rule.  Anybody who comes to touch anything
6  with MIT, they need to be on an NDA, on a work for
7  hire, if they're going to do work, either a vendor
8  or an employee.  So for me, because I never met
9  Wes, I don't know how Wes looked like, okay, and
10  this was back in 215 when Tim basically said that
11  Wes is Josh's friend, and he's a stress mechanical
12  engineer, which he has a knowledge of engineering
13  that his son lacked.  Because, as you know, in
14  engineering, there's people that have certain
15  specialty in CAD modeling, some in stress
16  analysis.
17        So he was using this gentleman who
18  happened to be his roommate.  That's the
19  information I was given.  Again, I never met Wes.
20  I don't know Wes, never talked to him.  I never
21  e-mailed Wes.  So this is the information that I
22  was given, and this is the information when Tim

226

1  told me that I need to pay for him and his son,
2  and I paid.
3        So I was assured that Wes was under an
4  NDA.  So now, when there is no NDAs produced for
5  Josh or Wes, then, they violated.  This is in
6  violation of, you know, the confidential
7  information, anything related to the ARES has been
8  violated.  So that's --
9    Q    And is there any other facts of which
10  you're aware that have any relevance to MIT's
11  contention that Tim and Josh Clemente did
12  something inappropriate with MIT's intellectual
13  property as it related to Wes Regimbal?
14    A    Yes.  I mean, they did not sign the NDA.
15    Q    Is that the only thing?
16    A    And the work for hire.  Because if they
17  got him working and he got paid, okay, that's the
18  thing that Tim failed as a member of the LLC and
19  failed his fiduciary duty to protect and safeguard
20  the information.
21    Q    I'm just trying to get the list down
22  here.

227

1    A    Okay.
2    Q    So is there anything else, other than
3  the NDA as it relates to Wes Regimbal?
4    A    Mr. Henson, I swear to you, I answered
5  you with what I am aware.
6    Q    That's all I'm asking you to do.
7    A    Because I am not aware of lots of
8  things.  So I answered you what I am aware, okay?
9  I have been through this exercise before, okay?
10  And I wasn't aware of lots of things before I
11  hired this gentleman, okay?  I was with another
12  lawyer.  And after, you know, they said, Yes, this
13  is what we did, and now I hired Laurin, and now
14  the information was released and learned about it
15  that I didn't know.  So you're asking me.  I don't
16  know.
17    Q    Okay, thank you.  So the GrabCAD, you
18  mentioned that as another event that MIT believes
19  was an event indicating wrongful possession or
20  wrongful use of intellectual property as it
21  relates to Tim and Josh; correct?
22    A    Yes.

228

1    Q    And when did that occur?
2    A    I think from, basically, seeing all the
3  documents that was released, in 217.
4    Q    What part of 2017?
5    A    It's related to the new ARES design.
6  I'm have not seen because nobody release the other
7  documents.  And the only -- what I've seen in 217
8  regarding the second-generation ARES.
9    Q    Okay.  Can you tell me in just sort of
10  layperson speech, what is GrabCAD?
11    A    This is something that, you know, they
12  shared with each other, you know.  They created,
13  you know, a file between Jonathan Adam, Tim, and
14  Josh, where they would take information, okay,
15  from Cardinal Scientific or Twenty First Century,
16  and then they share it back to Jonathan Adam.  And
17  Jonathan Adam work on it, share it with Josh, Josh
18  share it with Tim, Jonathan Adam share it with
19  Tim.
20        All this information, the GrabCAD has a
21  drawing design and everything, Step 5 that
22  basically belonged to, you know, the ARES.  And

229

1  everything related to the ARES, okay?  I only
2  learned about this when there was a release of
3  documents, okay?  And Josh never released all
4  this.  We asked for it.  Tim, also the same thing.
5  So this is all belong to MIT.  So right now, we
6  are talking, when MIT's stuff is in a different
7  location.
8      Q   Yeah.  And so what specifically was
9  wrongfully done with respect to the GrabCAD?
10     A   They are kept by Josh and Tim, and now
11 with Jonathan Adam.  But with Josh and Tim,
12 they're keeping it, and they're using it as
13 leverage against MIT.
14     Q   Tim was MIT's president?
15     A   Oh, yeah.
16     Q   He was MIT?
17     A   That's correct.
18         MR. MILLS:  Object to the form.
19     A   That's correct.  He was MIT president,
20 but he was also secretly filing patents with his
21 son without his partner knowing it.  You know, and
22 that's the president.

230

1      Q   So the GrabCAD, did you ever -- I mean,
2  was there anything -- did you ever ask for that to
3  be returned?
4      A   Through my attorneys again, I asked him
5  what is missing, and I put a list.  We went
6  through multiple -- I don't know the word --
7  requests asking him to release.
8      Q   In this litigation?
9      A   Yeah.
10     Q   Okay.  And any time before this
11 litigation?
12     A   I didn't know it existed.
13     Q   Okay.  Okay.  And so the answer is, no,
14 prior to this litigation there was no request
15 because you didn't know about it?
16     A   I didn't know.
17     Q   Okay.
18     A   If that was all you are trying to get,
19 you should have told me, make it easy for me, you
20 know.
21     Q   Okay.  And then, so we've talked about
22 Cardinal Scientific, Twenty First Century.  We've

231

1  talked about the filing the patent, we talked
2  about sharing with Wes Regimbal, we talked about
3  -- let me make sure that I'm understanding
4  Jonathan Adam and how MIT believes that Josh or
5  Tim did anything wrong with respect to what MIT
6  believes is its intellectual property, again,
7  including confidential information and trade
8  secrets, as it relates to Jonathan Adam.
9      A   Okay.  What is your question?
10     Q   I just asked it.
11     A   What is it?
12     Q   What does MIT believe was wrongfully
13 done --
14     A   Okay.
15     Q   -- by Tim and Josh as it relates to
16 Jonathan Adam?
17     A   First of all, Jonathan Adam, okay, was
18 involved with Josh, and Josh was sharing MIT
19 information, confidential information, regarding
20 the ARES.  And he was working with him without the
21 knowledge of MIT member.  Tim knew about this, and
22 he did not even let me know this.

232

1          Second, okay, while they were working,
2  okay, I learned later on, okay, and from Cardinal
3  Scientific that Josh and Jonathan Adam, they were
4  using a fraudulent Siemens software that basically
5  put MIT at risk.
6      Q   Okay.
7      A   And third, okay, I find out that Josh,
8  who doesn't have an NDA with MIT, and who is not
9  an employee of MIT, goes and signs an MIT NDA with
10 Jonathan Adam without my permission, without even
11 letting me know.
12     Q   Okay.  Was there anything else regarding
13 Jonathan Adam?
14     A   Yes, sir.
15     Q   Okay.
16     A   Jonathan Adam still holds MIT
17 information, I learned based on the production
18 that he released.  He still did not release
19 everything, you know, that belong to the ARES.
20     Q   Okay.  And just to be clear, I'm asking
21 about any wrongful conduct that you are
22 attributing -- that MIT is attributing to Tim or

233

1  Josh.
2  **A   Yeah.  Tim and Josh allowed this to**
3  **happen, okay?  Tim was the president, Mr. Henson.**
4  **This was his duty, to safeguard MIT information,**
5  **and to make sure MIT information, they are not,**
6  **you know, given to outsiders.**
7  Q   Anything else with respect to Jonathan
8  Adam?
9  **A   I don't remember.**
10  MR. MILLS:  I can't give you the answer,
11  as much as I'd like to.
12  MR. HENSON:  Let's take a three-minute
13  break.
14  MR. MILLS:  Perfect.  I was going to
15  suggest the same thing.
16  THE VIDEOGRAPHER:  We are going off the
17  record.  The time is 3:17 p.m.
18  (Whereupon, a recess was taken.)
19  THE VIDEOGRAPHER:  We are back on the
20  record.  The time is 3:30 p.m.
21  BY MR. HENSON:
22  Q   All right.  Mr. Alubbad, I'd like to ask

234

1  you some questions about correspondence that was
2  received from your attorney to Tim Clemente.  What
3  exhibit?
4  MS. LEGRAND:  Is it 10?
5  MR. HENSON:  10.
6  (Exhibit 10 was marked for
7  identification and is attached to the transcript.)
8  Q   For the record, this is MIT 4507 through
9  4508.  Take a moment to read it.
10  Mr. Alubbad, do you recognize this
11  document?
12  **A   Yes, I do.**
13  Q   And Alan H. Sachsel, he was an attorney
14  for F2E; correct?
15  **A   Yes.**
16  Q   And do you recall authorizing your
17  attorney to send this message to Mr. Clemente?
18  **A   Yes, I do.**
19  Q   The date of this letter is
20  September 2nd, 2019; correct?
21  **A   Yes.**
22  Q   And Mr. Sachsel opens by saying, It was

235

1  good meeting you last Tuesday, August 27th.
2  Do you see that?
3  **A   Yes, I do.**
4  Q   Do you recall meeting with Mr. Sachsel
5  and Mr. Clemente on August 27, 2019?
6  **A   Yes.**
7  Q   And where did that meeting take place?
8  **A   It was in my office.**
9  Q   In your office?  And what was the
10  address of your office at that time?
11  **A   1934 Old Gallows Road, Suite 402.**
12  Q   And is that in Vienna, Virginia?
13  **A   Yes, sir.**
14  Q   And we're going to come back to this
15  letter in greater substance here in just a few
16  minutes.  But I wanted to ask about an allegation
17  in the complaint that Josh Clemente had
18  misrepresented his role at MIT.  Are you aware of
19  that allegation?
20  **A   I believe so.**
21  Q   And the allegation was that Josh
22  Clemente did not have any officer title or

236

1  affiliation with MIT; is that right?
2  **A   Yes.**
3  Q   And specifically, that he was not the
4  vice president of engineering?
5  **A   That's correct.**
6  Q   And on the second page of this e-mail --
7  **A   Are we talking about the letter?**
8  Q   I'm sorry.  The second page of this
9  letter --
10  **A   Okay.**
11  Q   -- of Exhibit 10, you see on the third
12  paragraph from the top, Mr. Sachsel writes to
13  Mr. Clemente saying that MIT's website lists Josh
14  as vice president of engineering and Ken as
15  director of operations?
16  **A   That's correct, sir.**
17  Q   And this was -- is it correct that these
18  representations occurred without your knowledge or
19  consent?
20  **A   That's correct.**
21  Q   And the Ken here is Ken Fournier, right?
22  **A   That's correct.**

237

1    Q    And Mr. Sachsel wrote in the last
2  sentence of this paragraph, Creation of either the
3  position of vice president or director of
4  operations required an affirmative vote or written
5  consent.  I mean, I am assuming he's saying
6  written consent, written of the members.  You see
7  that there?
8    A    Yes.
9    Q    And then he cites the provision in the
10 operating agreement?
11   A    Yes, sir.
12   Q    Is this accurate?  Is this your
13 understanding that creation of these job titles
14 was required to be accomplished by written consent
15 or approval of the members?
16        MR. MILLS:  Object to the form.
17   A    That's what it says in the document.
18   Q    Was that your understanding as well?
19   A    Yes.  That's the word of the lawyer.
20   Q    Okay.  The word of the lawyer that you
21 authorized to send?
22   A    That's correct.

238

1    Q    And again, this was dated September 2nd,
2  2019.  When was the first time that you learned
3  that Josh Clemente had been allegedly
4  misrepresenting his status with MIT?
5    A    This is back in -- whenever Tim created
6  the website.  Tim was in control.  He created the
7  website.  I just saw the website, and it's says,
8  you know, Josh is the VP for engineering and Ken
9  director of operations.  So --
10   Q    And at no time prior to that did you
11 notice that --
12   A    Because we didn't have a website.
13   Q    Okay.
14   A    Yeah.  And at the time when we created
15 the company, I mean, Josh was in California, and
16 he was helping his dad remotely.  So there was
17 nothing until they built the product, and then
18 they started taking pictures and then made the
19 website for the company.  And this is when Tim, he
20 put Josh as the VP of engineering and, you know.
21   Q    And did you feel that it was wrong for
22 Josh to misrepresent his status as VP of

239

1  engineering?
2    A    At that time, to be honest with you,
3  when Tim did it, I didn't make a big fuss about
4  it, okay?  I didn't.
5    Q    It didn't bother you?
6    A    It didn't bother me, okay?  Tim was in
7  charge, okay?  He was the president.  He made the
8  website.  He didn't discuss it with me.  And you
9  know what, it is his son.  What can I say?  I
10 didn't make a big deal.  I didn't argue with Tim.
11 I didn't make any issue whatsoever.  Then later
12 on, he asked me to print business card, and I
13 called my assistant, and I said, Christina, work
14 with them; see what they want.
15        Mr. Henson, I had a partner who I trust,
16 and he was a friend.  So I wasn't an obstacle.  We
17 were together, working side-by-side to develop and
18 create the products of the company.  These things
19 did not really create an issue for me.  I was
20 trying to accommodate everything my partner was
21 asking me.
22   Q    So you were aware, then, that Josh

240

1  Clemente had been using the vice president of
2  engineering title for some time, right?
3    A    Yes.
4    Q    For years?
5    A    But I didn't give it to him.  I didn't
6  assign him.  I didn't instruct his father.  I
7  didn't give Tim permission to do it.
8    Q    You instructed Christina Kindlon to
9  order business cards?
10   A    No.  Because they asked her, and I asked
11 her -- she called me, and she said, Tim --
12        I said, Give them whatever they want.
13 You know what?  Things were already done,
14 Mr. Henson.  A website was shared with me, and you
15 know what?  It says Josh VP and Mr. Ken Fournier,
16 director of operations, okay?  He's in control.
17 He's the guy who made everything, not me.  The
18 question, did Mr. Tim Clemente say, Hey, Fahmi, my
19 partner, I really would like to make the website,
20 and I want to put you in it; I want to put Josh; I
21 want to put the neighbors in it?  No, that wasn't
22 discussed with me, Mr. Henson, okay?  It was done

241

1 and was given to me. Okay. That's it.
2    Q    And so, I mean, it sounds like you are
3 saying that you consented to the title being used
4 for some period of time?
5    **A    I mean, it's not the idea of consented**
6 **or not. It was done, either I liked it or not.**
7    Q    You didn't oppose it?
8    **A    You know what? I mean, when he did it,**
9 **okay, I mean -- because anyway, I figured Josh**
10 **eventually is going to be a part of the company.**
11 **He is getting compensated. He has an NDA, you**
12 **know, all of the above.**
13    Q    Let me show you what will be marked as
14 Exhibit 11.
15        (Exhibit 11 was marked for
16 identification and is attached to the transcript.)
17    Q    Mr. Alubbad, what's been marked as
18 Exhibit 11 reads, Declaration of Fahmi Alubbad.
19        Do you see that?
20    **A    What page?**
21    Q    On the very first page.
22    **A    Oh, yes.**

242

1    Q    And this is before the Patent Trial and
2 Appeal Board?
3    **A    Yeah.**
4    Q    And the date of this declaration, if you
5 turn to Page 9, you'll see that it's August 6th,
6 2023; is that right?
7    **A    Okay.**
8    Q    Yes?
9    **A    Yes.**
10    Q    And you individually signed this
11 declaration?
12    **A    Yes.**
13    Q    Now, on the third page of this
14 declaration, do you see where you actually
15 reference Josh Clemente as MIT's VP of design and
16 engineering?
17    **A    Page 3?**
18    Q    Yes, sir. On Paragraph 10, Page 3.
19 I'll read it for you: Exhibit 1011 is a true and
20 correct depiction of a screenshot of the inventor
21 and patent owner, Joshua Clemente, of the 11174677
22 patent, MIT's VP of design and engineering, being

243

1 featured in the Area 6 video.
2        Do you see that there?
3    **A    Yeah.**
4    Q    You were referencing him. You didn't
5 say that was a misrepresentation, did you?
6    **A    No. Because this is what, in the**
7 **videotape, because I was, you know, looking into**
8 **what the videotape, what the website, what**
9 **everything, you know, that has been shared with**
10 **the client that says that he is the VP of**
11 **engineering. So I couldn't make another**
12 **statement, other than what is the fact when this**
13 **was done.**
14    Q    So you're saying you were helpless to
15 prevent Josh Clemente from using the title that
16 you believed was a misrepresentation?
17    **A    No. That's not what I said. You said**
18 **to me if this is true. When this was filed by my**
19 **attorney, okay, this is what, on that date, that's**
20 **what it says in all the videos.**
21    Q    I see. I see. Okay. Well, let's talk
22 about Paragraph 16 of this declaration.

244

1    **A    16.**
2    Q    It's on Page 5. And Paragraph 16
3 references and attached Exhibit 1014, which is
4 actually attached to this declaration as well.
5 And we'll go to it just a minute. But just so
6 it's properly -- you identify here in Paragraph
7 16, you wrote, Exhibit 1014 is a true and correct
8 copy of MIT's marketing brochure created on
9 October 31, 2017, by Tim Clemente for marketing
10 the new generation ARES product. And it continues
11 on from there.
12        Did I read that correctly?
13    **A    Yes, sir.**
14    Q    And then, if you go over to the Exhibit
15 1014.
16    **A    What page?**
17    Q    I think it's the page following your
18 signature.
19    **A    Okay. Yes.**
20    Q    And it's a 12-page document?
21    **A    Yeah, I see it.**
22    Q    If you could just take a look through it

245

1 and tell me if you recognize it.
2    A    Yeah, I see it.
3    Q    Do you recognize this document?
4    A    Yes, I do.
5    Q    And on Page 7 of the declaration -- go
6 flip just a moment to the declaration.  On Page 7,
7 Paragraph 24, let me know when you're there.
8    A    I am there.  Okay.
9    Q    It reads:  At least three dozen hard
10 copies of the October 2017 brochure, Exhibit 1014,
11 were distributed to attendees at MIT's exhibit
12 site at Milipol 2017.  In Paragraph 25 you write,
13 I digitally distributed copies of the October 2017
14 brochure, Exhibit 1014, to potential customers via
15 the WhatsApp in the weeks before Milipol 2017 to
16 generate customer interest in the new generation
17 ARES project at Milipol.  And you reference 26
18 again, distributing the October 2017 brochure via
19 WhatsApp.
20       Do you see that there?
21    A    Yes.
22    Q    All right.  Now, going back to the

246

1 October 2017 brochure, Page 5 of 12, so this
2 reads, Mission Exhibit 1014, Page 5 of 12.
3    A    Yes.
4    Q    Who is that a picture of in the bottom
5 right-hand corner?
6    A    That's Mr. Josh Clemente.
7    Q    Mr. Josh Clemente?
8    A    Yes.
9    Q    And right underneath him there's a
10 description of ARES is protected by worldwide
11 patents pending; is that right?
12    A    That's correct.  And it says, under his
13 name, he's the VP of engineering.
14    Q    That's correct.  That's exactly right.
15 So you distributed to many potential customers
16 this very exhibit; correct?
17    A    I said it earlier, before you even
18 showed me this document, I said yes.  I said Tim
19 created it, and I distributed it.
20    Q    I see.  So you were distributing
21 documents that reflected what you allege was a
22 misrepresentation of Josh Clemente's role at MIT;

247

1 is that correct?
2    A    No.  Because that's the website that was
3 created by Tim Clemente, and the video that Tim
4 Clemente made, okay?  We don't need to do a
5 catalog, Mr. Henson.  You just give the customer
6 the website of the company, and they will see the
7 video, and it says, My name is Tim Clemente, I am
8 the president and the founder of MIT, and then you
9 see Josh Clemente, I am the vice president of
10 engineering.  I have no control.
11    Q    You have control.
12    A    No.  This is - he did not give me
13 control of the website in 10/2022.
14    Q    Now, you could have refused to
15 distribute this brochure because of the
16 misrepresentation, couldn't you?
17    A    No.
18    Q    You couldn't have?  You had no control?
19    A    No.  I have no control.  As I said to
20 you earlier, I was just going along with my
21 partner.  Why?  Because Josh is the son.  If it
22 was somebody else, okay, other than his son, yes,

248

1 I put my foot in the door.  But that's his son.  I
2 always accepted Tim because of family situation,
3 and this is why they say in business, you never
4 hire family, okay?  For me, I was always drawing a
5 fine line, trying to respect Tim, and trying not
6 to do anything to upset him because of Josh.
7    Q    Just not compensating Josh, though?
8    A    Well, that --
9       MR. MILLS:  Objection.
10    A    Josh has nothing to do with me.  You can
11 repeat in a million times.
12    MS. LEGRAND:  Andrew, this is a topic
13 near and dear to my heart, where I am slightly
14 tempted to --
15    Q    Would you like to direct questions to
16 him?
17    MS. LEGRAND:  Just on the Josh.
18    MR. HENSON:  Yeah.  Do you want to do it
19 now?  Let's go off the record real quick.
20    THE VIDEOGRAPHER:  We are going off the
21 record.  The time is 3:47.
22    (An off-the-record discussion was held.)

249

1    THE VIDEOGRAPHER:  We are back on the
2  record.  The time is 3:47 p.m.
3  BY MR. HENSON:
4    Q    All right, Mr. Alubbad --
5    A    Yes, sir.
6    Q    -- we're back on the record.  We were
7  discussing just now an exhibit, that of an
8  October 17 brochure that you distributed to
9  potential customers around the Milipol event of
10  2017.  Do you recall testimony about that?
11    A    Yes, I do.
12    Q    And so you had awareness that this title
13  was being used by Josh Clemente for at least, you
14  know, looking from the date of the October 2017
15  brochure and comparing it against the September 2,
16  2019, letter from your attorney, you know, well
17  over a year, you had awareness that this title was
18  being used by Josh Clemente; correct?
19    A    That's correct.
20    Q    And at no point did you attempt to stop
21  it until September 2nd, 2019; correct?
22    A    Because Tim refused.

250

1    Q    At no point did you attempt to stop it
2  before September 2nd of 2019?
3    A    I couldn't stop it.
4    Q    Why couldn't you have stopped it?
5    A    Because Tim was in control of the
6  website.  Tim created a new e-mail address that
7  was different than the company e-mail address, and
8  he refused to give it to me and to give me access.
9  So -- and then, I am not a YouTube specialist or a
10  video specialist.  It was Tim that did all these
11  things.  And I was instructed, okay, that not to
12  make any changes after I get access because we are
13  at litigation, okay?  So Tim made all these
14  videos.  Tim created everything.
15    And look, for me, I had to choose.  It
16  was a really difficult decision for me.  We have a
17  product.  We are trying to develop and market it.
18  And then we have lots of potential, okay?  And the
19  last thing I'm just going to sit and worry, argue
20  with Tim about these things because Josh happened
21  to be his son.  I told him repeatedly about this,
22  but he ignored me.

251

1    And just for the record, as of today, I
2  know when my attorney -- because Josh -- I made
3  sure to tell Rebecca to tell Josh to remove from
4  his LinkedIn, the video, and he did remove it.  To
5  this date, we have not been given access to the
6  YouTube.  When you go you see YouTube, that Tim
7  was the president.  So for me --
8    Q    Mr. Alubbad, let's just keep it --
9    A    Okay.  But you asked me.  I have no
10  access to it.
11    Q    I don't think I asked you about that.
12    MR. MILLS:  Just can you repeat --
13    Q    So you could have fired Mr. Clemente as
14  president at any time, right?
15    A    No.  He was my friend, and I wasn't
16  going to.
17    Q    You had the authority?
18    A    Yes, I do have the authority.  And I
19  wasn't using the authority against a friend, okay,
20  because you know what?  I mean, look, Tim did lots
21  of things that I didn't like, and I wasn't just
22  going to sit and fight.

252

1    Q    Please, Mr. Alubbad -- so, Mr. Alubbad,
2  you also have used a number of job titles that
3  were never created by written consent; correct?
4    A    I don't know what you're talking about.
5    Q    Have you ever used the title of director
6  of international business development for MIT?
7    A    Yes, sir, I did.
8    Q    That was never created by any sort of
9  written consent or for approval by the members,
10  was it?
11    A    I don't think we have a document that
12  say this.
13    Q    You don't have a document because it
14  didn't happen, right?
15    A    No.  There is no document.  That's what
16  I'm saying.
17    Q    And we talked previously about your use
18  of the title director of marketing.  That was
19  title was never created, right?
20    A    It's the same thing, director of
21  marketing and business, you know.  You just took
22  part of it.  It's the same thing.

253

1  Q   Okay. And they're entirely different
2  words. But what about chief executive officer?
3  When did you start using chief executive officer?
4  **A   I don't think I use this except, I**
5  **think, when we filled the export license. I think**
6  **it says owner or CEO. I'm not really sure, okay?**
7  **But there was -- I don't think I have a business**
8  **card that I have made that says that I am the CEO**
9  **of, you know.**
10  Q   Yeah. So I'm sorry. Are you disputing
11  your use of the term chief executive officer?
12  **A   And when you say disputing, I didn't use**
13  **it, you know, in a marketing effort or even I have**
14  **a business card that says CEO on it.**
15  Q   Well, when did you use it?
16  **A   I think, you know, in the application,**
17  **because I am the designated officer for the State**
18  **Department. And I think they needed a title and**
19  **all that stuff. And I think, because this is --**
20  **you know, I have a compliance manager who is**
21  **filling all these things for me. But again, if,**
22  **you have a specific document you would like to**

254

1  **show me, I am happy to tell you a yes or no.**
2  Q   Well, answer me this: There was never a
3  written consent or any approval of the members to
4  designate you as chief executive officer; correct?
5  **A   To make it easier for you, no. I don't**
6  **have.**
7  Q   You don't have a document because it
8  doesn't exist?
9  **A   Yeah. I don't have a document, yes.**
10  Q   And so you never were properly named
11  chief executive officer at MIT, right?
12     MR. MILLS: Object to the form.
13  Q   Is that correct?
14  **A   I think it's correct, yes.**
15     MS. LEGRAND: This has been previously
16  marked. This is a version, just for simplicity,
17  MIT Bates -- do you want the previous --
18     MR. HENSON: I will. Just let me mark
19  this as exhibit.
20     MS. LEGRAND: All right.
21     MR. HENSON: Could you please refer. I
22  don't remember the exact --

255

1     MS. LEGRAND: Exhibit --
2     THE WITNESS: This is Exhibit 11.
3     MS. LEGRAND: No, no, no. Hold on.
4  We're going back to your declaration, which is --
5  did I mention my greatest weakness is not keeping
6  track of exhibits? Exhibit 12. Oh, Exhibit 5.
7  Here is what's marked as Exhibit 5. For what it's
8  worth, it would be the assistant. I have a copy
9  of the exact same document that, in addition to
10  having an MIT exhibit number, it is an MIT Bates
11  number, but same exhibit. And so it's MIT Exhibit
12  -- oh, sorry. Fahmi Exhibit 5 in this deposition.
13  Q   Mr. Alubbad, your referring back to
14  Exhibit 5; is that correct?
15  **A   Yes.**
16  Q   Could you please look at Paragraph 19?
17  **A   Paragraph -- what page is that?**
18  Q   It might be on a different page.
19     MR. MILLS: It's Page 7.
20     MR. HENSON: Page 7?
21  **A   Yeah. It's exactly what I said.**
22  Q   So you represented to the US Department

256

1  of State that you were MIT's chief executive
2  officer; correct?
3  **A   That's what it says, yes. And I already**
4  **answered you this before I've seen the document.**
5  Q   Okay. So I'm just, you know -- so you
6  represented to the federal government that you
7  have an officer title that was never given to you
8  by MIT; correct?
9     MR. MILLS: Object to the form.
10  **A   Again, I am the majority owner of the**
11  **company, okay, and I am the designated officer for**
12  **the, you know, them. So technically, this is what**
13  **I was advised by the compliance manager to write,**
14  **CEO/owner.**
15  Q   Okay. So the compliance manager asked
16  or recommended that you just come up with a
17  fictitious --
18  **A   It's not a fictitious nothing. This is**
19  **basically was done for that, because I'm the**
20  **majority shareholder, and I am the designated**
21  **officer responsible for all export and item. I am**
22  **the one responsible. Tim used to be the person,**

257

1  and Tim is no longer.  So I took that
2  responsibility.  So this is what's written.  And
3  like I said to you, I mean, just the title was
4  written for the ITAR.
5      Q   Is there any other job titles that
6  you've come up with for your work at MIT?
7      A   No, sir, I don't.
8      Q   What about consultant?
9      A   Yes.  I am a consultant.
10     Q   Now, isn't it true we heard in Mr. Noel
11 Matchett's deposition that you had been asking
12 folks at MIT to not let third parties know that
13 you are the majority owner of MIT; isn't that
14 right?
15     A   That's correct.
16     Q   You asked that you be referred to as the
17 consultant of MIT?
18     A   That is correct.
19     Q   But that's not true, is it?
20     A   To me, it's true, because that's my
21 role.  I'm a consultant.  That's what I do best.
22     Q   So you don't think there's anything

258

1  misleading about telling a client --
2          MR. MILLS:  Hold on.
3      Q   You don't think there's anything
4  misleading about telling MIT's officers or
5  employees, Noel Matchett, for example, that -- I'm
6  sorry.  You look confused.  Noel Matchett is an
7  employee who testified about it.
8      A   That's correct.
9      Q   Okay.
10     A   I'm not misleading anybody.
11     Q   Okay.  All right.  And I'm just trying
12 to confirm.
13     A   Okay.
14     Q   So you told Noel Matchett not to tell
15 others that you were the controlling owner of MIT,
16 right?
17     A   I did not tell Noel Matchett anything.
18     Q   You told Noel Matchett to tell others
19 that you were the consultant of MIT, right?
20     A   Noel Matchett is a compliance manager.
21 He does not interact with customers or vendors.
22     Q   Well, who did you tell?

259

1      A   Okay.  I told Tim.
2      Q   You told Tim?
3      A   Yes.
4      Q   And so you don't think there was
5  anything misleading about telling Tim not to tell
6  third parties that you were the actual majority
7  owner?
8      A   No, sir.
9      Q   And why not?
10     A   Tim was in agreement.  Why?  Because
11 part of my job, okay, as a consultant is,
12 basically -- this is what the customer knows me
13 about.  I am a consultant.  I help, you know,
14 government and non-government clients, okay?  So
15 for me, I told Tim it will be a lot easier for me
16 to present myself, okay, that I am the consultant
17 for MIT so I can help, you know, get you the
18 business.  Because at the end of the day, I don't
19 see any cheating or doing anything that harm MIT.
20 So for me, it was easier for me because of my
21 relationship with all these different government
22 agencies when they know me as a consultant.  This

260

1  is all my career.  For them, it's easy for them to
2  talk with me, and for me, to help them, you know,
3  in whatever decision they're trying to make.
4      Q   Does the kingdom of Saudi Arabia know
5  that you are the controlling owner of MIT?
6      A   Yes, they do.
7      Q   Have they always known that?
8      A   Not before.
9      Q   Not before?
10     A   No, sir.
11     Q   Only recently?
12     A   Yeah.  Well, no it's not recently.
13 They've learned about it probably 2023, yeah.
14     Q   And --
15     A   And actually, to be honest with you,
16 it's nobody's business.
17     Q   Does Atlantis --
18     A   Because I am the president.
19     Q   Does Atlantis have an agreement with
20 Saudi Arabia, the kingdom of Saudi Arabia, for
21 compensation for vehicle sales?
22     A   Sir, let me make things very clear to

261

1  you.  I am a US citizen, and I don't take, and I
2  never took, any money from any foreign entity or
3  any foreign government.  Even when I consulted for
4  the government, I did it free for charge, because
5  that's a conflict of interest for my work here in
6  the US.
7    Q    Can you answer the question, please?
8    A    I answered it.
9        MR. MILLS:  He just did.
10   A    I answered it, okay?  I don't take
11 money, never took money, not from anybody, Saudi
12 or the whole entire world on the map.  And you can
13 take my word to the bank and record it.
14   Q    So Atlantis has never been
15 compensated --
16   A    No.
17   Q    -- for any of the work that it's done?
18   A    No.  1,000 percent.
19   Q    And -- I see.
20   A    So --
21   Q    And let's -- I just want to make sure
22 I'm understanding you.  So never, it's never

262

1  generated any income at all; is that what you're
2  saying?
3        MR. MILLS:  No.  You asked about from
4  foreign governments.  He obviously --
5        MR. HENSON:  Excuse me.
6        MR. MILLS:  Yeah.  You're completely
7  misconstruing --
8        MR. HENSON:  Then the witness can tell
9  me that.
10       MR. MILLS:  Okay.
11       MR. HENSON:  And you can object to form.
12       MR. MILLS:  My objection --
13       MR. HENSON:  Object to form, Laurin,
14 please.
15       MR. MILLS:  No.  Not when you're
16 misconstruing.
17       MR. HENSON:  No.  That's not what that
18 is.
19       MS. LEGRAND:  Not an objection to form.
20       MR. HENSON:  It was a speaking
21 objection.  If the witness --
22       MR. MILLS:  Okay.  Ask your question.

263

1        MR. HENSON:  I don't want any more
2  argumentative or strongly-suggestive or speaking
3  objections.  That is completely out of line, and
4  there's been a lot of them today.
5        MR. MILLS:  There haven't been.
6        MR. HENSON:  There have been.
7        MR. MILLS:  You're mischaracterizing.
8  Changing your question --
9        MR. HENSON:  We're done with that
10 discussion.
11       MR. MILLS:  Okay.  So ask your question.
12       MR. HENSON:  All right.
13 BY MR. HENSON:
14   Q    Has Atlantis ever received compensation
15 from foreign governments?
16   A    The answer is no.
17   Q    Has Atlantis ever received compensation
18 from entities affiliated with foreign governments?
19   A    The answer is no.
20   Q    Has Atlantis ever received compensation
21 from companies that operate in the kingdom of
22 Saudi Arabia?

264

1    A    The answer is no.
2    Q    You've never received -- Atlantis has
3  never received any compensation from companies
4  operating in the kingdom of Saudi Arabia?
5    A    I already answered you, no.
6    Q    Okay.
7    A    And please add, not only Saudi Arabia;
8  add the whole entire world to it, just to make it
9  easier for you.  So add Saudi, add the rest of the
10 other countries international, in case you missed
11 the question.  I'm helping you out.
12   Q    So sitting here today, your testimony is
13 that Atlantis has never made a dime off of MIT; is
14 that right?
15   A    Okay.  You know what?  Now you ask me a
16 separate question.
17       MS. LEGRAND:  Yes.  Answer.
18   Q    That happens in depositions.  There are
19 multiple questions.
20   A    So you asked me before, Mr. Henson, if I
21 made any money from foreign government.
22   Q    Just answer the question.

265

1    A    No.  You want me to answer the question.
2 I'd like to understand your question.  Your
3 question before, if I made any money from any
4 foreign entity, either government or
5 nongovernment, and my answer is no, correct?  For
6 the record, that's what I said, no.  Now your
7 question, did Atlantis make money out of MIT?
8    Q    Yes.
9    A    What does Atlantis got to do with MIT?
10    Q    Well, that's my question.
11        MS. LEGRAND:  That's the question.
12    A    The answer is no, because there is no
13 relationship, other than Atlantis basically funded
14 some of the money to MIT.
15        MS. LEGRAND:  So that's a relationship.
16 So there's one relationship.
17        MR. HENSON:  Okay.  We're back.
18    Q    So Atlantis has never been compensated,
19 directly or indirectly, for any sales of MIT's
20 ARES.
21    A    1,000 percent, sir, no.  And if you have
22 something, please, I urge you, you and Rebecca, to

266

1 show it to me.
2        MS. LEGRAND:  I'm not allowed yet.
3        THE WITNESS:  Okay.
4    Q    And you mentioned that Atlantis loaned
5 money to MIT; is that right?
6    A    That's correct, sir.
7    Q    How much?
8    A    The money that was loaned to the company
9 sometimes came from me personally, my personal
10 account.  Sometimes came from F2E, and sometimes
11 came from Atlantis account.  And all of my
12 accountants, everything is documented, because
13 this is tax record and financial record.  It's by
14 the accountant of the company.
15        And by the way, Tim is aware because I
16 used to give him check out of Atlantis.
17    Q    You said a check?  Not for himself,
18 because he was never paid, right, or almost never
19 paid?
20    A    No.  Because Tim had an account, MIT
21 account, okay, that he opened, and I used to
22 sometimes give him a check out of Atlantis.

267

1    Q    All right.  I'd like to change gears for
2 just a minute and go back to Exhibit 10.
3    A    Which page?
4    Q    It's Exhibit 10, and I'm just
5 referencing to reset the reference to the, Good to
6 meet you last Tuesday, August 27th, from Allen
7 Sachsel.
8        Are you aware that there was a recording
9 obtained of that meeting on August 27th?
10    A    No.
11    Q    You're not aware that there was an audio
12 recording?
13    A    No.  And I swear to God, if I knew.
14    Q    No.  I'm asking you today.  You're aware
15 that there is an audio?
16    A    Oh, now I am.  But when Tim was
17 recording me secretly, like a coward, I didn't
18 know.
19    Q    Might that have had something to do with
20 his distrust of you at your word?
21    A    No, no.
22        MR. MILLS:  Objection.  Object to the

268

1 form.
2    A    No.  I never lied to him.  So ask your
3 question.
4    Q    All right.  I'm going to introduce a
5 place-holder exhibit for the record.  This is an
6 audio file, and I'll be playing a short excerpt
7 from that document.
8        COURT REPORTER:  Counsel, do you want
9 the audio on the file transcribed as well?
10        MR. HENSON:  I'll read the time stamps,
11 so I think it's fine.
12        MS. LEGRAND:  I mean, for what it's
13 worth, if you can, I think it would be helpful.
14        MR. HENSON:  Sure.  Okay.  If it's
15 possible.
16        THE VIDEOGRAPHER:  Okay.  The audio is
17 coming through clear.  We'll get it done.
18        MS. LEGRAND:  Exhibit 12?
19        COURT REPORTER:  Yes.
20        (Exhibit 12 was marked for
21 identification and is attached to the transcript.)
22    Q    Okay.  And for the record, this is Bates

269

1  TCLEM 55, and I will be paying a short excerpt
2  from time stamp 33 minutes and zero seconds.
3      (Following is played from exhibit)
4      MR. ALUBBAD:  My point is, okay -- okay,
5  if you close this, please tell me when so I can
6  tell them, you know, so at least he can put on the
7  record that the bank account has been closed.
8  Second, you know, it is really important for me,
9  you know.  With all respect, Tim, okay, I
10 understand we're all busy, okay?  And for your
11 son, I'm sure he has the time, because I asked
12 this officially, and he wrote you guys a letter.
13 And I ask, This is a company letter, okay?  I know
14 he did it.  This belongs to MIT.
15     MR. CLEMENTE:  What's a company record?
16     MR. ALUBBAD:  I mean, whatever Josh has;
17 whatever he received from, you know, the control,
18 wireless control company, and from, you know.  All
19 this is MIT record, okay?  I mean, when I trusted
20 him, because he was part of us, okay?  I told him,
21 Please take it.  I never treated him like he's a
22 stranger.  So for me, I'm not going to be, you

270

1  know, somebody twist my arm, because he said,
2  Okay, for me, I am taking it.  Okay.  Maybe.  I'm
3  giving you that.  This is MIT.
4      MR. CLEMENTE:  Everything he did, Fahmi.
5  Come on.  No, no, no.  Stop.  You're accusing him.
6      MR. ALUBBAD:  I'm not.
7      MR. CLEMENTE:  No.  When he -- he's
8  running all over the world setting up a new
9  company, and he gets -- he goes from Georgia to
10 San Francisco or wherever.  We had good Wi-Fi, and
11 he downloaded everything he could.
12     MR. ALUBBAD:  But he said to Cory --
13     MR. CLEMENTE:  No, no, no.  Wait a
14 minute.  That was his hard-earned work.  Wait.
15 You don't own any of it.
16     MR. ALUBBAD:  Oh, I don't?
17     MR. CLEMENTE:  No.  Not what he did.
18     MR. ALUBBAD:  Okay.
19     MR. CLEMENTE:  You will, and the company
20 will, and he's giving it to the company.
21     MR. ALUBBAD:  Okay.
22     (Recording stopped.)

271

1      Q    All right.  I'm going to stop it for
2  just a moment at 34 minutes, 50 seconds.
3      Mr. Alubbad, did you recognize your
4  voice on that recording?
5      A    Yes.  I recognize, yes.
6      Q    And did you recognize Mr. Tim Clemente's
7  voice as well?
8      A    Yes.
9      Q    And did you hear Mr. Clemente telling
10 you that you don't own -- that MIT doesn't own any
11 of what Josh created?
12     A    Yeah.
13     Q    You heard him say that?
14     A    Yes, I did.
15     Q    And he said that you will own it, but
16 without compensation, MIT doesn't?
17     A    That's what I said earlier.
18     Q    Okay.
19     A    This is how they are basically --
20     Q    Hold on.  I just asked if you heard it.
21     A    Yeah, I heard it.
22     Q    Okay.  So as of August 27th, 2019, you

272

1  were aware that Tim Clemente believed that Josh
2  Clemente owned what he created; correct?  You
3  understood he believed that?
4      A    Tim.  Tim believed this?
5      Q    Yes.
6      A    Yeah.  Okay.  And that's the president
7  of the company.
8      Q    Right.
9      A    Yeah.  Okay.
10     Q    And he was urging you to compensate Josh
11 for his work; correct?
12     A    That's what he wanted, yeah.
13     Q    I'm going to continue on at 34 minutes,
14 50 seconds.
15     (Audio Resumed.)
16     MR. ALUBBAD:  You say I don't own.  This
17 is all MIT.
18     MR. CLEMENTE:  What Josh did?  Does Josh
19 own what Josh did or does MIT?
20     MR. ALUBBAD:  It's MIT.
21     MR. CLEMENTE:  Then he should be
22 compensated, if he hasn't been compensated.

**273**

1      MR. SACHSEL:  I don't think he's been
2  compensated.  It was done for MIT, and I think MIT
3  owns it, yes.
4      MR. CLEMENTE:  How, under a work for
5  hire?
6      MR. ALUBBAD:  No, not work for hire.
7      MR. CLEMENTE:  How?
8      MR. ALUBBAD:  Under the operating
9  agreement.
10      MR. CLEMENTE:  No.  I know.  And it says
11  everything is a work for hire, and I'm asking what
12  a definition of the work for hire --
13      MR. SACHSEL:  Did he sign an NDA?
14      MR. CLEMENTE:  I don't know if he did.
15      MR. SACHSEL:  -- a representative --
16      (Recording stopped.)
17   **A   Oh, let's finish.  Let's hear it.**
18   Q   Oh, I will.  I will.
19   **A   Okay.**
20   Q   I just wanted to stop it right there for
21  just a moment.
22   **A   Okay.**

**274**

1      **So this is stopping at 35 minutes, 28**
2  **seconds.  You just heard Tim Clemente say that he**
3  **does not know if Josh Clemente signed an NDA;**
4  **correct?**
5   Q   Well, I mean, you stopped it, so I
6  wanted to hear the rest.
7   Q   I can, but didn't you hear --
8   **A   I mean, this is what he said to the**
9  **lawyer, but that's not what he told me.  He said**
10  **it in the recording because he knew he was**
11  **recording this, and maybe he doesn't want to, you**
12  **know, implicate himself, that he lied in recording**
13  **when he had released it.  But Tim always assured**
14  **me that there was an NDA, Mr. Henson.  He can**
15  **record.  He can do whatever he want.  He can play**
16  **with words, okay?  Like I said to you, he always**
17  **assured me 1,000 percent, there is an NDA.**
18   Q   Always, except in this recording?
19      MR. MILLS:  Argumentative.
20   **A   This recording, like I said to, you**
21  **know, for me, first of all, I didn't know that I**
22  **was recording, and I was honest, and I was telling**

**275**

1  **him everything.  Nothing had changed in this**
2  **recording.  I even wondered, when this recording**
3  **was released, what is it that I said when he was**
4  **in deposition that he had to record me, because I**
5  **would not say it in an e-mail?  There is nothing.**
6  **He said to the lawyer, when he asked him -- the**
7  **lawyer ask him, is there a patent?  There is an**
8  **NDA?  And he said, No.**
9      COURT REPORTER:  Counsel, was there an
10  objection?
11      MR. MILLS:  Yes.
12   Q   All right.  I'm going to continue on at
13  35 minutes, 28 seconds.
14   **A   Can you please repeat it?  I want you to**
15  **go back and you -- and before, when he asked**
16  **the question and don't stop it, because we need to**
17  **hear the whole thing.**
18   Q   Which question?
19   **A   About the NDA, when the lawyer asked**
20  **him.**
21   Q   Okay.  I'm replaying at 35 minutes, 9
22  seconds.

**276**

1   **A   Okay.**
2      (Audio resumed.)
3      MR. CLEMENTE:  How?  Under work for
4  hire.
5      MR. ALUBBAD:  No.  Not work for hire.
6      MR. CLEMENTE:  How?
7      MR. ALUBBAD:  The operating agreement.
8      MR. CLEMENTE:  No.  I know.  And it says
9  everything is a work for hire, and I'm asking what
10  a definition of work for hire --
11      MR. SACHSEL:  Did he sign an NDA?
12      MR. CLEMENTE:  I don't know if he did.
13  You sent it in 2013.  In '13, he didn't, I guess.
14      MR. ALUBBAD:  In 213, also.  So again, I
15  said, when he stopped taking my calls, I say,
16  Please get me the NDA.
17      MR. CLEMENTE:  Okay.  My question is, if
18  he hasn't been compensated, how can we take from
19  him what he did, the fruits of his labor, without
20  his compensation?
21      MR. ALUBBAD:  I never hired --
22      MR. CLEMENTE:  You just said you never

277

1  hired, then there's no work for hire.
2        MR. ALUBBAD:  No.  What I said -- no.
3  You didn't let me finish.  When I came up to do
4  MIT, I never made a deal with Josh I made with
5  you.
6        MR. CLEMENTE:  No.  I know, Fahmi.  What
7  I'm saying is Josh when out of his way to create a
8  product that we can sell.  He just handed that
9  product over --
10        MR. ALUBBAD:  Okay.
11        MR. CLEMENTE:  -- for our manufacturer.
12  He has not been compensated for it.
13        MR. ALUBBAD:  You decided to --
14        MR. CLEMENTE:  There's either
15  reasonableness or there isn't.
16        MR. ALUBBAD:  You decided, with all
17  respect, to bring your son into it.
18        MR. SACHSEL:  What we're talking about
19  has not been handed over to him.
20        MR. CLEMENTE:  He handed it over.  What
21  I'm saying is, he hasn't been compensated for it.
22  So although I respect (inaudible), he's using it

278

1  to get is a contract price for building the
2  system?  We can't say we own it and Josh gets
3  nothing, and that's what he's saying.
4        (Recording stopped.)
5    Q    I'm stopping at 36 minutes, 40 seconds.
6        At the end there, Mr. Alubbad, did you
7  hear Tim Clemente again say, you know, we can't
8  say that we own what Josh created without
9  compensating him, or words to that effect?
10    A    That's what he said.
11    Q    Okay.  And so as of August -- at least
12  as of August 27, 2019, you knew that you had
13  notice that Tim Clemente contended that Josh
14  Clemente owned the intellectual property that he
15  created?
16    A    As of what date?
17    Q    August 27th, 2019.
18    A    Okay.
19    Q    And did that concern you?
20    A    What is the question?
21    Q    Did it concern you that Tim Clemente
22  said that Josh Clemente owned the intellectual

279

1  property he created?
2    A    Yes, it did concern me.
3    Q    It did concern you?
4    A    Yeah.
5    Q    What did you do?
6    A    That's why my lawyer was in discussion
7  with him.  And basically, we asked for the
8  material.  And Tim also failed to tell me, okay,
9  that his son was under a patent.  And, you know,
10  when he was recording me, I guess, he failed to
11  tell me that he also filed a professional patent,
12  and his son also filed, you know, a professional
13  patent also.
14        But yet, he was coming to negotiate with
15  me.  Because you need to listen to the whole
16  thing.  He was coming to negotiate, which was in
17  violation of the operating agreement.  Because Tim
18  Clemente, as the president, he cannot negotiate on
19  behalf of his son.  His loyalty is to MIT, not to
20  Josh Clemente or to Jonathan Adam or Ken Fournier.
21    Q    You would agree that it's important to
22  shore up the claims to ownership of the

280

1  intellectual property on the ARES, right?
2    A    Everything that was done to the ARES,
3  from an invention, design, everything belong to
4  MIT.
5    Q    That's your contention, right?
6    A    That's -- yes.
7    Q    Yeah.  So -- and obviously, Tim Clemente
8  obviously expressed issues with that, didn't he?
9    A    I mean, look, he expressed, you know,
10  this many times, but you know what?  Tim, his
11  loyalty to the company, and his interest was for
12  himself and Josh, not for MIT, okay?  So he was --
13  even the lawyer, you will hear on the tape, and he
14  told him, and he told him in the letter, Tim, what
15  you're doing is wrong.
16    Q    That's your lawyer?
17    A    Yeah.
18    Q    F2E's lawyer?
19    A    But any lawyer will tell you, because to
20  the operating agreement, when you have two members
21  -- this is a member-managed LLC, Mr. Henson, okay?
22  And Mr. Tim Clemente, as the president, he had

281

1 fiduciary duty to the company.  His fiduciary duty
2 not to Josh Clemente or to Jonathan Adam or
3 anybody else [sic].  He is basically -- this is
4 his duty to protect.  Everything belong to MIT,
5 not to come and negotiate with the other majority
6 member, you know, about his son.  So that's my
7 answer to you.
8    Q    So in this audio recording, the third
9 voice that we heard there, you recognize that as
10 Allen Sachsel, right?
11    A    Yes, sir.
12    Q    And again, that was F2E's lawyer.  So in
13 this audio recording, Tim told you, in front of
14 your lawyer, that he did not believe MIT owned
15 what Josh created, right?
16    A    That's what he said.
17    Q    And you didn't remove Tim as president,
18 did you?
19    A    No, I didn't.
20    Q    In fact, he remained president for over
21 four years thereafter?
22    A    Tim remained the president until he was

282

1 removed in December 2023.
2    Q    Which is over four years after this
3 recording was obtained; correct?
4    A    Yes.  Because I was in the dark.
5        MR. MILLS:  Just answer the question.
6    A    Yeah.
7    Q    So you were in the dark, is your
8 testimony?
9    A    That's correct.
10    Q    And you didn't file a lawsuit for over
11 four years after this recording was obtained,
12 right?
13    A    That's correct.  Actually, I want to go
14 back.  You said four years, no.  Because the first
15 lawsuit, it was with Stern and David Marko.  It
16 was in 2022.
17        MS. LEGRAND:  Which he didn't file
18 because he thought it violated his ethical duties.
19    Q    That lawsuit was not filed until
20 October 16th, 2023; is that right?
21    A    Because I tried to work things out.
22    Q    Just, is it right?

283

1    A    It is right.  I tried to work it out
2 with Tim so he's not basically sued, because he
3 begged me, okay, that he would resolve everything.
4 So --
5    Q    You knew that Josh was owed something
6 for his work, though, right?
7        MR. MILLS:  Object to the form.
8    A    No.
9    Q    No?
10    A    No.  Because he has a percentage from
11 his dad.
12    Q    Well, we know that's not true.  You had
13 to consent to give it to him and you didn't,
14 right?
15        MR. MILLS:  Objection.  Argumentative.
16    A    Okay.  That's fine.
17    Q    You would agree that you can't steal
18 something that belongs to you, right?
19    A    I don't understand your question.
20    Q    Yeah.  If this ballpoint pen is my
21 property, I can't steal it because it's mine,
22 right?

284

1    A    Well, that's your interpretation.
2    Q    Well, do you disagree?  Do you agree?
3 You disagree that you can't steal something that
4 belongs to you?
5    A    If you are referring, Mr. Henson, to the
6 ARES to the MIT, I disagree with your analogy,
7 because everything belong to the ARES regarding
8 design, invention, everything is belongs to MIT.
9    Q    But you would also agree with me that if
10 it didn't belong to MIT, there was nothing wrong
11 with what Josh Clemente did; correct?
12        MR. MILLS:  Objection to form.
13    A    That's not the case here.
14    Q    Okay.
15    A    Okay.
16        MR. HENSON:  All right.  Let's take a
17 five-minute break?
18        MR. MILLS:  Perfect.
19        THE VIDEOGRAPHER:  We are going off the
20 record.  The time is 4:24 p.m.
21        (Whereupon, a recess was taken.)
22        THE VIDEOGRAPHER:  We are back on the

285

1  record.  The time is 4:39 p.m.
2      MR. HENSON:  Okay.  Back on the record.
3  At this point in the day, I want to review a
4  couple things.  So I think there is a little over
5  -- we've been going for a little more than five
6  hours now, Laurin.  And I think we can get it done
7  today if Mr. Alubbad is willing to stay two hours
8  longer than seven hours.
9      MR. MILLS:  It's not going to happen.
10  We're going to stay to 7:00 o'clock, like I said.
11  So let's get moving, and then we'll discuss
12  whether we need to make it up.  I'm not going to
13  wear out the witness or myself.
14      MR. HENSON:  Okay.
15      MR. MILLS:  Okay.  Or these guys.
16      MR. HENSON:  Okay.  So if the plaintiff
17  is not amenable, I mean, it's clear.  I've got a
18  lot of other issues that I need to get to.  But
19  out of -- my cocounsel also has separate claims
20  that she has to ask questions for.
21      MR. MILLS:  So let's see where we're at
22  7:00.

286

1      MR. HENSON:  What I'm saying is, I need
2  to turn it over to her.
3      MR. MILLS:  I got you.
4      MR. HENSON:  -- Rebecca LeGrand, so that
5  she can ask questions for, you know, her client.
6  But that does not in any way reflect that I'm
7  done.  I have a lot of critical issues.  But based
8  upon the existing time frame for today, I need to
9  give my cocounsel time.
10      MR. MILLS:  Yeah.  Do what you will.
11  Let's get on.
12      MR. HENSON:  Well, we will need -- I can
13  assure you that we will need to come back
14  tomorrow.
15      MR. MILLS:  Well, we'll discuss that at
16  7:00.
17      MR. HENSON:  Okay.  I mean, I'm turning
18  it over.  So nothing's going to change between now
19  and 7:00?
20      MR. MILLS:  Yes.
21      MR. HENSON:  I'll turn it over.  Do you
22  want to sit here, Rebecca?

287

1      MS. LEGRAND:  I'll stay here.  Is that
2  okay, court reporters?  I will take this
3  microphone.  Thank you.
4      All right.  We're still on the record,
5  yeah?  I'm going to keep this moving.
6      EXAMINATION BY COUNSEL FOR THE
7      DEFENDANT, JOSHUA CLEMENTE
8  BY MS. LEGRAND:
9   Q   Mr. Alubbad, let me just start by going
10  way back to the beginning here.  You were talking
11  about when you studied.  Was it the University of
12  Florida; is that correct?
13   A   That's correct.
14   Q   And what was your degree in again?
15   A   Biomaterial.
16   Q   Say again?
17   A   Biomaterial.
18   Q   Biomaterial.  So was then an engineering
19  degree?
20   A   That's correct.
21   Q   What kind of biomaterial were you
22  studying?

288

1   A   Polymer engineering.
2   Q   Polymer engineering?
3   A   Yeah.
4   Q   Okay.
5   A   So I was specialized more into the
6  biomaterial, any artificial material implanted in
7  the human body on the medical side.
8   Q   Okay.
9   A   So that's the polymer side of it.
10   Q   Okay.  Do you have any experience with
11  mechanical engineering?
12   A   Not at all.
13   Q   None, right?  So that's why things like
14  computer-assisted design files, those are not
15  something you know much about; is that fair?
16   A   That's fair.
17   Q   Okay.  And what year did you graduate
18  from the University of Florida?
19   A   The beginning of '89.
20   Q   Of 1989?
21   A   Yes.
22   Q   Okay.  And then you returned to Saudi

289

1 Arabia; is that correct?
2     A    That's correct.
3     Q    Okay.  And let me start, you were born
4 in Turkey; is that right?
5     A    That's correct.
6     Q    And how long did you live in Turkey?
7     A    I didn't live.  I did not live.  I just
8 -- I was born.
9     Q    How did you move -- okay.  And after you
10 were born, were you taken to Saudi Arabia right
11 away?
12     A    My father was in the government, so I
13 have sisters who are not even born in Saudi.  They
14 are born in different countries.  So --
15     Q    Okay.  But you were born in Turkey.
16 Your father was in the Saudi Arabian government;
17 is that right?
18     A    Uh-huh.
19     Q    What was your father doing at the time
20 when you were born?
21     A    The only thing I can describe my
22 father's job is like the head of FAA.

290

1     Q    Head of, like, Federal Aviation
2 Administration?
3     A    Yeah, like FAA.
4     Q    Okay.  So by the time you were a little
5 kid, where were you living?
6     A    No.  I was just born in Turkey, but all
7 of my life, I grew up in Saudi.
8     Q    Okay.  So when you were born you were a
9 Saudi citizen?
10         COURT REPORTER:  Is that a yes?
11     Q    And you grew up there?  Yes?  Sorry.
12     A    Yes.
13     Q    And you grew up in Saudi Arabia?
14     A    That's correct.
15     Q    And your father worked for the Saudi
16 government, okay.  And when was the first time you
17 traveled to the US?
18     A    The first time I came when the
19 government sent me in 1980.
20     Q    When the Saudi Arabian government sent
21 you in 1980.  And what did you do in 1980?
22     A    I was in Rutgers University studying

291

1 English.
2     Q    You were at Rutgers, you said, learning
3 English, okay.  Did you graduate from Rutgers?
4     A    No.  I just took English language.  I
5 was living at the dorm.  And then after I finished
6 -- I didn't even finish the whole course.
7     Q    Okay.
8     A    I traveled to Florida.
9     Q    You traveled to Florida.  So when did
10 you first start at the University of Florida?
11     A    I don't know.  Maybe '84.
12     Q    Okay.
13     A    I'm not sure.  Maybe '84.
14     Q    And then, after you got your
15 bioengineering degree, you returned to Saudi
16 Arabia?
17     A    That's correct.
18     Q    And what were you doing?  What was your
19 first job when you went back to Saudi Arabia?
20     A    I transferred from the Ministry of
21 Interior to the Ministry of Defense.
22     Q    So you were initially in the Ministry of

292

1 Interior?  And when did you transfer to the Saudi
2 Ministry of Defense?
3     A    When I came back.
4     Q    So you were working for the Ministry of
5 the Interior when the government sent you to the
6 US to learn English?
7     A    That's correct.
8     Q    And then after you got your
9 bioengineering degree, you went back to Saudi
10 Arabia; you were working for the Ministry of
11 Defense; is that right?
12     A    That's correct.
13     Q    And what was your title at the Ministry
14 of Defense?
15     A    I was the director of medical research
16 and operations for the Saudi military.
17     Q    Director of medical research?
18     A    Yes.
19     Q    How long did you have that title for?
20     A    Until I left Saudi Arabia, right after
21 the Gulf War.
22     Q    And you and mentioned -- well, so after

293

1  the Gulf War, what year was that, if you remember?
2      A    '91.
3      Q    1991, okay.  So was it 1991 when you
4  moved to the US, back to the US?
5      A    No.  I came back right when the war
6  ended, which was the end of '92, I believe, you
7  know.  I came to the US.
8      Q    Okay.  And you were on a tourist visa
9  initially?
10     A    I came as a visitor, to visit some of my
11 friends, you know.
12     Q    Okay.  On the recording that you know
13 happened, you mentioned that you've got
14 connections to the Saudi intelligence community.
15 Is that what you're articulating?  It looks like
16 you're trying to hint at something.  Is this Saudi
17 intelligence?
18     A    I mean, look, I was sent to school by
19 the international security, which is the Ministry
20 of Interior, okay?  But after I graduate, they
21 paid for all my school and my trainings and
22 everything, I went back to Saudi Arabia, and I

294

1  left.  I went to work at the Ministry of Defense
2  because my job — what they want me to do to work
3  as an officer in this field, it wasn't appealing
4  to me.  So I liked my career, what I studied, and
5  I wanted to do more into the medical side.
6      Q    And that's why you went to the Ministry
7  of Defense?
8      A    That's correct.
9      Q    So why did you leave all that and move
10 to the United States?
11     A    That's my personal reason.  I don't feel
12 like discussing it.
13     Q    Okay.  When did you become a US citizen?
14     A    I became a US citizen in the mid-'90s,
15 right after I came.
16     Q    How did you get your citizenship?
17     A    I think the US government wanted me to
18 have a citizenship.
19     Q    Okay.  Most people, right, it's hard to
20 get citizenship, isn't it?
21     A    Yeah.
22     Q    How long did it take for you to?

295

1      A    It didn't take long.
2      Q    But you mentioned you were on a tourist
3  visa for, like, multiple years, right?
4      A    Look, when you come to the United States
5  into a Saudi passport, the only way, you need to
6  have a visa to come as a tourist.  But, you know,
7  I mean, that's not impossible for the US
8  government to change your tourist visa.
9      Q    No.  But you didn't have to apply?
10     A    Apply how?
11     Q    Apply to the State Department and say
12 you want a different kind of visa; you want a
13 permanent visa?
14     A    No.  Because again, you know, I did what
15 the US government did.  You know, I followed the
16 instructions.
17     Q    Do you have a US passport?
18     A    Yes, I do.
19     Q    You usually use your Saudi passport,
20 though, don't you?
21     A    That's not correct.
22     Q    Okay.  But you still have a Saudi

296

1  passport?
2      A    Yes.
3      Q    When did you first get a US passport?
4      A    I think in the '90s. I don't know.  '95
5  maybe, or '94.  I'm not sure.
6      Q    Okay.  You're married, right?
7      A    That's correct.
8      Q    When did you get married?
9      A    I got married in '99.
10     Q    So you were already US citizen when you
11 got married?
12     A    Yes.
13     Q    Okay.  All right.  Let me change topics
14 a little bit.  Atlantis.  You testified earlier
15 that Atlantis has no business relationship with
16 MIT; is that right?
17     A    That's correct.
18     Q    And Atlantis is a consulting company?
19     A    That's correct.
20     Q    And did Atlantis ever sign an agreement
21 with MIT?
22     A    Yes.

297

1    Q    What agreement was that?
2    A    Well, when you said with MIT, when we
3 started, I started with Tim Clemente, and we
4 didn't have MIT. So when he wanted to discuss
5 information with me, okay, regarding, you know,
6 when he called me -- because in Tim's deposition,
7 he said I called, which that's not true. He
8 called me. And basically he said, you know, about
9 what he's working. And I said to him, Okay, we
10 need to sign an NDA. So we didn't have MIT, so I
11 gave him Atlantis NDA, and he signed Atlantis NDA.
12    Q    Okay. And sorry. So that's one
13 connection to MIT. Are there other agreements
14 that Atlantis signed with MIT?
15    A    There is when, also before this, when
16 Tim asked for me to pay Josh and his roommate. I
17 said, Anything. I have a rule, anything I pay, it
18 has to be an invoice. So they send me an invoice.
19 And that time, the only invoice, you know -- the
20 only thing that was going at that time is
21 Atlantis. So they send it to Atlantis, and I paid
22 a check from Atlantis to Josh.

298

1    Q    Okay. And since we're on the topic, the
2 NDA that you wanted Josh to sign, that was an
3 Atlantis NDA, was in it?
4    A    Okay. I knew you were going to ask me
5 this.
6    Q    Okay.
7    A    So when I send the NDA --
8    Q    Yes.
9    A    -- to Mr. Tim Clemente, I send it to him
10 in a Word format.
11    Q    Yes.
12    A    Okay. Because eventually this became
13 MIT.
14    Q    What became MIT eventually?
15    A    The NDA of Atlantis.
16    Q    How did that happen?
17    A    Because I told him to change it. I gave
18 it to him in a Word format, and I said you need to
19 change from Atlantis, make it MIT.
20    Q    Did you review those changes?
21    A    Right now, we are using the same NDA,
22 okay?

299

1    Q    The NDA that you've been saying Josh
2 signed -- in fact, you tried to make him swear
3 that he signed an NDA?
4    A    I didn't say make him, because I wasn't
5 in communication with Josh. It's Tim.
6    Q    Well, we'll look at those documents in a
7 bit, if we have time.
8    A    Yeah. Please.
9    Q    You had said that you paid Josh back in
10 2013 as Atlantis, and you were invoiced as
11 Atlantis; correct?
12    A    That's correct.
13    Q    Okay. Because you said MIT wasn't
14 really up and running yet, right?
15    A    That's correct. And his father wanted
16 me to pay his son, you know.
17    Q    Okay.
18    A    And I said, Send me an invoice.
19    Q    Sure. And you know that the only NDA
20 that you sent to Tim at the time was an Atlantis
21 NDA?
22    A    That's correct.

300

1    Q    Okay. We were talking, though, about --
2 I sidetracked a little there -- Atlantis
3 relationships with MIT. What are the other
4 agreements that Atlantis and MIT have both signed?
5    A    What other agreement? What?
6    Q    Are there other agreements that MIT and
7 Atlantis have both signed?
8    A    You know, Rebecca, I don't even recall.
9    Q    Okay. But you testified under oath that
10 Atlantis and MIT had no connection to each other?
11    A    Yeah. Because your question, if there
12 is connection, in my interpretation, connection
13 is, like, you know, there is some relationship in
14 the business or something. For me, this is how I
15 interpret there is no connection. Because your
16 next question, you're getting paid money and all
17 that stuff. No.
18    Q    I didn't ask if you were getting paid
19 money yet.
20    A    Mr. Henson, you know.
21    Q    Sure.
22    A    So for me, I wanted to understand. And

301

1  I'm here to answer all your questions.  Just
2  please make it clear so I can answer.
3      Q   Okay.  But I need you to -- it will go
4  faster --
5      A   Okay.
6      Q   -- if I don't have to just impeach you
7  all the time, right?
8          MR. MILLS:  Objection.
9      A   Okay.
10     Q   Okay.  You mentioned the Terradyne
11 lawsuit earlier, right?
12     A   That's correct.
13     Q   Okay.  Who else -- the Terradyne lawsuit
14 was a lawsuit that Atlantis and, I guess, a
15 company called Terradyne, right?
16     A   That's correct.
17     Q   Terradyne makes armored vehicles out of
18 Canada, right?
19     A   That's correct.
20     Q   And the crux of that lawsuit was that
21 Terradyne was supposed to pay commissions to
22 Atlantis, Atlantis alleged, based on Terradyne

302

1  sales to Saudi Arabia; correct?
2      A   That is correct.
3      Q   Okey-dokey.  So Atlantis would get a
4  commission, or should have gotten a commission,
5  according to the litigation.  Atlantis should have
6  received a commission from Terradyne if Terradyne
7  sold armored vehicles to Saudi Arabia, right?
8      A   That's correct.
9      Q   And there were agreements at issue in
10 that litigation, right?
11     A   What agreement?
12     Q   MIT also got subpoenaed in that
13 litigation, didn't it?
14     A   That's correct.
15     Q   Okey-dokey.  Why did MIT also can get
16 subpoenaed in that litigation?
17     A   Okay.  Very simple.
18     Q   Good.
19     A   Because Tim and I visited the Canadian
20 company.
21     Q   Okay.
22     A   And when we visited the Canadian

303

1  company, we were trying also to see if we can also
2  put the ARES system onto their armored vehicle.
3  So we went as, like, two separate entities.  I
4  went as Atlantis, and Tim went as MIT, okay?
5      Q   Okay.
6      A   And I shared with Tim, I told him what I
7  was doing for the Saudi government underneath, and
8  whatever commission we were going to make, we were
9  going to split it between us.
10     Q   Okay.  So if you would have made any
11 commission from Terradyne --
12     A   Yes.
13     Q   -- you would have split it with MIT?
14     A   With Tim.
15         With Tim, personally?
16     A   Oh, yeah.  This has nothing to do with
17 MIT.  This is, like, two people who are trying to
18 do the business outside.  Because the business has
19 nothing to do with MIT.
20     Q   Which business has nothing to do with
21 MIT?
22     A   Terradyne.

304

1      Q   Didn't Terradyne and MIT and Atlantis
2  all sign an NDA?
3      A   Yeah.  That's correct.
4      Q   Okay.  Why didn't you mention that when
5  I was asking about other agreements involving
6  Atlantis and MIT?
7      A   Okay.  Well, I did not remember there
8  is, you know, this particular incident.  But when
9  you asked me, I said yes, because I said to you,
10 we went, both of us, Tim went as MIT, and I went
11 as Atlantis.
12     Q   Okay.  Let me -- you mentioned -- you
13 named Atlantis employees earlier.  Who's Christina
14 Kindlon?  She is your assistant, right?
15     A   Yes, she was.  But she's no longer.
16     Q   Who -- in 2013 who was paying Christina?
17     A   I was.
18     Q   You, Fahmi Alubbad?
19     A   That's correct.
20     Q   What different companies that you know
21 about was Christina working for?
22     A   Well, Christina was working for me in

305

1  Atlantis and was working for me for OmniTrue.  And
2  then when Tim failed to do his job, I made
3  Christina also help MIT.
4       Q    So Christina was working for you, for
5  OmniTrue, for Atlantis, and for MIT; is that
6  right?
7       A    No.  Let me repeat what I said.
8       Q    Okay.
9       A    When I said me, means Atlantis.
10      Q    You means Atlantis, okay.
11      A    Okay.  And OmniTrue, which is also --
12 she's assisting me in OmniTrue.  She was not
13 working for the OmniTrue, she was working for me,
14 assisting me.  She's my assistant for OmniTrue.
15 She's my assistant for Atlantis.  And then I gave
16 her more duty to help, you know, Tim, because Tim
17 was using his younger daughter.  She was in high
18 school, and she couldn't -- I mean, she wasn't
19 there most of the time.  So she was helping out.
20      Q    Okay.  So when you -- we talked a little
21 earlier about how you like to be described as a
22 consultant instead of an MIT owner, right?  When

306

1  you were described as a consultant, it was in
2  Atlantis consulting?
3       A    That's not true.
4       Q    That's not true?
5       A    1,000 percent not true.
6       Q    Did you ever tell -- well, did you use
7  your Atlantis consulting e-mail to communicate
8  about MIT?
9       A    Yeah.  I mean, I used my e-mail,
10 Atlantis, MIT, you know.
11      Q    Right.  But they're two companies that
12 have nothing to do with each other, you said?
13      A    That's correct.
14      Q    Except that you would use your Atlantis
15 e-mail address to communicate about MIT?
16      A    You need to be more specific.  To whom?
17      Q    To the Saudi government?
18      A    To the Saudi government?  Easy for me to
19 answer you, because the MIT e-mail server from the
20 Saudi government is not accepted.  So only I had
21 to use my e-mail, and Tim is aware of that.
22      Q    So when you were communicating with

307

1  Saudi Arabia, you had to use your Atlantis e-mail?
2       A    That's correct.  For some reason, they
3  would not accept either my e-mail or Tim's e-mail.
4  Because Tim had another e-mail addresses.  It's
5  called Tim@MIT.technology, and my e-mail is
6  MIT@missionintegratedtechnology.  And we have the
7  proof that the Saudi government server for their
8  intelligence will not accept it.
9       Q    Why would it accept -- well, you had
10 multiple e-mail addresses for Atlantis, right?
11      A    No.  I have -- when I started Atlantis,
12 I had Atlantiscorp@cox.net.  And then, you know, I
13 created a Gmail account, because this was using
14 Cox, and I was having all kinds of problems with
15 Cox.  And then I created, you know,
16 Fahmi@aclcorporation.
17      Q    You created Fahmi@aclcorporation?
18      A    Yes.
19      Q    Okay.
20      A    That's correct.
21      Q    And the Saudi servers accepted both your
22 cox.com and your --

308

1       A    Actually, I don't think -- most of the
2  contact with the latest contract we did with the
3  PSS --
4       Q    Yep.
5       A    -- the Presidency of State Security,
6  nothing from Atlantis Corp.  Everything gets
7  Fahmi@aclcorporation.  Nothing.
8       Q    So nothing with MIT either?
9       A    Yes.  With MIT.  I would copy.  Whenever
10 I send an e-mail, Rebecca, I copy MIT.
11      Q    Okay.  But you used your Atlantis
12 Consulting e-mail exclusively when communicating
13 with the Saudi government?
14      A    No.  You cannot say exclusively, because
15 I used my MIT e-mail.  But for this particular
16 agency, I don't know what's their problem.
17      Q    Okay.  And you said earlier that
18 Atlantis was never paid by foreign governments,
19 right?
20      A    Say it again.
21      Q    We were talking about how you and how
22 Atlantis would get paid for consulting work, among

309

1  other things.
2     A    That's correct.
3     Q    And you said for your consulting work
4  you never got paid by the Saudi government?
5     A    That's correct.
6     Q    Is that because you would usually
7  structure things the way you did with Terradyne,
8  where you would get a commission upon the sale?
9     A    So you guys asked me earlier, and you
10 said, How do you get paid, Atlantis?  And I said,
11 There's two ways.  Either I get paid as a
12 retainer, a monthly retainer, okay, or I get a
13 success fee or commission, whatever you want to
14 call it.  That's how I get paid.  But I always get
15 paid from this side, not from the government side.
16    Q    But you know that if there is a sale
17 from the Saudi government to transfer funds to
18 purchase something, the funds are coming from
19 Saudi Arabia; you know this?
20    A    Yes.
21    Q    Sure.  Okay.
22    A    It could be any of them.

310

1     Q    Could be.  They're often -- you have a
2  lot of connections with the Saudi government?
3     A    Everyone, everywhere.
4     Q    So are there any other -- so in addition
5  to Atlantis signing an NDA with MIT and Terradyne,
6  and -- in addition to the ones we've talked about,
7  and Christina Kindlon using -- well, Christina
8  would use an Atlantis e-mail account sometimes,
9  right?
10    A    That's correct.
11    Q    And an MIT e-mail account sometimes,
12 right?
13    A    That's correct.  Yes.
14    Q    And an OmniTrue e-mail?
15    A    And OmniTrue, yes.
16    Q    In addition to that -- and the offices
17 right now are all in the same space too, right?
18 No?  Okay.  I'll skip that for now.
19         Are there any other agreements, like,
20 signed agreements, between Atlantis Consulting and
21 MIT?
22    A    To be honest with you, I really don't

311

1  recall.  But if there's something, I am happy to
2  answer either yes or no.  But I don't recall.
3     Q    When you were communicating to the Saudi
4  government using your Atlantis Consulting e-mail
5  address, was there any hope that Atlantis would
6  get a commission from sales to the Saudi
7  government?
8     A    Absolutely not.  Absolutely not.
9     Q    How about other people getting a
10 commission from those sales?
11    A    Which other people?
12    Q    When MIT was seeking to sell to the
13 Saudi government, did anybody get a commission?
14    A    You have to be more specific.  Which
15 year?
16    Q    Say again?
17    A    You have to be more specific.  At what
18 year we are talking about?
19    Q    Let's talk about -- left me make it much
20 easier.  Well, okay.  So it's your testimony that
21 Atlantis has loaned the money to MIT, you said, or
22 given money?  Which one?

312

1     A    Yeah, loaned.
2     Q    How much?
3     A    Over 500,000.
4     Q    Well, okay.  So you said Atlantis and
5  MIT had no business relationship, except Atlantis
6  loaned over $500,000 to MIT?
7     A    That's correct.
8     Q    When?
9     A    I mean, since 213, I have been the only
10 source of funding.  I put over $1.7 million into
11 the company.
12    Q    You or Atlantis or OmniTrue?
13    A    So, you know, okay.  You keep asking me
14 this question.  Atlantis is me; F2E is me; Fahmi
15 personal account is me.  So when I say it's me, I
16 hope I'm not misrepresenting myself, okay?
17 Sometimes the funding I have in Atlantis, okay,
18 and I would just write a check.  And, you know,
19 everything is kept a record with my accountant.
20 Sometimes I don't have enough funding to write it,
21 I write it from my personal account.  So there is
22 payment that was paid from F2E of, I think, close

313

1  to 900,000 from F2E. There's personal. I don't
2  know. Maybe 250 or something. And then the rest
3  is from Atlantis.
4     Q    250 is from what, you?
5     A    My personal account.
6     Q    And the rest, you said. How much is the
7  rest?
8     A    The Atlantis. I think it's over
9  500,000, you know. So is close to -- so far, I
10 mean, when I put to build the first one, the
11 second one, to keep the company running until we
12 get our first business, I put over $1.7 million.
13         And by the way, for the record, Tim was
14 aware of all this.
15    Q    Okay. Let me see. All right. This is
16 not super exciting. I want to mark this as
17 Alubbad Exhibit 13. That is a good thing. This
18 is going to be Alubbad Exhibit 13 for the court
19 reporter. I'm sorry. I wasn't paying attention
20 to the sticker. Okay.
21        (Exhibit 13 was marked for
22 identification and is attached to the transcript.)

314

1     Q    So Exhibit 13 is an e-mail chain. I'm
2  going to flip back to the third page, the last
3  page first, to MIT 1551; do you see that?
4     A    Yeah.
5     Q    Okay. And the very first e-mail is from
6  a guy named Jim at Lenco Armor to Tim Clemente,
7  right?
8     A    Uh-huh.
9     Q    And that's from March 2014; is that
10 right?
11    A    Yeah.
12    Q    Yeah. And then if you look at the next
13 e-mail up, yeah, on the second page. So that's
14 MIT 1550. It's an e-mail from Lenny Light at
15 Lenco to Tim. And if you look at the second
16 sentence, do you see where it says, Anyhow -- this
17 is Lenny writing, and you see where it says,
18 Anyhow, I just wanted to let you know we were
19 contacted by your consultant today?
20    A    Yeah, I see it.
21    Q    Okay. That meant you, right?
22    A    That's correct.

315

1     Q    And Lenny knew you because of Atlantis,
2  right?
3     A    Okay.
4     Q    Okay. Is that true?
5     A    What's true?
6     Q    When you were interacting with Lenny in
7  2014, you were interacting as Atlantis Consulting?
8     A    Okay. So there's two ways I answer your
9  question. Either you want me to explain to you
10 the issue behind this e-mail, or I just answer you
11 blindly yes or no.
12    Q    I would like you to answer just the
13 question I ask --
14    A    Okay.
15    Q    -- honestly.
16    A    Okay. Yes, I was introduced, yes -- I
17 mean, I was telling him, yes, I am consultant.
18    Q    Specifically a consultant with the
19 company Atlantis Consulting?
20    A    That's correct.
21    Q    Okay. When did Lenny learn that you
22 were actually an owner? Let me ask you a little

316

1  broader. When did anyone at Lenco learn that you
2  are an owner of Mission Integrated Technologies?
3     A    Probably in 220.
4     Q    How did they learn?
5     A    Because I told them.
6     Q    Was there a time when Cardinal
7  accidentally sent an NDA to Lenco?
8     A    There was an incident where Cardinal
9  shared an NDA that we signed between MIT and
10 Lenco, and somebody got in trouble and got fired,
11 because we signed with Lenco for them to share
12 ITAR-related material. And I got upset. And then
13 the president, basically, he took the decision to
14 fire that guy. So, but, it was signed between,
15 not Atlantis, for your record. It was between MIT
16 and Lenco.
17    Q    Right. But it was an agreement -- an
18 NDA with Cardinal that was shared with Lenco was
19 what got you very upset, right?
20    A    I don't know what you're referring.
21 MIT, when we hired Cardinal, the first thing, I
22 made them sign an NDA with MIT.

317

1    Q    Correct.  And you signed that NDA from
2 MIT?
3    A    That's correct.
4    Q    Right.
5    A    Okay.  And when we wanted to share --
6 Lenco, they were concerned about the ITAR-related
7 material, and they wanted to know -- I think, when
8 they were discussing with them if there is NDA or
9 something.  And the gentleman who was working at
10 Cardinal accidentally went and shared with them
11 the NDA between us and Cardinal.  Yes, I got upset
12 because this is confidential information between
13 two companies.  He had no right to share it with
14 Lenco, and he got fired.
15    Q    He did.  I know.  So in 2017, when you
16 were very upset at Tim, we talked about, right
17 after Milipol in 2017, right?
18    A    Yes.
19    Q    And you said that was partially -- at
20 the time, you said about ITAR restrictions on the
21 Lenco vehicle; right?
22    A    That's correct.

318

1    Q    But Lenco didn't even know that you were
2 connected to MIT at that time, then?
3    A    No.  They knew.
4    Q    I thought you said 2020 was when they
5 learned?
6    A    No.  You asked me if they knew I was a
7 part owner of the company.
8    Q    Oh, okay.
9    A    That's your question.
10    Q    Fair.  Fair.
11    A    Okay.
12    Q    So what did they think you were at MIT?
13    A    I don't know.  I can't really think or
14 imagine what they were thinking, because this
15 discussion never came.  They always knew I'm a
16 friend of Tim and associated with MIT.
17    Q    Associated with MIT?
18    A    I mean, yes.
19    Q    But you tried not to use an MIT title
20 when you were communicating with Lenco for years,
21 right?
22    A    I mean, until now, I don't.

319

1    Q    Why?
2    A    I mean, with everybody, actually.  Not
3 because I'm hiding.  I feel I am much better when
4 I act as a consultant.
5    Q    For Atlantis?
6    A    No.  For MIT.
7    Q    When you were communicating with Lenco
8 in 2016, say, you were communicating as Atlantis;
9 correct?
10    A    And I still, until now, communicate as
11 Atlantis.
12    Q    That's right.  Why don't you communicate
13 as MIT?
14    A    I do communicate as MIT.  And I told you
15 earlier, I don't mix two things.  Anything related
16 to MIT, I communicated as MIT.  But people,
17 because they know me, sometimes when they respond
18 -- they see Fahmi, and they respond to Atlantis.
19 And then I send them back again.  I reply from
20 MIT, because I try to keep MIT business all in the
21 MIT.
22    Q    Except with Saudi Arabia?

320

1    A    Saudi Arabia, I explained to you.  And
2 for the record, because of this -- and I can prove
3 to you all the e-mail.  We are happy to release it
4 to you, that their server rejected.
5    Q    Okay.  You said Saudi Arabia learned for
6 the first time that you were an owner of MIT in
7 2023; correct?
8    A    Yeah.  Maybe 2022 or 2023.
9    Q    How did they learn?
10    A    They learned because I mentioned to them
11 that I was funding all the money for the bond,
12 okay?
13    Q    Okay.
14    A    And because they had some concern about
15 Tim, and I basically said, I am putting all the
16 bond, and, you know.  So that's why I am basically
17 part of, you know, the company, and I am putting
18 all the bond and, you know.  But all day-to-day
19 operation, Tim is the president, and, you know,
20 the guy.  So basically, they were rolling the red
21 carpet for Tim, you know, because he's the
22 president.  So I wasn't even, like, involved in

321

1  all this.  I gave Tim everything so he can get all
2  the credit.  And he did.
3      Q   How much was the bond?
4      A   The bond, it was for over 870,000.
5      Q   Is that how much -- and how was that
6  paid?
7      A   I paid it in cash.
8      Q   To who?
9      A   What do you mean to who?
10     Q   Where did the bond -- the bond, you said
11 paid it in cash.  Where did that cash, like,
12 physically go?
13     A   To the bank.
14     Q   Which bank?
15     A   The bank in Saudi Arabia.  That's the
16 requirement of the government.
17     Q   Okay.
18     A   It has to be issued by the Saudi bank.
19     Q   You, like, sent cash to a bank in Saudi
20 Arabia?
21     A   No.  I basically had it, you know, over
22 there.  They wired the money, and, you know,

322

1  basically, they issued the bond, and they give a
2  copy to the government, and Tim, he received a
3  copy of it.
4      Q   The cash that was used for that bond,
5  was that from Atlantis?
6      A   No.
7      Q   Who was it from?
8      A   From my family.  I borrowed.
9      Q   From your family?
10     A   Yes.
11     Q   In Saudi Arabia?
12     A   Yes.
13     Q   Does your family work -- is your family
14 -- which family members?
15     A   I mean, when you say which family
16 member, I come from a large stock.  So I have
17 eight sisters; I have three brothers.  So my
18 family, they have money.
19     Q   Which family member provided the money
20 for the MIT bond?
21     A   I think my brother.
22     Q   That brother, just give me a first name.

323

1  I'm not trying to pry, really.  I just need to be
2  specific, as you've asked.  What is your brother's
3  first name?
4      A   Khalid.  Khalid.
5      Q   Khalid.  Does Khalid work for the
6  government of Saudi Arabia?
7      A   No.
8      Q   Where does Khalid work?
9      A   He works in the bank.
10     Q   Near a bank?
11     A   Yeah.
12     Q   In the same bank that issued the bond?
13     A   No.
14     Q   It's a Saudi bank, though?
15     A   Yeah.  He worked in a bank, and then he
16 left the bank, started working business.  But --
17     Q   Okay.  Was there a loan agreement with
18 Khalid for that money?
19     A   No.  Because they are family.
20     Q   Well, with family, you don't need an
21 agreement, right?
22     A   No, we don't.

324

1      Q   I mean, what about Tim, though, right?
2      A   Look, I mean, you're asking me if I had
3  an agreement with my brother, no.
4      Q   No.  Because you trusted your brother?
5      A   That's correct.
6      Q   Let's do this quickly.  This is going to
7  require me to use exhibits that I don't have
8  enough copies of, but -- okay.  Let's start with
9  an exhibit we all have.  So Exhibit 2 is the first
10 amended complaint, going way back in time here.
11 All right.  So you got Exhibit 2 in front of you?
12 Yes?  No?
13     A   Exhibit 2?
14     Q   There we go.  All right.  If you can go
15 to Page 11, Paragraph 50.
16     A   11?
17     Q   Page 11, Paragraph --
18     A   Oh, Page 11.  Okay.
19     Q   Okay.  Can you just read Paragraph 50?
20     A   F2E discovered that Josh was holding
21 himself out as MIT vice president of engineering
22 only after reviewing marketing material Tim and

325

1  Josh had printed for distribution at industrial
2  trade show.
3      Q    When was that?
4      A    The first time I've seen this, back, I
5  believe, in 216; 216 when Tim was making the
6  presentation material and make the videotape, when
7  he set up the company website.
8      Q    That's what you testified earlier?
9      A    That's correct.
10     Q    Does that mean that Paragraph 50 is
11 wrong?
12     A    I mean, whatever.
13     Q    You need to answer.  Is it correct that
14 you discovered that Josh Clemente was holding
15 himself out as MIT's vice president of engineering
16 only after reviewing the marketing materials that
17 Tim and/or Josh had printed for distribution at an
18 industry trade show; is that accurate?
19     A    It is not 100 percent accurate, okay?
20 Because I've seen this when Tim release the
21 website, okay?  And I think back in -- I don't
22 know -- 215, 216, when he made the website and put

326

1  Josh as the vice president.
2      Q    You said when was that, the website?
3      A    I don't know.  I think when he released
4  it, 215 or 216.  I don't remember the date.  He
5  was in control of the website.
6      Q    Okay.
7      A    And he made lots of presentations
8  before, when we had the first ARES system —
9      Q    Yeah.
10     A    — before we made catalog, you know, to
11 the new ARES system.
12     Q    Yeah.  So you knew -- I think what
13 you're saying is what you said earlier was wrong;
14 is that fair?
15     A    I don't know if it's wrong or not, you
16 know.  Maybe it is not written the way, you know,
17 I am just saying to you.
18     Q    Well, the complaint, I think we've
19 agreed, is wrong, right?  That Paragraph 50 is not
20 accurate; correct?
21     A    I mean, it needs to be modified.
22     Q    Yeah.  And it's been modified once

327

1  before already, hasn't it?
2           MR. MILLS:  Object to the foundation.
3      A    I don't know.
4      Q    Do you remember -- well, look at the
5  very first page.  It's titled, First Amended
6  Complaint, right?
7      A    I didn't do this document.
8      Q    Yeah.  But you are the plaintiff, right?
9      A    Okay.
10     Q    And do you think it's important to tell
11 the truth in documents that are filed in court?
12     A    I am always telling the truth.
13     Q    Well, except that Paragraph 50 is wrong?
14     A    Well, maybe, you know, this is something
15 you can address it to my lawyers.
16     Q    I have.
17     A    Okay.
18     Q    I've addressed it in court filings.
19     A    Okay.
20     Q    So let's see if we can get a little
21 closer here.  I'm going to show you -- I've only
22 got one copy.  I didn't think I'd have to use it.

328

1  It's an MIT document.  We'll mark it as MIT
2  Exhibit 14.
3           MR. MILLS:  Why don't I make a copy of
4  this?
5           MS. LEGRAND:  Well, I've got lots of
6  documents I want copies of.  It's going to be a
7  really quick question.
8           MR. MILLS:  Okay.  Because then I can't
9  keep track of it.
10          MS. LEGRAND:  I hear you.  We can make
11 copies right afterwards.
12          (Exhibit 14 was marked for
13 identification and is attached to the transcript.)
14     Q    All right.  So do you see that e-mail?
15 We're looking at Fahmi Exhibit 14.  What's the --
16     A    Exhibit 20.
17     Q    Yeah, yeah.
18     A    Yes.
19     Q    Thank you.  Okay.  This is an e-mail --
20 oh, sorry.
21     A    You can keep it.
22     Q    No.  I don't need you to have it.  I'm

329

1  sorry.
2      A    It's okay.
3      Q    I apologize.
4      A    Thank you.
5      Q    Abigail is smarter than me for many
6  reasons.  Sorry.  We'll get there.  Sorry, very
7  clumsy.  Okay.  So you're looking at Exhibit 14.
8  The first page is an e-mail, you see that, marked
9  MIT 3551??
10     A    Yes, I see it.
11     Q    Okay.  And it's an e-mail from a guy
12 named Mohammed?
13     A    Yeah.
14     Q    To Atlantis; do you see that?
15     A    Yeah, I see it.
16     Q    Okay.  And also cc'ing to a guy named
17 Yousef.  Who's Yousef?
18     A    That's his brother.
19     Q    That's Mohammed's brother?
20     A    Yeah.
21     Q    Is he also at maidan.com?
22     A    That's correct.

330

1      Q    And Mohammed asks -- well, Mohammed is
2  writing to -- who is this written to, the first
3  e-mail?
4      A    This is written to Mohammed.
5      Q    Well, the bottom e-mail.  So the first
6  e-mail is from Mohammed to who?
7      A    To me.
8      Q    And what does it actually say in the to
9  line?
10     A    Huh?
11     Q    What's the to line actually say?
12     A    It says we are preparing for MIT
13 briefing after tomorrow with the MISF, the
14 document we gave MIT is attached; please send it
15 to us in a PowerPoint.  Okay.
16     Q    Okay.  Hold on.  I was asking an easier
17 question first, though, which was just -- it says
18 to Atlantis Corp, right?
19     A    That's correct.
20     Q    But that's you?
21     A    That's correct.
22     Q    Yeah, yeah, yeah.  Okay.  So Mohammed is

331

1  asking you at Atlantis Corp. to send a PowerPoint
2  of the -- a PowerPoint, right?
3      A    Uh-huh.
4      Q    When Mohammed sent this to you, did he
5  know you worked for MIT, or that you owned MIT?
6      A    No.  He knows I am the consultant for
7  MIT.
8      Q    He knows you work for Atlantis?
9      A    He knows Atlantis is my company.
10     Q    Okay.  So he thinks he's talking to
11 Atlantis, not MIT?
12          MR. MILLS:  Object to the foundation.
13     A    No.  I mean, as I told you, my role is
14 always as a consultant.  People, they know me as a
15 consultant.  All of these relationships from 1996,
16 or even before, people know who I am as Atlantis,
17 because my company has always been Atlantis, doing
18 business in the region.  So it really doesn't
19 matter.  It's irrelevant for them, is it MIT or
20 even the moon, okay?  They know who I am.
21     Q    Do you remember, was Saudi Arabia
22 surprised when they learned you owned MIT in 2022

332

1  or 2023?
2      A    Not at all.
3      Q    Not at all.  Okay.
4      A    Tim would like to know this, that maybe
5  they're surprised, no.  See, I mean, this is what
6  he'd like to believe in his head.
7      Q    No.  This is purely me.
8      A    Yeah.  Okay.
9      Q    Okay.  So looking at -- so you replied
10 in this e-mail from Mohammed on September 4th,
11 2015, right?
12     A    Uh-huh.  Yes.
13     Q    Okay.  And there's an attachment, right?
14     A    Yes.
15     Q    What are you attaching to this e-mail?
16     A    It's the presentation that Tim made.
17     Q    Okay.  Did Tim write the -- let's look
18 at the first page.  What language is this in?
19     A    This is a presentation in English, and I
20 made it in Arabic.
21     Q    Okay.  Did Tim write it in Arabic?
22     A    No.  I had it done in Arabic.

333

1    Q    Okay.  Let's look at -- it's the sixth
2  page total, third page of the document.  Yep, yep,
3  yep.  Okay.  On Page MIT 003556, which you're
4  already on, it looks like.  Yep.  You're already
5  there?
6    A    I know.  I know where you're going.  Go
7  ahead.
8    Q    Right.  Why are you not --
9    A    Why am I not doing what?
10    Q    What does that say?  That presentation
11 is an MIT presentation?
12    A    Uh-huh.
13    Q    Okay.  And it's a MIT presentation
14 that's being provided to people in Saudi Arabia?
15    A    That's correct.
16    Q    In Arabic?
17    A    That's correct.
18    Q    Talking about MIT?
19    A    That's correct.
20    Q    And why am I staring at Josh Clemente's
21 picture on the third or so page of that
22 presentation?

334

1    A    Because Tim made that presentation, and
2  he liked to brag about his pictures and everybody
3  else's pictures.  And for me, like I said earlier,
4  it really doesn't matter.  He's the president,
5  making a presentation.  I am giving it.  All this
6  to me, Rebecca, is irrelevant.  What is relevant
7  to me?  To bring the business to the company.
8  That is what is relevant.  He wanted to put that
9  he is the Superman; he is the top-notch law
10 enforcement; he is the counterterrorism; he's on
11 the TV, until we get really smacked, and I had to
12 tell him, You need to stop this.  Because one
13 government agency in Bahrain, they said, Is he the
14 president of MIT, or he is counterterrorism, or he
15 is somebody who does interview on Fox, and talking
16 about, you know this.
17        And I said to him, You better choose.
18    Q    To Tim, you said that?
19    A    Yes.
20    Q    Okay.  But let's talk about what's
21 important.
22    A    Yeah.

335

1    Q    Because I understand that --
2    A    So this --
3    Q    What's important to me is that the court
4  in Virginia has accurate information.  That's
5  important.
6    A    Okay.
7    Q    Paragraph 50 of the amended complaint
8  says, F2E discovered that Josh was holding himself
9  out as MIT's vice president of engineering, only
10 after reviewing marketing materials Tim and/or
11 Josh had printed for distribution at an industry
12 trade show.
13        First of all, you've already said that,
14 no, there was a website before that; correct?
15    A    That's correct.
16    Q    And before that even, in 2015, you are
17 distributing a presentation describing Josh
18 Clemente as the vice president of MIT in Arabic,
19 aren't you?
20    A    I'm not describing anybody.  This is his
21 dad describing his son and putting wherever he
22 want.  All this is irrelevant for the customer.

336

1  What's relevant is the ARES.
2    Q    Okay.  Why did you provide that document
3  to Saudi Arabia, and I don't know who else?
4    A    I provided it, Rebecca, not to Saudi.  I
5  provided it to Kuwait, to Qatar, to United Arab
6  Emirates, to Egypt.  I can go on with the list.
7    Q    I agree.
8    A    Tim knows this.
9    Q    I agree.
10    A    Okay.
11    Q    Why are you saying that you did not know
12 that Josh Clemente was described as MIT's vice
13 president when you have described him that way in
14 presentations you sent out since at least 2015?
15    A    Again, like I said to, maybe this is,
16 you know, the way it's written, is not, you know,
17 the right way.  But like I say to you, I mean,
18 this is something, you know — I did not write
19 this.
20    Q    Your lawyer did?
21    A    Yes.  My lawyer did.  I'm sorry.
22    Q    Did your lawyers ask you -- yeah.

337

1        MR. MILLS: Don't answer that.
2    Q    Sorry. Okay. So your lawyer got that
3 wrong?
4    **A    Okay.**
5    Q    Is that right?
6    **A    I think so. They need to reword it and**
7 **they correct it. So--**
8    Q    Let's move on. Just real quickly, let's
9 use this as Exhibit 15. For you. For you. And
10 I'll give you a copy. This is 15, I think. Am I
11 correct?
12       COURT REPORTER: Yes.
13       (Exhibit 15 was marked for
14 identification and is attached to the transcript.)
15    Q    Okay. MIT 15, you got that in front of
16 you, Mr. Alubbad?
17    **A    I do.**
18    Q    Good. First page here is MIT 002831;
19 you see that?
20    **A    Yes.**
21    Q    Okay. This is a November 2nd, 2018,
22 e-mail from MIT@missionintegratedtech.com; do you

338

1 see that?
2    **A    Yes, I see it.**
3    Q    To Tim Clemente, right?
4    **A    Uh-huh.**
5    Q    Cc is Atlantis Corp. That's your
6 Atlantis Corp. e-mail address?
7    **A    That's correct.**
8    Q    Okay. And can you just read the first
9 sentence?
10    **A    I said, Dear, Tim, please use this**
11 **brochure. I did change the e-mail address on the**
12 **front.**
13    Q    Okey-doke. So you are affirmatively
14 telling Tim to use the presentation that was
15 attached to this e-mail, yeah?
16    **A    That's correct.**
17    Q    Okay. Let's look at -- some of the
18 Bates numbers here may be janky, so feel free to
19 check my work later. This presentation, on the
20 final page, which I can't see a Bates number on
21 it. Can you flip to the very last page of the
22 exhibit marked as MIT 15 -- or, sorry, as Fahmi

339

1 Exhibit 15. Last page, please. Okay. Whose
2 picture is on the bottom left of this?
3    **A    Josh Clemente.**
4    Q    Okay. And what does it say under Josh
5 Clemente's name?
6    **A    Vice president of engineering.**
7    Q    Okay. Why -- you had updated this
8 brochure yourself in November 2018; correct?
9    **A    Okay. Tim gave me that brochure, and**
10 **why this e-mail happened: Tim had the previous**
11 **brochure. It was his e-mail and his phone number.**
12 **People are calling; he is not responding, as**
13 **usual, because most of his time on the West Coast,**
14 **okay? So I basically had a talk with him, and I**
15 **said, Tim, you know, I mean, people are telling me**
16 **you're not answering; so either you figure out**
17 **something, or you need to put my phone number or**
18 **the company e-mail address.**
19       **And then, Tim, he said, Can you change**
20 **it? Okay.**
21       **I said to him, This is a PDF, the file,**
22 **okay? So basically I have one of my guys,**

340

1 **engineering guys, to change and remove his number**
2 **and put my number, and that's it. But I did not**
3 **change anything else, left the catalog as is.**
4    Q    You had the power to change anything you
5 wanted in that brochure, didn't you?
6    **A    Yeah. I wasn't changing anything.**
7    Q    You had changed the e-mail address?
8    **A    I changed the e-mail and the phone**
9 **number, yes.**
10    Q    Why didn't you change the reference to
11 Josh Clemente?
12    **A    Because, you know, it's -- as I said**
13 **earlier, Rebecca, it's irrelevant, because the**
14 **company website is in control of Tim, and it has a**
15 **video.**
16    Q    Okay.
17    **A    People can see a video. They don't need**
18 **to read the piece of paper.**
19    Q    Okay. When are you saying that you had
20 access to the MIT website? When did that happen?
21    **A    I think he gave me access in 2020.**
22    Q    Okay. Did you change the MIT website to

341

1 take off the video?
2    A    At a later stage, I did, but not that
3 time.
4    Q    You made a new video in the last couple
5 months, didn't you?
6    A    That's correct.
7    Q    Where you replaced the Josh audio with
8 an automated computer-generated audio?
9    A    That's correct.
10    Q    You did that just this year; correct?
11    A    That's correct.
12    Q    Do you know when?
13    A    Probably last month.
14    Q    Okay.  Why didn't you do it sooner?
15    A    Because I was advised.
16        MR. MILLS:  Again, don't talk about
17 attorney advice.
18    A    Okay.  Then that's it.
19    Q    Okay.  And with the PDF, you just didn't
20 think it was worth changing it, because you felt
21 like you were not able to change the website?
22    A    That's correct.

342

1    Q    Did you ask Tim to change the website?
2    A    I asked him repeatedly.
3    Q    About that, about to take the Josh video
4 down?
5    A    I asked him repeatedly to clean and
6 remove, and he would tell me, Yes, yes.
7        And finally I said, I need access to it.
8 You saw one of my lawyers -- God bless his sole
9 because he basically told them and say it.  And in
10 every e-mail, I said, I need access.  And even in
11 this e-mail, I still need access to the e-mail and
12 the website.  This is in 218.  In 219, it's the
13 same thing:  I need access.  I don't know how many
14 times I can ask.
15    Q    I'm not going to go back through
16 everything right now, but did Christina have
17 access to the website?
18    A    No, no.
19    Q    Okay.  So the PDF that you were
20 distributing in 2018, you were comfortable
21 continuing to have it say that Josh was the VP of
22 engineering for MIT?

343

1    A    Because Josh is Tim's son, and for me, I
2 really didn't care what he wanted to call his son,
3 okay?  He wanted to make him, like, you know, I
4 mean, VP or whatever.  I was always under the
5 impression -- and I repeat myself -- that Josh was
6 under NDA.  And Josh was compensated, okay, from
7 the 5 percent he was getting from his dad.
8    Q    Okay, good.  Good actually reminder.
9    A    Okay.
10    Q    Still looking at Exhibit 15, which is
11 still in front of you.
12    A    Okay.
13    Q    We talked earlier about you knowing you
14 didn't have an NDA from Josh Clemente.  You knew
15 that pretty early on, right?
16    A    Please?  You said?
17    Q    Let me ask, first of all, there was an
18 e-mail sent to you that said that Josh and Wes
19 would send you an NDA, right?
20    A    They send it to Tim.  They send it to
21 me.  I don't recall the exact, because it was
22 instructed.  As I told you, I had no communication

344

1 with Josh.  Tim sent him the NDA.  Okay.
2    Q    When did you first ask him, Hey, can I
3 get a copy of the NDA that I know that you got for
4 Josh?
5    A    I can tell you, I asked him lots of
6 times.
7    Q    Okay.
8    A    Okay.  But I cannot recall every time.
9 I know there is in here in the e-mail.  I ask in
10 217 to Josh directly.  I said, I need a copy of
11 your NDA.  And I asked Tim.  And I kept asking Tim
12 repeatedly.  So you have here in 218, I am asking
13 him, Please let me know if you found Josh's NDA,
14 okay?
15    Q    And remember, you said --
16    A    And I said, If you cannot find it, then
17 I need Josh to sign an NDA in 219.  You heard it
18 on the tape.  Oh, well, I'm not sure, but I guess
19 he did, okay?  I kept asking about the NDA.  And
20 as I say to Mr. Henson, until David Marko, when we
21 were trying to make the agreement, Josh for the
22 first time said, I never signed an NDA.

345

1    Q    Yeah.

2    A    Okay?

3    Q    Yeah.

4    A    So that's when I learned about it.

5    Q    But you already knew in 2018 that you
6  have a copy, right?

7    A    Yeah.  I never had a copy.

8    Q    Didn't you think it was important to
9  deal with that more promptly?

10    A    Because Tim is the president.

11    Q    Okay.

12    A    And this is his son.  And it was his
13  responsibility and part of his fiduciary duty to
14  make sure everything belong to MIT, kept
15  confidential, and anybody who comes to work with
16  MIT, regardless who it is, to have an NDA and work
17  for hire.  This is his responsibility.

18    Q    You didn't even ask.  There is no
19  document about a work-for-hire agreement with
20  Josh, is there?

21    A    This is Tim's responsibility.  You can
22  ask him.

346

1    Q    So you never even sent an e-mail about a
2  work-for-hire agreement, right?

3        MR. MILLS:  Objection.  Foundation.

4    A    Again, I did not ask Josh to do anything
5  for me or for MIT.  It was Tim who wanted his son
6  to assist him.

7    Q    Did you have a -- strike that.

8        The 5 percent.  You keep talking about
9  the 5 percent.  Let's be real clear.

10    A    Yes.

11    Q    Did Josh Clemente ever receive any
12  membership or ownership interest in MIT?

13    A    I don't know what agreement he had with
14  his dad.

15    Q    Well, hold on a second.  Is there any
16  way that Josh could own shares in MIT and you
17  wouldn't know?

18    A    I cannot answer this.  This is something
19  you need to ask him.

20    Q    Let's put on our 30(b)(6) cap here.  So
21  you're speaking on behalf of the entity MIT.

22    A    Okay.

347

1    Q    Is there a way that Josh could transfer
2  ownership shares or membership units in MIT --
3  sorry -- that Tim could transfer shares to Josh
4  without you knowing?

5    A    According to the operating agreement,
6  no.  He has to let me know first.

7    Q    And every time he asked -- every time
8  Tim asked you about transferring shares to Josh --

9    A    Okay.

10    Q    -- and I'll just say through -- let's
11  just do it through January 2022 for now -- Tim
12  asked you a number of times, Can I transfer those
13  shares to Josh now, right?

14    A    From what date?

15    Q    I'm just going to say for now, any time
16  before 2022, he asked multiple times, right?
17  We've gone through some of those times.

18    A    Only.  Only.

19    Q    Only what?

20    A    Only when there is a requirement, either
21  for a bank, okay?

22    Q    Wait.  Hold on.  So the answer there is

348

1  yes, right?

2        MR. MILLS:  Objection to foundation.

3    A    Only when he wanted.  As I testified
4  earlier, we created the company in 213.  Tim had
5  all the time in the world to come and say --
6  because as I mentioned to you, Tim was a friend
7  and somebody I know, you know, his family and have
8  lots of respect for them.  He could have basically
9  said, when we set up the company, and he said, I
10  am bringing my son to help me and Ken Fournier; we
11  would like your attorney to set up the operating
12  agreement.  Nothing happened.  In 214, the whole
13  year passed, nothing happened.  In 215, when there
14  is a bank document that is needed, Tim said, Okay,
15  I want to do this.

16        I didn't stop Tim to create the
17  document, or to make the document and basically
18  get the lawyer to do it.  Whatever he wanted to do
19  between him and Ken Fournier, that's his business.

20    Q    But you told Tim that he could not
21  transfer shares of MIT to Josh without your
22  consent, right?

349

1     A    Yes.  For that instant, in 215,
2  regarding the bank, because he got an e-mail, and
3  basically I already did it.  And we said, Since
4  you already did it without telling me, you know,
5  that's not going to work.
6     Q    Okay.  And then when he asked again in
7  2017 to transfer shares --
8     A    In 2017, he did not ask me.
9     Q    Okay.  We looked at an exhibit earlier?
10     A    Yeah.  Again, this in 2017.  Again, you
11  know, like I said to you, every time there's --
12  when we needed a bank document, he comes and say
13  this, you know, to me, but not because he is
14  really truly wanted to give his son and Ken
15  Fournier.  Because when he started with Ken
16  Fournier, he promised him 1 percent.  And then he
17  changed to 2 percent.  And then finally, Ken
18  Fournier got 6 percent.  I mean, but again, I
19  stood back from all these things.  This is between
20  them.
21     Q    Whoa, whoa, whoa.  You stayed out -- you
22  prevented any shares from going to Josh Clemente;

350

1  correct?
2     A    I did not prevent anything.
3     Q    Without your approval --
4     A    Without my approval.
5     Q    -- shares could not go to Josh?
6     A    That's correct.
7     Q    And you never provided that approval,
8  did you?
9     A    Because Tim did not ask for the attorney
10  to go and do this.
11     Q    So it's just that Tim asked you wrong?
12     A    You know, now, when I see things, okay,
13  this is my conclusion after I see this:  Tim was
14  trying to extract more percentage from me, okay,
15  and not even use the percentage that he was taking
16  to his son.  And the fact that now, when I listen
17  to the tape, in 219, the guy come in recording me
18  secretly, and then to trying to negotiate with me
19  about taking cash money for his son, okay, and not
20  asking, you know, for percent.  He was negotiating
21  in behalf of his son and Jonathan Adam to take
22  cash from me, but he failed to tell me that he

351

1  filed for a provisional patent with his son, and
2  his son is filing for a patent.
3     Q    Let's talk about that leverage.
4     A    Yeah.
5     Q    You said at the outset, Tim Clemente got
6  25 percent ownership of MIT from instead of 20
7  percent at the outset, when the company was first
8  formed in 2013?
9     A    That's correct.
10     Q    So that 5 percent could go to the people
11  who were helping Tim Clemente?
12     A    That's correct.
13     Q    And -- but at the outset, he had
14  25 percent?
15     A    That's correct.
16     Q    What does he have now?
17     A    His rate of percentage today is
18  6.5 percent.
19     Q    As of when you filed this suit, what was
20  his percentage?
21     A    When the suit was filed, before we did
22  the dissolution, I think he was 13.

352

1     Q    13 percent?
2     A    Yeah.
3     Q    So when you filed the suit, instead of
4  being the 25 percent, he was 13 percent, right?
5     A    Uh-huh.
6     Q    And Josh still had nothing, right?
7     A    Josh refused.
8     Q    Hold on.  Question:  Did Josh have
9  anything, any ownership percentage in MIT?
10     A    Again, in 2022, after all these things,
11  Josh refused the percentage.
12     Q    What is F2E's ownership percentage?
13     A    Now?
14     Q    Yes.
15     A    As of today?
16     Q    Yes?
17     A    As of this hour, 90.5 percent.
18     Q    So you've gone from 75 percent to
19  90.5 percent?
20     A    Yeah.  I went, you know, because after
21  we did the 2022 agreement with David Marko and
22  Josh refused his 5 percent, because he knew there

353

1  was a lawsuit, so he figured he needed to stay out
2  of it, and basically he said, Just give it to Ken.
3       And then Tim, I said, Your son made a
4  big deal about -- you made a big deal.
5       Oh, well, my son, now he's part of a
6  company, and, you know, it's $100 million riding,
7  you know, and he doesn't need.  He said, It's
8  better to give it to Ken.
9       I said, Okay, you know what, Tim, this
10 is your percentage.  If you want to give it all to
11 Ken, that's your business.
12   Q   How did it go from -- let me stop.  So I
13 need to get this straight.  It's MIT owns
14 75 percent -- whoops.  F2E owns 75 percent of MIT
15 when it was formed in 2013, right?
16   A   That's correct.
17   Q   And in 2017, I think that changes.  Am I
18 right about that?
19   A   That's correct.
20   Q   What happened in 2017?
21   A   Because we needed a bond, as I said
22 earlier, for Saudi Arabia.  Okay.  In 215 -- I'm

354

1  sorry to go back a little bit, because this is
2  important.
3    Q   Okay.
4    A   In 215, for Algeria, we needed the same
5  bond.  So we gave the same consent letter that
6  David Marko made, and he refused it sign it.  I
7  left it alone.  I made the bond.  In 217, because
8  the percentage for Algeria was 95.  So in 217, we
9  needed to do a bond, and I basically said, Look,
10 this is the same document I gave you in 217 again.
11 And I think there is an e-mail.  If you don't want
12 to sign it, that's fine with me, but you, as a
13 member of the company, you're obligated.
14       And then finally, Tim signed, where he
15 gave 6 percent back in order to lower his
16 percentage to 19 percent.
17   Q   So you told Tim that he was obligated by
18 his duties at MIT to give you an additional --
19   A   No.
20   Q   -- 6 percent interest?
21   A   No.  I did not tell him he need to give
22 it to me, because --

355

1    Q   Who did he need to give it to?
2    A   No.  What he -- the bank said -- when
3  they saw the operating agreement, they said
4  anybody who's at 20 percent or more need to be on
5  the bank record.  Tim refused.  I don't know why,
6  but he refused to be on the bank record.  He did
7  not want to take any responsibility whatsoever.
8  He wanted me to take all the responsibilities.  So
9  the only way that was suggested by the attorney,
10 he drafted this consent letter.  We send it to
11 Tim.  And I said, Okay, you basically give this
12 percentage back, okay, so it makes you 19 percent,
13 okay, and then I become the 6 percent, and then
14 the 6 percent goes back to you when, you know,
15 everything is paid and all that stuff.
16   Q   When you unilaterally decided you've
17 been paid back, right?
18   A   That's correct.
19   Q   Until then, nobody gets anything?
20   A   Nobody.
21   Q   And has anybody ever gotten anything?
22   A   And I didn't get anything.

356

1    Q   And how much needs to be paid back
2  before anybody, other than you, would ever see a
3  dime from MIT revenue?
4    A   Until I get every penny I put to date.
5    Q   And how much is that?
6    A   I really don't know.  Because right now,
7  also, you know, the company need to operate.  And
8  if Tim does not participate, and Ken Fournier,
9  participate -- because right now, the company is
10 also paying legal bills.  And if they don't
11 participate, I'm going to do another capital call.
12   Q   Well, you just did one.  That's how we
13 got him the 6 percent?
14   A   Yeah.  And I will to another.
15   Q   So you're going to unilaterally -- that
16 MIT agreement, for the operating agreement and
17 everything else, from Tim Clemente's perspective,
18 because it turns out, he has no protection,
19 according to you?
20   A   No.  That's not true.
21   Q   How come that's not true?
22   A   I mean, because he was the president,

357

1 and his job is, basically, do the day-to-day
2 operation of MIT. I did not get involved in this.
3 But always the agreement said, any decision to be
4 made, it has to be approved by the member, okay?
5 So for me, I mean, it's not like the guy was
6 basically handcuffed and couldn't do anything. He
7 did not want to take any responsibility when it
8 comes to financing. I mean, Rebecca, he did not
9 want to be on the bank account, okay?
10    Q    Okay. But at the end of the day, any
11 time you wanted, it's your position that you could
12 fire Tim as president?
13    A    That's correct.
14    Q    Okay.
15    A    But I haven't done it. I only did it on
16 December 23rd, after I discovered that there is a
17 patent that he was with his son, you know -- I
18 mean, secretly filing a patent, not telling me
19 about it, lying to me the whole time. Yeah, you
20 know. So --
21    Q    You fired Tim Clemente as MIT's
22 president after you filed this lawsuit; correct?

358

1    A    That's correct.
2    Q    So why did you file this lawsuit before
3 you even got around to trying to, I guess, fire
4 Tim?
5    A    It's actually, because you were the
6 lawyer.
7    Q    That's true.
8    A    When we went with the Stern (phonetic).
9    Q    Yeah?
10    A    And Stern, when Tim made that --
11    MR. MILLS: Don't talk about any advice
12 from Stern.
13    A    No. Okay.
14    Q    I don't know who Stern's lawyer -- I'm
15 not sure that Stern was representing MIT anyway,
16 but --
17    A    Yeah, he was representing MIT.
18    Q    Well, then he can tell it to, you know,
19 then it's -- the privilege ran to Tim?
20    MR. MILLS: Well, I'm going to disagree
21 with that.
22    MS. LEGRAND: I mean, it's true as a

359

1 technical matter. But let's not argue. I know we
2 are short on time, as my colleague has pointed
3 out.
4    Q    We are going to need more time because,
5 in part, you are making --
6    A    Okay.
7    Q    You filed this current lawsuit when Tim
8 was still president?
9    A    That's correct.
10    Q    Then you fired Tim as president?
11    A    That's correct.
12    Q    Then, when you filed the lawsuit, Tim
13 was down to only 13 percent shares, right?
14    A    That's correct.
15    Q    And because many of the shares that Tim
16 had originally had had gone to you -- gone to F2E;
17 correct?
18    A    That's correct.
19    Q    Okay. And none of the shares have gone
20 to Josh Clemente?
21    A    That's up to Tim.
22    Q    No. Is there a legal way that Tim could

360

1 have transferred shares to Josh without your
2 consent?
3    MR. MILLS: Objection to form.
4    A    Again -- bless you. Again, the
5 question, I said it, and I repeat it. If Tim
6 wanted the percentage to be transferred to Ken and
7 to Josh, okay, he could have basically asked to do
8 it the right way and have the lawyer do it, and he
9 did not.
10    Q    Okay. Just holding this document.
11 Okay. This is totally my fault. Let's just real
12 quickly do this one. Alubbad Exhibit 16, move on.
13 Alubbad Exhibit 16. 16, all right.
14    (Exhibit 16 was marked for
15 identification and is attached to the transcript.)
16    A    I know this.
17    Q    You do have to look at it. Okay. Well,
18 you said you know this document, yeah? What is
19 it?
20    A    Do you want the short answer?
21    Q    Yes, please.
22    A    Okay. The short answer, Tim gave it to

361

1 me on March 4th, 2022, after I learned of the
2 patent.
3     Q    Okay.  And what does this document try
4 to do?
5     A    Actually, when he gave it to me, I did
6 not want to even look at it.
7     Q    Okay.  Well, let's look at it, because
8 you said you know this document, right?
9     A    Yes, I know it.
10     Q    Have you looked at it now?
11     A    I looked at it when he gave it to me at
12 10:00 o'clock in the morning at the subcontractor
13 office in Butler, Pennsylvania.
14     Q    Okay.  What does it say?
15     A    It's basically -- he was trying to trick
16 me, okay, after I found out about the patent, and
17 he knew I was very upset.  He gave me this piece
18 of paper, trying to tell me, okay, Josh will
19 transfer if we transfer.  But nothing in this
20 letter says that the 5 percent coming from me or
21 coming from him.
22     Q    Did you ask him about that?

362

1     A    I didn't want to ask him.  I said, Tim,
2 this letter is going to my lawyer.
3     Q    Okay.  But Tim ultimately did give
4 another 5 percent -- in addition to the 5 percent
5 ownership shares that he'd already given to F2E in
6 2022, or in --
7     A    Not 5 percent.
8     Q    6 percent, correct.  Later, when shares
9 were given to Ken Fournier, those come from Tim;
10 correct?
11     A    That's correct.
12     Q    So there's every reason to think that
13 Tim would have provided those 5 percent from his
14 shares, right?
15         MR. MILLS:  Object to the foundation.
16     Q    You can answer.
17     A    Again, I don't know what -- Tim, when he
18 discovered that -- when I discovered that there is
19 a patent and Tim lied to me, basically, he was
20 never -- he wanted to do everything right, okay,
21 and immediately, all of a sudden, okay, he wanted
22 to do the transfer; he wanted to do the

363

1 percentage, and do everything.  And you know what?
2 I said, Okay, fine.
3         I didn't object for him to do it the
4 right way.  But when it came in to the
5 distribution, his son refused it.
6     Q    Well, hold on.  You refused -- we are
7 looking at Exhibit 16, a document you remember
8 receiving; correct?  It's a one-page document,
9 right?
10     A    That's correct.
11     Q    And it's a very simple agreement.  Can
12 you just read the first paragraph, the Number 1?
13     A    It says, The intention of the members of
14 Mission Integrated Technologies to transfer to you
15 a 5 percent ownership of MIT in recognition for
16 your efforts on the design and engineering of the
17 ARES system.
18     Q    Okay.
19     A    Okay.
20     Q    Did you agree to this?
21     A    Now, before I answer --
22     Q    You need to answer.  We are really short

364

1 on time, sir.
2     A    No.  No.
3         MR. MILLS:  You can ask questions.  You
4 can answer.
5     Q    It's a yes or no question.
6     A    No.  This is not a yes or no.
7     Q    Did you sign this document?
8     A    I didn't sign anything.
9     Q    So you did not sign the document?
10     A    No, I did not.  Because it doesn't say
11 where is the 5 percent coming from.
12     Q    So you're saying that's the only thing
13 you needed?
14     A    I wasn't even going to sign anything.
15     Q    I know you weren't.
16     A    I wasn't going to sign it.
17     Q    Correct, you were not.  Regardless of
18 where that came from?
19     A    No.  Because I find out that he lied to
20 me.
21     Q    Because you were angry?
22     A    Yes, I was angry.

**365**

1    Q    You never signed this document?
2    A    I never signed it.  I wanted my lawyer
3  to look at it.
4    Q    Right.  You would rather have MIT spend
5  hundreds of thousands of dollars in legal fees
6  than sign this document because you're angry?
7         MR. MILLS:  Objection.  Foundation.
8    A    No.  That's a wrong statement.
9    Q    Why?
10    A    Because you were the lawyer for Josh.
11  When I heard the Stern, I tried to do it the nice
12  way.  And you said to my lawyer -- and I've seen
13  all the text messages between Tim and Josh -- that
14  I am a garbage human, and he is bluffing.  Well, I
15  wanted to show all of you that I'm not bluffing.
16  So this is why I filed the lawsuit.
17    Q    Was it in MIT's best interest for you to
18  make a show of not bluffing?
19    A    You know what?
20         MR. MILLS:  Object to the foundation.
21    A    This is not for you to decide what is
22  this.  MIT information, confidential information,

**366**

1  has been compromised, and has been stolen, in my
2  opinion, and the president of the company colluded
3  with his son, okay, and exposed company
4  information, and they used it as leverage at me.
5    Q    Well, did it work?  Have they ever got a
6  dime from you?
7    A    You know what?  That's irrelevant.  You
8  know what?  When you hired -- when Stern was
9  handling my case, we ask both Josh and Tim to
10  release everything.
11    Q    Yeah.
12    A    And did they release?
13    Q    Yes.
14    A    No, they did not.  They did not.  They
15  violated.
16    Q    You received a USB key from Tim
17  Clemente, didn't you?
18    A    Oh, my God.  No, they did not.
19    Q    What do you mean?  Did you receive a USB
20  key from Tim Clemente?
21    A    Rebecca, I am telling you --
22    Q    Okay.

**367**

1    A    -- Josh and Tim violated that contract.
2    Q    What contract?
3    A    In July, he was asked by David Marko --
4    Q    Yes.
5    A    -- if he released everything, Tim, and
6  Tim signed on it.  In November 2022, there is an
7  e-mail with a letter with all these things from
8  Stern asking if he would release everything, and
9  he said, Yes.  Where was it in 2022, in July and
10  November, that Tim release that he applied for a
11  provisional patent in 217 between him and his son?
12    Q    I don't know that that's what you were
13  asking for.
14    A    No.  But that's one.
15    Q    Okay.
16    A    One of the things.
17    Q    All the Cardinal information, all of the
18  vendor information that we talked about earlier --
19    A    Yes.
20    Q    -- MIT has had that for a long time;
21  correct?
22    A    No.

**368**

1    Q    In 2022, was a drive shared with you, an
2  online drive that had all the vendor information
3  for all the different companies we talked about
4  earlier?
5    A    For the record, Rebecca, I will say to
6  you that's not true.
7    Q    What?
8    A    There is an e-mail.
9    Q    Yeah.
10    A    An e-mail that called Catholic for
11  something, okay, one of his e-mail addresses, and
12  basically between him and Josh telling me.  And I
13  replied immediately, because I remember.  I said
14  to Tim, This is not my responsibility; this is
15  your responsibility as the president to make sure
16  all the record of MIT is, you know.  And I never
17  opened it, okay?
18    Q    You never opened it?
19    A    Never opened it.
20    Q    How do you know it wasn't there, then?
21    A    You know what?  Because it was -- it was
22  the responsibility of Tim to make sure all the

369

1 company record is there. And then I learned later
2 on, when the information was released, that you
3 guys released -- Tim and Josh basically said, Oh,
4 make sure you don't release everything to him.
5 Oh, and Josh is saying, Yeah, I'm not going to
6 release, because I don't trust.
7    Q    When you brought this lawsuit, had you
8 even bothered to look at what had already been
9 provided to you by Josh and Tim?
10    A    No.
11    Q    You filed this lawsuit that alleges MIT
12 had not --
13    A    And my guess was right. My hunch was
14 right that they were both lying.
15    Q    So you filed a complaint in court --
16    A    Uh-huh.
17    Q    -- stating that you had never been given
18 information?
19    A    Yes. Until I this day, I don't have the
20 information.
21    Q    You're talking about because you think
22 there's e-mails or text messages that you've seen

370

1 now that you think you should have gotten sooner?
2    A    Because, you know, right now, the e-mail
3 and text messages shows that they were not going
4 to give me the information.
5    Q    But you never even looked at what was
6 provided to you, did you?
7    A    Because it was the responsibility of Tim
8 Clemente as the president to make sure all the
9 company information.
10    Q    But when Tim told you he had provided
11 you all the company information --
12    A    No, he did not tell me. He did not. So
13 you can say whatever you want.
14    Q    Tim sent -- you were given access to a
15 great deal of information, and you never opened
16 it; correct?
17    A    Again, like I said to you --
18    Q    Because it was your hunch?
19    A    No. It's not even. Because I was
20 always consistent with my questions, what I
21 needed.
22    Q    Okay.

371

1    A    When I hired Cardinal Scientific -- and
2 this is from the record.
3    Q    It's all for the record.
4    A    Okay. I told -- you know. He sent me
5 an e-mail. You received -- we received that --
6 you guys received that e-mail. And in this
7 e-mail, it says, Fahmi, I received everything from
8 Cardinal, and he spelled it out.
9    Q    Yes, correct. That was in 2017, right?
10    A    2017.
11    Q    Right.
12    A    So they gave them that original file.
13 So one, I asked -- I asked Tim, I need the
14 original file you got from Cardinal.
15    Q    Yep. And how do you know he didn't
16 receive that?
17    A    And to this day, they have not given it
18 to me.
19    Q    You didn't even look at what you were
20 given, did you?
21    A    Look, the original file was given on a
22 CD and thumb drive and all of these documents.

372

1    Q    With your science background, you
2 understand that data can be moved from a physical
3 piece of media, like a disc, to another form of
4 media, right?
5    A    Uh-huh.
6    Q    Is what matters the physical disc or the
7 information? You're saying you wanted that
8 information; correct?
9    A    I wanted exactly the original
10 information. I paid for it, and they received it.
11 And I wasn't going to deviate from this.
12    Q    Did you ever check if the information
13 you received --
14    A    I don't need to check.
15    Q    Why not?
16    A    Because it's Tim's responsibility.
17    Q    Didn't Tim tell you that he had given
18 you all the information you should have received?
19    A    No. No.
20    Q    Tim never said that to you?
21    A    No. Because I find out later on, he was
22 lying.

373

1    Q    Well, that's not my question.
2    A    Okay.
3    Q    My question is, why you are alleging
4  that to this day, MIT does not have information
5  that Cardinal provided?
6    A    Yes.  To this day, I don't have it.
7    Q    To this day, you have not looked; that's
8  correct?
9    A    No.  I needed the -- I was always
10 consistent.  I needed the original file.  When
11 somebody gave you this pen --
12   Q    Yes?
13   A    -- I needed this pen that they gave it
14 to you because I wanted to make sure, if you took
15 something from this pen.  I wanted the original
16 file so I can go back to Cardinal.  I said, this
17 is the original file you gave me.
18   Q    Well, you could go back to Cardinal,
19 couldn't you?
20   A    No.
21   Q    Why not?
22   A    Because I wanted the information that

374

1  Josh and Tim took.
2    Q    Why was it in MIT's interest to be
3  fighting about whether you had a CD versus --
4  strike that.
5          Did you care at all about the actual
6  data here, about the data from Cardinal, about the
7  data from the Twenty First Century?
8    A    Yes.
9    Q    Okay.  Did you ever check to confirm
10 that you had all the data that Twenty First
11 Century ever produced for MIT, and all the data
12 that Cardinal produced for MIT?  Did you ever
13 check that you had that?
14   A    To check where?
15   Q    Well, could you ask Cardinal?
16   A    I don't need to check with Cardinal,
17 because I paid, you know, the vendor, and he gave
18 us the information.
19   Q    Who gave you the information?
20   A    The president of Cardinal.
21   Q    Yes.
22   A    Gave it to Tim and Josh.

375

1    Q    Okay.
2    A    And I wanted it from Tim --
3    Q    Okay.
4    A    -- and Josh to return the stuff that MIT
5  paid for.  I don't know what's so difficult about
6  this.
7    Q    Well, you understand about -- let's try
8  to get to a question.  We are short on time, and I
9  am entitled to a yes or no question.
10   A    Okay.
11   Q    Did you ask Cardinal, can you give me
12 the exact same information that you gave to Tim or
13 Josh; yes or no?
14   A    Yes, I did ask them.
15   Q    When did you ask that?
16   A    I asked them when, I think -- I don't
17 know -- maybe in 219, I did ask them.
18   Q    And what did they say?
19   A    He gave me a thumb drive, okay, and
20 basically, he said he wasn't sure if it has
21 everything.  Because he said, It's been a while,
22 and he doesn't have all the file, because he told

376

1  me there were some videos and pictures they took,
2  and he wasn't sure.
3    Q    Is there an e-mail documenting that?
4    A    No.  I went to him personally.
5    Q    So he just told you that over the phone,
6  that he wasn't sure if he had lost --
7    A    No.  I was with him at the office.  I
8  talked to him.
9    Q    Okay.  What specifically do you think
10 you didn't receive from Cardinal?
11   A    You see, this is -- again, I am not
12 aware what was in the original disc.  How can I
13 compare?
14   Q    Well, Cardinal --
15   A    How could I compare?
16   Q    Well, you trust Cardinal, don't you?
17   A    It doesn't matter what I trust or not to
18 trust.  I paid for something; I want it back.
19   Q    Okay.  The Twenty First Century, first
20 of all, did you pay for everything Twenty First
21 Century did?
22   A    To my knowledge, I did, until I found

377

1  out later on that Josh, who was not authorized,
2  made a payment.
3      Q    How much was his payment?
4      A    30,000.
5      Q    So Josh paid for a bunch of the Twenty
6  First Century work, then, didn't he?
7      A    Well, he wasn't authorized to start with
8  to pay, because the funding was with Tim Clemente.
9      Q    But he did make that payment; correct?
10     A    And I was not aware of it until 2020.
11     Q    And has Twenty First Century made
12  software that gets used for a wireless control
13  system for the ARES, right?
14     A    That's correct.
15     Q    Is there anything that MIT needs
16  regarding that software that MIT doesn't have?
17     A    I don't understand your question.
18     Q    Apart from your desire to punish Josh
19  and Tim --
20     A    This is not about punished.  Don't put
21  words in my mouth.  I'm not punishing anybody.
22     Q    What is it MIT needs from Twenty First

378

1  Century that MIT doesn't have?
2      A    I want the original file that I paid for
3  it, that included the schematic, the design, and
4  the source code file.
5      Q    From Twenty First Century?
6      A    That Josh received.
7      Q    Have you gone to Twenty First Century
8  and asked Twenty First Century, can you give me a
9  copy?
10     A    I did not.
11     Q    You never asked Twenty First Century?
12     A    No, ma'am.
13     Q    Why not?
14     A    I did only asked for Cardinal.
15     Q    You only asked for Cardinal, but you
16  didn't ask for Twenty First Century?
17     A    No, I did not.
18     Q    Have you been able to use the software?
19     A    I updated it, and I use something
20  different.
21     Q    The source code for the Twenty First
22  Century software, MIT has that, right?

379

1      A    No, I don't have.
2      Q    Do you know that?
3      A    I don't have anything.  Everything that
4  was taken from Josh, he did not return.
5      Q    You said there was a thumb drive sent to
6  you by Tim Clemente, right?
7      A    Thumb drive sent to me?
8      Q    Let me say this:  There been multiple
9  times when people have shared information with you
10  that came from Twenty First Century and came from
11  Cardinal, and you said earlier that you never even
12  looked at what you had, right?
13     A    That's not what you asked me.
14         MR. MILLS:  Let me make a suggestion.
15         MS. LEGRAND:  Yeah.
16         MR. MILLS:  Because we have, like, less
17  than an hour.
18         MS. LEGRAND:  I know.  Let's take a
19  short break.
20         MR. MILLS:  The HVAC in the building is
21  off.
22         MS. LEGRAND:  Oh, you should see my

380

1  office.  It's even worse.
2          MR. MILLS:  The door is now locked.
3          MS. LEGRAND:  Yeah, that's okay.
4          MR. MILLS:  So if someone needs go the
5  bathroom, you'll have to knock and they'll have to
6  let you back in.
7          MS. LEGRAND:  That's okay.  We're going
8  to go to 7:00.  I want to use as much time as I
9  can.  If you want to take a four-minute break, we
10  can take a four-minute break.
11         MR. MILLS:  That's fine.
12         MS. LEGRAND:  You want take a
13  four-minute break?
14         MR. MILLS:  Yeah.
15         MS. LEGRAND:  Okay.  I'm up for that, in
16  part, because I'm losing my folders, but, like,
17  four minutes, we'll be right back.
18         MR. MILLS:  Yep.
19         THE VIDEOGRAPHER:  We are going off the
20  record.  The time is 6:08 p.m.
21         (Whereupon, a recess was taken.)
22         THE VIDEOGRAPHER:  We are back on the

381

1 record.  The time is 6:16 p.m.
2 BY MS. LEGRAND:
3    Q    Okay, thank you.  All right,
4 Mr. Alubbad, I'm going to hand you are a document
5 that we'll mark as Alubbad Exhibit 17.
6         MS. LEGRAND:  Laurin, I've only got my
7 copy and these two, but that will do.
8         (Exhibit 17 was marked for
9 identification and is attached to the transcript.)
10   Q    So, Mr. Alubbad, you've just been handed
11 Exhibit 17.  And do you see the first page has a
12 Bates number MIT 7571?
13   A    That's correct.
14   Q    Okay.  And I'm going to have you flip to
15 the very last page.
16   A    Okay.
17   Q    Actually, sorry about that.  I'm going
18 to have you flip to -- I can't find the document.
19 That's my fault.  Sorry.  If you sort of flip
20 along -- and I apologize for this exhibit being a
21 little ugly -- there is an MIT 007612.  And
22 actually, if you want to simplify things, I'd be

382

1 happy to actually just do the MIT.
2    A    07612?
3    Q    Yeah.
4    A    Okay.
5    Q    Yeah.
6         MS. LEGRAND:  Mr. Mills, if you'd like,
7 I'm happy to take out the last bit, so that it's
8 just the set of consecutive MIT Bates numbers.
9         MR. MILLS:  It's fine.
10        MS. LEGRAND:  Okay, thank you.
11   Q    So let me take you first of all to
12 MIT --
13   A    007608.
14   Q    That's close.  I agree, you are
15 definitely often ahead of me, sir.  7608 --
16 actually, I was going to start with MIT 0075.  So
17 that's just a couple pages away.
18   A    75?
19   Q    Yeah.
20   A    7604 or 7605.
21   Q    I'm going a little earlier.  You're
22 right where we're headed.

383

1    A    Okay.
2    Q    It's MIT 7598.  It should be --
3    A    Okay.  7598, I have it.  Yes.
4    Q    All right.  And this is a statement of
5 registration with the Department of State, right?
6    A    That's correct.
7    Q    For Mission Integrated Technologies,
8 right?
9    A    That's correct.
10   Q    And this relates to export control
11 stuff, for lack of a better word, right?
12   A    Yeah.
13   Q    In fact, and when you were talking about
14 this application, you'd call it an ITAR
15 registration; is that fair?
16   A    That's correct.
17   Q    Okay.  ITAR is the -- what does ITAR
18 stand for?
19   A    International Trade --
20   Q    Trafficking, Arms?
21   A    Yes.
22   Q    It's about arms, in part, right?

384

1    A    Yeah.
2    Q    Okay.  And if you flip to the second
3 page of this document, MIT 7599.
4    A    Okay.
5    Q    Okay.  First question -- well, if you
6 look at the top of the page, there's a block
7 that's No. 7, and it says, Member of the board of
8 directors, senior officers, partners and owners;
9 do you see that?
10   A    Yes, I see it.
11   Q    Okay.  And there's two people listed,
12 right?
13   A    That's correct.
14   Q    And the second person listed is who?  Is
15 you.  I'm sorry.  The first person listed is Tim
16 Clemente; is that fair?
17   A    That's correct.
18   Q    Second person listed is you?
19   A    Is me.
20   Q    Okay.  And it asks for citizenship here.
21 It says citizenship, and then it has a parentheses
22 for citizenships; do you see that?

385

1    A    Where is it?  Citizenship, where?  Which
2 part?
3    Q    So I'm looking at the second entry.
4    A    Oh, citizenship, yes.
5    Q    It says citizenship, and then it has
6 parentheses around the letter S, right?
7    A    That's correct.
8    Q    So it's asking if you've got more than
9 one citizenship, you should list both; isn't that
10 what that means?
11    A    I don't know.
12        MR. MILLS:  Object to the form.
13    Q    You don't know?
14    A    No, I don't know.
15    Q    You said earlier you're a dual citizen
16 of Saudi Arabia and the US?
17    A    That's correct.
18    Q    Why did you only list the United States
19 here?
20    A    I did not file that application.
21    Q    Who did?
22    A    Noel Matchett.

386

1    Q    Did you tell Noel Matchett that you were
2 a dual citizen?
3    A    He knows.
4    Q    Have you reviewed his transcript from
5 his deposition?
6    A    I don't recall reading it.  I was here.
7    Q    Okay.  You were here?
8    A    Yeah.
9    Q    So it's your recollection that you
10 consulted with Noel, and he told you need to list
11 your Saudi citizenship?
12        MR. MILLS:  Object to the form and the
13 foundation.
14    Q    You can answer.
15    A    My answer to you, Noel Matchett always
16 did the export license for me, for Atlantis, for
17 OmniTrue, and for MIT.
18    Q    Yeah.  So Noah Matchett is another
19 person who worked for all three of your companies?
20    A    That's correct.
21    Q    And he worked for Atlantis first; is
22 that right?

387

1    A    That's correct.
2    Q    And later you had him start helping with
3 MIT's ITAR compliance?
4    A    That's correct.
5    Q    And on this document we're looking at
6 right now, and the page we're looking at, which is
7 MIT 7599, you are listed as an owner, right, of
8 MIT?
9    A    Okay.
10    Q    Are you?
11    A    Yeah.
12    Q    Okay.  And it asked for your
13 citizenship, and you only list the United States?
14    A    Again, that's what it says, United
15 States, and the person who filled this and gave it
16 to me is Noel.  Noel is the compliance manager who
17 understand this stuff better than me.
18    Q    But Noel has to get information from
19 you, right?
20    A    I mean, yes.  Noel knows that I'm a dual
21 citizenship.
22    Q    Okay.  But Noel isn't the one who has to

388

1 sign this document, is he?
2    A    No.  That's me.
3    Q    It's you.  And let's flip to that page.
4 If you'd go to use MIT 7603, the last -- yeah
5 7603.  Just a couple pages more.
6    A    Okay.
7    Q    Okay.  So it needs a senior officer
8 details and signature; you see that?
9    A    I see it.
10    Q    And what's the senior officer's name?
11    A    Fahmi Alubbad.
12    Q    And what's the senior officer's title?
13    A    Owner and CEO.
14    Q    And what's the date?
15    A    The date 05/11/219.
16    Q    Okay.  And did you sign this?
17    A    I did.
18    Q    And when you signed this, what did you
19 list as your title?
20    A    It's listed here, owner and CEO.
21    Q    Why did you list yourself as CEO?
22    A    Again, Noel Matchett filled it, not me.

389

1    Q    So is this an accurate statement?

2    **A    I mean, this is a title that is needed**

3    **as the designated officer.  And I don't understand**

4    **what is the requirement for the State Department.**

5    **You need to ask Noel Matchett.**

6    Q    But you were not the CEO of MIT, were

7    you?

8         MR. MILLS:  Object to the foundation.

9    **A    Again, this is just for the State**

10   **Department.**

11   Q    So it wasn't important to get that --

12   when you were submitting a document to the State

13   Department, this is an important document, isn't

14   it?

15   **A    That's correct, yes.**

16   Q    In fact, you were so upset about ITAR

17   violations --

18   **A    That's correct.**

19   Q    -- you had got in this whole fight --

20   **A    That's correct.**

21   Q    -- with Tim, okay.  So wasn't it

22   important to give accurate information to the

390

1    State Department in connection with MIT's ITAR

2    application?

3    **A    Again, all my information is correct.**

4    Q    Were you the CEO?

5    **A    I, as the -- I mean, as the major**

6    **operating member, the majority owner, okay, and**

7    **you know, it says owner/CEO.  It doesn't say**

8    **owner/president.  This is what, you know — I**

9    **mean, it's written.  Noel Matchett is the guy who**

10   **understands about export, not me.  I'm not the**

11   **expert guy.**

12   Q    Did Noel Matchett have access to all MIT

13   corporate documents?

14   **A    Yes.**

15   Q    Did he review MIT's operating agreement?

16   **A    I can't recall, but I think he maybe**

17   **seen operating agreement.**

18   Q    Okay.  If we go back one page to MIT

19   7602?

20   **A    7602, yes.**

21   Q    Okay.  Do you see the Number 12 at the

22   top of the page?

391

1    **A    Yes.**

2    Q    Okay.  I'm just going to read that first

3    sentence.  It says, Under penalty according to

4    federal law -- and it cites a number of statutes,

5    one of which is 18 USC at 1001, I warrant the

6    truth of all statements made herein together with

7    any and all appendices and attachments thereto,

8    and I further warrant some more stuff.  I'm just

9    going to read that first part.

10   **A    Okay.**

11   Q    But it says, I warrant the truth of all

12   statements made herein, right?

13   **A    Yes.**

14   Q    Who was warranting that, the truth of

15   all statements in this document?

16   **A    It's me.**

17   Q    So it was true or false that you were

18   the CEO of MIT?

19   **A    Again, the CEO is just a title was given**

20   **into this.  But it wasn't, like, I have a business**

21   **card, and I'm doing, you know, business that it**

22   **says the CEO.  I mean, that's the only best answer**

392

1    I can give you.

2    Q    How many officers did MIT have in 2019?

3    **A    Two.**

4    Q    Two?

5    **A    Yes.**

6    Q    Who were the two officers?

7    **A    Tim Clemente and myself.**

8    Q    And what was your title?

9    **A    I didn't really actually have a title.**

10   **I used the director of marketing for the**

11   **international.  But basically, I did not really**

12   **have an exact title, you know, that I was using,**

13   **or I have a business card.  For the export**

14   **license, because I am the designated, the way I**

15   **understood it from Noel, this is the owner/CEO,**

16   **and I went along with it.**

17   Q    Okay.  Just real quickly, let's look at

18   Exhibit -- I'm going to go back in just a second,

19   but just to close the loop real quick, can you

20   grab Exhibit 4 out of there, the very beginning?

21   **A    Exhibit 4?**

22   Q    Yeah.

393

1      A     Okay.  Exhibit 4.
2      Q     All right.  This is a document that you
3   had had in your hands, and you looked at at the
4   start of this deposition, right?
5      A     Yeah.
6      Q     Is it?
7      A     Yeah.
8      Q     What is this document?  You can just
9   read the top, if you want, the bold part.
10     A     Notice of Rule 30(b)(6) Deposition of
11  Defendant.
12     Q     Yep.  Along with objections, right?
13     A     Okay.
14        THE WITNESS:  This is the one, Laurin, I
15  got today.
16        MR. MILLS:  This is the one.  He gave
17  this to you today.
18     A     Okay, yes.  Today, but I did not read
19  it.
20     Q     Well, did you ever read the topics that
21  you were supposed to be able to testify about as
22  an MIT representative?

394

1      A     The document that I got last week says
2   Rule 30(b)(6) deposition, yes.
3        MR. MILLS:  He saw the objections one.
4        MS. LEGRAND:  This is the objections
5   one.  That's why --
6        MR. MILLS:  No.  This is the notice.
7        MS. LEGRAND:  No, it's not.  That's
8   Exhibit 4.  For that reason --
9        MR. MILLS:  Exhibit 4 is the --
10        MS. LEGRAND:  Oh, you are totally right.
11  I wrote -- all right.  Exhibit 1.  I am the worst.
12  I'm sorry.  I think it's Exhibit 1.
13     A     Okay.  So --
14     Q     I'm sorry.  That's completely my fault.
15  I took bad notes because we only have one copy.
16     A     Exhibit 1, the plaintiff rule.
17     Q     Next one.  I'm sorry.  So this one?
18  Exhibit 3?
19        MR. MILLS:  Look at Exhibit 3.
20        MS. LEGRAND:  Yeah.  Thank you.  Sorry,
21  guys.  All right.  I apologize for that.  Laurin,
22  you can help him follow this, potentially.

395

1        MR. MILLS:  You guys never gave it to
2   me.
3        MS. LEGRAND:  I'm offering to accept
4   your help.
5   BY MS. LEGRAND:
6      Q     Okay.  So that is a document that's been
7   marked as Exhibit 3; correct?
8      A     Yeah.
9      Q     Okay.  What's that document?
10     A     This document is the plaintiff's notice
11  of Rule 30(b)(6) deposition.
12     Q     And what else?
13     A     Objection to defendant.
14     Q     Okay.  So you reviewed this document?
15     A     That's correct.
16     Q     So I'm going to look at the general
17  objections.  You see where it says general
18  objections?
19     A     Yes.
20     Q     Okay.  So these are objections that your
21  lawyer provided; is that fair?
22     A     Okay.

396

1      Q     Is that what happened?  Is that what
2   this is?
3      A     I believe so.
4      Q     You've seen this document before,
5   though, right?
6      A     Yes.
7      Q     Okay.  Can you just read the first
8   sentence under general objection?
9      A     Where?  Under general objections.
10        MR. MILLS:  Yeah.
11     Q     Yeah.
12     A     MIT objects to all topics insofar as
13  defendant Tim Clemente was MIT President and only
14  officer at all times between MIT founding
15  October 215 and his removal as the president in
16  accordance with the terms of MIT operating
17  agreement in December 2023.
18     Q     Okay.  Which of these documents -- and
19  you've still got Exhibit 17 in front of you too,
20  the ITAR application?
21     A     Yes.
22     Q     Which of those two documents is true and

---

**397**

1  which is false?
2      MR. MILLS:  Object to the foundation.
3      **A   I am not following your question.**
4      Q   The ITAR application --
5      **A   Okay.**
6      Q   -- says that you are a senior officer of
7  MIT, right?  In 2019, right?
8      **A   That's correct.**
9      Q   And this document right here, the MIT
10  objections, says that Timothy Clemente was MIT's
11  president and only officer at all times between
12  MIT's founding in October 2013 and his removal as
13  president in December 2023, right?
14      **A   Uh-huh.**
15      COURT REPORTER:  Sorry.  Did you say yes
16  or no?
17      **A   Yes.  I'm sorry.**
18      Q   So one document says that MIT only had a
19  single officer in 2019, right?  Did the MIT
20  objections say that only Tim Clemente was an
21  officer?
22      **A   Okay.**

---

**398**

1      Q   Is that what it says?
2      **A   That's what it says.**
3      Q   Is it wrong?
4      **A   Again --**
5      Q   Is this another mistake?
6      **A   I mean, I did not make this document.**
7      Q   Okay.  So this is not true?  It is not
8  true that there was only one MIT officer in 2019?
9      **A   Again, I did not write the document.**
10      Q   I just need to know, though.
11      **A   Okay.**
12      Q   How many officers did MIT have in 2019?
13      MR. MILLS:  Object to the foundation.
14      **A   Always two officers.**
15      Q   Always two officers, okay.  So then,
16  this objection in the MIT objections, you disagree
17  with?
18      **A   This is something you need to ask my**
19  **lawyer.**
20      Q   Did you tell your lawyer that this was
21  wrong when you reviewed this document with him?
22      MR. MILLS:  You don't have to answer

---

**399**

1  that.
2      THE WITNESS:  Okay.
3      Q   All right.  Fair enough.  There's no
4  resolution from MIT that says you're the CEO,
5  right?
6      **A   No.**
7      Q   There's no resolution that's says you're
8  an officer at all, right?
9      **A   MIT is a member company, and it has two**
10  **people.**
11      Q   Yeah, well --
12      **A   Myself and Tim.  That's the only thing I**
13  **can answer.**
14      Q   And you just told the State Department
15  you were a CEO because it was convenient?
16      **A   It's not convenient.  This is the**
17  **compliance manager, who is empowered and hired.**
18  **He did this and made the letter at the end, and I**
19  **just basically followed.  Because he was hired**
20  **because this is -- this stuff, he knows it better.**
21  **Otherwise, this is where his name [sic].  He**
22  **prepared it, not me.**

---

**400**

1      Q   Hold on.  Show me where.
2      **A   He prepared it for Tim back in 217.**
3      Q   Well, where does it say about his name
4  here?  It just says third-party contact, right?
5      **A   Yeah.  Third-party contract.**
6      Q   And that's Noel Matchett that we've been
7  talking about?
8      **A   That's right.**
9      Q   Noel Matchett was not employed by MIT at
10  the time, was he?
11      **A   In 219?**
12      Q   Correct.
13      **A   219, no, I don't think so.**
14      Q   And he's listed as a third-party point
15  of contact, right?
16      **A   Okay.**
17      Q   Is that right?  Is that what it says?
18      **A   That's what it says here.**
19      Q   Okay.  And the person who's listed as
20  the senior officer for MIT is you; correct?
21      **A   Senior officer, yes.**
22      Q   Okay.  Under penalty of perjury, you

401

1 said you were the senior officer for MIT?
2   A   That's correct. I'm the owner, yeah.
3   Q   And the CEO is what you said under
4 penalty of perjury in 2019?
5   A   Okay.
6   Q   Is that what you said?
7   A   That's what the document says, yes.
8   Q   Do you think someone modified the
9 document?
10   A   No, I don't think.
11       MR. MILLS: You're arguing with him now.
12   Q   Okay. Let's flip ahead. You correctly
13 -- you were supposed to correctly guess that I was
14 going ahead with documents. So if you flip ahead
15 to MIT 7606, same exhibit. Okay.
16   A   7606?
17   Q   Correct.
18   A   Okay.
19   Q   Okay. And what is this document?
20   A   This is the export license for the Saudi
21 contract.
22   Q   And what's the total amount -- the total

402

1 value of the Saudi contract that's listed in this
2 contract?
3   A   It's listed 14 million.
4   Q   $14 million, yeah?
5   A   Yeah.
6   Q   Okay. And the foreign end user listed
7 is the President of State Security for the kingdom
8 of Saudi Arabia; is that right?
9   A   Presidency.
10   Q   Presidency of State Security. So that's
11 PSS; is that the abbreviation?
12   A   That's correct.
13   Q   Okay. All right. One of the questions
14 on this application -- if you go to the sixth page
15 of the document, which is MIT 006712.
16   A   6702?
17   Q   12.
18   A   67 --
19       MR. MILLS: Where is that?
20   A   67? There is no 67.
21       MR. MILLS: There isn't anything like
22 that in mine either.

403

1   A   I see 7. It's all --
2   Q   Oh, I might be dyslexic. 7612, I
3 apologize.
4   A   Okay. 7612, okay. Hold a second.
5 7610, 7612, yes.
6   Q   Sorry. Okay. Do you see about near the
7 top of the page where it says compliance with 22
8 CFR 130?
9   A   Okay.
10   Q   Do you see that?
11   A   Yeah.
12   Q   And there's a box checked, right?
13   A   You mean compliance with 22 CFR 130?
14   Q   Yes.
15   A   Okay. There is the second one.
16   Q   What is that? So can you -- the box
17 that's checked, what does it say?
18   A   That transaction meets the requirement
19 of 2022 CFR 130.[sic], the applicant or its vendor
20 have not paid, nor offered, nor agreed to pay in
21 respect of any sale of which license or approval
22 is requested, political contributions, fees,

404

1 commission, in the amount as specified. And,
2 okay.
3   Q   Okay. So you were certifying here that
4 MIT and its vendors had not paid or offered these
5 different kinds of contributions, fees, or
6 commissions; that's what you're certifying here?
7   A   That's correct.
8   Q   What did you do to confirm that that was
9 correct?
10   A   What do you mean?
11   Q   Is it true that MIT and its vendors have
12 not paid, offered, nor agreed to pay in respect to
13 any sale for which a license or approval is
14 requested?
15   A   That's correct.
16   Q   Political contributions, fees, or
17 commissions; it's correct that there was no offer
18 or agreement to pay any of those things?
19   A   No. I mean, here it says approval
20 requested political contribution, fees, commission
21 in the amount as specified. We did not make any
22 contribution. We only had an agreement with a

405

1  local company, who is basically doing the
2  maintenance and the support for us.
3      Q    What was the local company called?
4      A    It's called Awajem Security Company.
5      Q    Awajem, can you spell that?
6      A    A-W-A-J-E-M.
7      Q    How much was Awajem promised?
8      A    Awajem, they were promised in the
9  contract that, you know, we agreed with them, I
10 think 15 percent of the total contract when we
11 signed with them in 217.  And because of the
12 problems we have with this contract, they did not
13 get their full amount, okay?  So they end up
14 getting a lot less than what we promised them,
15 because this contract -- we had lots of problems
16 due to Covid and the delayed the payment and the
17 increases of the prices from all the vendors.  So
18 we basically -- we get hit a lot with this.  So
19 they end up getting paid, in total, if I recall,
20 1.4 million.
21     Q    Awajem got paid 1.4 million?
22     A    That's correct.

406

1      Q    From who?
2      A    From MIT.
3      Q    Where did those -- and --
4      A    And with the knowledge of Tim.
5      Q    Okay.  Are you confident that that is
6  consistent to what you swore to in that ITAR
7  application we just looked at?
8      A    100 percent.  Because this was not a
9  contribution of political or doing anything.  This
10 is --
11     Q    Wait, wait, wait.  Let's read it one
12 more time.  What does it say?
13     A    I don't need to read it because --
14     Q    It says commissions; correct?
15     A    Okay.  But that's not commission.
16     Q    Okay.  What is it?
17     A    It is a service.
18     Q    It's a percentage of total sale amount
19 paid to a vendor; correct?
20     A    Okay.  Let me explain to you the
21 contract.  The contract with Saudi Arabia was
22 signed directly with the government.  They did not

407

1  want any company involved.  But with their
2  approval, they wanted a local company to do the
3  maintenance and the support every three months for
4  the 24 vehicles.  The 24 vehicles, they are
5  distributed around the kingdom.  So the company
6  has to do maintenance support, and they have to
7  send people, and they travel, and do this.  So
8  basically, what they got is not something unheard
9  of.
10     Q    I didn't ask if it was unheard of.
11     A    Yeah.
12     Q    In fact, it's very heard of for folks to
13 get commissions on sales in Saudi Arabia, right?
14        MR. MILLS:  Objection to the foundation.
15     A    Again, when you are working in a
16 government deal directly, you're not involving
17 anybody because it prohibits, you know, to pay.
18 That's the whole deal.  And the contract was given
19 directly between MIT and the PSS.
20     Q    Okay.  But nonetheless, 1.4 million went
21 to Awajem?
22     A    That's correct.

408

1      Q    A Saudi Arabian company?
2      A    Yeah.
3      Q    That was working for MIT?
4      A    It wasn't working for MIT.  They had a
5  contract signed with MIT to do the maintenance
6  every three months for 24 vehicles distributed in
7  the kingdom.
8      Q    Okay.  You talked about problems with
9  the Saudi Arabian contract.  Wasn't one of the
10 problems that the contract that was provided to
11 Saudi Arabia said that MIT would provide guns in
12 addition to the ARES?
13     A    No.  Guns?
14     Q    Do you remember a conversation about
15 that?
16     A    No.  No.  I think there was a mistake in
17 the document --
18     Q    Yeah.
19     A    -- the translation that the government
20 sent us in English.  The way they translated the
21 gun port in the vehicle, they described it as
22 guns.  So when we send the copy of the actual

409

1 technical specifications to the State Department,
2 they rejected the license. And when we came back,
3 they brought it to our attention, that they are
4 talking about guns. And then we told them, Wait a
5 second; I think there is wrong in the translation.
6 And then I had to go and re-translate the whole
7 entire technical document. And then the license
8 was accepted.
9    Q    Okay. Whose mistake was it that they
10 licensed?
11    A    The government of Saudi Arabia.
12    Q    Ah, okay.
13    A    Because they provided us a poor
14 translation.
15    Q    The government, okay. But that was a
16 serious mistake, right?
17    A    It was not from MIT.
18    Q    So the date on -- but it was a problem
19 that the contract that Saudi Arabia provided --
20 did they provide it directly to the State
21 Department? I don't know how that works.
22    A    No. When you do a contract with Saudi

410

1 Arabia, they require that everything is done in
2 Arabic.
3    Q    Yeah.
4    A    Okay. So basically, we told them, in
5 order to submit the license, the State Department
6 required all the documents in English. So they
7 provided us in English.
8    Q    Okay.
9    A    We did not review it. We just
10 submitted, because they send us -- if it's coming
11 from the government, it has the logo and
12 everything. And when they reviewed it, okay, it
13 turned out that it had Arabic -- I mean, they
14 translated, whoever translated, either used Google
15 or whatever. But the translation was wrong. When
16 it was brought to my attention, I said, Well, wait
17 a second, guys; I looked at the Arabic, and I
18 tried to compare with the English. And I said,
19 No, no, no; the translation is horrible, okay? So
20 I called the government, and they said, Fahmi, can
21 you do it.
22    Q    Do what?

411

1    A    The translation.
2    Q    When you first negotiated the contract
3 with Saudi Arabia we're talking about here, was
4 the contract drafted in English or Arabic or both?
5    A    Both.
6    Q    It had to be in both, right?
7    A    That's correct.
8    Q    Yeah. And, I mean, Tim Clemente was the
9 president of MIT when that contract happened?
10    A    And he was the one who was negotiating.
11 I was helping him.
12    Q    And he can't negotiate in Arabic, right?
13    A    But I helped him.
14    Q    Yeah. Did you go back and look at what
15 was in the English version of the contract that
16 was signed by MIT?
17    A    See, there is two. There is a contract,
18 and there is a technical document.
19    Q    Yeah.
20    A    Are you talking about the actual
21 contract with the financial terms and the
22 conditions?

412

1    Q    Which one was wrong?
2    A    It's the technical specification.
3    Q    Okay.
4    A    Which is separate.
5    Q    So the technical specification, was that
6 a document that MIT provided to Saudi Arabia in
7 both English and Arabic?
8    A    No. They provided to us both in English
9 and Arabic.
10    Q    When?
11    A    Oh, back in 215 -- in 217.
12    Q    Did you look at what it said in 2017?
13    A    This is when we discovered, you know,
14 there has some issues, okay? And basically, that
15 time they were just a tender, okay? We were not
16 entering into account.
17    Q    Yeah. That wasn't a real contract yet?
18    A    Exactly.
19    Q    Exactly.
20    A    They just basically send us the tender
21 to find for the contract.
22    Q    Okay.

413

1      A    Okay.  So basically, they give you a
2  tender specification, and they said, Okay, we are
3  interested in entering into a contract with you;
4  here is the technical specification; we need you
5  to submit your offer.
6      Q    Okay.
7      A    And we submitted our offer, and our
8  offer was accepted in 217.
9      Q    Did your offer include the technical
10 specification?
11     A    Yes.
12     Q    Did the offer that was accepted in the
13 English version of it, did it talk about providing
14 guns as well as gun ports?
15     A    There is no -- I mean, provided.  I
16 mean, we understood.  When Tim and I, we worked,
17 Tim had to make a compliance sheet to comply with
18 each things.  We knew what it meant, that there is
19 an issue with the translation.  But because we had
20 the Arabic and the English, I was helping Tim when
21 we were making the proposal.  We were trying to
22 ignore the translation.  In our proposal, which I

414

1  have an original copy, the government, they said,
2  Please make a table when you submit.  If you see
3  something that is misrepresented, just write your
4  explanation.
5          So what Tim and I did, when we
6  submitted, we just had a table, and we said, Here,
7  comply.  And then we wrote the correct thing.
8      Q    Okay.
9      A    So for example, in the technical
10 specification, the customer said -- because I
11 worked with the client in order to, you know, get
12 the contract to MIT by giving them our
13 specification, because the original specification
14 was written to our competitor.
15     Q    Yeah.
16     A    And basically, I told them, you know,
17 Our system is more unique.  And I told them the
18 features, and they changed their specifications.
19     Q    Okay, fine.  That's what you told to the
20 government of Saudi Arabia?
21     A    That's correct.
22     Q    Which, at the time, they thought you

415

1  were just Atlantis Consultant?
2      A    No.
3          MR. MILLS:  Objection to --
4      Q    They did not know at the time you were
5  an owner?
6      A    Again, this is irrelevant, because --
7      Q    Just answer.  No, no, no.  First, just
8  answer.
9      A    No.
10     Q    They did not?
11     A    I was the consultant for MIT.
12     Q    That's what the government of Saudi
13 Arabia thought?
14     A    That's correct.
15     Q    And you asked the government of Saudi
16 Arabia to issue a new specification?
17     A    That's correct.
18     Q    And they did?
19     A    They did.
20     Q    Okay.  But then, years down the road,
21 you had ITAR problems because the document from
22 Saudi Arabia said that you were going to supply

416

1  guns?
2      A    Yes.  It wasn't saying -- the way it was
3  translated, that person who translated the gun
4  port in an armored vehicle, he translated like a
5  gun.  There is a difference.  It is a gun port.
6      Q    Yeah.
7      A    Okay.  So whoever translated -- because
8  they said, We need the vehicle to have a gun port,
9  so we can use 7.62 or 5.52.
10     Q    Guns?
11     A    That's the sub-machine guns.
12     Q    You accidently agreed to provide machine
13 guns?
14         MR. MILLS:  Objection to the foundation.
15     A    No, I did not.
16     Q    Okay.  But the mistranslation led the
17 State Department to think that?
18     A    They -- basically, the way the
19 translation, it was a mistake from the government,
20 and we corrected it.
21     Q    That sounds good.  I will move on, sort
22 of.  Let's mark this as Exhibit 18.

417

1        (Exhibit 18 was marked for
2   identification and is attached to the transcript.)
3       **A    Are we done with this?**
4       Q    Yes.  Thank you.  And I'm showing you
5   what's been marked as Exhibit 18, and it's MIT
6   2302 is the Bates number; do you see that?
7       **A    Yes.**
8       Q    Okay.  And that's an e-mail from you; is
9   that right?
10      **A    That's correct.**
11      Q    Who are you sending this to?
12      **A    This is — which part do want me to —**
13      Q    The top e-mail is an e-mail from you to
14  who?
15      **A    To Fahad.**
16      Q    Who is Fahad?
17      **A    Awajem.**
18      Q    Awajem.  That's the company we talked
19  about earlier?
20      **A    That's correct.**
21      Q    That got $1.4 million?
22      **A    That's correct.**

418

1       Q    From the contract from the Saudi Arabian
2   government?
3       **A    That's correct.**
4       Q    Okay.  Whose Fahad?
5       **A    Fahad is one of the employees of the**
6   **company.**
7       Q    Of Awajem?
8       **A    That's correct.**
9       Q    Has he ever worked directly for MIT?
10      **A    No.**
11      Q    I'm sorry, for Atlantis?
12      **A    No.**
13      Q    Okay.  And can you just -- it's really
14  short.  Just read the two sentences that are in
15  the e-mail to Fahad.
16      **A    I would like to borrow from you 40,000**
17  **to pay SyTec for some modification for MIT.**
18  **Please see below wiring instruction.  Please**
19  **reference in your wire the MIT vehicle.  I will**
20  **pay the money once I have the money available with**
21  **me.  I'm willing to sign a promissory note to**
22  **guarantee your payment, including 5 percent**

419

1   commission on any sale in Saudi Arabia.
2       Q    Okay.  Do you have Fahad's response?
3       **A    Yeah, Fahad respond, And wired the money**
4   **to Sytec.**
5       Q    Okay.  Did you provide any further
6   promissory note?
7       **A    Nothing.**
8       Q    But you said you would, right?
9       **A    If we get business.**
10      Q    Well, you did do business?
11      **A    No.  Okay.  So let me explain to you the**
12  **nature why I did this, because this is important.**
13      Q    Okay.
14      **A    My father was dying in intensive care,**
15  **and I had to leave Saudi Arabia, and Tim wanted to**
16  **take the vehicle to Ivis Tech so they can take the**
17  **first ARES and try to basically modify to lower,**
18  **you know, the weight on this.  And they wanted**
19  **$40,000, okay?  And I was for 30 days in intensive**
20  **care until my dad passed away.  And then I had to**
21  **call, you know, these people to do a favor for me.**
22  **And we were talking about the first ARES, and I**

420

1   **said, If we do business, I'll try you guys give**
2   **you [sic] because it was very difficult.  We'd**
3   **never done business in 216 for the first ARES, and**
4   **I just paid them their 40,000, and the whole thing**
5   **ended.**
6       Q    When did you pay them the 40,000?
7       **A    I paid them after, you know — after my**
8   **dad died, and I just gave them the money.**
9       Q    And I am sorry for this.  I am very
10  sorry for your loss.  My father's got health
11  issues right now too, so I feel you.  But can you
12  tell me when your father passed away?
13      **A    My father passed in 214, in 214 or 216.**
14  **I'm not really in on the date.  I'm not really.**
15      Q    Okay.  But you said you paid Fahad --
16      **A    Yeah.**
17      Q    -- at Awajem?
18      **A    Yes.**
19      Q    $40,000?
20      **A    That's correct, I paid them.**
21      Q    And you remember about when you paid
22  that back?

421

1    A   I don't remember, but I already paid it.
2  I pay all.  There is one thing about me, I don't
3  have loans.  I don't have any money.  I don't owe
4  anything.  So I always pay people on time.  I
5  don't even have any payment where I owe any money
6  to anybody.
7    Q   Okay.  Is there a record?  That $40,000
8  that got paid back to Awajem, how was that payment
9  made?
10   A   I think -- I have to check.  Maybe I
11 wired them the money, you know, from my account.
12   Q   Which account?
13   A   Atlanta's account.
14   Q   Why would that come from an Atlantis
15 account?
16   A   I mean, for me, I was the source of
17 funding for MIT.  MIT didn't have the money to go
18 and wire him the money.  So that time, we didn't
19 even have business.  So I was loaning money to the
20 company.
21   Q   Okay.  But - so Atlantis paid $40,000 to
22 Awajem?

422

1    A   That's correct.
2    Q   Does Atlantis do a lot of work with
3  Awajem?
4    A   Not really.
5    Q   How much?
6    A   Sometimes we use Awajem, okay, if we
7  have work, you know, where they need to do
8  maintenance.  They have a good team to do
9  maintenance.  And other than this, no, I do work
10 with mainly government agencies, unless the
11 government agency recommend us, okay, to use a
12 local contractor.  I would prefer to work with
13 Awajem.
14   Q   And has Atlantis worked with Awajem for
15 contracts, other than selling the ARES to Saudi
16 Arabia?
17   A   We did some business with them back
18 over, maybe, 10 years ago.
19   Q   Okay.  Tell me about that.
20   A   Okay.  There was a US company that I
21 consult for, and we had a contract selling radars
22 for (indiscernible) company.  And they wanted a

423

1  local company to do the installation and the
2  integration in country.  Unfortunately, most
3  American companies, they don't like to travel to
4  Saudi Arabia and to do work.  They would rather
5  subcontract the work to local company.  So we use
6  their engineers and their technician to help us to
7  do this.
8    Q   And that wouldn't have been Atlantis,
9  though, then, because Atlantis was just
10 consulting?
11   A   That's correct.
12   Q   Which company was it?
13   A   It's called DMT.
14   Q   What does DMT stand for?
15   A   Detection — it's DMT Radar.  They have
16 this information, but it's DMT Radar.
17   Q   Is that a company that you were an owner
18 of?
19   A   No.
20   Q   What is your role at DMT?
21   A   I am their consultant for the Middle
22 East, and I have an e-mail address.

424

1    Q   You're a consultant for?
2    A   The whole Middle East and North Africa.
3    Q   Oh, you're the consultant for the Middle
4  East and you have a D --
5    A   DMT e-mail address.
6    Q   DMT e-mail address.  So you're still a
7  consultant for DMT?
8    A   That's correct.
9    Q   DMT sells -- what does DMT do now?
10   A   DMT, they make radars.
11   Q   Who do they sell the radar to?
12   A   Everywhere.
13   Q   Do they sell the radar to people -- to
14 security forces?
15   A   They sell everywhere, either law
16 enforcement or military or commercial.  The radar
17 can be used in Fords or in waters.
18   Q   So Atlantis worked with Awajem to help
19 DMT install radar; is that --
20   A   I recommended them for DMT.
21   Q   Okay.
22   A   As I explained earlier, and I want to

425

1  make it clear, I don't sell.  I don't take money.
2  I don't do anything except whenever the companies,
3  the US company or the European, I work with, they
4  need somebody, I give them the option; they make
5  their own decision.
6     Q    You take money as a commission when a
7  company you're consulting for makes a sale, right?
8     A    You can call it commission, or you can
9  call it success fee, or you call it consultation
10 fees.  I mean, whatever the word you want to use.
11    Q    What did you use when you filed suit
12 against Terradyne?
13    A    In Terradyne, it was a straight
14 commission.
15    Q    All right.  Let's change topics a little
16 bit.  All right.  This is going to be fun, kids.
17 Let me just look up here.  What's the time?  6:57
18 are you okay with me --
19       MR. MILLS:  I don't know what you --
20       MS. LEGRAND:  I'm just going to go to
21 the financial documents, unless you tell me -- I'm
22 just trying to be polite with the time vis-à-vis.

426

1     Q    Okay.  So I want to give this.  This is
2  a very large document.  It's going to be marked as
3  MIT Exhibit 18?
4        MR. MILLS:  19.
5        (Exhibit 19 was marked for
6  identification and is attached to the transcript.)
7     Q    19.
8     A    You got your wish.  You always wanted
9  the financials, and you got it.
10    Q    I know I did.
11    A    See?
12    Q    I know.  When did I get these?  You
13 know, I didn't get these until recently, right?
14    A    Anyway.
15    Q    I mean --
16    A    That's fine with me.
17    Q    Okay.  So we've got in front of you what
18 has been marked as Alubbad Exhibit 19.  Yeah.  Can
19 we give him --
20       COURT REPORTER:  Sorry.
21    Q    And you've got a copy.  All right.  This
22 is a big old document.  It's got T. Clemente.

427

1  Read the Bates stamp on the first page.
2     A    068347.
3     Q    And it's got a TCLEM?
4     A    TCLEM, yes.
5     Q    Okay.  And just to -- can you look at
6  the Bates stamp on the very last page just so
7  we --
8     A    TCLEM 068525.
9     Q    Okay.
10       MR. MILLS:  It's actually 26.
11    A    No, no.  On the back, 068526.
12    Q    Okay, Thank you.  And you recognized
13 these immediately as MIT financial documents,
14 right?
15    A    I think so.  I hope your not going to
16 ask me lots of questions, because I'm not an
17 accountant.
18    Q    That's okay.  The first page here is a
19 cover letter; do you see that?
20    A    Yeah.
21    Q    And the title is, Reply to minority
22 members response and the request for documents;

428

1  you see that?
2     A    Yes.
3     Q    And what's the date on this letter?
4     A    March 25th.
5     Q    2024?
6     A    Yes.
7     Q    Okay.  Why was MIT providing financial
8  documents to Timothy Clemente on March 25th, 2024?
9     A    Because in February, we sent Tim
10 Clemente and Ken Fournier a request for a capital
11 call.
12    Q    Yeah.
13    A    And then they had -- my understanding,
14 they have 30 days to respond.
15    Q    Okay.
16    A    Tim waited until the last day to respond
17 to object.
18    Q    Okay.
19    A    So, okay.  The company need to operate;
20 the company need to pay rent; the company need to
21 pay salary.  So basically, we did the capital
22 call.

429

1    Q    So you diluted -- and as a result of
2    that, you diluted Timothy Clemente's ownership
3    even more, right?
4    **A    I mean, when you say more —**
5    Q    What was it before the capital call?
6    **A    Okay.  Before the capital call, he was**
7    **13 percent, and Ken Fournier, 6 percent.**
8    Q    After the capital call, what did Tim
9    Clemente have?
10   **A    It went to 6.5 percent, and Ken Fournier**
11   **went to, I believe at 3 percent, I think.  Yeah.**
12   Q    Okay.  Did F2E provide capital after the
13   capital call?
14   **A    Yes, ma'am.**
15   Q    How much?
16   **A    300,000.**
17   Q    300,000?
18   **A    In cash.**
19   Q    And where did those funds come from?
20   **A    It came from F2E.**
21   Q    But F2E is just a holding company, you
22   said?

430

1    **A    Yeah.**
2    Q    So how would F2E have $300,000?
3    **A    Because I put the money from Atlantis**
4    **into F2E.**
5    Q    Okay.  Why did you put it -- why did you
6    -- I'm not going to use the word laundering; that
7    seems wrong.  Why did you --
8         MR. MILLS: It does.
9         MS. LEGRAND: It does seem wrong.  I
10   mean, I was looking for a better word.  I agree.
11   Q    Why did you take money from Atlantis,
12   give it to a holding company called F2E, and then
13   give it to MIT instead of just giving it from
14   Atlantis to MIT?
15   **A    At the advice of my accountant.  He told**
16   **me, Every time, if you want to put money, it is**
17   **easier for accounting, because F2 is the majority**
18   **shareholder of MIT.  So it's always better for**
19   **accounting to show that the money is coming from**
20   **F2E, okay?  So for me, I had to write a check,**
21   **deposit it, and then write it.  It makes it a lot**
22   **easier for him when he does his accounting.**

431

1    **Because, anyway, Atlantis is a US company; F2E is**
2    **a US company, and we have to do taxes and record.**
3    **So this is at the advice of my accountant.**
4    Q    Okay.  So you wrote a $300,000 check
5    from Atlantis?
6    **A    That's correct.**
7    Q    And then deposited into an F2E?
8    **A    That's correct.**
9    Q    When did F2E open a bank account?
10   **A    When we started the —**
11   Q    Company?
12   **A    The company, and we registered MIT.**
13   Q    But where's F2E's bank?  What bank is
14   F2E based out of?
15   **A    It's always been at the same bank.**
16   **Citibank.**
17   Q    Okay.  Is Citibank also MIT's bank?
18   **A    Yes.  And MIT also has another bank**
19   **account.  We opened it in Bank of America.**
20   Q    Okay.  But so for this time -- I just
21   skip that.  Thank you.
22        Let's look real quickly at Paragraph 2

432

1    of the first page of the letter we're looking at.
2    **A    Yes, ma'am.**
3    Q    Okay.  Thank you.
4         MR. MILLS: The Paragraph Number 2?
5         MS. LEGRAND: Correct, thank you.
6    Sorry.  Good clarification.
7    Q    Do you see where I am on Paragraph 2?
8    **A    Yes, yes.**
9    Q    It says, As you are aware, the company
10   has had three sales in its history; do you see
11   that?
12   **A    That's correct.  I see it.**
13   Q    Okay.  What are those three sales?
14   **A    The three sales, one to Saudi Arabia,**
15   **one to the government of Indonesia, and one to**
16   **Miami.**
17   Q    Okay.  Which was first?
18   **A    I think that the contract was signed**
19   **with Saudi was first.  And then second was**
20   **Indonesia; third was Miami.**
21   Q    Okay.  And the Saudi Arabia contract,
22   that first one, was that the one that connects to

433

1 the ITAR license application we looked at?
2    A   That's correct.
3    Q   So the original amount of that contract
4 was $14 million about?
5    A   No, ma'am.
6    Q   What's the right number?
7    A   The amount is 16.5 million.
8    Q   Thank you.  16.5 million, okay.  And did
9 MIT receive $16.5 million from the government of
10 Saudi Arabia?
11    A   That's correct.
12    Q   When?
13    A   The payment came in stages, okay?  So
14 usually, the government, they don't pay you all,
15 because they hold your money.  So eventually, when
16 we delivered part of the contract, once you
17 deliver the vehicles and they arrive in the
18 country, and they check everything, then they pay
19 you the rest of the money.  So eventually, we
20 receive the full amount.
21    Q   And when was that?
22    A   The last payment, probably '23.

434

1    Q   2023?
2    A   Yeah.  Early 2023.
3    Q   Okay.
4    A   Because the contract was for 24
5 vehicles.  And because we had issues and delays
6 with Ford, we had to do it in stages.  We shipped
7 it in three stages of eight.  So there was three
8 shipments, and every shipment we send, we received
9 a batch.  So the payment was broken.  And this is
10 all with Tim's awareness and copies and
11 everything.
12    Q   Okay.  So there's this letter.  And then
13 after that, can you sort of flip through what's
14 after that?
15    A   That is Mission Integrated balance
16 sheet, okay.
17    Q   Okay.  And let's start with -- let's
18 see.  Give me a second.  Yeah.  Okay.  Let's go to
19 Bates numbers 068351.
20    A   Okay.
21    Q   Okay.  And the title is Mission
22 Integrated Technology balance sheet as of

435

1 December 31st, 2020; do you see that?
2    A   Okay.
3    Q   That's what it says?
4    A   Yes, that's what it says.
5    Q   Okay.  And you've looked at it.  You've
6 seen balance sheets before, right?
7    A   Yeah.  But again, I need to let you
8 know.  I am not a financial person, so I'm not
9 going to be able to answer any question.  You
10 know, you guys can subpoena my accountant, if you
11 want.
12    Q   Okay.  Do you remember that deposition
13 notice we talked about, that 30(b)(6) deposition
14 notice?
15    A   Uh-huh.
16    Q   You were designated as MIT's
17 representative who could speak about the topics,
18 right?
19    A   That's correct.
20    Q   So let's look at --
21    A   But I am not an accountant.  Even when
22 you speak on behalf of a company, you have

436

1 lawyers, you have accountants, you have people
2 designated to do this.
3       MR. MILLS:  Before you get all huffy,
4 why don't you just ask him some questions and see
5 if he can answer them?
6    Q   Okay.  Looking at TCLEM 68351?
7    A   Yes.
8    Q   Do you see where it says long-term
9 liabilities project advances?
10    A   Long-term liability project, okay.
11    Q   Okay?
12    A   Yes.
13    Q   And how much -- what's the dollar
14 amount?
15    A   7,899,219.
16    Q   What does that represent?
17    A   This is -- I think maybe represent part
18 of the payment we received.
19    Q   Why is it called a liability?
20    A   Again, I did not do this document.  This
21 is an accounting document.  So I'm not going to be
22 able to answer any questions about any financial

437

1 record, because I'm not an accountant.

2    Q    Okay.

3    A    Okay.

4        MS. LEGRAND: Mr. Mills, the designated

5  30(b)(6) witness needs to be able to answer

6  questions.

7        MR. MILLS: No. You need to be able to

8  ask more specific questions than to say bring

9  somebody who can answer every question about every

10 piece of finances here. We made objections about

11 that. And if you wanted to be specific, we would

12 have designated someone differently. We told you,

13 he could testify at a certain amount of detail,

14 and the issue is sales. If you want to know what

15 the total revenue was and the cost of the goods

16 sold, he can testify to that, okay? You want to

17 get into the balance sheet niceties, he's not

18 going to be able to answer that.

19       MS. LEGRAND: Okay. I have a very

20 significant problem with that because we have a

21 30(b)(6) notice. But I'm going to put that aside

22 for now in the interest of time, though I'm

438

1  preserving this issue.

2        MR. MILLS: Yeah. You don't need to

3  lecture me on it, please.

4        MS. LEGRAND: Okay. I would love to

5  talk topics.

6        MR. MILLS: Okay.

7    Q    So let's talk where Mr. Mills suggested.

8    A    Okay.

9    Q    What was -- I was going to use words

10 exactly, but I forgot -- total revenue that MIT

11 has received from sales of the ARES?

12   A    For which one?

13   Q    Well, what is different? For which

14 contract you mean?

15   A    Uh-huh.

16   Q    So there's three contracts, and that's

17 it; is that fair?

18   A    Yeah.

19   Q    Okay. Saudi Arabia is the first?

20   A    Okay.

21   Q    Well; is that right?

22   A    Yeah, Saudi Arabia is the first.

439

1    Q    Second one, you think is Indonesia?

2    A    That's correct.

3    Q    Third one, Miami-Dade?

4    A    That's correct.

5    Q    Saudi Arabia, what were the revenues for

6  the sales of the ARES?

7        MR. MILLS: I think he already answered

8  that.

9        MS. LEGRAND: I don't think so.

10   A    So the total contract was for

11 16.5 million.

12   Q    Okay.

13   A    Okay. And I think -- I think the

14 revenue was around 1.6, 1.7 million, okay?

15   Q    Revenue was 1.6 million?

16   A    Yeah.

17   Q    What was -- so I'm not an accountant

18 either. I admit that. There's revenue, and then

19 there's expenses, and just sort of simplistically,

20 you subtract expenses from revenue?

21   A    Look, I mean, to make it easy for you --

22   Q    Sure.

440

1    A    -- we had only three projects.

2    Q    Okay.

3    A    Okay. The company lost money.

4    Q    Okay.

5    A    Okay. So, I mean, what we basically got

6  from this, at the beginning, this is what we were

7  able to make, 1.6 or 1.7 million. I don't have

8  the exact detail for Saudi contract. The

9  Indonesian contract was from 998,000, just short

10 of a million dollars, okay? And I think we made

11 180K on this. And then Miami contract was for

12 250,000. We actually lost more than 50,000 on

13 this contract.

14   Q    Okay. So --

15   A    Would you like me to continue?

16   Q    Are there other contracts? No?

17   A    No. So --

18   Q    No, no.

19   A    No. Because it's important for you to

20 know what also we did with the money.

21   Q    Briefly, sure.

22   A    Okay. So what we did, we went and

441

1 invested in building a demo vehicle. So I
2 purchased a brand-new Ford F-550 and we build a
3 system that cost us close to 370,000, okay? And
4 then, because the client wanted to see our system
5 on an armored truck, I spoke to Lenco, and I said,
6 Can you lend us a vehicle?
7      He lend us a vehicle, and we built
8 another ARES on it, and that cost us over 150,000.
9    Q    When was that?
10   **A    It was in 2023, probably.**
11   Q    Okay. So why --
12   **A    And then -- and then I have inventory of
13 over 160,000 of parts. So all this money, okay,
14 that whatever we got, we invested to get all these
15 things. And this is with the knowledge of his
16 Royal Highness, the president of MIT, okay?**
17   Q    He doesn't refer to himself that way.
18   **A    Well, okay, because he knows every
19 little detail, because I have never made any
20 commitment without him knowing.**
21   Q    Did he know how much money MIT would
22 have to earn before he would ever see a dime for

442

1 his years of work?
2    **A    He was aware of every contract and every
3 payment we received.**
4    Q    Right now. I asked you earlier --
5    **A    Okay.**
6    Q    -- how much money would MIT have to get
7 before Tim Clemente would see a dime? What's the
8 answer?
9    **A    The answer was, before he was fired as
10 the president, we were supposed to get a contract
11 from Saudi Arabia as a follow-up business. And we
12 were hoping jointly, Tim and I, if we get this
13 business, I was going to get paid; he was going to
14 get paid, and the company will be high in the sky.
15 Unfortunately, the contract got on hold, and the
16 government decided not to go with it due to a
17 budget issue.**
18   Q    But you received $16.5 million for a
19 contract with Saudi Arabia?
20   **A    Yeah.**
21   Q    And Tim saw zero dollars?
22   **A    And I saw zero. Yeah. You can shake**

443

1 your head, if you want to.
2      MR. MILLS: There are documents that
3 show it, but that's not the balance sheet; it's
4 the income statement.
5      MS. LEGRAND: I get you on that. I
6 think we can all guess. We're not going to go
7 down that road, but we can guess.
8      MR. MILLS: You don't have to guess.
9 It's right on the papers.
10     MS. LEGRAND: Well, okay.
11   Q    Of the $16.5 million that MIT received
12 for the sale to Saudi Arabia, what we already know
13 that one point something million went to Awajem,
14 right?
15   **A    No. 1.4.**
16   Q    1.4 million. Did anything go to
17 Atlantis?
18   **A    No, no.**
19   Q    Okay. You said that some of it was
20 invested, didn't you?
21   **A    Some of the money was paid to do the
22 other thing. And then, okay, also another thing,**

444

1 a payment was made to F2E.
2    Q    How much was the payment to F2E?
3    **A    I think 700,000.**
4    Q    Okay. So when you said you didn't get
5 any money from the Saudi Arabia contract, F2E got
6 700,000?
7    **A    That's correct.**
8    Q    And you are F2E?
9    **A    That's correct.**
10   Q    So the accurate statement is that you
11 received $700,000 after the Saudi Arabian contract
12 was done; is that --
13   **A    No. That's not true.**
14   Q    Why not?
15   **A    Because I did not receive this money
16 right after the contract. This is after what --
17 when we delivered all the three contracts. I
18 wanted to get paid for some of my loans.**
19   Q    You want to get paid for some of your
20 loans?
21   **A    That's correct.**
22   Q    And how much is the total amount of your

445

1  loan?
2      **A   I think it's over 1.7 million.**
3      Q   But that's not -- is there a document
4  somewhere that has all of your loans written?
5      **A   Yeah.  My accountant has everything.**
6      Q   Is your accountant your accountant for
7  you personally?
8      **A   It's for the company.**
9      Q   Well, is it Erol?
10     **A   Yeah, it's Erol.**
11     Q   What's Erol's last name?
12     **A   Ozdemir.**
13     Q   Erol.  I'm going to call him Erol; is
14 that okay?
15     **A   Yeah, that's fine.**
16     Q   Erol is the accountant for MIT; is that
17 right?
18     **A   That's correct.**
19     Q   Is Erol also your personal accountant?
20     **A   Erol does my accounting for Atlantis.**
21 **He does the accounting for F2E; he does the**
22 **accounting for OmniTrue; he does the accounting**

446

1  for Atlantis.
2      Q   Okay.  And the $700,000 that got paid to
3  F2E, when was that, approximately?
4      **A   Probably in 2023, December or November.**
5  **I'm not sure.  I can get you the date, if you**
6  **want.**
7      Q   Why didn't Timothy Clemente receive any
8  money at the same time?
9      **A   To receive money for what?**
10     Q   For his work for MIT for --
11     **A   No.  The agreement, with all respect,**
12 **okay, that we signed, is for MIT to get their loan**
13 **first before any distribution, and that was the**
14 **agreement that he signed.**
15     Q   Well, the agreement was for F2E, right,
16 to get?
17         COURT REPORTER:  Is that a yes?
18     **A   Yes.**
19     Q   Yes.  Give me just a second here.  Okay.
20 Let's just get this squared away.  Mark this as
21 Alubbad 20.  20.  20.
22         MR. MILLS:  So this will be number 20?

447

1          MS. LEGRAND:  Yeah.
2          (Exhibit 20 was marked for
3  identification and is attached to the transcript.)
4      Q   Alrighty.  I'm showing you what's been
5  marked as Exhibit 20, and you see there's an MIT
6  Bates number on the first page?
7      **A   Yes, ma'am.**
8      Q   MIT 4754; you see that?
9      **A   That's correct.**
10     Q   And it's an e-mail chain.  Let's see.
11 Let me start you with Tim Clemente.  If you look
12 halfway down that first page, Tim Clemente is
13 e-mailing Atlantiscorp@cox.net on April 21st,
14 2017; do you see that?
15     **A   Yes.**
16     Q   Okay.  And attached on this, just to get
17 us oriented, can you flip to one page or two pages
18 double-sided, but flip to the unanimous written
19 consent.
20     **A   Okay.**
21     Q   Yeah.  You see it's MIT 4756 is the page
22 number?

448

1      **A   Yes, that's correct.**
2      Q   Okay.  And you've been referencing this
3  agreement a couple times, right?
4      **A   That's correct.**
5      Q   This agreement -- let me use the
6  terminology correctly, if I can.  A 6 percent
7  ownership interest in MIT is transferred from Tim
8  Clemente to F2E here, right?
9      **A   Yes.**
10     Q   Bringing Tim Clemente's ownership
11 interest from 25 percent down to 19 percent,
12 right?
13     **A   That's correct.**
14     Q   And also in this document -- I'm still
15 on MIT 4756.  The last paragraph on the first page
16 says -- well, can you just read the -- yeah.  Read
17 that first sentence for me, if you would,
18 Mr. Alubbad.
19     **A   Which one?**
20     Q   The one that starts, Now, therefore, be
21 it resolved, on that same first page.
22     **A   Okay.  In accordance with Article 14C,**

449

1  **F2E shall be repaid their entire -- entirety of**
2  **the additional capital contribution made before,**
3  **currently, or after the effective date of this**
4  **written consent prior to the company making any**
5  **distribution. Okay.**
6      Q    Okay. And then, if you flip to the
7  second page of the unanimous consent agreement?
8      **A    Okay.**
9      Q    That first paragraph is continued. The
10 first full sentence on that second page starts,
11 For the avoidance of doubt; do you see that?
12     **A    For the avoidance of doubt, in the event**
13 **the company generate revenue from the sale of its**
14 **product and services and all profits and net cash**
15 **flows that exceed the company's operational**
16 **expense as determined by F2E, at its sole**
17 **discretion, shall first be paid to F2E.**
18     Q    Okay. So it was your understanding that
19 -- well, what was your understanding of how it
20 would be determined when anybody, other than F2E,
21 got any money?
22     **A    After. After we get paid all their**

450

1  **loans.**
2      Q    But you don't know what the total amount
3  of F2E loans is, do you, or do you? What is the
4  total amount of F2E loans?
5      **A    You asked me, and I already explained to**
6  **you.**
7      Q    What is the total amount?
8      **A    I told you, it's around maybe**
9  **1.7 million. I don't have the exact number, but**
10 **it's around 1.7 million.**
11     Q    Did you ever disclose that to Tim
12 Clemente?
13     **A    Tim Clemente knows everything.**
14     Q    Tim Clemente knows the amount of your
15 loans to MIT?
16     **A    Yes, he knows.**
17     Q    Of the $16.5 million that MIT received
18 from the government of Saudi Arabia --
19     **A    Yes.**
20     Q    Okay. 700,000 went to F2E?
21     **A    That -- I mean, yeah. After we finished**
22 **all the projects and everything.**

451

1      Q    And some of it went to investments in --
2  you were talking about investments, right, in a
3  armored --
4      **A    I mean, this was requirement during Tim.**
5  **All these things happened while Tim was the**
6  **president, okay? The armored vehicle, the demo**
7  **vehicle, that thing, he was in part of all these**
8  **things. So he was aware of every little details.**
9  **He was aware of the money, what's received from**
10 **Saudi Arabia. We sat together. I showed him the**
11 **balance sheet of all the money we received.**
12     Q    When?
13     **A    I showed it to him in Butler,**
14 **Pennsylvania.**
15     Q    Uh-huh?
16     **A    We were sitting, and he wanted to know,**
17 **and I showed him.**
18     Q    And about when did that happen?
19     **A    I don't remember the date, okay,**
20 **exactly. But there's one thing, Rebecca, for**
21 **sure, for the record. Tim, as a partner -- and he**
22 **knows. And this is this exact word to me. I**

452

1  **always say, Tim, whatever you need, just ask me.**
2      **And he said, Fahmi, I trust you. I**
3  **trust you dearly.**
4      **I said, No, but you are my partner.**
5  **Anything you need, just ask me. He wanted to know**
6  **-- he's said, I just want to know what we**
7  **received, the payment. I showed it to him.**
8      **I said, The Saudis, they just wired**
9  **this. This is a partial payment, and this is the**
10 **PO from Indonesia. We received this amount.**
11 **There is no hidden agenda.**
12     Q    Did Tim know that he would never see a
13 dime of the $16.5 million that was coming in from
14 Saudi Arabia?
15     **A    This was never discussed. He never**
16 **discussed and said, What I am going to get, Fahmi?**
17 **He never discussed it with me. And we did not**
18 **have that discussion, okay? This was never**
19 **discussed.**
20     **If Tim asked me, he said, What I am**
21 **getting? You can bet your life, I will tell him,**
22 **100 percent. I said, Tim, whatever we got -- and**

453

1  this is the balance sheet, and all this, you know.
2  I don't know if we are making money.  He knew we
3  were losing money.  He knew it.
4      Q    Okay.  You said Tim could come to you as
5  a partner and ask for what he needed?
6      A    Anything.  He was never denied anything.
7      Q    Well, let's actually just look at the
8  same exhibit, the Fahmi Exhibit No. --
9          MR. MILLS:  20.
10         MS. LEGRAND:  20, sorry.
11     Q    So there's an e-mail on the third page
12 Tim Clemente to Atlantiscorp@cox.net, right?
13     A    Yes.
14     Q    And that's an e-mail that went to you,
15 right?
16     A    That's correct.
17     Q    Okay.  And do you see the sentence, the
18 second to last, sort of, little paragraph on the
19 first page here?  It's says, I have some concerns
20 with the agreement as your lawyer wrote it up.
21     A    Yes, I see it.
22     Q    And then, Tim Clemente raises concerns,

454

1  right?
2      A    Yeah.
3      Q    Okay.  And one of the concerns he raises
4  -- flip to the second page here -- is that Josh
5  has been working for the past few years with no
6  compensation, except for one small payment he
7  received in 2013; do you see that?
8      A    Yeah.  I see that there.
9      Q    Okay.  And then, the next paragraph --
10 can you just read the first sentence of the next
11 paragraph that starts with, Instead?
12     A    Instead of me -- again, this is the same
13 story.  Instead of me transferring 6 percent of
14 F2E, I would like to transfer, you know,
15 10 percent.
16         In 215 he said 4 percent and this.
17 Every time when there is a bank document, he make,
18 you know, I mean, the same thing.  So this was for
19 the Saudi contract, and I know what he said.  He
20 was offering to transfer now 10 percent to his
21 son, because he was trying to avoid to sign the
22 consent.

455

1      Q    And then, if you look at the second to
2  last paragraph there.  It says, If there isn't
3  time to do the resolution to make Josh a member
4  now, or if you're too busy with everything else
5  right now to go over this, I understand.
6      A    Yeah.
7      Q    And then the next sentence says -- from
8  Tim says, I just want to give Josh a commitment
9  that it will happen very soon, and I would like to
10 know that we can figure out an amicable ownership
11 structure soon down the road.
12         Did I read that right?
13     A    Yes, you read it right.
14     Q    Okay.  And then did you ever give Josh a
15 commitment about what he would receive?
16     A    Let's look at my reply.
17     Q    Indeed.  What does your reply say?
18     A    Huh?
19     Q    What does it say, your reply?
20     A    Okay.  I basically said -- because this
21 wasn't urgent.  We needed to do the document again
22 for the bank, for the bond.  And basically,

456

1  because you left some where Tim is saying -- in
2  one e-mail he put 175,000.  In his second e-mail,
3  he said 2-, but there is another e-mail, I remind
4  you, he put 300,000.  So beside the issue, he said
5  he put the expenses.
6          And I said to him, I understand you have
7  put expenses, but you never shared anything with
8  me.  I have no issue with this.  Just please keep
9  record of everything, and you will get paid.
10         And I said, I never said only my
11 expenses need to be paid.
12         Anyway, this is the same consent
13 document I gave you in 215, where I was funding
14 everything, and you did not want to sign it.  If
15 you do not trust me, you don't feel comfortable
16 signing the document, then don't sign it.  You, as
17 a member, have a duty to help me in submitting
18 financial document to the bank in order to do the
19 business.  As your partner, I understand you
20 couldn't do this due to your bad credit, so I am
21 taking all the risk and everything related to
22 marketing, financial loan, and all other expenses.

457

1    Q    Okay.  And then he signed the document?
2    **A    Then he said, Okay, I'll sign it.**
3    Q    Okay.  Did you say anywhere here that
4  you disagreed with Tim's proposal to someday
5  transfer ownership in MIT?
6    **A    I did not.  I did not cover this,**
7  **because I know Josh was compensated by his dad.**
8  **And I would not — I did not respond to his**
9  **request about the transferring, because he is**
10 **pulling the same thing on me he did in 215.  Every**
11 **time we need a bank document, he tried to use the**
12 **same thing.**
13   Q    Why didn't --
14   **A    In between, he doesn't come to me and**
15 **say, Look, now we need to sit down.  Before we**
16 **move any forward [sic], we need to sit down and**
17 **address this.  No.  Only these things comes when**
18 **there's a bank document.**
19   Q    It came to you in January 2017, right?
20 We looked at that document earlier.  There was no
21 bank document then, was there?
22   **A    No.  There was no bank document, but we**

458

1  were bidding for, you know, other contracts, and
2  it always required financial, and Tim always used
3  this.  The same thing he did with me in 219.  He
4  goes and signs the contract in Saudi Arabia while
5  he's at the airport to write me an e-mail.  And he
6  said, Okay, now we're getting the contract of
7  Saudi Arabia; how much are you going to pay Josh?
8    Q    Right.  So doesn't that -- remember how
9  you testified earlier that you thought it was
10 important that before Josh got paid, MIT have some
11 revenue or have some sales, right?
12   **A    That's correct.**
13   Q    So isn't Tim doing exactly what you said
14 he should do?
15   **A    Doing what?**
16   Q    Well, MIT had just signed a big
17 contract, right?
18   **A    But signed a big contract, receiving**
19 **10 percent down payment, and I have to pay Josh?**
20 **There is no agreement for me to pay Josh.**
21   Q    I guess I'm confused about when the okay
22 time for Tim to raise this with you was, since it

459

1  wasn't okay in 2015; it wasn't okay in 2017, and
2  then he came to you in 2019 and said --
3    **A    Okay.**
4    Q    -- we justed sign a contract, it was
5  also not okay?
6        MR. MILLS:  Object to the form.
7    **A    Yes.**
8    Q    So when would it have been okay?
9    **A    It was okay once F2E get paid for all**
10 **their loans, okay, and then we do the**
11 **distribution, and then we structure the company.**
12   Q    There has, to this day, never been a
13 distribution, right?
14   **A    No.**
15   Q    And do you think there ever will be a
16 distribution?
17   **A    Oh, yeah.**
18   Q    When?
19   **A    Once we do the business.  If we get**
20 **another contract, by all means, he will get his**
21 **share.**
22   Q    You've said that to him before, haven't

460

1  you?
2    **A    I said it, you know, to him, and I told**
3  **him, and I said even to Josh, Nobody gets any**
4  **distribution; nobody gets any percentage until F2E**
5  **gets paid.**
6    Q    You said that to Josh?
7    **A    In 217 when he did not want a job, he**
8  **wanted 10 percent and was pounding on the table.**
9    Q    Okay.
10   **A    Okay.**
11   Q    That's December 2017?
12   **A    That's December 217.  And since then, I**
13 **did not talk to him.**
14   Q    Okay.  You said total F2E loans to MIT
15 you thought were about 1.7 million?
16   **A    I believe, yeah.**
17   Q    So -- but there's been 700,000 paid back
18 now?
19   **A    That's correct.**
20   Q    So what's the balance now?
21   **A    I have to look at my record to give you**
22 **the exact number.**

461

1    Q    How come you're confident that Tim would
2  get a distribution if there were another contract
3  if you don't know that amount?
4    A    I am not -- I don't have all these
5  numbers in my head.  You are allowed to ask me.  I
6  could get you numbers, if you want.
7    Q    I would love for you to get those
8  numbers?
9    A    Okay.  No problem.
10    Q    I would like to see all of the money
11  that is owed to F2E before any distribution will
12  be made to the members.
13        MR. MILLS:  We can get you the current
14  loan balance.
15        MS. LEGRAND:  That would be great.
16    Q    Does it really exist?
17    A    Yeah.
18    Q    Okay.
19    A    I mean, since you -- you know, Josh
20  doesn't have an NDA, okay, and I refused to give
21  you all the financial documents --
22    Q    That's true.

462

1    A    Okay, Tim needs to request it from us,
2  and I know he's going to forward it to you.
3        MR. HENSON:  I'm going to make those
4  same requests on the record.
5        THE WITNESS:  Yeah.
6        MR. MILLS:  So we'll give it to you.
7        MS. LEGRAND:  That would be terrific.
8  Thank you.  And obviously, I do respect the
9  confidentiality agreement in this case.  I take
10  that very seriously.
11        THE WITNESS:  Okay.  But he doesn't.
12    Q    Well --
13    A    I know him more than you, so I'm a good
14  judgment of people because I know him for close to
15  20 years.
16    Q    I look forward to reviewing the
17  information.
18        All right.  So just really quickly, so
19  I'm looking at the financial documents again
20  quickly, which is the exhibit --
21    A    Okay.
22    Q    Okay.  And I'm just -- there's a profit

463

1  -- we were looking at balance sheets before,
2  remember?
3    A    Okay.
4    Q    I'm going to just, partially with
5  Mr. Mills' suggestion, before the balance sheets
6  are profit and loss statements; do you see that?
7    A    That is what number?
8    Q    I'm going to turn you to the 2020 profit
9  and loss statement, which is Bates number --
10        MR. HENSON:  I'm sorry.  Before we get
11  into this, do you mind if we take like a
12  one-minute break?
13        MS. LEGRAND:  No, I don't mind at all.
14  Do you know, where are we at time-wise?  Yeah.
15  Let's do that.  So we are going to go off the
16  record.
17        THE VIDEOGRAPHER:  We are going off the
18  record.  The time is 7:31 p.m.
19        (Whereupon, a recess was taken.)
20        THE VIDEOGRAPHER:  We are back on the
21  record.  The time is 7:37 p.m.
22        MS. LEGRAND:  Okay.  And just for the

464

1  record, we are almost at 8:00 o'clock here, and we
2  did take -- you guys did take a little bit longer
3  than a minute to come back just now.
4        MR. MILLS:  Okay.  We can go to 8:01.
5        MS. LEGRAND:  Well, it's more than that.
6        THE WITNESS:  Let's give them until
7  8:05.
8        MR. MILLS:  Okay.  8:05.
9        MS. LEGRAND:  That helps.  I'll take
10  8:05.  I'm not saying we hit everything, but we
11  have a right to ask about.  I'll take your 8:05.
12        All right.  So --
13        MR. HENSON:  And just a reminder, I'm
14  still not --
15        MS. LEGRAND:  Yes.  Yeah, yeah, yeah.
16  And I'm asking questions about documents that we
17  received within the last two weeks.
18        MR. MILLS:  You guys don't have to take
19  it up with me.
20        MS. LEGRAND:  I'm just saving time on
21  the record.
22  BY MS. LEGRAND:

465

1    Q    TCLEM. Okay. So I'm looking at the
2  profit and loss statement that you've got in front
3  of you that's part of Exhibit 19, and then I was
4  pointing us to the 2020 profit and loss statement,
5  which is TCLEM 68357.
6    A    68370?
7        MR. MILLS: 357, 68357.
8        THE WITNESS: 57, this one?
9        MR. MILLS: Yeah.
10    Q    And at the top of that page, do you see
11  profit and loss January through December 2020?
12    A    Yes.
13    Q    And it's Mission Integrated
14  Technologies, LLC profit and loss; is that right?
15    A    Yes.
16    Q    Okay. And we were looking at a balance
17  sheet before for 2020; do you remember that?
18    A    I guess.
19        MR. MILLS: Why don't ask him about this
20  document?
21    Q    This document shows -- it lists a number
22  of expenses; do you see that?

466

1    A    Where? Total expense?
2    Q    Yes. Do you see the total expenses?
3    A    Yeah, I see total expenses.
4    Q    Okay. What was the income, the gross
5  income?
6    A    Where are you looking at?
7    Q    Well, I don't think that -- what it
8  looks to me like, there's a number of expenses
9  listed coming to $32,997; do you see that?
10    A    Okay. Yes.
11    Q    And then there's no gross income, right?
12  Because look at the net. What's the net income
13  listed?
14    A    Minus 32.
15    Q    Minus 32,997, right?
16    A    Uh-huh.
17    Q    Which is the exact same amount as the
18  expenses; right?
19    A    Okay.
20    Q    Well, is that right?
21    A    That's what is written there.
22    Q    So did MIT have any income in 2020?

467

1    A    No, we did not.
2    Q    But MIT received $7.99 million from the
3  government of Saudi Arabia in 2020?
4    A    16.5 million.
5    Q    Got you. I didn't know you had it all
6  in 2020.
7        MR. MILLS: We didn't have any of it in
8  2020.
9    Q    Well, I think in 2020 you had a
10  long-term project advance of 7.899 on the balance
11  sheet?
12    A    Again, we did not receive all our
13  payment. We received it in chunks, and I would be
14  more than happy to provide the schedule of payment
15  we received with the date and amount.
16    Q    Okay. Well, actually let's -- it's a
17  little tricky, I admit, for late at night, but can
18  we look at the 2021 balance sheet, which is --
19        MR. MILLS: The balance sheet or profit
20  and loss statement?
21        MS. LEGRAND: The balance sheet. And I
22  know. I'm happy to pull this document apart.

468

1    A    Where? At which page?
2    Q    It's TCLEM 68352.
3    A    352.
4    Q    And I'll stick with --
5    A    Okay.
6    Q    Okay. You see that? You see it says at
7  the top of the page Mission Integrated Technology
8  balance sheet as of December 31st, 2021?
9    A    Okay.
10    Q    Is that what it says? You're on the
11  right page, and that's what you guys are reading?
12    A    Yes.
13    Q    Okay. Do you see a long-term
14  liabilities entry near the bottom of the page?
15    A    Yes.
16    Q    How much is that?
17    A    9,912,960.
18    Q    Okay. And if you look up actually,
19  under assets, do you see where it says other
20  assets?
21    A    Other assets, yeah.
22    Q    How much does it say for other assets?

469

1    A    7,000,702.

2    Q    For what is it listed as?

3    A    **Again, this is questions you need to ask**
4 **my accountant. I'm not an accountant.**

5    Q    Well, what does it say? What are the
6 words.

7    A    **This says, Other assets in the ARES.**

8    Q    Was there $7.7 million spent for R&D for
9 the ARES?

10    A    **Again, this is something that needs to**
11 **be addressed with my accountant.**

12    Q    Accounting aside, just as a factual
13 question?

14    A    **I can't answer you.**

15    Q    How much was spent on R&D for ARES?

16    A    **I don't have all the numbers in front of**
17 **me to answer you about this. This is my**
18 **accountant. You know, you put your questions,**
19 **what you need, and we will give you the answer.**

20    Q    What was the cost of goods sold for the
21 ARES?

22    A    **Again, I don't have the numbers, but Tim**

470

1 has it.

2         MR. MILLS: It's actually on the profit
3 and loss statements, but that's okay.

4         MS. LEGRAND: Well, show us. Okay.

5         MR. MILLS: Read them. Because you're
6 moving between balance sheets --

7         MS. LEGRAND: I understand.

8         MR. MILLS: -- for different years, and
9 there's not necessarily a correlation between
10 what's on a balance sheet --

11         MS. LEGRAND: I understand.

12         MR. MILLS: -- and income and expenses
13 that comes in a year.

14         MS. LEGRAND: So tell me where I can
15 find the cost of goods sold.

16         MR. MILLS: You can take a look at the
17 profit and loss statements that starts on 8355,
18 and it talks about, I think, some of these years.
19 There's just --

20         MS. LEGRAND: Am I going to get to
21 7 million anywhere here, sir?

22         MR. MILLS: Well, like, if you look at

471

1 Page 68359, you'll see cost of goods sold. It
2 starts showing up on that. And so, you know, I
3 haven't gone and analyzed all these things. And
4 if you go to the final page, you'll see lots of
5 costs of goods.

6         MS. LEGRAND: Okay. So let's look at
7 that, actually.

8         MR. MILLS: Yeah.

9         MS. LEGRAND: Sorry to do this now.
10 Okay. I do want to go there. Where are we at?
11 Do you still have --

12    A    **As I said to you earlier --**

13    Q    I know you said --

14    A    **I will not be able to answer any of the**
15 **financials, because I have an accountant who**
16 **basically does all the accounting for the company.**

17    Q    Again, the 30(b)(6) notice requested
18 someone who is knowledgeable on these topics on
19 behalf of MIT.

20    A    **Okay.**

21    Q    You could have designated your
22 accountant.

472

1    A    **Well --**

2         MR. MILLS: Let me put down an
3 objection. It's useless lecturing him and me on
4 that.

5         MS. LEGRAND: It's useless, but we need
6 this information. So for now --

7         MR. MILLS: Ask a coherent question;
8 you'll probably get a coherent answer.

9    Q    How much was spent on ARES research and
10 development? Just putting aside how it was
11 accounted for, how much was spent on research and
12 development for the ARES?

13         MR. MILLS: In what year?

14    Q    On the new ARES between January 2017 and
15 2023.

16    A    **I don't have all the numbers.**

17    Q    Approximately?

18    A    **I don't know.**

19    Q    Was it more than a million?

20    A    **I really don't know.**

21    Q    Was it more than 5 million?

22    A    **I really don't know. But what I know,**

473

1  that for every project, I shared with Tim a sheet
2  that basically said the total amount we received,
3  and this is what we spent on every vendors. And I
4  made a circle that shows how much we spent and how
5  much money we got. Because every vendor, we spent
6  money, is attached to an invoice.
7      Q    And that's on a document that you
8  produced in this litigation?
9      A    No. This is what's shown to Tim when we
10  were working, because he wanted to know what we
11  received and all these things. This is what I say
12  to you, when Tim was the president, he was aware
13  of everything.
14      Q    What happened to that document that you
15  showed to Tim?
16      A    What do you mean what happened?
17      Q    Well, there's a document you showed to
18  Tim that you say would have shown all the cost of
19  the vendors?
20      A    Because when he asked me how much we
21  spend, okay, I was always trying to tell Tim. But
22  Tim would never -- honestly, he never come and

474

1  said, Fahmi, I'm having problem; I don't trust
2  you; I need to see accounting. This was never.
3  The only time Tim was asking me for accounting
4  paper is to show the investor that he was
5  preparing a presentation.
6      Q    That's because he trusted you, isn't it?
7      A    100 percent. And he had no reason not
8  to trust me because I never cheated him.
9      Q    Well, does he trust you now?
10      A    You know what? I don't even trust him.
11      Q    I know you don't. You sued him. He's
12  never seen a dime after spending 10 years working
13  for MIT, right?
14      A    You know what? He basically did not
15  spend a penny. He used me to spend the money so
16  him and his son can steal the information and file
17  for a patent without me knowing. That's what
18  happened.
19      Q    How much has the loss of that -- how
20  much has it cost MIT to not -- Josh's conduct,
21  just Josh's conduct, because Josh filed a patent,
22  which we did. We all agree there is a valid

475

1  patent out there?
2          MR. MILLS: Object to the foundation.
3      Q    Sorry. We all agreed that there's a
4  presumptively valid patent out there?
5          MR. MILLS: There's an issued patent out
6  there.
7      Q    There is an issued patent that is
8  entitled to a presumption of validity. Let me say
9  that again. There's a patent that exists;
10  correct?
11      A    Okay.
12      Q    Is there a patent that you have told the
13  Patent and Trademark Office covers the ARES
14  product that MIT is selling?
15          MR. MILLS: I object to the foundation.
16      A    I don't understand the question.
17      Q    We are short on time so let me stop.
18      A    I don't understand your question.
19      Q    For the interest of time, that is
20  obviously one of the many questions that we need
21  to ask, though luckily, he has signed
22  declarations.

476

1          All right. Let me try and go
2  higher-level here since we're almost out of time.
3  We were talking about the capital call, right?
4  The capital call this year?
5      A    Yes.
6      Q    You issued a capital call to the other
7  two members of MIT this year, right?
8      A    Yes.
9      Q    And why was that capital call issued?
10      A    Because we needed money.
11      Q    Okay. And tell me -- just tell me again
12  the date of the capital call?
13      A    I think when we did it in February 2024.
14      Q    February of 2024?
15      A    Yeah.
16      Q    So just a couple months ago?
17      A    Yes. Yes.
18      Q    And why did you need money in February
19  of 2024?
20      A    Because the company has to operate and
21  pay salaries and pay rent. And basically, now the
22  company is under a lawsuit for the patent.

**477**

1    Q    Well, to be clear, who filed the
2  lawsuit?
3    A    MIT.
4    Q    That is right.  Okay.
5    A    So the legal fee is in order to protect
6  the MIT IP and recover all the information that
7  was taken, okay, and has not been returned to MIT.
8    Q    Which you will only accept if it was
9  physically on the same piece of plastic?
10    A    No.  If -- when I asked for the
11  information that they received from the vendor, I
12  paid for it; they have not received it.  And after
13  what I've seen, what has been released, it was
14  coordinated between the president, who had the
15  fiduciary duty for the company, was telling his
16  son and his lawyer friend, Gary Gill, that, don't
17  worry, we're not going to give them everything,
18  and Josh is basically said, No [sic].
19        Let me explain something to you:  Josh
20  was never under NDA.  Josh did not have an NDA
21  with Ivis Tech.  Josh did not have the authority
22  to send information of MIT to a third party

**478**

1  without my permission.
2    Q    Okay.
3    A    Okay?  So did Josh have an NDA with Ivis
4  Tech?  He violated this, because Ivis Tech can
5  take my information and use it, and then they said
6  to me, I'm sorry.
7    Q    Hold on.
8    A    -- but I did not take it from him.
9    Q    Hold on.  Ivis Tech had an NDA with MIT,
10  right?
11    A    That's correct.
12    Q    Has Ivis Tech ever misused MIT's
13  information?
14    A    How would I know this?  Because I find
15  out, based on the text messages that was released
16  from Tim, that he was in cahoots with Cory Brant.
17    Q    In cahoots because you said you should
18  buy me out, didn't you?
19    A    You know what?  This is in 217, okay,
20  when we were arguing about, you know, the Milipol.
21    Q    Yeah.
22    A    When they wanted to make a decision --

**479**

1  when Tim Clemente violated the operating agreement
2  by using a French foreign national to appoint him
3  as the director of MIT marketing for Europe.
4    Q    Yeah.
5    A    Okay?
6    Q    No, no.  Go ahead.  I'm just listening
7  to you.
8    A    And then, when he violated ITAR, okay,
9  with the vehicle -- you can roll your eyes as you
10  want, okay.  This is written in the e-mail.
11    Q    Yes, I've read the e-mail.
12    A    Okay.  So I'm glad you read it.
13    Q    Okay.  I think my question was, you have
14  a duty, right, right now, to do what is in the
15  best interest of MIT; is that correct,
16  Mr. Alubbad?
17    A    That's correct.
18    Q    You understand you have a fiduciary duty
19  to MIT; correct?
20    A    That's correct.
21    Q    And you issued a capital call this year;
22  correct?

**480**

1    A    That's correct.
2    Q    Because of legal fees incurred; correct?
3    A    And because the company need money.  We
4  have no business; we have no contracts.  We only
5  did three contracts.  We have -- as of today, I'm
6  not hiding, like I have a contract and I hid it
7  from Tim or hid it from anybody else.  We have no
8  business.  We have no contract, okay?  We have
9  zero.  I am struggling.
10        I am busy right now.  This is taking all
11  my time to deal with the lawsuit instead for me
12  taking care of and trying bring business to the
13  company.
14    Q    Why was it better for MIT, for you, to
15  spend hundreds of thousand -- how much do you
16  think you've spent on legal fees?
17    A    Now it's probably over 400,000.
18    Q    Why was it better for MIT to spend
19  hundreds of thousands of dollars on legal fees
20  than to accept a free assignment of the patent?
21    A    You know what?  I am really surprised
22  for you asking me this question.

481

1    Q    Okay.
2    A    We tried to settle with Stern.
3    Q    Yes.
4    A    You remember?
5    Q    Oh, I do.
6    A    And what was the reason we did not
7 settle?
8    Q    You would not release Joshua Clemente
9 from liability.  You were threatening to sue him
10 no matter what.
11    A    That's not true.
12    Q    I got the e-mails.
13    A    Okay.  And I have the e-mail.
14    Q    Well, what do you think?  Why?
15    A    And you know what?  I will tell you
16 something for the record.
17    Q    Tell me something for the record.
18    A    I am so happy that this here, it is a
19 blessing from God.  You know why?
20    Q    No.
21    A    Because I was kept in the dark.
22    Q    It's a blessing from God that you didn't

482

1 resolve this for no money --
2    A    No.
3    Q    -- so you can vindictively pursue --
4    A    No.
5        MR. MILLS:  Objection.  This is
6 argumentative.
7    A    That means nothing.  You can say
8 whatever you want.  If you are going to sit and
9 trash me like he trashed me, okay --
10    Q    I'll be punished, right?
11    A    -- in his e-mail, you know what?  You
12 have no right.
13        MR. MILLS:  Fahmi, Fahmi, You don't have
14 to answer anymore.  Fahmi, you're finished.
15    A    No.  No.  I mean, I tried to do the
16 right thing.  The fact -- I gave him a complaint
17 that was not filed.  Do you know I talked to him
18 three times that I beg you, three times I repeated
19 it to him.  I said, Tim, I beg you, don't ruin our
20 friendship; please do the right thing.  And what
21 did they do?
22    Q    Tried very hard to do that, don't you

483

1 think?
2        MR. MILLS:  Objection.
3    A    Oh yeah?  He did?  Okay.  That's your
4 opinion.
5    Q    Did Josh Clemente offer to assign the
6 patent and suit to MIT for zero dollars?
7    A    What they did, they manipulated the
8 document and the e-mails.  Why didn't you
9 introduce the e-mails?
10    Q    Which e-mail?
11    A    The e-mail that -- the long e-mail with
12 David Marko when I discovered -- look, we
13 discussed the agreement with the knowledge of Tim,
14 and Tim agreed and initialed it.  And he said to
15 the lawyer, I'm giving it to Ken and to Tim -- to
16 Josh and sign it.  You know what is so funny?
17 That Mr. Ken Fournier, who was involved from 213,
18 okay, he signed the retroactive NDA.  He signed
19 everything, did not complain.
20    Q    Yeah.
21    A    And Josh and Tim, what they did?  They
22 manipulated the document and gave it to me.

484

1    Q    Okay.  I got those e-mails.  If we had
2 more time, I would introduce them.  You want to
3 stay longer?
4        MR. HENSON:  We will be taking this up.
5        MS. LEGRAND:  If you want to stay
6 longer, I've got that document.
7        MR. MILLS:  What?
8        MS. LEGRAND:  He just said why won't you
9 introduce that.
10        MR. MILLS:  Ask him a question, not me,
11 please.  You have a few more minutes to get out of
12 here.
13    A    You have the document.  Ask me whatever
14 you want.  The document explains everything.
15    Q    Ken Fournier signed the agreement saying
16 that he had signed but then lost an NDA in 2013?
17    A    He signed a retroactive NDA.
18    Q    Okay.
19    A    Because Tim said, Ken signed, and then
20 he couldn't remember.  And then Ken said, Hey,
21 guys, I don't care; give me whatever you want.  He
22 signed everything.  He did not complain.

485

1  Q  Ken didn't complain?

2  **A  Did not complain.**

3  Q  And Josh complained, didn't he?

4  **A  Well, Josh did not complain to me. They**
5  **basically modified and altered the document**
6  **without giving me the courtesy of my lawyer to**
7  **know.**

8  Q  We would be happy to look at those
9  documents, if we were given more time. For now,
10 did Josh offer to assign the patent to MIT; yes or
11 no?

12 **A  He signed the document. He did not sign**
13 **the right document we gave him.**

14 Q  Did he offer to assign the patent to MIT
15 in exchange for no money?

16 **A  The document that was given to in, I**
17 **believe, July 2022 from David Marko, he gave us a**
18 **document different than what we gave him.**

19 Q  Was he allowed to negotiate? Was Josh
20 Clemente allowed to negotiate with you?

21 **A  It's Tim who negotiated on behalf of his**
22 **son, as usual. Tim always negotiating on behalf**

486

1  **of his son.**

2  Q  Was anyone allowed to negotiate about
3  the language of the agreement that was sent to
4  Josh?

5  **A  Yes, ma'am.**

6  Q  Who?

7  **A  Tim Clemente. We had four versions of**
8  **the agreement.**

9  Q  Yes.

10 **A  Okay. And he discussed it, because he**
11 **did not like some of the language that the lawyer**
12 **wrote. So they discussed it repeatedly, until Tim**
13 **felt comfortable with the language that he's going**
14 **to present to Josh and Ken. He initialed each**
15 **page, and he said in the e-mail, I will take it**
16 **for Josh and Tim. This could have been fine. If**
17 **Tim and Josh said, Look, guys, we signed the**
18 **document, but we changed this part, we changed**
19 **this part. But they failed to tell us. They just**
20 **basically said, Fahmi, he will not read; the**
21 **lawyer will not read. And basically, this is when**
22 **they got caught.**

487

1  Q  Hold on a second. We're very short on
2  time.

3  **A  Okay.**

4  Q  But you knew that the original agreement
5  would have given ownership shares to Josh
6  Clemente; correct?

7  **A  Yeah.**

8  Q  Okay. And the cover e-mail from Tim
9  Clemente back to you, part of this e-mail chain
10 that you know really well, says Josh doesn't want
11 the ownership shares, so here's what we're doing
12 instead?

13 **A  Yeah. He say that because he start**
14 **giving him a whole bunch of reasons that, to me,**
15 **he did not tell his son, apparently, the truth,**
16 **that he was negotiating, trying to take money from**
17 **me from 219.**

18 **But beside the issue. Go ahead.**

19 Q  Okay. So Tim responded to you --

20 **A  Okay.**

21 Q  -- and said Josh Clemente does not want
22 to do what's in the agreement; he wants to do

488

1  something different, right?

2  **A  That's fine, yeah.**

3  Q  So -- and then he had proposed what they
4  wanted to do with that was different, right?

5  **A  They wanted to do it in their own terms.**

6  Q  Yes, they did. What is wrong with that?

7  **A  Because Tim Clemente, who was the**
8  **president of the company, negotiated this**
9  **agreement. I did not. He negotiated it.**

10 Q  With who?

11 **A  With the lawyer on behalf of his son.**

12 Q  Was it your understanding that Josh
13 Clemente was reviewing the document all those
14 times before it was sent to Josh Clemente?

15 **A  This is something you need to ask Tim**
16 **Clemente.**

17 Q  I mean, Josh Clemente wrote to you that
18 the first time he saw the document was when he got
19 it from his father, and that he didn't know about
20 rounds of changes. This was the first time he's
21 gotten to comment; isn't that what he said?

22 **A  That's what he said to a bunch of people**

489

1  in the e-mail.
2     Q   Yes.
3     A   And I'm one of them.  But you know,
4  Rebecca, this is not my problem.  His father, who
5  was the president, who was elected to do this, he
6  is the one who decided to negotiate.  He never
7  once said to the lawyer, Hey, guys, I can't; I
8  need to bring my son into the picture.
9     Q   Whoa, whoa, whoa, whoa.  You think that
10 the lawyer didn't understand that Josh Clemente
11 would have to review this agreement that he was
12 being asked to sign?
13    A   I can't read what's the lawyer thinking.
14 I am telling you what Tim Clemente told the
15 attorney.  And we had the conference call together
16 for one hour where Tim negotiated the agreement
17 with my lawyer.
18    Q   Did Tim have a lawyer?  Did MIT ever
19 offer to pay so that Tim could have a lawyer too?
20    A   Tim never asked.
21    Q   If Tim had asked, would you have given
22 him a lawyer?  Because Tim would like a lawyer.

490

1        MR. MILLS: Objection to form.
2     A   Wait a second.  Wait a second.
3        MR. MILLS:  You don't have to answer.
4  There's no question pending.
5     Q   Hold on.  We are almost out of time, so
6  let me just go back a second here.  We were
7  talking about a capital call, right?
8     A   Yeah.
9     Q   Okay.  So the capital call was because
10 there was an urgent need for money for MIT?
11    A   That's correct, yes.
12    Q   Okay.  But in late 2023, F2E got paid
13 $700,000?
14    A   That's correct.
15    Q   Okay.  Why did F2E get paid $700,000
16 right then, in late 2023?
17    A   Because I need to get paid for some of
18 my money.
19    Q   Ah.  Was there any agreement saying that
20 said you should be paid on a certain time frame?
21    A   No.  But it says that, you know, once,
22 you know, F2E gets paid, okay, then, basically I

491

1  made a payment to myself.  I could have said,
2  Okay, you know what; I'm just going to pay myself
3  the thing.  No.  I just made a payment to myself,
4  okay, for some of the money that was spent.
5     Q   A payment of $700,000?
6     A   That's correct.
7     Q   If you had not -- if MIT had not paid
8  Fahmi Alubbad $700,000 in late 2023 --
9     A   Yes.
10    Q   -- would MIT have needed a $400,000
11 capital call in early 2024?
12    A   Probably not.
13    Q   So why was it in MIT's interest to pay
14 you before making sure that MIT could continue
15 operating?
16    A   No.  Because I have been investing since
17 213, and MIT had -- the only source of funding is
18 from me.  And you know what?  This is something
19 that I have been paying and running everything,
20 and my partner is not doing anything.  So —
21    Q   Was there any agreement that said when
22 F2E should get paid back?

492

1     A   According to the consent agreement, you
2  know, I get paid, you know, my money before any
3  distribution.  So there is no distribution — and
4  I repeat it — no distribution will be paid to
5  anybody until I get paid my loans.
6     Q   When MIT made the decision to pay you
7  $700,000 --
8     A   Okay.
9     Q   -- in late 2023, why was it in MIT's
10 interest to pay you before ensuring that MIT had
11 the money it needed to continue operating a month
12 later?
13    A   Because we had some money, okay, but
14 with the legal bills and the patent lawyer, it
15 just — it ran, you know — I mean, lots of bills
16 that I was paying, and this is where we are.
17    Q   $700,000 you paid F2E?
18    A   That's correct.
19    Q   Is more than you paid to lawyers, right?
20    A   Yeah.
21    Q   And you paid zero to Tim?
22    A   So?

493

1    Q    Zero to Josh?
2    **A    Josh, I have no agreement with him.**
3    Q    Tim and Josh worked for years on
4    products that MIT is now marketing, right?
5    **A    Uh-huh.**
6    Q    And they've never seen a dime, right?
7    **A    Okay.**
8    Q    Well, have they?
9    **A    And I haven't seen anything yet.**
10   Q    You've paid yourself back, though?
11   **A    But I still haven't gotten paid all my**
12   **money.**
13   Q    Why was it in MIT's interest to issue a
14   capital call in early 2023?
15   **A    Because I needed money to operate.**
16   Q    You needed money -- MIT needed money to
17   operate?
18   **A    That's correct.**
19   Q    Wouldn't MIT have not needed $400,000 to
20   operate --
21       MR. MILLS:  Asked and answered.
22       MS. LEGRAND:  All right.  It's 8:03, I

494

1    think I'm ready to -- I mean, I don't want to
2    waste two minutes.
3        MR. HENSON:  I mean, so, yeah.  I turned
4    the mic over to my codefendant here when I was
5    about five hours through the deposition.  There's
6    still some -- I mean, I would probably need two
7    hours to get through the rest of these 30(b)(6)
8    issues.
9        MS. LEGRAND:  And I haven't gotten
10   through some basic patent stuff either.  I mean,
11   we've tried to move as quick as we can.
12       MR. MILLS:  Okay.  Well, you guys are
13   going to have to call me tomorrow.
14       MS. LEGRAND:  Yeah.  We will.
15       MR. MILLS:  Okay.  And -- but my
16   inclination is to say no, but I'm tired right now.
17       MS. LEGRAND:  I would love to say, yes,
18   and we could push it a week, which you know we'd
19   be allowed to do.
20       MR. MILLS:  Discovery is over, and I
21   don't know, because I've tried this before when
22   people have said, sure, they'll agree to it, and

495

1    they don't.
2        MS. LEGRAND:  Who is they?
3        MR. MILLS:  The magistrate judges.
4        MS. LEGRAND:  I'm confident enough about
5    that if go on consent.  I heard what Bill Porter
6    -- I heard what our magistrate said.
7        MR. MILLS:  Okay.  I've been down this
8    road before.
9        MS. LEGRAND:  Okay.  So for the record,
10   then, you will consent?
11       MR. MILLS:  I did not say that.
12       MR. HENSON:  But we will connect
13   tomorrow to discuss.
14       MR. MILLS:  Yeah.  I'm saying.  I'm
15   exhausted.  I told you.
16       MS. LEGRAND:  I agree with you.  I would
17   love us to not go beyond --
18       MR. MILLS:  I told you that I didn't
19   want to go beyond 7:00.
20       MS. LEGRAND:  I hear you.  I would love
21   us to have a little time here.  And I'm asking for
22   your consent on the record.  I'm not saying that's

496

1    all we need.
2        MR. MILLS:  The answer is I'll think
3    about it in the morning, okay?  So give me a call,
4    and you guys focus yourself.  This was a very
5    unfocused deposition.
6        MS. LEGRAND:  Well, we were getting
7    discovery during the deposition.
8        MR. MILLS:  Please.
9        MS. LEGRAND:  Please.
10       MR. MILLS:  So I'll talk to the client,
11   and I'll see what we can do.
12       MR. HENSON:  And I want to object to
13   this being an unfocused deposition.  I mean, we
14   had a lot of pontification from the witness.  The
15   witness was obviously not prepared to talk to a
16   lot of these topics.
17       MR. MILLS:  He was completely prepared
18   to talk to the topics.
19       MR. HENSON:  Well, we'll agree to
20   disagree on it.
21       MS. LEGRAND:  I agree to disagree.  I do
22   appreciate everyone's time.  I'm happy to go --

497

1  well, do you want to --
2        MR. HENSON:  I mean, I think we're done,
3  according to plaintiff's counsel.
4        MS. LEGRAND:  Yeah.  It's 8:05 on the
5  dot.  I am merely respecting my promises, as I
6  intend to do.
7        MR. HENSON:  So we'll go off the record
8  for today, and just make a note on the record that
9  the defense is requesting to hold this open.
10 We'll be in touch tomorrow.
11       MS. LEGRAND:  Yeah.  I need to get --
12       THE VIDEOGRAPHER:  We are going off the
13 record.  The time is 8:05 p.m.
14       (Off the record at 8:05 p.m.)
15
16
17
18
19
20
21
22

499

1        CERTIFICATE OF TRANSCRIBER
2        I, Jacalyn Mann, do hereby certify that
3  the foregoing pages, to the best of my ability,
4  are a true and correct transcription from the
5  official electronic sound recording and
6  annotations of the proceeding taken on February
7  16, 2024, in the above-entitled matter; and that I
8  am neither counsel for, related to, nor employed
9  by any of the parties to the case and have no
10 interest, financial or otherwise, in its outcome.
11 Jacalyn Mann
12 February 20, 2024.
13
14
15 _____
16 4/21/2024
17
18
19
20
21

498

1        CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2        I, Brennan Plummer, the officer before
3  whom the foregoing proceedings were taken, do
4  hereby certify that said proceedings were
5  electronically recorded by me; that the foregoing
6  transcript, to the best of my ability, knowledge,
7  and belief, is a true and accurate record of the
8  proceedings; and that I am neither counsel for,
9  related to, nor employed by any of the parties to
10 this case and have no interest, financial or
11 otherwise, in its outcome.
12 BRENNAN PLUMMER, NOTARY PUBLIC FOR
13 FOR THE STATE OF MARYLAND
14
15 _____
16
17 4/17/2024
18
19
20
21
22