```
 1                 UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                      ALEXANDRIA DIVISION

 3     --------------------------x
       MISSION INTEGRATED        :     Civil Action No.:
 4     TECHNOLOGIES, LLC, et al.,:     1:23-cv-1608
                   Plaintiffs,   :
 5          versus               :     Friday, June 28, 2024
                                 :     Alexandria, Virginia
 6     CLEMENTE, et al.,         :
                                 :     Pages 1-37
 7              Defendants.      :
       --------------------------x
 8

 9          The above-entitled motions hearing was heard before
       the Honorable Leonie M. Brinkema, United States District
10     Judge.  This proceeding commenced at 10:17 a.m.

11                      A P P E A R A N C E S:

12     FOR THE PLAINTIFFS:    LAURIN MILLS, ESQUIRE
                              WERTHER & MILLS, LLC
13                            2121 Eisenhower Avenue
                              Suite 608
14                            Alexandria, Virginia  22314
                              (703) 547-4693
15
                              BRIAN DONNELLY, ESQUIRE
16                            WERTHER & MILLS, LLC
                              2000 Tower Oaks Boulevard
17                            Suite 200
                              Rockville, Maryland  20852
18                            (240) 912-3034

19     FOR THE DEFENDANT:     REBECCA LEGRAND, ESQUIRE
       (Joshua Clemente)      LEGRAND LAW PLLC
20                            1100 H Street, NW
                              Suite 1220
21                            Washington, D.C.  20005
                              (202) 587-5610
22
       FOR THE DEFENDANT:     ANDREW HENSON, ESQUIRE
23     (Timothy Clemente)     TROUTMAN PEPPER HAMILTON SANDERS LLP
                              1001 Haxall Point
24                            11th Floor
                              Richmond, Virginia  23226
25                            (804) 697-1390
```

1

```
 1   COURT REPORTER:          STEPHANIE M. AUSTIN, RPR, CRR
                              Official Court Reporter
 2                            United States District Court
                              401 Courthouse Square
 3                            Alexandria, Virginia  22314
                              (607) 743-1894
 4                            S.AustinReporting@gmail.com

 5        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                              2
```

```
 1                    P R O C E E D I N G S

 2          THE DEPUTY CLERK:  Civil Action Number

 3   1:23-cv-1608, Mission Integrated Technologies, LLC, et al.

 4   versus Clemente, et al.

 5          Will counsel please note their appearance for the

 6   record, first for the plaintiff.

 7          THE COURT:  Mr. Mills, you're over here on the --

 8          MR. MILLS:  We've switched sides.

 9          MS. LEGRAND:  We've switched sides.

10          THE COURT:  Yes, that's correct.  That's happened

11   to me before.  Fine.  Very good.  Because we're only dealing

12   with the counterclaim at this point.

13          MS. LEGRAND:  Correct, Your Honor.  And Rebecca

14   LeGrand on behalf of counterclaim plaintiff, Joshua

15   Clemente.

16          THE COURT:  And, Mr. Mills, you're here for the

17   defendant at this point.

18          MR. MILLS:  Correct, Your Honor.

19          THE COURT:  Now, you're both smiling, which makes

20   me happy, but, of course, I'm unhappy that you're here.  I

21   cannot understand why this case has not settled.  I mean, I

22   don't know the details.  I certainly know that Judge Porter

23   has spent multiple hours with you trying to get this case to

24   settle.  And, in fact, most of the case has settled.  The

25   entire complaint has been resolved.
```

1            What is left, of course, is this counterclaim,

2    this patent infringement counterclaim which, in some

3    respects, I would think from the MIT standpoint, should be

4    the elephant in the room, because in that counterclaim, were

5    Joshua Clemente to be successful, he gets an injunction.

6    And, as I understand it, this device, this mobile ladder

7    unit, is a major product of the company.  And if there's an

8    injunction, as you know, Mr. Mills, it's going to definitely

9    stymie what your client can do with that device.  So I don't

10   understand why this case hasn't settled.  And I would like

11   today to do whatever I can to help you along that line.

12           Mr. Mills, do you want to respond?  And, actually,

13   before you do that, let me ask you this, what's the status

14   of the proceeding before the Patent Office?

15           MR. MILLS:  It's -- it takes 12 months to go

16   through, and it's not going to resolve until probably

17   December.  And so it's been initiated.  There hasn't been

18   much action.  The action will take place in the fall and

19   will probably resolve in December/January time frame, is my

20   understanding.

21           THE COURT:  Okay.  All right.  I mean, that's the

22   other concern I have is, you know, if you can't settle,

23   whether I should actually just -- I always like to let the

24   PTO have the first shot at determining whether a patent is

25   valid or invalid.  And if the patent is -- were to be

4

```
 1    declared invalid, then that would pretty much -- it wouldn't

 2    moot the case, you can still, you know, bring a case in

 3    district court and the Court can see it differently, but it

 4    certainly is a significant factor the Court takes into

 5    consideration.

 6              Are you handling that proceeding before the PTO?

 7              MR. MILLS:  I am not, Your Honor.  A man named

 8    Tom Brown, who's a patent attorney, is.

 9              THE COURT:  All right.  So, I mean, again, you're

10    not able to get your clients together to work this out?

11              MR. MILLS:  Your Honor, the current status is

12    Joshua Clemente made a settlement offer last week.  We made

13    a -- without getting into the details, we made a

14    counteroffer on Monday, and it hasn't been responded to.

15    They're pretty far apart.  And that's where we are.  And the

16    trial is coming up, and so that's why we're here today.

17              THE COURT:  All right.  Ms. LeGrand, let me hear

18    from you.

19              MS. LEGRAND:  Yes.  I would love, as would my

20    client, to see this case resolved, and potentially allowing

21    the IPR proceedings to go first might be a reasonable way to

22    at least keep costs down.

23              I would point out one reason we think this case

24    ought to settle, even if MIT prevails on invalidating the

25    patent -- and we do not think they will for many reasons.
```

1    But if they invalidated the patent and that's their only

2    real defense, then anyone can compete with them, whereas our

3    efforts to settle have involved giving MIT an exclusive

4    right to use this patent.  So that's one of the reasons this

5    is sort of flummoxing.

6             I will say just for context, our initial -- we

7    quickly got a settlement offer after the motion for summary

8    judgment decision to MIT.  The initial response from MIT was

9    that they deemed our offer unworthy of a response.

10   Mr. Mills worked harder and did get us a response, but it's

11   still not a standard settlement agreement.  There are still

12   all sorts of demands as if MIT was still a plaintiff.

13            I do have one idea left as a potential settlement.

14   I'm always going to keep talking, but we have tried very

15   hard and come up against an economically irrational actor.

16            THE COURT:  Well, wait a minute, though.  Again,

17   I'm working off of the complaint and what I've seen in your

18   papers, but my understanding has been that Joshua Clemente

19   worked for quite a long time for MIT and did not receive any

20   salary.  That the most money he got was about $30,000, which

21   was spent for CAD or some kind of technical support to help

22   produce the diagrams for the patent or whatever.

23            So I keep thinking if this case went to trial, I

24   try to think how a juror would see a case.  I think a juror

25   would be sympathetic to somebody who's worked for a year or

6

```
1    two and not gotten any pay.  That's a pretty appealing

2    thing.  And then the guy says, well, you know, I've spent my

3    own money, and I've spent hours and hours and hours, I

4    developed, I'm the engineer, Mr. Alubbad is not an engineer.

5    I, and perhaps my father, we developed this improved device.

6    You know, we got the patent.  The plaintiff can't -- Alubbad

7    can't really argue he didn't know that this case was

8    patented because there's advertisements and stuff talking

9    about, you know, we have a protected product patent pending,

10   that sort of thing.

11          And so they're going to see this guy who's worked

12   hard, gotten the patent, and then they're going to see this

13   businessman on the other side who never paid him, who's, you

14   know, arguing that, you know, he didn't do the invention or

15   that this is not a legitimate patent.

16          It's a really bad case.  And, you know, it's an

17   unusual patent case.  There had been no Markman

18   constructions.  All right.  I don't think either side has a

19   patent expert.

20          Do either of you have an expert who's going to

21   talk about whether this does infringe or doesn't infringe?

22          MR. MILLS:  We have a validity expert, not an

23   infringement expert.

24          THE COURT:  Okay.

25          MS. LEGRAND:  I don't think there's any question
```

7

```
1  about infringement.  I think their main argument is the
2  on-sale bar which essentially acknowledges infringement.
3  And infringement is easy to demonstrate from some statements
4  under oath by MIT's majority owner.
5         So we think infringement is straightforward.
6  Invalidity is going to be the issue, and we think we would
7  win on that as well.  And I agree that the facts here are
8  extremely sympathetic.  We've just always been very open to
9  resolution if we can find one.
10         THE COURT:  But you don't have an expert to
11  counter their expert?
12         MS. LEGRAND:  I don't -- their expert's deposition
13  worked just fine for me.  I can use -- their expert's
14  deposition supports our validity arguments.
15         THE COURT:  Okay.  But is the on-sale bar the main
16  argument?
17         MS. LEGRAND:  On sale -- I could let Mr. Mills --
18  but, yes, my understanding is on-sale bar and they would
19  probably also argue that MIT marketing material anticipated.
20  But it would all be essentially -- the only argument for
21  invalidity is based on MIT's own actions very close in time
22  to the critical date, and we've got strong arguments for why
23  at least critical-dependent claims cannot be invalidated by
24  either the on-sale bar or the limited marketing material
25  that they'll talk about.
```

8

1              THE COURT:  And I've looked briefly at the patent.

2  Am I correct that there are two independent claims?

3              MS. LEGRAND:  Yes.

4              THE COURT:  The method claim at the very end.

5  Everything else -- we have the first independent claim, and

6  then everything else is a subsidiary of --

7              MS. LEGRAND:  Correct, Your Honor.

8              THE COURT:  Okay.  All right.  Dependent claims.

9  All right.

10             When I was looking at that sealing motion -- and I

11  forget which one of you filed it, but remember I denied the

12  motion to seal and -- so I had a chance to see some of the

13  exchange of emails that were going to be difficult evidence

14  again for a jury to see just the tone.  But I seem to recall

15  that in one of those emails, Joshua was offering the

16  plaintiff, I'm going to call Mr. Alubbad, the patent, but he

17  wanted about $50,000 as I recall -- I think that was the

18  number I saw in those papers -- for compensation for the

19  time he had spent -- some of the expenses that he had

20  incurred in working for the company.

21             I'm going to assume that that number has gone up

22  since that email exchange.

23             MS. LEGRAND:  That's correct, Your Honor.  Though

24  we have been reasonable, but that's correct.

25             THE COURT:  All right.  But as you also know, I

9

```
1   mean, it's still going to continue to cost money.  It's got
2   to be costing money, first of all, to proceed with this
3   trial.
4           Number 2, it's got to be costing real money to be
5   proceeding in front of the PTO, because patent lawyers tend
6   to be quite expensive.
7           Again, are you representing him?
8           MS. LEGRAND:  Josh is pro se.  He is quite good.
9           THE COURT:  Okay.
10          MS. LEGRAND:  But, yes, he's a brilliant guy.
11  He's pro se and has done I think a terrific job so far.
12          THE COURT:  It's a bit risky.
13          MS. LEGRAND:  I know.  Right.  And that's why --
14  this patent -- Josh is incredibly proud of this patent.  It
15  has great potential.  But he is in a different field now.
16  So he is trying to be efficient.  He's trying to find a way
17  forward here with expending the fewest resources as
18  possible, but we haven't had an exit ramp that we could
19  find.
20          THE COURT:  Well, again, I cannot understand why
21  MIT would take the risk of losing their ability to produce
22  their key -- do they sell other stuff besides this machine?
23          MR. MILLS:  It's its only product, Your Honor.
24          THE COURT:  Then, I mean, he could lose it if he
25  loses this case, if that patent is found valid by the jury.
```
                                                                    10

1    And you remember that the burden is clear and convincing

2    evidence to strike a patent.  Right.  It's not just, you

3    know, preponderance; it's a higher proof standard.  And, you

4    know, whether or not the jury will conclude that the patent

5    is invalid, that will be an interesting issue.

6              So I really want to urge you, because we're

7    getting close to the trial date, that this is the time -- I

8    don't know what Judge Porter's, you know, schedule is.

9    We're not open next Friday, so next week's a short three-day

10   workweek, and then we have the trial.  So there's not much

11   time left.

12             But it is -- to me, it seems like just throwing

13   good money after bad to continue litigating this case if the

14   plaintiff -- if MIT can get the patent, stop the expenses of

15   having to keep litigating in front of the PTO, and if the

16   cash demand from the -- from Josh is not too ridiculous, I

17   don't know why you can't work it out.

18             But there are other ways of doing it.  One

19   possibility might be -- I don't know if Josh would accept

20   this, but, you know, a royalty arrangement or the equivalent

21   of that.  Rather than all cash up front, maybe, you know, an

22   agreement.  Although, I think your parties probably don't

23   trust each other, but, you know, 5 percent of sales for the

24   next two years or something like that.  I mean, there are

25   creative ways if cash flow, for example, is a problem of

11

```
 1    satisfying, you know, both sides.

 2            But, at this point, you know, the case going to

 3    trial looks very, very risky, and it's going to be

 4    expensive.  And it doesn't solve anything because, you know,

 5    depending upon what we do, somebody can take an appeal and

 6    this thing can go on for a couple of years.  But I really,

 7    really, really, really think you need to sit down and try to

 8    work it out.

 9            I don't get the impression that the problem is

10    counsel.  The impression I have is -- because you're both

11    reasonable attorneys and you came in smiling, I suspect

12    there may be a problem with parties.

13            Have they been at all of Judge Porter's sessions?

14            MR. MILLS:  They were there at the first one, and

15    then my client was there for the second one; their clients

16    had gone back.  They live out of town and had gone home by

17    that point.

18            THE COURT:  I mean, some of the magistrate judges

19    are very successful with either video, you know, Zoom

20    participation or by phone, but you really ought to try to do

21    one more shot before the trial.

22            MR. MILLS:  Your Honor, to be candid, I don't

23    think there's enough time, given how much -- it's a

24    complicated trial, and I was hoping that your rulings today

25    might uncomplicate it and aid settlement.  Because one of
```

                                                              12

1    the things you said is the subject of our motion.  This is a

2    patent infringement case, and it's a tort, and there's duty,

3    breach, causation and damages, and the only relevant damages

4    in the case are those caused by the infringement.  And so

5    all of his pre-issuance expenses and work absolutely are

6    relevant and is not compensable as damages.  And so -- and

7    we're arguing to keep it out because it's unfairly

8    prejudicial.

9           THE COURT:  All right.  We can get to the motion.

10   Let's get to the motion.

11          The first thing is, in terms of the royalty

12   argument, I'm satisfied that the plaintiff -- and I have to

13   keep calling MIT the plaintiff.  That MIT was put on notice

14   that there could be a royalty issue in the case, because in

15   Josh's answers to the interrogatories, he indicated that he

16   was looking at a royalty of about 10 percent.

17          MR. MILLS:  Right.  He put us on notice of two

18   different royalties, one at 8 percent, one at 10 percent.

19   But he did not put us on notice of any damages witness.  And

20   the Rule 26 disclosure, who are the witnesses, what are they

21   going to testify on.  No damages witness.  No

22   interrogatories to us on damages.  No expert on damages.

23   And so there's nothing to rebut.  And the only evidence of a

24   reasonable royalty in the case is a hearsay declaration put

25   in by Timothy Clemente a month after discovery closed in

                                                              13

1    opposition to a summary judgment motion.  And that royalty

2    agreement from 2002 wasn't even produced, never disclosed

3    during discovery, and Timothy Clemente was never designated

4    on damages.

5            So I completely agree we are on notice of an

6    intent to seek a reasonable royalty.  There's no expert that

7    can testify to any of the Georgia-Pacific Factors.  The only

8    factor that Joshua Clemente can testify to as a factual

9    matter is the length of the patent, that's one of 15

10   factors, and that's it, that's the only evidence.  And the

11   jury cannot be permitted to speculate as to a reasonable

12   royalty.  There's no lost profits, there's no established

13   royalty in the case, and he can't get his development

14   expenses.

15           THE COURT:  True, but I think it would be also

16   perfectly appropriate for a jury to assume that one does pay

17   a royalty to use somebody's patent.  And they might come up

18   with 1 percent, and if they were to do that, I would not

19   take that away from the case, so you would have to go up on

20   appeal on that.

21           MR. MILLS:  The way the case law reads is that if

22   there's no proof, you have to instruct them that the only

23   royalty they can give is a zero royalty or a $1 nominal

24   royalty, and that's it.  There is no proof.

25           THE COURT:  But you understand that a $1 royalty

14

1  still puts your client in a funny position.  That means that

2  they did find the patent is valid, and that means the

3  injunctive relief goes into effect.

4          MR. MILLS:  I completely understand that, and I

5  have advised my client of that.

6          THE COURT:  Okay.

7          MR. MILLS:  He completely understands that.

8          And then there's the validity arguments, and we

9  have two validity arguments.  One is the on-sale bar, and

10  the other is the printed publication bar.  The on-sale bar

11  will be supported by about ten videos of a demonstration of

12  a fully functional ARES from July 17th to July 19th, 2017 in

13  Waldorf, Maryland, that Josh Clemente participated in.  He's

14  rappelling down ropes, he's running up and down the stairs.

15  And then there's an offer for sale to the people they

16  demonstrated it to a couple of months later, and in the

17  offer for sale it says this is the identical thing.

18          And now this is what's interesting in the case, is

19  five days after that demonstration in Waldorf, Timothy

20  Clemente, who is supposedly the president of MIT, files a

21  patent application in his name and Joshua Clemente's name.

22  And so it's absolutely ready for patenting.  He eventually

23  abandons that application.  But the exact device that was

24  demoed in Waldorf is shipped to Paris for the Milipol Paris

25  trade show in late November of 2017.  And Josh Clemente

15

1   obviously thinks that's an important date because he files

2   his provisional patent application 364 days later, just

3   getting under the wire to do that.  But it's the exact same

4   thing demoed.

5        The only thing that's not is a handheld -- it's

6   that -- not the claim you're talking about, 17, and I think

7   Claims 12 through 15, which is the handheld controller.

8   That is fully disclosed in a YouTube video that was posted

9   in advance of the Milipol trade show.  And the only thing in

10  it, it's the kind of claim the Patent Office shouldn't allow

11  because it doesn't teach anything.  It just says I have a

12  controller that has these features that that's it, it

13  doesn't teach you how to do anything, but it's absolutely

14  disclosed in the patent.  So we think it's going to be

15  invalid.  And even if it's not, there's no damages.  We

16  recognize the risk, but we think if you give the appropriate

17  ruling today, the case could become a lot easier to settle.

18        THE COURT:  All right.  Ms. LeGrand.

19        MS. LEGRAND:  Thank you, Your Honor.

20        I respectfully disagree with the narrow take that

21  Mr. Mills presents on the ability of a jury or the Court to

22  award damages once patent infringement is found.

23        Section 284 of the Patent Act says once

24  infringement is found, damages shall be, at a minimum, a

25  reasonable royalty, but it's not -- but provides flexibility

16

1    to ensure that the patent holder is fully compensated for

2    the infringement.  And there are numerous kinds of evidence

3    the jury can look to and that can be presented by lay

4    witnesses based on talking about their experiences, both

5    with other license agreements and in the context of the

6    sales here.

7              THE COURT:  No.  But how do you get around the

8    problem that under the discovery rules of both this court

9    and the Civil Rules of Procedure that a party is obligated

10   to provide notice to the other side when the request is made

11   in a proper discovery request of that type of evidence?  In

12   other words, that's the main argument that Mr. Mills is

13   making is that you never identified any individual or -- who

14   was going to provide that type of information.

15             MS. LEGRAND:  I would say our interrogatory

16   responses provide detail on exactly what we're planning to

17   argue.  Mr. Mills is complaining that we didn't say Josh is

18   the witness, but Josh signed those interrogatory responses.

19   So -- and if you look at what Josh was asked in his

20   deposition, Mr. Mills was very on notice that Josh was going

21   to be one of the main sources of information on a reasonable

22   royalty here.  So there's no actual --

23             THE COURT:  Now, what is Josh going to say?

24             MS. LEGRAND:  Josh can talk about a number of

25   things.  For instance, so Mr. Mills has asked to strike at

17

least two kinds of damages testimony.  One is testimony about Josh's out-of-pocket costs and the work he did.  That is not traditional, I agree, in a patent damages case, but it is also permissible.  In *Pulse Med*, a District of Maryland case that we cite is one that speaks to that. There are numerous Federal Circuit cases that speak to the fact that while patent holders tend to sort of follow these two traditional methods, what the Patent Act requires is not a rigid formula; it requires that a patent holder be made whole for the damages they suffered as a result of infringement, and that that kind of evidence can be different in different cases.  This is an unusual case, so it is going to be a little different.

        But as you said, a jury or the Court would have many ways to reasonably reach a decision about something -- something should have been paid here if they're practicing an invention, and there will be numerous facts in front of the jury that a jury could rely on to come up with a reasonable royalty or a different measure of compensatory damages.

        And the jury instructions that Mr. Mills submitted today just this morning I think are actually pretty helpful. We actually don't disagree that much on jury instructions. We have some disagreements that relate to this, but the standard patent jury instructions that Mr. Mills is working

18

```
 1    off of would support what we're trying to do as well.  They
 2    allow the jury to look at a range of factors and decide
 3    what's fair compensation once infringement has been found.
 4    So we don't think this is nearly as cabined as MIT is
 5    arguing.
 6                And, no, there was no surprise here.  We've moved
 7    incredibly quickly on a tight budget.  So I know that we're
 8    trying to work fast, but we have not hidden anything.  It's
 9    been very clear what our theory was and who's the source of
10    facts.  So we've certainly attempted to and answered any
11    questions Mr. Mills has asked.
12                THE COURT:  All right.  Well, the time and expense
13    that Joshua incurred in developing the patent is clearly, in
14    my view, relevant to the issue about inventorship and the
15    issue about, you know, how he went about getting the patent.
16                I will look at the jury instructions that you've
17    tendered and review the Georgia-Pacific Factors.  I can't
18    believe any other circuit courts are relevant.  This is a
19    patent case, and all those appeals go to the Federal
20    Circuit, and the Georgia-Pacific Factors have always been
21    the key ones.  I will look at the references that you cited,
22    but they're going to need to be from the Federal Circuit for
23    me to have any confidence in them.
24                Certainly, again, from an equity standpoint, I
25    think the issue about the amount of time -- the
```

19

1    uncompensated time that Joshua invested in developing the

2    patent and the expenses for, as I said, the CAD and other

3    outside entities that he had to use to get the patent the

4    way it is -- it's a very clear patent, it was actually an

5    easy one to read unlike some that we get -- is something

6    that I don't think would be irrelevant to the jury's

7    consideration.  And so I'm going to at this point find it

8    may go to the weight of some of this evidence, but I don't

9    think it goes to the admissibility of the evidence.

10            MR. MILLS:  Your Honor, can I briefly be heard?

11            THE COURT:  Yes.

12            MR. MILLS:  In our reply brief, we cite a case

13   from the Federal Circuit, 2024, three months ago on exactly

14   this issue.  There's a four-page discussion of causation.

15   And pre-issuance conduct, according to the *Brumfield* case

16   that's cited on page 3 of our reply brief, says pre-issuance

17   conduct is absolutely irrelevant and cannot be considered by

18   a fact-finder on damages.  And that's all this is.

19   Everything that Josh Clemente did was done before 2018.  The

20   patent didn't issue until late 2020 -- 2021, and so it's

21   irrelevant for damages purposes.

22            Now, whether it comes in for some other reason --

23   I'm not challenging inventorship in this case.  We

24   challenged ownership, but you've dismissed that part of the

25   case.  And so there's no inventorship challenge, there's no

20

```
 1    ownership challenge.  The only potential relevance is to
 2    smuggle that in through the back door and hope the jury
 3    feels sorry for him and gives him unpermitted damages.
 4          But causation is a critical element of a patent
 5    case, and the causation can't start until the patent issues.
 6    And this is not infringing conduct.  That's the only thing
 7    the Patent Act allows, and that's the only claim in the
 8    case.  And so if you were to allow that, it would be
 9    absolutely reversible error.
10          THE COURT:  All right.  Do you want to respond?
11          MS. LEGRAND:  Briefly.
12          I think Your Honor will see as you review the
13    cases cited by both parties that what the Federal Circuit
14    has been very clear on is the need for a case and
15    fact-specific approach that ensures that a party whose
16    patent has been infringed is fully compensated.
17          One of many ways that time spent -- investment in
18    the invention can come in -- and this is in Whitserve, which
19    does not go our direction on the punchline, I will
20    acknowledge.  Whitserve v. Computer Packages, Federal
21    Circuit 2012.  And this is not the only case out there, but
22    this is one that mentions explicitly that investment in
23    designing the invention could at least come in as relevant
24    to a reasonable royalty negotiation.
25          So one thing reasonable parties might talk about,
```

21

```
 1   and, in fact, did, though what they actually did isn't
 2   actually part of the usual approach.  But reasonable parties
 3   discussing a reasonable royalty, trying to negotiate that,
 4   would talk about, well, it costs us this much to develop it.
 5   And courts have said that that can come in for that purpose
 6   and also have said that compensatory damages can take many
 7   different forms.  And the idea is to -- and I know that the
 8   case that Mr. Mills cited in his reply, which is I would say
 9   really addressing a different issue largely, but is clear on
10   as well that this is no different than a tort in many ways.
11   We're talking about the same kind of damages.  There's been
12   a wrongful taking, essentially, in a patent case, and how do
13   you make the parties whose property was taken whole.  And
14   what the Federal Circuit teaches is it's a flexible approach
15   and fact-specific, and I think that's what the Court will
16   see.
17              THE COURT:  All right.
18              MR. MILLS:  Your Honor, I respectfully disagree.
19   The Georgia-Pacific case has been around since 1972.
20   There's 52 years of case law on that.  There are 15 factors.
21   And the investment made by the inventor is not among them,
22   and no court has allowed that.
23              It's an absolutely irrelevant factor.  It's the
24   market factors, and you can only get compensation for the
25   infringement.  It doesn't matter whether you spent $1
```

                                                                    22

1  developing your invention or a million dollars; it's the

2  issue of the market value.  Is there any kind of royalty or

3  profits from it.  And that's what the Patent Act seeks to

4  award.

5          THE COURT:  All right.

6          MR. MILLS:  But one quick -- there's issues about

7  the admissibility of the Tim Clemente royalty, because I

8  think that's absolutely inadmissible.  There's a question of

9  what Josh Clemente can testify to since he was never

10 designated as an expert.  He can't be allowed to harmonize

11 the Georgia-Pacific Factors.  And then there's a third

12 issue, which is unrelated to damages, it's bringing in

13 the -- you know, some statement on an ITAR form to have a

14 side show discussion about Mr. Alubbad's credibility.

15         THE COURT:  Well, on the last issue, that's going

16 to be an easy one to resolve, and that's this point.  I'm

17 going to wait to see how the trial evolves for this reason.

18 If the credibility of Mr. Alubbad becomes a major issue in

19 the case, then I will allow the plaintiff to approach the

20 bench to see whether this door can be opened; however, I

21 always believe what's good for the goose is good for the

22 gander.  And so to the extent that MIT was planning to do a

23 little bit of reputation besmirching by talking about Josh

24 inappropriately holding himself out to be the vice president

25 or that similar type of attacks perhaps on his character or

                                                        23

```
 1    credibility, I would also bar that.  In other words, if it

 2    we're going to open the door to some mud-slinging, then both

 3    sides can sling the mud, but if the door is not opened, then

 4    it will not apply to either.

 5          But I think at this point, it would not be

 6    appropriate for that to come in.  But, again, I don't know

 7    how the case will evolve.  I don't know how much there will

 8    be an attack by Mr. Alubbad, if at all, on Joshua, on the

 9    work that he did, on his integrity, et cetera.  If it starts

10    to get nasty, then that is -- I'm hanging that out there as

11    a possibility that the door will have been opened.

12          I don't know if there was, in fact, a material

13    misstatement made to the federal authorities.  Obviously

14    it's been alleged.  If the form does require that a person

15    advise the governmental authorities of any citizenship, and

16    if he was, in fact, a dual citizen between the United States

17    and Saudi Arabia and that was not included on the form, then

18    that is a problem, but it opens the door to his ability to

19    explain that, you know, as I understand it, that he didn't

20    realize that it had been omitted, that somebody else

21    prepared the form.

22          Nevertheless, when one signs a form, I assume it's

23    read before it's signed.  Again, I don't know the details,

24    that's what a trial is about.  I'm just saying that at this

25    point, I'm granting the motion preliminarily and saying it
```

24

```
 1   doesn't come in unless the door gets opened, but if the door
 2   is opened, all right, then I will reconsider and perhaps
 3   allow it to come in.  But for the same reason, MIT can't go
 4   after sort of the character of Joshua.
 5          I mean, again, this is a business case, it's like
 6   an ugly divorce, all right, between people who used to be
 7   partners.  I mean, the father, Timothy Clemente, and
 8   Mr. Alubbad were basically partners.  They started this
 9   business apparently together, and it's unfortunate it broke
10   apart the way it did.  I'm fully aware of the fact that
11   there's a lot of bad faith and mistrust.  The fact that
12   the -- Timothy filed this motion that he wanted a dismissal
13   based upon mootness to revert to one with prejudice, you
14   know, is again an indicator of a lack of trust and
15   confidence in the other side, and that makes rational
16   settlements very, very difficult, and I recognize that, and
17   I know you as counsel are struggling with that as well.
18   When I see that one of our very good magistrate judges has
19   spent I think 12, 14 hours --
20          MS. LEGRAND:  17.
21          THE COURT:  -- trying to get a case to settle --
22   and, actually, the whole complaint got settled, it's just
23   this counterclaim, which no one really spent that much time
24   on, obviously because there aren't the experts and the
25   normal things that would be done in a serious patent case.
```

25

```
 1    And yet, that now is -- you know, the tail is wagging on the
 2    dog.
 3              And, again, both sides are going to incur more
 4    attorney's fees.  And, in some respects, ironically I think
 5    the bigger risk on this one is for Mr. Alubbad, because if
 6    Joshua is not paying the costs of the litigation at the PTO
 7    and he's no longer in this business, he's doing some other
 8    kind of technical work, and he's a very talented engineer
 9    from what I can see, and he certainly, you know, draws a --
10    again, writes beautiful patents, the worst that happens to
11    him if he loses is he's paying Ms. LeGrand, but that's it.
12    On the other hand, if your client loses, again, he loses his
13    product, because the patent now belongs to Josh, and it puts
14    Josh in a much stronger bargaining position.
15              So I don't know what the numbers are, and there's,
16    you know, still time before Monday.  But because of the long
17    holiday, if we have to bring jurors in here on Monday
18    morning, the 7th or 8th, whatever that day is, and then I
19    find that you worked it out over the weekend, I am going to
20    impose a cost to the jury on both sides equally, so I just
21    want to have that out there.  But it really is the kind of
22    case that should settle.
23              And, again, I don't know how far apart you are.  I
24    assume it's just a monetary issue, or are there some
25    non-monetary issues?
```

                                                              26

```
 1              MS. LEGRAND:  Sadly, I was hoping it would be just
 2    a monetary issue, but we're -- the current offer still
 3    asks -- has numerous requirements for additional disclosures
 4    by Josh in non-standard terms if possible.  Mr. Mills had
 5    some hope that there was room to move on his end, but I had
 6    hoped to see a standard settlement agreement so we could
 7    just talk about numbers, and, no, we're not even there yet.
 8              THE COURT:  Well, putting aside the non-monetary
 9    issues, in terms of the monetary issue, are you in what I
10    call the same ballpark?
11              MR. MILLS:  I would say no, Your Honor.
12              THE COURT:  Has there been slippage since the
13    earlier part of the case in terms of numbers?
14              MR. MILLS:  Yes.  There --
15              THE COURT:  I'm sorry, you've got to be at the
16    lectern.
17              MR. MILLS:  I'm sorry.
18              The settlement proposals post ruling went up
19    exponentially, okay, from what was agreed, and that has
20    complicated it, and, quite frankly, I think made it
21    impossible to settle in the time we have left.
22              MS. LEGRAND:  I would not describe the difference
23    as exponential.
24              THE COURT:  Ms. LeGrand, you have to be at the
25    lectern as well.
```

27

```
 1          MS. LEGRAND:  I would not describe the differences
 2   as exponential as well.  What we've been saying -- I'll just
 3   throw it out there that my only hope right now is what we've
 4   been told and what the offer on the table says is that MIT
 5   thinks the patent is the worthless, and so they're not
 6   willing to pay anything for the patent.
 7          The best idea I've come up with in the last couple
 8   days is maybe we don't assign the patent.  I'm trying to be
 9   creative, but the numbers are not huge that Josh is looking
10   for.  But he is, at this point, looking to recover his fees,
11   which I think are very reasonable considering, but have
12   added up, and looking to get reasonable compensation for --
13   what he's offering to do is assign the patent wholesale to
14   MIT.  They could use it in perpetuity, they could block all
15   competitors.  His offering is very valuable for what I think
16   is a bargain rate, and there is room to move on the numbers
17   still.
18          But as Mr. Mills said, I mean, we've spent
19   17 hours with Magistrate Porter on non-monetary terms,
20   essentially, or at least seven of those hours.  We are
21   dealing with some -- MIT is demanding some unusual things,
22   but it's hard, but we're trying to.
23          THE COURT:  All right.  Well, you heard my word on
24   this.
25          All right.  So what we're going to do is,
```

                                                                    28

1    Number 1, in terms of a motion in limine, at this point, the

2    claims that Mr. Alubbad had lied to the authorities will not

3    be coming in.  All right.  Unless I find that the door has

4    been opened.  That also means that the allegations about,

5    you know, Josh holding him out -- himself out

6    inappropriately and that sort of thing also will not come

7    in.  All right.

8          In terms of the damages, I'm going to take a look

9    one more time at the reply brief and make sure that I'm

10   comfortable with that, and I'll take another look at the

11   position that the plaintiff is taking.

12         I think there is a real problem in my mind as to

13   whether or not discovery was properly handled in terms of

14   the necessary explanation as the theory for damages and

15   whether or not there was sufficient information given to the

16   defendant -- to MIT that would allow it to have gone into

17   the kind of discovery that you normally would do for a

18   damages kind of case.  And so we'll get an answer out to

19   your early -- either today or Monday on that.

20         And the time and expenses incurred by Josh, I'm

21   allowing that in the case with a caveat to the jury that

22   they can't consider that in terms of the damages issue.  But

23   it's -- it goes to how he went about developing the patent.

24   I think that's something -- inventorship is often an issue

25   in these cases, and even if it's not a direct issue, I think

29

1    it's part of the background that he's allowed to explain to

2    the jury as to how he went about doing the patent and the

3    types of steps that he went through.

4            And our juries are good.  They listen obviously to

5    what we tell them in our instructions.  I know that from the

6    many interesting questions we get from them when they're

7    deliberating, so I won't have any concern that they won't be

8    able to follow that instruction.  All right.

9            MS. LEGRAND:  Your Honor, may I mention one brief

10   point about discovery since it's a focus here?

11           THE COURT:  Yeah.

12           MS. LEGRAND:  And we brought this out more in our

13   opposition to MIT's very similar motion for partial summary

14   judgment.  But one reason that we didn't -- I had assumed

15   that we would get information on MIT's sales during

16   discovery, and that that would allow us to potentially

17   provide a more detailed update on, for instance, the royalty

18   base.

19           MIT initially refused to give us any financial

20   information.  We eventually got some information from Tim,

21   who had gotten it from MIT, and then we got additional

22   information after Mr. Alubbad's deposition either the day

23   after the close of discovery or the day of close of

24   discovery extremely late.  We bring that out briefly in our

25   opposition to summary judgment.

                                                            30

1           And a clarification I'm a little confused about.

2    When Your Honor unsealed exhibits attached to MIT's reply in

3    support of their motion for summary judgment yesterday, one

4    of those exhibits should have been the financial information

5    that Tim -- that we eventually got through Tim, but it looks

6    to me that that maybe wasn't actually filed.  And I just

7    wanted to clarify.  If we're arguing about discovery, one of

8    the things that MIT has pointed to in their related briefing

9    is, look, here's all the financial information that Tim

10   provided, and it was given to us as sealed Exhibit D to

11   MIT's reply in support of their motion for partial summary

12   judgment.  It looks to me that wasn't actually filed, and

13   I'm just a little confused about that.

14           But my broader point is, there were issues with

15   our ability to get discovery.  We didn't want to get into

16   expensive discovery fights, but there were serious issues

17   with our ability to get discovery.

18           THE COURT:  Well, you can certainly ask the

19   questions when he's on the stand.

20           MS. LEGRAND:  Yeah.

21           THE COURT:  And, again, if the president of the

22   company doesn't have any idea what his sales are, it doesn't

23   look like he's being forthcoming in that respect, then

24   that's a problem with the jury.

25           MS. LEGRAND:  I think the president will be happy

31

```
 1   to answer questions; it's costs that he was kept in the dark
 2   about.  But the majority owner can answer those questions.
 3   We will certainly be asking.  But I'm just saying, we didn't
 4   have documents to work off of to provide a more detailed
 5   anything.  So that's all I had.  Thank you, Your Honor.
 6            THE COURT:  All right.  Yes, Mr. mills.
 7            MR. MILLS:  The only thing I can say on that is
 8   they never asked any interrogatories about damages, didn't
 9   put on an expert, ever filed a motion to compel against us.
10   The first time it came up was in a 30(b)(6) notice that was
11   this thick, and Mr. Alubbad couldn't answer a detailed
12   question about a financial number.  We produced the numbers
13   the next day, the day after his deposition.
14            THE COURT:  All right.  Well, anyway, again, I
15   wish you all would think about -- I mean, you are thinking
16   about trying to resolve it.  I think you need to talk with
17   your clients, especially Mr. Alubbad who I just think is
18   risking an awful lot.
19            So I don't know, again, what the numbers are and
20   how far apart you are financially, but many times that can
21   be worked out.  As I said, it might be over a quasi royalty
22   type of arrangement.
23            In the meantime, you know, certainly to the extent
24   that the U.S. government is a customer of -- for this
25   product.  As I said I think once before, the government
```

```
 1   doesn't like dealing with parties who are involved in
 2   litigation, and so that's, you know, something else to just
 3   be thought about.  If there are contracts that are still out
 4   there or that you're working on, that could be an issue.
 5            But, in any case, if you don't settle it, we'll
 6   see you Monday morning.
 7            Now, let me just make sure we know how we're going
 8   to try the case because I don't think we've gone through
 9   this.  A week from Monday, yeah.  I'm going to sit a jury of
10   eight people, each side gets three peremptories.  As you
11   know, the civil rules are 6 to 12 jurors, so there are no
12   alternates as long as we have six at the end of the day.
13            You had originally anticipated this being a
14   five-day trial.  Now that it's down to this one issue, I
15   doubt it will be more than two or three days.  So make sure
16   your witnesses are on deck and ready to go.
17            I haven't looked at your voir dire yet or anything
18   like that.  I think given the amount of issues that may
19   percolate, if there are any other matters that need to get
20   resolved, I don't want to waste the jury's time, and they're
21   coming in at 10:00 on Monday morning.  So I want you to
22   notice anything for 9:00 that morning if there are
23   last-minute issues that we need to resolve.  All right.
24            We'll run the trial until 6:00 on Monday and on
25   Tuesday.  And if it goes into Wednesday, Wednesday we would
```

33

```
 1    be starting at 9:30 and running until about 6.  So that's

 2    what you need to be prepared for.

 3              I'm assuming you want a rule on the witnesses?

 4              MR. MILLS:  Yes, Your Honor.  I also have a motion

 5    to bring electronics in.

 6              THE COURT:  Yeah.  I'm going to get to that in a

 7    second.

 8              MR. MILLS:  Okay.

 9              THE COURT:  The rule on the witnesses would be

10    that obviously the principal can stay at counsel table, but

11    no one is to be discussing the trial testimony with any

12    witness who has not yet testified.  And if you don't reserve

13    a witness for re-call, if that witness comes into court and

14    watches the proceedings, then he or she is not going to be

15    allowed to testify again.  All right.

16              In terms of -- you've given me your voir dire and

17    you've given me the jury instructions, so I'll get back to

18    you on those as quickly as I can.

19              And in terms of the electronics, I assume you're

20    bringing a cable for your iPad?

21              MR. MILLS:  Correct, Your Honor.

22              THE COURT:  Because there's no hotspot in the

23    courthouse.

24              MR. MILLS:  Correct.

25              THE COURT:  As long as you do that.
```

34

1          Are you planning to do electronic --

2          MS. LEGRAND:  Yes, Your Honor, we were planning to

3    submit a similar motion and would be working off of a

4    laptop.  And we will submit some additional -- we do have

5    some disagreements with the jury instructions that Mr. Mills

6    submitted.

7          THE COURT:  I need to see -- both sides if you

8    have objections to the instructions, you need to get them --

9          MS. LEGRAND:  Monday is the deadline.  Mr. Mills

10   was early, as he often is, which we appreciate.  But we'll

11   get those to you on Monday.

12         THE COURT:  If you have not used the system here

13   before, you both need to contact Lance Bachman who's the

14   Court's AT and IT person, and you need to schedule -- and,

15   again, because next week is a short week, you've only got

16   three days.  In most cases, the people who are going to be

17   running the technology, come in here, make sure your

18   equipment works on our equipment so there's no issue about

19   that.  All right.

20         You still need paper copies of your exhibits.  All

21   right.  You need one set for me, one set for my law clerk,

22   and the original set that stays with the Court goes to the

23   witness.  So three sets.  And those all have to be here by

24   noon on Wednesday so that we can have them up in the

25   courtroom ready to go.  We're not going to have them coming

                                                          35

```
 1   in Monday morning when we're trying to get ready for the

 2   trial.  All right.

 3           If you haven't already gotten the list of

 4   potential jurors, the clerk's office tends to send that out

 5   about a week before trial, and you should be getting it

 6   Monday or Tuesday.  And I can't think of anything else that

 7   I need to mention to you.

 8           So I will sign the only form that I have right

 9   now, Mr. Mills, for you authorizing the laptop and the iPad,

10   and you'll be bringing in the cable.

11           MR. MILLS:  Yes.

12           THE COURT:  Okay.  Anything further that either

13   side wants to ask me?

14           MS. LEGRAND:  Not from us, Your Honor.

15           THE COURT:  And, again, if there's any interest at

16   all in Judge Porter, you better contact him right away.

17           And I am -- just for the record, I thought I had

18   already said it, I am denying Tim Clemente's motion to

19   dismiss Count 7 as moot -- I mean to change that ruling.  I

20   think that is the proper ruling.  Count 7 is out of the

21   case, and it's out because there was a clear representation

22   that the -- all the information has been turned over, and so

23   the issue is moot.  All right.  And I'm not going to change

24   that.

25           Anything further we need to address?
```

1          MR. MILLS:  Nothing from us, Your Honor.

2          THE COURT:  All right.  Very good.  We'll recess

3    court for the day.

4              (Proceedings adjourned at 11:04 a.m.)

5          ----------------------------------

6    I certify that the foregoing is a true and accurate

7    transcription of my stenographic notes.

8

9                        _Stephanie Austin_

10                    Stephanie M. Austin, RPR, CRR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                              37